JEDEDIAH WAKEFIELD (CSB No. 178058)
jwakefield@fenwick.com
FENWICK & WEST LLP
One Front Street, 33rd Floor
San Francisco, CA 94111
Telephone:    415.875.2300
Facsimile:    650.938.5200

DAVID HAYES (CSB No. 122894)
dhayes@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone:    650.988.8500
Facsimile:    650.938.5200

*Attorneys for Defendants*
DATABRICKS, INC., and
MOSAIC ML, LLC, formerly MOSAIC ML, INC.

*Additional counsel listed on signature page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| *In Re Mosaic LLM Litigation* | Master File Case No. 3:24-cv-01451-CRB<br>Consolidated with Case No. 3:24-cv-02653-CRB<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:      October 30, 2026<br>Time:      10:00 a.m.<br>Dept:      Courtroom 6, 17th Floor<br>Judge:     Hon. Charles R. Breyer<br><br>**REDACTED** |

FENWICK & WEST LLP

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

Case No.: 3:24-cv-01451-CRB

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| I. | STATEMENT OF ISSUES TO BE DECIDED | 1 |
| II. | INTRODUCTION AND SUMMARY OF ARGUMENT | 1 |
| III. | SUMMARY OF UNDISPUTED MATERIAL FACTS | 3 |
| | A. Mosaic | 3 |
| | B. Databricks | 3 |
| | C. Large Language Model Training | 3 |
| | D. Defendants' Uses of Training Datasets Containing Plaintiffs' Books | 5 |
| | E. Plaintiffs Had No Loss of Book Sales or Traditional Licensing Revenue from Defendants' or their Customers' LLM Training. | 8 |
| | F. Plaintiffs Have No Evidence of Infringing Outputs from Defendants' LLMs. | 9 |
| IV. | LEGAL STANDARD | 10 |
| V. | ARGUMENT | 10 |
| | A. Defendants Engaged in Fair Use by Using Plaintiffs' Books for LLM Training and Research | 11 |
| | 1. Factor One: The purpose and character of the use favors fair use. | 11 |
| | a. Defendants' use of Plaintiffs' books to train their LLMs and to support that training through research is self-evidently transformative. | 11 |
| | b. Copying Plaintiffs' books was a necessary intermediate step in creating transformative, non-infringing LLMs. | 13 |
| | c. The supposedly illicit origin of Books3 is irrelevant to the first fair use factor and to the overall fair use analysis. | 14 |
| | d. The commercial aspect of Defendants' LLM research and training does not weigh against fair use. | 16 |
| | 2. Factor Two: The nature of Plaintiffs' works favors fair use. | 16 |
| | 3. Factor Three: The amount and substantiality of the portions of Plaintiffs' books used by Defendants favors fair use. | 17 |
| | 4. Factor Four: The lack of any market harm to Plaintiffs favors fair use. | 18 |

FENWICK & WEST LLP

          a.      Defendants' LLM training and research did not harm Plaintiffs in any traditional, reasonable, or likely to be developed market. .......................................................... 18

          b.      The market to license Plaintiffs' books for LLM training is not legally cognizable and does not exist...................................... 20

   B.     Defendants' Limited Sharing of Datasets Formatted for LLM Training and Research Does Not Give Rise to Infringement Liability. ..................................... 22

          a.      Providing an interim copy for fair use is not infringement........... 22

          b.      There is no evidence of contributory infringement or inducement of infringement. .......................................................... 24

   C.     Defendants Are Entitled to Summary Judgment on Infringement Claims Concerning Databricks' DBRX Models. ............................................................... 25

VI.     CONCLUSION ....................................................................................................... 25

FENWICK & WEST LLP

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT         ii         Case No.: 3:24-cv-01451-CRB

FENWICK & WEST LLP

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
562 F.3d 630 (4th Cir. 2009)...............................................................................................14

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)............................................................................................................10

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,*
598 U.S. 508 (2023)................................................................................................10, 16, 18

*Authors Guild, Inc. v. HathiTrust,*
755 F.3d 87 (2d Cir. 2014)........................................................................... 13, 16-17, 20

*Authors Guild v. Google, Inc.,*
804 F.3d 202 (2d Cir. 2015)...................................................................................... *passim*

*Bartz v. Anthropic PBC,*
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ................................................................... *passim*

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
448 F.3d 605 (2d Cir. 2006)...................................................................................... 16-17

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994) ................................................................................... 11, 15-17

*Cox Commc'ns, Inc. v. Sony Music Ent.,*
146 S. Ct. 959 (2026) ................................................................................................24-25

*Dr. Seuss Enters., L.P. v. Penguin Books U.S.A., Inc.,*
924 F. Supp. 1559 (S.D. Cal. 1996).....................................................................................12

*Google LLC v. Oracle Am., Inc.,*
593 U.S. 1 (2021) ....................................................................................................... *passim*

*Kadrey v. Meta Platforms, Inc.,*
788 F. Supp. 3d 1026 (N.D. Cal. 2025) ................................................................... *passim*

*Kelly v. Arriba Soft Corp.,*
336 F.3d 811 (9th Cir. 2003)..........................................................................................13, 16

*Mattel Inc. v. Walking Mountain Prods.,*
353 F.3d 792 (9th Cir. 2003)...............................................................................................16

*Perfect 10, Inc. v. Amazon.com, Inc.,*
508 F.3d 1146 (9th Cir. 2007)............................................................................................13

*Sega Enters. Ltd. v. Accolade, Inc.,*
977 F.2d 1510 (9th Cir. 1992)..................................................................................... *passim*

*Seltzer v. Green Day, Inc.*,
   725 F.3d 1170 (9th Cir. 2013)......................................................................................18

*Sony Comput. Ent., Inc. v. Connectix Corp.*,
   203 F.3d 596 (9th Cir. 2000).................................................................................. 13-14

*Sony Corp. of Am. v. Univ. City Studios, Inc.*,
   464 U.S. 417 (1984).....................................................................................................10

*Tresona Multimedia v. Burbank High Sch. Vocal Music Ass'n*,
   953 F.3d 638 (9th Cir. 2020).......................................................................................20

**STATUTES**

17 U.S.C. § 102 ...............................................................................................................12

17 U.S.C. § 107 ......................................................................................................... *passim*

**RULES**

Fed. R. Civ. P. 56 ............................................................................................................10

**OTHER AUTHORITIES**

William F. Patry, Patry on Copyright § 10:155.40 (Mar. 2026 Update) ........................19

FENWICK & WEST LLP

**TABLE OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---|---|
| **Decl.** | **Declaration of David Evans, Ph.D. ("Evans Decl.")** |
| 1 | Opening Expert Report of Dr. David Evans, dated March 16, 2026 |
| 2 | Rebuttal Expert Report of Dr. David Evans, dated April 17, 2026 |
| 3 | Supplemental Disclosure of Dr. David Evans, "LLM-as-judge Testing (S. Shan Rebuttal Report ¶¶ 38-43)," dated May 28, 2026 |
| **Decl.** | **Declaration of Jonathan Frankle, Ph.D. ("Frankle Decl.")** |
| 1 | "MPT Foundation Series" Webpage |
| 2 | "Introducing MPT-7B: A New Standard for Open-Source, Commercially Usable LLMs" Webpage |
| 3 | Hugging Face MPT-7B Webpage |
| 4 | "MPT-30B: Raising the Bar for Open-Source Foundation Models" Webpage |
| 5 | Hugging Face MPT-30B Webpage |
| 6 | "Announcing MPT-7B-8K: 8K Context Length for Document Understanding" Webpage |
| 7 | Hugging Face MPT-7B-8k Webpage |
| 8 | "Introducing DBRX: A New State-of-the-Art Open LLM" Webpage |
| **Decl.** | **Declaration of Jonathan Hersh, Ph.D. ("Hersh Decl.")** |
| 1 | Rebuttal Expert Report of Jonathan Hersh, Ph.D., dated April 16, 2026 |
| **Decl.** | **Declaration of Michael Johnson, Ph.D. ("Johnson Decl.")** |
| 1 | Opening Expert Report of Dr. Michael T. Johnson, dated March 16, 2026 |
| 2 | Rebuttal Expert Report of Dr. Michael T. Johnson, dated April 17, 2026 |
| **Decl.** | **Declaration of Dr. Michael Sinkinson, Ph.D. ("Sinkinson Decl.")** |
| 1 | Rebuttal Expert Report of Michael Sinkinson, Ph.D., dated April 17, 2026 |
| 2 | ███████████████████████ |
| 3 | ████████████████████████████████████ |

FENWICK & WEST LLP

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

v

Case No.: 3:24-cv-01451-CRB

| EXHIBIT | DESCRIPTION |
|---|---|
| **Decl.** | **Declaration of Alexander Trott, Ph.D. ("Trott Decl.")** |
| 1 | Hugo Touvron et al., *LLaMA: Open and Efficient Foundation Language Models* |
| 2 | Together.ai, *RedPajama, a Project to Create Leading Open-Source Models, Starts by Reproducing LLaMA Training Dataset of Over 1.2 Trillion Tokens*, dated April 17, 2023 |
| 3 | Mosaic AI Research, *Introducing MPT-7B: A New Standard for Open-Source, Commercially Usable LLMs*, dated May 5, 2023 |
| **Decl.** | **Declaration of Catherine Tucker, Ph.D. ("Tucker Decl.")** |
| 1 | Opening Expert Report of Catherine Tucker, Ph.D., dated March 15, 2026 |
| **Decl.** | **Declaration of Jedediah Wakefield ("Wakefield Decl.")** |
| 1 | Excerpts from the transcript of the Rule 30(b)(1) deposition of Naveen Rao, Ph.D., taken October 29, 2025 |
| 2 | Excerpts from the transcript of the Rule 30(b)(1) deposition of Cody Blakeney, Ph.D., taken November 5, 2025 |
| 3 | Excerpts from the transcript of the deposition of Plaintiffs' expert Mark L. Seeley, taken April 30, 2026 |
| 4 | Excerpts from Vol. I of the transcript of the Rule 30(b)(1) and Rule 30(b)(6) deposition of Hanlin Tang, Ph.D., taken November 6, 2025 |
| 5 | Excerpts from the transcript of the Rule 30(b)(1) and Rule 30(b)(6) deposition of Jonathan Frankle, Ph.D., taken November 13, 2025 |
| 6 | Excerpts from the transcript of the Rule 30(b)(1) deposition of Sam Havens, taken October 10, 2025 |
| 7 | Excerpts from the transcript of the Rule 30(b)(1) deposition of Alexander Trott, Ph.D., taken November 24, 2025 |
| 8 | Excerpts from the transcript of the Rule 30(b)(1) deposition of Scott Sovine, taken December 5, 2025 |
| 9 | Alaa Khaddaj, Logan Engstrom & Aleksander Mądry, *Small-to-Large Generalization: Data Influences Models Consistently Across Scale* (May 22, 2025) |
| 10 | Excerpts from the transcript of the deposition of Plaintiff Stewart O'Nan, taken June 27, 2025 |
| 11 | Excerpts from the transcript of the deposition of Plaintiff Rebecca Makkai, taken July 11, 2025 |

FENWICK & WEST LLP

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

vi

Case No.: 3:24-cv-01451-CRB

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 12 | Excerpts from the transcript of the deposition of Plaintiff Jason Reynolds, taken July 16, 2025 |
| 13 | Excerpts from the transcript of the deposition of Plaintiff Brian Keene, taken July 23, 2025 |
| 14 | Excerpts from the transcript of the deposition of Plaintiff Abdi Nazemian, taken September 18, 2025 |
| 15 | Excerpts from Plaintiff Stewart O'Nan's Responses to Defendants' First Set of Requests for Admission, dated November 17, 2025 |
| 16 | Excerpts from Plaintiff Rebecca Makkai's Responses and Objections to Defendants' First Set of Requests for Admission, dated November 17, 2025 |
| 17 | Excerpts from Plaintiff Jason Reynolds's Responses and Objections to Defendants' First Set of Requests for Admission, dated November 17, 2025 |
| 18 | Excerpts from Plaintiff Brian Keene's Responses to Defendants' First Set of Requests for Admission, dated November 17, 2025 |
| 19 | Excerpts from Plaintiff Abdi Nazemian's Responses to Defendants' First Set of Requests for Admission, dated November 17, 2025 |
| 20 | Excerpts from the transcript of the deposition of Plaintiffs' expert Daniel Spulber, Ph.D., taken May 12, 2026 |
| 21 | Excerpts from Plaintiff Stewart O'Nan's Responses to Defendants' Second Set of Requests for Admission, dated November 21, 2025 |
| 22 | Excerpts from Plaintiff Rebecca Makkai's Responses and Objections to Defendants' Second Set of Requests for Admission, dated November 21, 2025 |
| 23 | Excerpts from Plaintiff Jason Reynolds's Responses and Objections to Defendants' Second Set of Requests for Admission, dated November 21, 2025 |
| 24 | Excerpts from Plaintiff Brian Keene's Responses to Defendants' Second Set of Requests for Admission, dated November 21, 2025 |
| 25 | Excerpts from Plaintiff Abdi Nazemian's Responses to Defendants' Second Set of Requests for Admission, dated November 21, 2025 |
| 26 | Excerpts from the transcript of the deposition of Plaintiffs' expert Shawn Shan, Ph.D., taken June 8, 2026 |
| 27 | ███████████████████████████████ |
| 28 | ████████████████████████████████████████ |

FENWICK & WEST LLP

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT    vii    Case No.: 3:24-cv-01451-CRB

## NOTICE OF MOTION AND MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on October 30, 2026, at 10:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Charles R. Breyer, located at Courtroom 6 – 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Databricks, Inc. (Databricks) and MosaicML, LLC, formerly MosaicML, Inc. (Mosaic) (together, Defendants), will and hereby do move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting summary judgment on all claims asserted by Plaintiffs in their Second Amended Consolidated Complaint (Dkts. 253-3, 254, 305) (SACC).

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Proposed Order, and other materials submitted in connection with the Motion; the records and docket in this matter; any reply that Defendants file in support of this Motion; and any evidence and argument presented to the Court.

Dated:  June 29, 2026                    FENWICK & WEST LLP


By:  */s/ Jedediah Wakefield*
    Jedediah Wakefield (CSB No. 178058)
    jwakefield@fenwick.com
    Ryan Kwock (CSB No. 336414)
    rkwock@fenwick.com
    One Front Street, 33rd Floor
    San Francisco, CA 94111
    Telephone:      415.875.2300
    Facsimile:      650.938.5200

    David Hayes (CSB No. 122894)
    dhayes@fenwick.com
    Diana C. Buck (CSB No. 339314)
    dbuck@fenwick.com
    801 California Street
    Mountain View, CA 94041
    Telephone:      650.988.8500
    Facsimile:      650.938.5200

    Jonathan T. McMichael (CSB No. 304737)
    jmcmichael@fenwick.com

FENWICK & WEST LLP

DEFENDANTS' MOTION FOR                    viii                    Case No.: 3:24-cv-01451-CRB
SUMMARY JUDGMENT

Deena Feit (admitted *pro hac vice*)
dfeit@fenwick.com
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone:       206.389.4510
Facsimile:       650.938.5200

Charles Moulins (admitted *pro hac vice*)
cmoulins@fenwick.com
Justine Vandermel (admitted *pro hac vice*)
justine.vandermel@fenwick.com
902 Broadway, 18th Floor
New York, NY 10010
Telephone:       212.430.2600
Facsimile:       650.938.5200

Zachary Harned (CSB No. 335898)
zharned@fenwick.com
730 Arizona Avenue, 1st Floor
Santa Monica, CA 90401
Telephone:       310.434.5400
Facsimile:       650.938.5200

*Attorneys for Defendants*
DATABRICKS, INC., and
MOSAIC ML, LLC, formerly
MOSAIC ML, INC.

FENWICK & WEST LLP

## I.    STATEMENT OF ISSUES TO BE DECIDED

1.    Was Defendants' use of Plaintiffs' books as training data for research and development of large language models (LLMs) a fair use under Section 107 of the Copyright Act?

2.    Was Defendants' provision of access to training datasets containing copies of Plaintiffs' books to nine customers and a graduate student for LLM research and development a fair use under Section 107 of the Copyright Act?

3.    Alternatively, can Plaintiffs meet the high bar of showing secondary copyright liability for their contributory infringement and inducement claims, where there is no evidence that Defendants' provision of access to training data for LLM research and development induced infringement or provided a service tailored to infringement?

4.    Are Defendants entitled to summary judgment on Plaintiffs' copyright infringement claim related to Databricks' DBRX models, where uncontradicted evidence shows that Databricks did not use Plaintiffs' books to train those models?

## II.    INTRODUCTION AND SUMMARY OF ARGUMENT

LLMs represent a fundamental shift in computing.  They respond to a broad range of queries and help with countless tasks—from accelerating cancer research to helping write emails.  To do all of this, LLMs must first be trained on a vast amount of text to learn the structure of language across a range of linguistic contexts.

Defendants Mosaic and Databricks used Plaintiffs' books—along with hundreds of billions of words of other text—to train a series of open-source LLMs and conduct LLM research designed to broaden access to artificial intelligence (AI).  That use was fair use.  As another court in this District held when granting summary judgment in Meta's favor for using books to train LLMs, "[t]here is no serious question" that using copyrighted text to train AI models is transformative.  *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1044 (N.D. Cal. 2025).  The undisputed record in this case compels the same conclusion.

Mosaic was founded by AI researchers with a goal of making AI accessible to a broader range of organizations by reducing the cost and computing power required to train AI models.  To demonstrate that concept, Mosaic trained and publicly released a series of LLMs called the MPT

FENWICK & WEST LLP

models, free of charge, as open-source tools for the research community. Those models were trained on massive, varied datasets assembled from publicly available sources, including two widely used AI research datasets called The Pile and RedPajama. Plaintiffs' books represented a small portion of a sub-dataset called Books3, which itself represented less than 3% of the MPT models' overall training data. The MPT models derived statistical patterns about the structure of language from that vast corpus of text. But they do not store, reproduce, or enable retrieval of Plaintiffs' books. And they have not harmed Plaintiffs in any cognizable market: Plaintiffs cannot identify a single lost book sale, lost licensing dollar, or any infringing output from Defendants' models.

Plaintiffs nevertheless seek to hold Defendants liable for copyright infringement. Their theory is that using any copyrighted text when developing a transformative new technology—even as a small fraction of a massive training corpus—requires the permission of every single rightsholder. That theory is wrong as a matter of law, and it would be devastating to the progress of science and the useful arts that the Copyright Act serves to promote. Accepting it would mean that every researcher, developer, and institution seeking to train an AI model must first negotiate with and obtain licenses from potentially millions of rightsholders, at transaction costs that would grind research to a halt—all to protect against a harm that, in this case, simply does not exist.

The four statutory fair use factors weigh decisively in Defendants' favor. Defendants' use was highly transformative: the MPT models and Defendants' LLM research served a fundamentally different purpose than Plaintiffs' books, and the training process created new, mathematical representations of linguistic structure that no author owns and no author can monopolize. The small percentage of book text used within a much larger dataset was a reasonably necessary part of assembling the massive, varied, and accurate textual corpus required for LLM training. And Defendants' use caused no cognizable market harm—neither to the market for Plaintiffs' books nor to any traditional licensing market. The hypothetical market Plaintiffs now assert—licensing books for transformative LLM training—is not legally cognizable, does not exist, and could not exist given the insurmountable transaction costs that any AI developer would face in attempting to individually license the massive amount of works necessary to train an LLM.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                2                Case No.: 3:24-cv-01451-CRB

Defendants are also entitled to summary judgment on Plaintiffs' secondary liability claims arising from the sharing of preprocessed AI training datasets with nine business customers using Defendants' LLM training platform and a graduate student for LLM research. Just as the Second Circuit held in *Authors Guild v. Google, Inc.*, 804 F.3d 202, 228-29 (2d Cir. 2015) ("*Google Books*"), a party that makes interim copies for fair use and provides those copies to others for the same fair use does not incur infringement liability.

Finally, and independently from the fair use analysis, Plaintiffs' claims premised on Databricks' separate DBRX models fail because Databricks indisputably did not use Plaintiffs' books to train those models.

The Court should grant summary judgment in Defendants' favor.

## III.    SUMMARY OF UNDISPUTED MATERIAL FACTS

### A.    Mosaic

Mosaic was a start-up founded by AI researchers and entrepreneurs to reduce the cost of training AI models, thereby broadening access to the technology. Frankle Decl. ¶¶ 2-3. Mosaic's mission included publicly sharing state-of-the-art research on efficient model training. *Id.* ¶¶ 3, 5. Mosaic also offered a highly efficient platform for organizations to train AI models. *Id.* ¶ 4. Databricks acquired Mosaic in July 2023; Mosaic is no longer an operating entity. *Id.* ¶ 6.

### B.    Databricks

Databricks was founded in 2013 by a group of researchers from UC Berkeley. Frankle Decl. ¶ 7. Databricks offers companies a platform to manage and derive insights from their data, including by training AI models. *Id.* One of Databricks' foundational goals is to democratize AI by making it available to a broad range of organizations. *Id.*

### C.    Large Language Model Training

LLM training seeks to develop a representation of the complex statistical patterns of language that will enable a model to *generalize*—to produce novel and contextually relevant outputs in response to never-before-seen user requests across varied domains. Johnson Decl. ¶ 14. LLMs are mathematical models consisting of a network of nodes ("neurons") that store "weights," which represent the "importance" of each textual input to the final output. *Id.* ¶¶ 11-12. LLM

FENWICK & WEST LLP

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT                3                Case No.: 3:24-cv-01451-CRB

training is an iterative process that adjusts those weights until the model can generalize; the trained weights are called model "parameters." *Id.* ¶¶ 12, 34. The training process includes several steps, which are simplified below:

*First*, engineers assemble textual training data, which must be *massive in quantity*, highly *varied in substance* (e.g., across topics, formats, styles, and perspectives), and factually and linguistically *accurate* (e.g., free of typos or misused vocabulary). Johnson Decl. ¶¶ 26, 28-30, 32. A massive quantity of text is necessary for an LLM to derive correct statistical relationships across the entire breadth of a language. *Id.* ¶ 28. Text variety ensures that a model can generate appropriate outputs across a broad range of situations. *Id.* ¶ 29. Text accuracy allows LLMs to predict the correct usage of words. *Id.* ¶ 30.

*Second*, textual training data is converted into numeric codes called "tokens," which can represent words, parts of words, or other textual elements. Johnson Decl. ¶¶ 18-19, 33. On average, each word converts into roughly 1.25 tokens. *Id.* ¶ 18. A "vector" of numerical values is assigned to each token, to incorporate information about the mathematical relationships among words. *Id.* ¶ 20. And each token is encoded with "positional" information about its location. *Id.* ¶¶ 21, 33.

*Third*, the model undergoes "pre-training," which involves iteratively repeating tasks for which the correct output is known, such as predicting the next word in a textual sequence. Johnson Decl. ¶ 34. The model uses any error between its current output and the known correct output to adjust the model weights to improve output correctness. *Id.* This exercise is repeated hundreds of billions of times, using several hundred billion tokens or more. *Id.* ¶¶ 28, 34. The resulting model parameters reflect general statistical patterns from the textual training data, but do not "store" that data itself. *Id.* ¶¶ 13-14 & 58-61; Evans Decl. ¶¶ 10-18. LLMs learn language patterns and structures that are not unique to any one author or source.

Finally, a pre-trained LLM can undergo secondary training—called "fine-tuning"—to enhance its performance on a specific task. Johnson Decl. ¶¶ 35-36. During that process, an LLM is trained on data related to the fine-tuning objective. *Id.* As with pre-training, the data used for fine-tuning is not stored or compressed in the model. Evans Decl. ¶¶ 10-18.

**D.    Defendants' Uses of Training Datasets Containing Plaintiffs' Books**

Defendants downloaded and used two AI training datasets, The Pile and RedPajama. Plaintiffs are published fiction authors who allege that The Pile and RedPajama included a sub-dataset called "Books3," containing unauthorized copies of 28 of their books.

***The Pile and RedPajama.***  The Pile was created in 2020 by the non-profit research group EleutherAI to advance scientific research by allowing researchers to train and study LLMs. Johnson Decl. ¶ 40.  It consisted of 22 smaller datasets, representing approximately 300 billion tokens. *Id.*  RedPajama was created in 2023 through a partnership led by Together AI—a company focused on building open-source AI infrastructure—with the support of federal agencies and universities. *Id.* ¶ 39.  RedPajama aimed to replicate the data used by Meta in creating its first-generation LLaMA LLMs, to enable others to build on and advance Meta's public research. *Id.*  It consisted of seven datasets, representing over 1.2 trillion tokens. *Id.*  Both The Pile and RedPajama included Books3, which purportedly consists of 196,000 books representing approximately 27 billion tokens. *Id.* ¶ 38.

***Defendants' Acquisition of the Datasets.***  Mosaic downloaded RedPajama and The Pile from Hugging Face, an online AI research platform.  Frankle Decl. ¶ 9.  Databricks came into possession of Mosaic's copies of those datasets when it acquired Mosaic.  *Id.*  It is undisputed that Defendants never used a peer-to-peer filesharing protocol like BitTorrent to obtain AI training materials.  Ex. 1[1] (Rao Dep.) at 108:20-23; Ex. 2 (Blakeney Dep.) at 153:6-154:4.  Plaintiffs do not allege that Defendants ever used what Plaintiffs term "shadow libraries" of "pirated" works.  To the contrary, Plaintiffs' purported expert on "piracy" testified that Hugging Face is not a "shadow library" and that the organizations that created The Pile and RedPajama do not operate "shadow libraries."  Ex. 3 (Seeley Dep.) at 107:17-108:10 & 109:16-110:20.

***Mosaic's Use of Books3 for AI Training.***  Mosaic used components of RedPajama and The Pile—including Books3—as part of much larger datasets to train a series of LLMs called the "MosaicML Pretrained Transformer" (MPT) models, released between May and July 2023.  Frankle Decl. ¶ 10 & *id.*, Exs. 2, 4, 6.  Mosaic understood that LLM training required the use of a

---

[1] All exhibits are attached to the Wakefield Declaration unless indicated otherwise.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

5

Case No.: 3:24-cv-01451-CRB

massive, varied, and accurate textual corpus. Trott Decl. ¶ 4. Mosaic further understood that using contemporary books helped achieve that technical requirement by providing a large volume of varied and accurate text from which its LLMs could derive statistical patterns about long-form, modern writing. *Id.* ¶ 11. The use of Books3 and other elements of RedPajama also facilitated performance benchmarking against Meta's LLaMA model, which helped Mosaic build on Meta's research and participate in community-wide efforts to advance the science of AI model training. *Id.* ¶ 10; Frankle Decl. ¶¶ 10-11. But Books3 represented a small proportion of the overall training data for the MPT models—together with other books data, it represented 3 to 3.5%, depending on the model. Johnson Decl. ¶¶ 46-48.

Mosaic released the MPT models as a free proof-of-concept demonstration of its enterprise platform's capabilities, not as a standalone commercial product. Ex. 4 (Tang Dep. Vol. I.) at 44:21-45:7; Ex. 5 (Frankle Dep.) at 69:21-70:13. It made the models and their weights publicly available (i.e., "open sourced") on Hugging Face, for a target audience of AI developers and researchers. Frankle Decl. ¶¶ 5, 12. Mosaic's statements about the models emphasized that its platform reduced training time and cost. *Id.* ¶ 12; Trott Decl. ¶ 18. Mosaic never marketed the MPT models to consumers, nor did it create an app or user-friendly interface to query the models. Frankle Decl. ¶ 17. Thus, installing and operating the MPT models required specialized knowledge and hardware. Johnson Decl. ¶ 50. Newer generations of open-source models from other developers quickly eclipsed the MPT models, which are now obsolete. Frankle Decl. ¶ 21.

At the time, though, Mosaic was among the industry leaders in improving the ability of LLMs to handle a long "context window"—the "box" in which a user inputs prompts and receives a response. A long context window allows LLMs to process lengthy prompts, such as voluminous legal or medical records. Ex. 6 (Havens Dep.) at 160:2-161:9 & 147:8-18; Ex. 7 (Trott Dep.) at 236:12-18 & 283:12-13. Mosaic developed its platform's capability to train models that could handle a context window of over 65,000 tokens, which is about the size of a short novel. Trott Decl. ¶¶ 15-16. To demonstrate that capability, Mosaic fine-tuned one of the MPT models on a subset of fiction books, then entered *The Great Gatsby* (which is just under 68,000 tokens) as a prompt and asked the model to generate an epilogue. *Id.* ¶ 16. Mosaic called that model the "MPT-

FENWICK & WEST LLP

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

6

Case No.: 3:24-cv-01451-CRB

7B-StoryWriter-65k+", to evoke the idea that the model could handle long prompts and was fine-tuned on fiction. Trott Decl. ¶ 15. While the epilogue to *Gatsby* was an impressive demonstration of Mosaic's technical achievement, it did not make sense as fiction—for example, Gatsby is both dead and alive in the epilogue. *Id.* ¶ 17.

*Defendants' Use of Books3 for AI Research.* In addition to training the MPT models, Defendants used Books3 or datasets incorporating Books3 for targeted AI research, including to test a new technique for long-context fine-tuning. Frankle Decl. ¶¶ 31-36; Ex. 2 (Blakeney Dep.) at 451:7-16.

While Plaintiffs have suggested vaguely that this testing somehow related to the "development" of a subsequent model series released by Databricks and called "DBRX" (SACC ¶ 52), Defendants' uncontradicted evidence confirms that Databricks did not use Books3 as part of the training materials for DBRX. Trott Decl. ¶ 22; Ex . 2 (Blakeney Dep.) at 488:8-13; Ex. 7 (Trott Dep.) at 219:18-21, 253:25-254:5.

*Defendants' Provision of Access to Training Datasets That Included Books3 for LLM Training on their Platforms*. Between approximately February 2023 and January 2024, Defendants provided nine business customers with links to RedPajama or The Pile in cloud-based storage locations on the Amazon Web Services Simple Storage Service or Oracle Cloud Infrastructure. Frankle Decl. ¶ 46; Ex. 4 (Tang Dep. Vol. I) at 101:12-102:12 & 198:1-7. These customers were all engaged in LLM training or related research using Defendants' platforms. Frankle Decl. ¶ 46; Ex. 8 (Sovine Dep.) at 154:6-24, 175:15-176:22, 216:4-217:15. While AI developers could already access training-formatted versions of RedPajama and The Pile on Hugging Face, Defendants provided those customers with links to separate versions of the datasets converted into a binary file format required by Defendants' training infrastructure—the Mosaic Data Shard (MDS) format. Frankle Decl. ¶¶ 41-47. Defendants also tokenized some of the data. *Id.* ¶ 41; Ex. 4 (Tang Dep. Vol. I) at 108:8-14; Ex. 8 (Sovine Dep.) at 175:15-176:22. Defendants never charged their customers a fee for those datasets. Frankle Decl. ¶ 42. Databricks also provided the link to its preprocessed RedPajama dataset to a graduate student, who used it for research on a paper about LLM training. Frankle Decl. ¶ 42; Ex. 9 at p. 26.

FENWICK & WEST LLP

There is no evidence that these few recipients of links to Defendants' preprocessed datasets shared them, or that anyone ever used them for anything other than LLM training and research. The datasets were not indexed to facilitate a search for specific books, and their formatting prevented normal reading. Johnson Decl. ¶¶ 68, 70, 73-74. Unsurprisingly, there is no evidence that anyone ever used the datasets shared by Defendants to read Plaintiffs' books.

### E. Plaintiffs Had No Loss of Book Sales or Traditional Licensing Revenue from Defendants' or their Customers' LLM Training.

Plaintiffs testified that they are unaware of any lost book sales caused by Defendants' LLMs. Ex. 10 (O'Nan Dep.) at 102:15-104:7 & 109:3-7; Ex. 11 (Makkai Dep.) at 112:4-113:10; Ex. 12 (Reynolds Dep.) at 89:9-90:8 & 132:23-133:5; Ex. 13 (Keene Dep.) at 216:15-217:4 & 251:15-252:4; Ex. 14 (Nazemian Dep.) at 185:7-25. Plaintiffs also admitted that they are unaware of any outputs by Defendants' LLMs that substitute for or compete with their books. Exs. 15, 18-19 at pp. 4-12; Exs. 16-17 at pp. 6-14. Defendants' economics expert Dr. Catherine Tucker analyzed book sales rank data and Plaintiffs' own book royalty statements, and concluded that the available empirical information is inconsistent with the notion that Defendants' activities—including the limited sharing of datasets for AI training on their platforms—had any impact on Plaintiffs' book sales. Tucker Decl. ¶¶ 25-33. Plaintiffs' economics expert did not refute Dr. Tucker's analysis—in fact, he did not submit *any* opinion on whether Defendants' conduct harmed Plaintiffs' book sales to consumers. Ex. 20 (Spulber Dep.) at 63:20-23.

Plaintiffs likewise testified that they are unaware of any lost revenue from Defendants' conduct in licensing markets traditionally associated with books, such as the markets for film adaptations or foreign translations. Ex. 10 (O'Nan Dep.) at 129:12-17; Ex. 11 (Makkai Dep.) at 185:15-186:14; Ex. 12 (Reynolds Dep.) at 115:18-118:10 & 132:23-133:5; Ex. 13 (Keene Dep.) at 246:12-247:11; Ex.14 (Nazemian Dep.) at 136:20-139:21. Again, their economics expert provided no opinion about whether Defendants harmed Plaintiffs in the market for licensing books for secondary or derivative uses (other than the hypothetical market for licensing books as AI training data, discussed below). Ex. 20 (Spulber Dep.) at 63:14-64:13. And their purported "piracy" expert likewise pointed to no evidence of lost sales or licensing opportunities for Plaintiffs' works. Ex. 3

FENWICK & WEST LLP

(Seeley Dep.) at 54:7-8, 57:11-22, 96:25-97:25, 102:5-103:17. Nor could Plaintiffs identify any lost opportunities caused by Defendants' LLMs—they have not lost book deals, and they anticipate continuing to publish books as they did before Defendants' conduct. Ex. 10 (O'Nan Dep.) at 139:1-4 & 135:11-19; Ex. 11 (Makkai Dep.) at 173:25-174:9 & 185:15-186:14; Ex. 12 (Reynolds Dep.) at 89:14-90:8 & 132:23-133:5; Ex. 13 (Keene Dep.) at 72:10-23, 216:15-217:4, 251:15-252:4; Ex. 14 (Nazemian Dep.) at 187:20-188:24, 193:3-13, 194:9-14.

**F.      Plaintiffs Have No Evidence of Infringing Outputs from Defendants' LLMs.**

This litigation is *not* about infringing LLM outputs. None of the Plaintiffs have ever used or seen Defendants' LLMs, much less seen or heard of any infringing output. Ex. 10 (O'Nan Dep.) at 95:17-96:7 & 101:15-102:13; Ex. 11 (Makkai Dep.) at 109:8-17 & 110:9-112:10; Ex.12 (Reynolds Dep.) at 87:11-90:15; Ex. 13 (Keene Dep.) at 187:13-16, 211:22-212:9, 214:1-215:20; Ex. 14 (Nazemian Dep.) at 175:7-176:9, 177:14-19, 178:1-10, 182:3; Exs. 15, 18-19 at pp. 4-6; Exs. 16-17 at pp. 6-8; Exs. 21 & 24 at pp. 24-27; Ex. 22 at pp. 10-13; Ex. 23 at pp. 21-23; Ex. 25 at pp. 8-11. Their technical expert, Dr. Shawn Shan, conceded that there is no evidence of Defendants' LLMs generating outputs that are substantially similar to content in Plaintiffs' books. Ex. 26 (Shan Dep.) at 202:4-6 ("[T]here is no evidence I have seen in this case about MPT model[s] regurgitating, you know, Plaintiff[s'] work specifically."). Defendants' expert Dr. David Evans subjected the MPT models to robust "adversarial" testing to "extract" infringing outputs, including by prompting the models with excerpts from Plaintiffs' books *millions* of times. Evans Decl. ¶¶ 22-30. He was unable to generate outputs substantially similar to anything in Plaintiffs' books, other than a few excerpts of unprotected content (e.g., from the Bible) *quoted* in some books. *Id.* ¶¶ 30, 39, 46, 49-50.

Nor do Plaintiffs allege that any of the nine customers who received preprocessed versions of The Pile or RedPajama from Defendants created models that produce output substantially similar to their books. SACC ¶¶ 88-99. There is no evidence whatsoever of that in the record.

Accordingly, the only question is whether Defendants engaged in copyright infringement by using Plaintiffs' books for AI training and training-related research, or by allowing some customers and a graduate student to use them for that same purpose.

## IV.    LEGAL STANDARD

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That standard is met where there is insufficient evidence for a reasonable factfinder to find in favor of the non-movant on any "facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-52 (1986).

## V.    ARGUMENT

Fair use is an express statutory limitation on copyright: "the copyright owner does not possess the exclusive right to such a use," and a party "who makes a fair use of the work is not an infringer … with respect to such use." *Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417, 433 (1984). That limitation "reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and other arts." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 526 (2023). Section 107 of the Copyright Act sets forth four non-exclusive factors for assessing fair use: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. The application of those factors "requires judicial balancing, depending upon relevant circumstances, including 'significant changes in technology.'" *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 19 (2021).

Defendants made intermediate copies of Plaintiffs' books to create a new technology— precisely the type of activity that fair use encourages to "further[] the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create." *Warhol*, 598 U.S. at 531. Indeed, another court in this District has described this technology as "exceedingly" and "spectacularly" transformative. *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1021-33 (N.D. Cal. 2025). Mosaic's use in no way diminished Plaintiffs' incentives to create books. The MPT models do not generate outputs that are substantially similar to Plaintiffs' books,

FENWICK & WEST LLP

and Plaintiffs cannot point to a single lost book sale or lost dollar from traditional licensing stemming from Defendants' activities.  Mosaic's use of their books is quintessential fair use, which advances science without causing market substitution.

Defendants' provision of specially formatted training datasets to a limited group of customers and a graduate student to enable more fair use—LLM training and research on Defendants' platform—also does not give rise to any infringement liability, as a court held on analogous facts in *Google Books*.  804 F.3d at 228-29.  Plaintiffs' claims therefore all fail as a matter of law.  And Plaintiffs' infringement claims premised on Databricks' DBRX models should not survive, as Databricks did not use Plaintiffs' books to train those models.

**A.  Defendants Engaged in Fair Use by Using Plaintiffs' Books for LLM Training and Research.**

The four statutory factors weigh decisively in favor of fair use, as Defendants used Plaintiffs' books only as back-end inputs in a highly transformative process, to develop non-infringing technology that has not harmed Plaintiffs in any cognizable market for their books.

**1.  Factor One: The purpose and character of the use favors fair use.**

The first fair use factor asks "whether the new work merely 'supersede[s] the objects' of the original creation ... ('supplanting' the original), or instead adds something new, with a further purpose or different character; it asks, in other words, whether and to what extent the new work is 'transformative.'"  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).  Importantly, "the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works."  *Id.*

**a.  Defendants' use of Plaintiffs' books to train their LLMs and to support that training through research is self-evidently transformative.**

The LLM training process *literally* transformed Plaintiffs' books: every word was converted into tokens enriched with numerical information about their position and relationship to other textual elements, and those tokens were aggregated with hundreds of billions of other tokens.  Johnson Decl. ¶¶ 46, 51-52.  The training process then deployed that vast universe of tokens in billions of mathematical exercises, which iteratively computed numerical parameters. *Id.* ¶ 34.  The

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

11

Case No.: 3:24-cv-01451-CRB

FENWICK & WEST LLP

resulting LLMs did not "store" copies of Plaintiffs' books or any of the other training data, nor could they enable "retrieval" or "reverse engineering" of the books. *Id.* ¶¶ 58, 62-64; Evans Decl. ¶¶ 10-18. Mosaic thus irreversibly transformed the training data, including Plaintiffs' books, into something much greater than the sum of its parts: a statistical representation of language, in all its nuances and applications. In doing so, the training process captured what every author uses but no author owns—the structure of language.

More fundamentally, "[t]here is no serious question" that the LLMs resulting from Defendants' use of Plaintiffs' books "had a 'further purpose' and 'different character' than the books," making that use "highly transformative." *Kadrey*, 788 F. Supp. 3d at 1044. The purpose of Plaintiffs' books is to be read by humans in their entirety and thereby entertain, educate, provoke thought, emotionally engage, and/or elicit empathy. Ex. 10 (O'Nan Dep.) at 41:24-43:15, 65:20-22, 68:5-7, 94:9-13; Ex. 11 (Makkai Dep.) at 67:13-15 & 71:17-72:23; Ex. 12 (Reynolds Dep.) at 58:3-59:10 & 107:21-108:10; Ex. 13 (Keene Dep.) at 114:14-116:24; Ex. 14 (Nazemian Dep.) at 109:7-112:6. By contrast, the primary purpose of the MPT models was to generate relevant, helpful responses to widely varied input prompts. Johnson Decl. ¶¶ 13-15. Another purpose of those models was to demonstrate how Mosaic's platform could train sophisticated LLMs in a cost- and time-efficient manner, which supports scientific progress. Frankle Decl. ¶ 11.

The purpose of the MPT models was *not* to reproduce the text of Plaintiffs' books or any other training data, which the MPT models indisputably cannot do. Evans Decl. ¶¶ 10, 14, 50. Plaintiffs have claimed that the MPT models can generate outputs in the style of their books. Even if that were true (it is not), such a use of the MPT models would be non-infringing because style is unprotectable. *See* 17 U.S.C. § 102(b); *Kadrey*, 788 F. Supp. 3d at 1045 ("[S]tyle is not copyrightable—only expression is."); *Dr. Seuss Enters., L.P. v. Penguin Books U.S.A., Inc.*, 924 F. Supp. 1559, 1568 n.11 (S.D. Cal. 1996) ("[A] writer's general style established across a body of work is not copyrightable.") (Citation omitted).

Nor does the hypothetical, non-infringing use of the MPT models to generate text in Plaintiffs' "style" alter the conclusion that the MPT models serve a fundamentally different purpose than Plaintiffs' books, given that the models embody a mathematical representation of *the entire*

FENWICK & WEST LLP

FENWICK & WEST LLP

*English language.*  As the *Kadrey* court explained when rejecting this same argument, "[e]ven if one possible use of [Meta's LLM] is to generate text with similarities to unprotectable aspects of the plaintiffs' books, that does not mean Meta's copying had the same purpose as those books." 788 F. Supp. 3d at 1045.  The *Bartz* court addressed this issue by analogizing to how human authors themselves learn to write: "[I]f someone were to read all the modern-day classics because of their exceptional expression, memorize them, and then emulate a blend of their best writing, would that violate the Copyright Act?  *Of course not*."  *Bartz*, 787 F. Supp. 3d at 1021-22 (emphasis added).  That reasoning applies with equal force in this case, where the purpose of the MPT models—to generate relevant outputs in response to every conceivable prompt—transcends the purpose of any single component of their training datasets.

Additionally, the MPT models have a radically different character than Plaintiffs' books.  They are software tools that can generate entirely new output in response to prompts.  Plaintiffs' books are fixed, unchanging text reflecting their authors' personal expression.  It is difficult to imagine two more different things.  Thus, the MPT models have both a "further purpose" *and* a "different character" than Plaintiffs' books.  Defendants' use of Plaintiffs' books to create the models is therefore highly transformative.

### b. Copying Plaintiffs' books was a necessary intermediate step in creating transformative, non-infringing LLMs.

Courts have consistently held that it is fair use to make digital copies of protected works—including entire books—as an intermediate step to creating a transformative technology.  It was fair use to copy: (1) *millions* of books to create a full-text searchable database and to display book snippets (*Google Books*, 804 F.3d at 214-25; *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 94-101 (2d Cir. 2014)); (2) images to create a search engine that displays "thumbnail" versions (*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159-62 (9th Cir. 2007); *see also Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-22 (9th Cir. 2003)); (3) part of a computer program to develop a software platform (*Oracle*, 593 U.S. at 26-40); (4) video games to reverse-engineer a game console's compatibility requirements and create competing games (*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520-28 (9th Cir. 1992)); (5) video game console software to develop a console

emulator (*Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 602-08 (9th Cir. 2000)); and (6) student papers to develop an online plagiarism detection system (*A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 637-45 (4th Cir. 2009)). Even though each of these cases involved verbatim copying, often of entire creative works, they consistently recognize that intermediate copying is fair use when it is a necessary step for a transformative use. *See, e.g.*, *Oracle*, 593 U.S. at 26-29; *Sega*, 977 F.2d at 1520.

Defendants' use of Plaintiffs' books fits squarely within this well-established line of cases: Defendants copied Plaintiffs' books only as intermediate steps in creating and using the massive, varied, and accurate corpus of text necessary to train their LLMs. They did so to obtain mathematical inferences about unprotectable aspects of Plaintiffs' books and the large corpus of other training data—the structure and patterns of language. And the resulting technology was far more transformative than anything in those precedential fair use cases—it was "among the most transformative many of us will see in our lifetimes." *Bartz*, 787 F. Supp. 3d at 1033. Thus, decades of legal precedent support the conclusion that Defendants' intermediate copying was fair use.

### c. The supposedly illicit origin of Books3 is irrelevant to the first fair use factor and to the overall fair use analysis.

Plaintiffs have suggested that fair use should not apply here, notwithstanding any transformative use by Defendants, because Books3 was originally "derived from" a "shadow library" containing unauthorized, or "pirated," copies of books. SACC ¶¶ 21-23. But it is undisputed that Defendants did not obtain their training datasets from "shadow libraries," and that the organizations that created those datasets were not "shadow libraries" either. Ex. 3 (Seeley Dep.) at 107:17-108:10 & 109:16-110:20. To the contrary, Defendants' training datasets originated from EleutherAI and Together AI, research organizations dedicated to advancing AI development. RedPajama's creation was supported by federal agencies and reputable universities. The datasets were used widely within the AI community, contributing to reproducible and transparent research. Johnson Decl. ¶¶ 37, 41-44. And Mosaic obtained those datasets from Hugging Face, a legitimate platform—Plaintiffs' own technical expert uses it—that facilitates AI research. *Id.* ¶ 44; Frankle Decl. ¶ 9; Ex. 26 (Shan Dep.) at 147:12-148:15. Mosaic did so for purposes of AI research and

FENWICK & WEST LLP

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

14

Case No.: 3:24-cv-01451-CRB

training—*not* to read Plaintiffs' books or to create a free digital book library. Databricks, in turn, came into possession of the datasets by virtue of acquiring Mosaic. And there is no evidence of either Defendant doing anything to support any so-called "shadow library." In short, neither acted in bad faith when acquiring Plaintiffs' books.

Even so, bad faith is legally irrelevant to fair use. The Supreme Court has expressed "justifiable" "skepticism" about the relevance of bad faith in the fair use analysis because "[c]opyright is not a privilege reserved for the well-behaved." *Oracle*, 593 U.S. at 32. Thus, the circumstances preceding Defendants' use, and any inferences of "bad faith" that might be drawn from them, are legally irrelevant to the fair use inquiry. Moreover, Plaintiffs' core argument—that unpermitted copying is "piracy" that defeats fair use—gets the law backwards. *Every* fair use case involves use *without permission*, which a copyright holder could always label as "piracy." Yet, "being denied permission to use a work *does not* weigh against a finding of fair use." *Campbell*, 510 U.S. at 585 n.18 (emphasis added). As such, being denied a license or breaking off licensing negotiations does not preclude a finding of fair use. *Oracle*, 593 U.S. at 8; *Sega*, 977 F.2d at 1514.

Relatedly, no legal principle required Defendants to begin the transformative process of LLM training with authorized copies of Plaintiffs' books, such as by borrowing them from a library. Section 107 of the Copyright Act allows innovators to make *unauthorized* use of protected works, and it focuses on "the *use* made of a *work* in any particular case," not on each copy made in that use. 17 U.S.C. § 107 (emphasis added). It is undisputed that making digital copies of the books was a necessary step of the use at issue—LLM training. It would be illogical to precondition that necessary step of *permitted* unauthorized copying on the acquisition of an *authorized* copy. Such a precondition would also undermine the fair use doctrine's "guarantee of breathing space within the confines of copyright." *Campbell*, 510 U.S. at 579. By the same token, Mosaic's initial *acquisition* of unauthorized copies of Plaintiffs' books specifically for purposes of fair use cannot give rise to copyright infringement, as that would defeat the core tenet of Section 107—that "the fair use of a copyrighted work … is not an infringement of copyright." 17 U.S.C. § 107.

As discussed, Plaintiffs have contended that Defendants' conduct is not fair use because Defendants engaged in "piracy" of Plaintiffs' books. But Plaintiffs define "piracy" as *any* copying

FENWICK & WEST LLP

FENWICK & WEST LLP

without permission from the rightsholder. Ex. 3 (Seeley Dep.) at 12:14-18. Their purported "piracy" expert contends that a use is "still piracy even if it's fair use." *Id.* at 21:21-22:16. That label is therefore distinctly unhelpful to the Court in analyzing fair use. And Plaintiffs' definition of "piracy" as any copying without permission overlooks the bedrock principle that, if "use is otherwise fair, then no permission need be sought or granted." *Campbell*, 510 U.S. at 585 n.18. The Court should therefore ignore Plaintiffs' rhetoric labeling Defendants' plainly transformative use as "piracy."

### d.     The commercial aspect of Defendants' LLM research and training does not weigh against fair use.

Mosaic publicly shared the MPT models' code and weights for free to advance the science of AI development. That public sharing also indirectly served a commercial purpose: to demonstrate the capabilities of Mosaic's AI-training platform. But the "[t]he commercial nature of [a] use is not dispositive" because "it is to be weighed against the degree to which the use has a further purpose or different character." *Warhol*, 598 U.S. at 531. Indeed, the leading cases upholding the fair use defense in the Ninth Circuit and at the Supreme Court, discussed throughout this brief, involved commercial use. Because Defendants' use of Plaintiffs' books was highly transformative, the indirectly commercial nature of the models does not count against fair use.

In sum, Defendants conducted research and created generative AI tools with a radically different purpose and character than Plaintiffs' books. Their intermediate copying for transformative, non-infringing purposes is fair use under well-established precedent. The first factor weighs heavily for fair use.

### 2.     Factor Two: The nature of Plaintiffs' works favors fair use.

The second factor weighs the nature of the copyrighted works. While creative works are "closer to the core of intended copyright protection" than functional works (*Campbell*, 510 U.S. at 586), "[p]ublished works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred." *Arriba*, 336 F.3d at 820. This factor "typically has not been terribly significant in the overall fair use balancing." *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 (9th Cir. 2003); *Google Books*, 804 F.3d at 220. Courts often treat the factor as

neutral when a defendant uses a creative work for a transformative purpose. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612-13 (2d Cir. 2006); *HathiTrust*, 755 F.3d at 98.

While Plaintiffs' books are creative works, they were published and Defendants used them for a highly transformative purpose that was not tied to any book's creative expression—deriving statistical information about language to create a new technology. *See Sega*, 977 F.2d at 1524 (explaining, with respect to the second factor, that it is fair use to copy "expressive elements of [a] work that 'must necessarily be used as incident to' expression of the underlying ideas, functional concepts, or facts."). The second factor thus does not weigh against fair use.

### 3. Factor Three: The amount and substantiality of the portions of Plaintiffs' books used by Defendants favors fair use.

The third fair use factor asks whether "the amount and substantiality of the portion" of the works used by Defendants was "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586. This factor "will generally weigh in favor of fair use where … the amount of copying was tethered to a valid, and transformative, purpose." *Oracle*, 593 U.S. at 34. "Complete unchanged copying has repeatedly been found justified as fair use when the copying was reasonably appropriate to achieve the copier's transformative purpose and was done in such a manner that it did not offer a competing substitute for the original." *Google Books*, 804 F.3d at 221.

Defendants copied Plaintiffs' books verbatim to assemble a massive corpus of varied and accurate text, as required for LLMs to derive correct statistical inferences. Johnson Decl. ¶¶ 28-30. Plaintiffs' books added to the training materials' overall volume and diversified them with high-quality examples of edited, contemporary, long-form prose. Trott Decl. ¶ 11. Copying the books' entire text allowed the models to derive inferences concerning the use of words and other elements in a continuous, coherent, long-form text. Ex. 1 (Rao Dep.) at 35:24-36:10, 97:14-20, 99:20-101:8; Ex. 4 (Tang Dep. Vol. I) at 292:14-293:12. As Plaintiffs' technical expert put it, books provide functionally useful information for LLMs—"*continuous* prose with *sustained narrative structure*." Ex. 26 (Shan Dep.) at 216:11-16 (emphases added). Thus, verbatim copying of Plaintiffs' books was reasonable in relation to Defendants' transformative purpose of training the MPT models with a massive, varied, and accurate dataset. *See, e.g., Kadrey*, 788 F. Supp. 3d

FENWICK & WEST LLP

FENWICK & WEST LLP

at 1050 (finding "it was 'reasonably necessary' for Meta to 'make use of the entirety of the works'" because "LLMs work better if they are trained on more high-quality material"). That conclusion is buttressed by the fact that, as discussed below, Defendants' copying of Plaintiffs' entire books "did not offer a competing substitute for the original." *Google Books*, 804 F.3d at 221.

Thus, the amount and substantiality of Defendants' copying was tethered to a valid, transformative purpose, and the third factor therefore weighs in favor of fair use.

### 4. Factor Four: The lack of any market harm to Plaintiffs favors fair use.

Finally, the fourth factor looks to "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). It "focuses on actual or potential market substitution." *Warhol*, 598 U.S. at 536 n.12. "Where the allegedly infringing use does not substitute for the original and serves a 'different market function,' such factor weighs in favor of fair use." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013). Importantly, the factor considers only "impact on 'traditional, reasonable, or likely to be developed markets.'" *Id.*

The fourth factor weighs strongly in favor of fair use. Defendants' LLM training and research did not create substitutes for Plaintiffs' books in any cognizable markets, like those for the sale of books to readers or licensing for derivative uses, such as movie adaptations. Plaintiffs have contended instead that Defendants harmed them in the market for licensing their books as data to train LLMs. But that hypothetical market is irrelevant; Plaintiffs are not legally entitled to monopolize a market for transformative uses, as that would eviscerate fair use. And even if that market were relevant, it does not and cannot exist because of insurmountable economic barriers.

### a. Defendants' LLM training and research did not harm Plaintiffs in any traditional, reasonable, or likely to be developed market.

Unsurprisingly, Plaintiffs cannot identify any lost sales tied to Defendants' conduct. *Supra* at III.E. The MPT models are not themselves substitutes for Plaintiffs' books and they do not generate any infringing outputs that could substitute for them. Dr. Tucker's uncontradicted empirical analysis shows no impact on Plaintiffs' book sales following the training and release of the MPT models, or Defendants' internal LLM research. Tucker Decl. ¶¶ 25-33. Each Plaintiff also testified to having no awareness of Defendants' conduct causing lost revenue from licensing

FENWICK & WEST LLP

their books for derivative uses that feature the books' expressive elements, such as movie or play adaptations, translations, or audiobooks. *Supra* at III.E.

Separately, Plaintiffs cannot show cognizable harm by claiming that other authors may use the MPT models to flood the market with inexpensive, non-infringing books. That "dilution" theory of harm is counter to "the 300-year old requirement in Anglo-American case law that harm to the market must be harm to the individual work and cannot be speculative." William F. Patry, Patry on Copyright ("Patry") § 10:155.40 (Mar. 2026 Update). Moreover, as the *Bartz* court explained in rejecting that theory, "[t]he [Copyright] Act seeks to advance original works of authorship, not to protect authors against competition." *Bartz*, 787 F. Supp. 3d at 1031-32. As such, "[a]n attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression." *Oracle*, 593 U.S. at 39 (citing *Sega*, 977 F.2d at 1523-24). Indeed, the Ninth Circuit has found fair use even where the express purpose of copying was to create new, non-infringing products that competed with the original works. *Sega*, 977 F.2d at 1523. Any theory tied to market "dilution" from AI-generated, non-infringing works therefore lacks "any connection to either the statute, basic principles of copyright law, and case law …." Patry § 10:155.40.

Setting aside that lack of legal merit, there is no evidence that the MPT models have flooded or ever could flood the market with non-infringing books. Plaintiffs cannot point to a single instance of the MPT models generating a book, much less of such a book being offered for sale. Exs. 15, 18-19 at pp. 1-4; Exs. 16-17 at pp. 2-5. Indeed, the models, including MPT-7B-StoryWriter-65k+, cannot generate narratively coherent fiction, even when prompted with an entire book as an input. Trott Decl. ¶¶ 17, 20.

Plaintiffs have also attempted to imply market impact by connecting Defendants' conduct to so-called "piracy." But Plaintiffs' purported "piracy" expert is not an economist and conducted no economic analysis of whether Defendants caused Plaintiffs to lose book sales or licensing revenue for derivative uses. Ex. 3 (Seeley Dep.) at 54:7-8, 57:11-22, 96:25-97:25, 102:5-103:17 ("I did not do any economic analysis."). As Defendants' expert Dr. Jonathan Hersh—an economist who studies online piracy—explained, "piracy" occurs when the illegal distribution of copyrighted

materials causes consumer substitution and impacts legal sales of those materials. Hersh Decl. ¶¶ 19-37. There is no evidence of that here. Accordingly, Plaintiffs have no basis to accuse Defendants of "piracy" and cannot use that pejorative label to bootstrap a showing of market harm.

Thus, Defendants have not harmed Plaintiffs in any traditional, reasonable, or likely to develop market for books.

> **b.** **The market to license Plaintiffs' books for LLM training is not legally cognizable and does not exist.**

Plaintiffs have alleged harm in the licensing market for the very transformative use at issue here—LLM training and research. But "a copyright holder cannot prevent others from entering fair use markets merely 'by developing or licensing a market for … transformative uses of its own creative work.'" *Tresona Multimedia v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 652 (9th Cir. 2020) (citation omitted). That would make the fourth factor a circular exercise that defeats fair use in every case: "it is a given in every fair use case that plaintiff suffers a loss of a *potential* market if that potential is defined as the theoretical market for licensing the very use at bar." *Id.* (citation omitted). As the *Kadrey* court put it when rejecting that argument, "to prevent the fourth factor analysis from becoming circular and favoring the rightsholder in every case, harm from the loss of fees paid to license a work for a transformative purpose is not cognizable." 788 F. Supp. 3d at 1052; *see also Bartz*, 787 F. Supp. 3d at 1032. Thus, under the fourth factor, "[t]he only market harms that count are the ones that are caused because the secondary use serves as a substitute for the original, not when the secondary use is transformative …." *HathiTrust*, 755 F.3d at 99. Because LLM training is highly transformative, the hypothetical licensing market for that use is not legally cognizable and bears no relevance to the fourth factor analysis.

Even if that hypothetical market were cognizable, it still would not move the fourth-factor needle because that market does not and cannot exist. Plaintiffs have never licensed their works for LLM training or negotiated to do so. Ex. 10 (O'Nan Dep.) at 130:3-8 & 131:19-21; Ex. 11 (Makkai Dep.) at 178:9-179:1; Ex. 12 (Reynolds Dep.) at 118:11-119:1; Ex. 13 (Keene Dep.) at 229:21-230:3 & 231:4-232:10; Ex. 14 (Nazemian Dep.) at 162:1-5 & 163:1-24; Exs. 15, 18-19 at p. 12; Exs. 16-17 at p. 15. As Defendants' expert Dr. Michael Sinkinson has shown, a market for

FENWICK & WEST LLP

licensing books like Plaintiffs' to train AI models is doomed to fail. That market would require AI developers to engage in arm's-length negotiations with hundreds of thousands of authors for licenses to books that, individually, contribute near-zero value to LLM training. Sinkinson Decl. ¶¶ 11-14. Indeed, Plaintiffs—not their publishers—have the sole right to license their books for LLM training. Ex. 10 (O'Nan Dep.) at 76:2-17 & 130:3-14; Ex. 11 (Makkai Dep.) at 76:4-76:18 & 194:24-195:4; Ex. 12 (Reynolds Dep.) at 61:6-17 & 119:14-18; Ex. 13 (Keene Dep.) at 229:3-17; Ex. 14 (Nazemian Dep.) at 162:1-18. Plaintiffs' expert Dr. Daniel Spulber recognized that this is the case for most published fiction and non-fiction books. Ex. 20 (Spulber Dep.) at 146:18-147:5. And Plaintiffs themselves testified that they would each want to engage in direct, detailed negotiations with any prospective AI licensee. Ex. 10 (O'Nan Dep.) at 133:3-134:3; Ex. 11 (Makkai Dep.) at 195:15-197:4; Ex. 12 (Reynolds Dep.) at 119:14-121:15; Ex. 13 (Keene Dep.) at 233:2-233:19 & 236:22-240:20; Ex. 14 (Nazemian Dep.) at 164:5-167:9. The transaction costs of these individualized negotiations, on the scale required to assemble the massive textual corpus necessary to train LLMs, would exceed any reasonable economic value of contemporary books to the LLM training process. Sinkinson Decl. ¶¶ 13-14. Moreover, the incremental value of each author's books to LLM training is negligible, such that AI developers and individual authors would be unable to agree on the market value of a single book for LLM training. *Id.* ¶¶ 13, 15-16, 24-25.

Plaintiffs' expert Dr. Spulber has failed to substantiate a viable licensing market for fiction books. He has pointed to AI-related agreements between AI developers and various large companies. But nearly all those agreements are unlike anything individual authors could agree to—they typically cover large content libraries owned by a single entity, and most do not even involve the licensing of books. Sinkinson Decl. ¶¶ 19-22. The only agreement involving the copyrights of individual book authors resulted in the licensing of ▮▮▮ books, at a cost of ▮▮▮ per book. *Id.* ¶¶ 23-25. Those ▮▮▮ books represent a miniscule fraction of the hundreds of billions of tokens required to train the MPT models, at a cost that no AI developer would pay on a large scale—especially to train open-source models like the MPT models, which were released for free to the scientific community. *Id.* And that agreement—which does not involve any of Plaintiffs' books—was entered in ▮▮▮▮▮▮, more than a year after Mosaic had trained and released

FENWICK & WEST LLP

the last of the MPT models. *Id.* ¶ 27. There is therefore no evidence of a functioning data licensing market that Plaintiffs could have participated in. Therefore, Plaintiffs were not deprived of any licensing fees. *Id.* ¶¶ 29-30.

In sum, Defendants' transformative use of Plaintiffs' books did not harm any cognizable market for those books: Plaintiffs did not lose any sales, nor any licensing revenue for derivative uses of their books' expressive elements. The fourth factor therefore weighs strongly in favor of fair use. And the balancing of all four factors compels the conclusion that Defendants engaged in fair use by making reasonably necessary intermediate copies of Plaintiffs' books to create a transformative technology that did not create market substitutes for those books. The Court should grant summary judgment in favor of Defendants on Plaintiffs' direct and vicarious infringement claims (Counts 1 and 2), which are based on Defendants' LLM training and research.

**B.    Defendants' Limited Sharing of Datasets Formatted for LLM Training and Research Does Not Give Rise to Infringement Liability.**

Plaintiffs assert claims for contributory copyright infringement and inducing infringement, premised on Defendants' provision of links to preprocessed versions of RedPajama or The Pile to nine business customers using Defendants' AI training platform, and to a graduate student conducting LLM research. Those claims fail because Defendants merely provided interim copies of books for fair use by others. Independently, there is insufficient record evidence for the essential elements of contributory infringement and inducement to infringe.

**a.    Providing an interim copy for fair use is not infringement.**

As the Second Circuit explained in the *Google Books* case, a party that makes interim copies of works for fair use and then provides those interim copies to third parties for further fair use is not liable for any form of copyright infringement, especially where—as here—there is no evidence of direct infringement by those third parties. In *Google Books*, the plaintiffs argued that Google exceeded the bounds of fair use by providing digital copies it had made when creating the Google Books search engine to libraries for the purpose of enabling the libraries' "provision of fair use digital searches." 804 F.3d at 228-29. In ruling for Google, the Second Circuit noted that "[t]he libraries propose to use their digital copies to enable the very kinds of searches that we here hold

FENWICK & WEST LLP

to be fair uses in connection with Google's offer of such searches to the Internet public …." *Id.* The court then held that there was no principled basis for holding Google liable merely for facilitating fair use through the provision of interim digital copies of books. *Id.* at 229. Importantly, the court declined "to hold Google liable as a contributory infringer based on *the mere speculative possibility* that libraries, in addition to, or instead of, using their digital copies of Plaintiffs' books in a non-infringing manner, may use them in an infringing manner." *Id.* (emphasis added). The court was satisfied that, if any libraries misused the interim copies for infringement, "such libraries may be liable to Plaintiffs for their infringement." *Id.*

The Second Circuit's reasoning in *Google Books* is squarely on point here because Defendants, like Google, simply shared access to datasets containing interim copies of Plaintiffs' books to enable the same fair use that they themselves engaged in. Indeed, it is undisputed that Defendants provided links to their copies of RedPajama or The Pile to nine of their customers "to make it easier to train" LLMs on Defendants' platforms. Ex. 8 (Sovine Dep.) at 154:6-9. And Databricks shared a link to RedPajama with a graduate student to facilitate LLM research. Frankle Decl. ¶¶ 5, 42. Mosaic had preprocessed these datasets specifically for use on its training platform. *Id.* ¶¶ 41-42; Johnson Decl. ¶ 66. The datasets could not plausibly serve as substitutes for Plaintiffs' books, given the technical efforts that would be required to search for, extract, and convert the books into a readable format. Johnson Decl. ¶¶ 67-74; Frankle Decl. ¶¶ 41-42. The undisputed record therefore shows that Defendants shared datasets containing copies of Plaintiffs' books solely for fair use, as in *Google Books*.

Any notion that the customers and graduate student used the datasets for anything other than fair use is "mere speculative possibility" that cannot support liability. *Google Books*, 804 F.3d at 229. There is no evidence that any recipient extracted Plaintiffs' books from the datasets for reading, or made the datasets available for others to do so. Nor is there evidence that any of the nine customers—most of whom developed specialized products solely for enterprise applications— used the datasets to train models capable of producing outputs substantially similar to Plaintiffs' books. Tucker Decl. ¶¶ 11-12, 32. Plaintiffs have not even alleged infringing outputs by those companies' AI models. SACC ¶¶ 90, 98. And Defendants' economics expert, Dr. Tucker, found

FENWICK & WEST LLP

FENWICK & WEST LLP

no statistically significant change in Plaintiffs' book sales rankings after Defendants provided customers with access to the datasets, which undercuts the possibility that they created any market substitutes for Plaintiffs' books. Tucker Decl. ¶¶ 31-33.

In sum, Defendants did nothing more than share interim copies of Plaintiffs' books to facilitate LLM training and research on their platform, which is itself fair use for the reasons shown above. *Supra* at V.A. Because facilitating fair use does not violate any interest protected by copyright, Plaintiffs' contributory infringement and inducement claims fail as a matter of law.

### b.    There is no evidence of contributory infringement or inducement of infringement.

Even if Plaintiffs could show that the graduate student and nine customers with whom Defendants shared the preprocessed datasets had used them in a potentially infringing manner (e.g., to read Plaintiffs' books or to train an LLM designed to generate infringing outputs), there is no evidence sufficient to raise genuine issues of material fact on Plaintiffs' contributory and inducement claims. The Supreme Court has set a high bar for secondary copyright liability, reflecting the principle that "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another." *Cox Commc'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959, 967 (2026). Accordingly, contributory liability attaches *only* where a party "induced the infringement" *or* provided a service "tailored to that infringement." *Id.* A party induces infringement "if it actively encourages infringement through specific acts," such as "market[ing] …software as a tool to infringe copyrights." *Id.* And "[a] service is tailored to infringement if it is not capable of substantial or commercially significant noninfringing uses." *Id.* (Citation modified).

There is no evidence that Defendants engaged in either of those actions. Defendants promoted their platform as a cost-efficient tool for organizations to train LLMs for a wide range of applications, and provided preprocessed versions of The Pile or RedPajama to nine customers expressly for that purpose. Frankle Decl. ¶¶ 11, 42-46; Ex. 8 (Sovine Dep.) at 154:6-9. No evidence suggests that Defendants encouraged their customers (or the graduate student) to train models that could produce outputs substantially similar to Plaintiffs' books, or to extract Plaintiffs' books from Books3 and convert them into a readable format instead of purchasing them.

Separately, the datasets shared by Defendants were not "tailored" to infringement. To the contrary, they were formatted to train transformative LLMs on Defendants' platform, and were therefore "capable of substantial or commercially significant noninfringing uses." *Cox*, 146 S. Ct. at 967; Frankle Decl. ¶¶ 40-46. Thus, even if Defendants' customers had used the datasets for some purpose other than training LLMs, there is insufficient evidence for a reasonable factfinder to conclude that Defendants actively encouraged infringement or provided a service tailored to infringement. Plaintiffs' claims for copyright infringement and inducement (Counts 3 and 4) therefore fail, and the Court should grant summary judgment on them in favor of Defendants.

### C.    Defendants Are Entitled to Summary Judgment on Infringement Claims Concerning Databricks' DBRX Models.

Plaintiffs' claim for direct infringement premised on the so-called "development" of Databricks' DBRX models does not raise any triable issue of material fact. Uncontradicted evidence establishes that Databricks did *not* use the Books3 dataset to train the DBRX models. Trott Decl. ¶¶ 21-22; Ex. 2 (Blakeney Dep.) at 488:8-16. Instead, Databricks used that dataset for unrelated AI research, including during testing of a new long-context fine-tuning technique. Frankle Decl. ¶¶ 31-35. There is thus no evidence on which a reasonable factfinder could find Defendants liable for direct copyright infringement with respect to the DBRX models, and Defendants are entitled to summary judgment on that claim.

## VI.    CONCLUSION

For the foregoing reasons, the Court should grant Defendants' summary judgment motion.


Dated: June 29, 2026                              FENWICK & WEST LLP


                                                  By:  /s/ Jedediah Wakefield
                                                      Jedediah Wakefield (CSB No. 178058)
                                                      jwakefield@fenwick.com
                                                      Ryan Kwock (CSB No. 336414)
                                                      rkwock@fenwick.com

DEFENDANTS' MOTION FOR                    25                    Case No.: 3:24-cv-01451-CRB
SUMMARY JUDGMENT

One Front Street, 33rd Floor
San Francisco, CA 94111
Telephone:        415.875.2300
Facsimile:        650.938.5200

David Hayes (CSB No. 122894)
dhayes@fenwick.com
Diana C. Buck (CSB No. 339314)
dbuck@fenwick.com
801 California Street
Mountain View, CA 94041
Telephone:        650.988.8500
Facsimile:        650.938.5200

Jonathan T. McMichael (CSB No. 304737)
jmcmichael@fenwick.com
Deena Feit (admitted *pro hac vice*)
dfeit@fenwick.com
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone:        206.389.4510
Facsimile:        650.938.5200

Charles Moulins (admitted *pro hac vice*)
cmoulins@fenwick.com
Justine Vandermel (admitted *pro hac vice*)
justine.vandermel@fenwick.com
902 Broadway, 18th Floor
New York, NY 10010
Telephone:        212.430.2600
Facsimile:        650.938.5200

Zachary Harned (CSB No. 335898)
zharned@fenwick.com
730 Arizona Avenue, 1st Floor
Santa Monica, CA 90401
Telephone:        310.434.5400
Facsimile:        650.938.5200

*Attorneys for Defendants*
DATABRICKS, INC., and
MOSAIC ML, LLC, formerly
MOSAIC ML, INC.

FENWICK & WEST LLP

DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT                    26                    Case No.: 3:24-cv-01451-CRB