# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

- - - - - - - - - - - - - - - - x

In Re: Mosaic LLM Litigation  : Master File Case No.

                                       : 3:24-cv-01451-CRB

- - - - - - - - - - - - - - - - x


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


Videotaped deposition of Mark Lawrence Seeley

Boston, Massachusetts

April 30, 2026

9:06 a.m.


Job No.: 630920

Pages: 1 - 199

Reported By: Alan H. Brock, RDR, CRR

Accompanying me here today is also William Castillo Guardado, also of the Saveri Law Firm.

MR. WAKEFIELD:  We will also say that on the Zoom also attending are Shayon Ghosh from Databricks, counsel at Databricks, and Professor Hersh.

THE VIDEOGRAPHER:  The court reporter today is Alan Brock, representing Planet Depos.  The witness will now be sworn.

MARK LAWRENCE SEELEY, being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. WAKEFIELD:

Q.   Good morning, Mr. Seeley.

A.   Good morning.

Q.   You've just given an oath, and that's the same oath you would give if you were testifying in court.  You understand that?

A.   I do.

Q.   Could you state your full name for the record.

A.   Mark Lawrence Seeley.

Q.   And what is your current residence address?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Mark Lawrence Seeley

Conducted on April 30, 2026                                    12

Q.   Did I say privacy?                              09:12:21

A.   You said privacy, yes.                          09:12:23

Q.   I keep doing that.  I will try not to.          09:12:24
Piracy.                                              09:12:27

      And maybe we can jump to a definition that     09:12:28
you provide at Paragraph 16 --                       09:12:33

A.   I thought I did that somewhere.                 09:12:37

Q.   Page 4.                                         09:12:39

A.   So in my report and Paragraph 16 --             09:12:44

      MR. YOUNG:  Hold on.  There's not a            09:12:47
question pending; right?                             09:12:48

      MR. WAKEFIELD:  I can ask a question.          09:12:50

      MR. YOUNG:  Thank you.                         09:12:52

Q.   But you define piracy as the unauthorized       09:12:53
copying, downloading, or distribution of copyrighted 09:12:57
works, including book content, without permission from 09:13:01
the rightsholder.                                    09:13:04

A.   That is correct.                                09:13:06

Q.   And is that a definition you used -- or let     09:13:06
me ask that question differently.                    09:13:10

      Is that the definition that you used           09:13:12
throughout your report?                              09:13:14

A.   I believe so, yes.                              09:13:15

Q.   And do you stand by that definition today?      09:13:16

A.   I do.                                           09:13:18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Mark Lawrence Seeley
Conducted on April 30, 2026                54

publishers already were offering e-books.

A.    Correct.

Q.    But you didn't measure whether demand for e-books from consumers had gone up or not; correct?

A.    That sounds like an economist article.  So this was not an economist article.

Q.    And you're not an economist.

A.    Correct.

Q.    And you're not an accountant; correct?

A.    I'm not that, either.

Q.    And if you wanted to actually do a study on whether Google Books affected demand for existing channels of lawful e-book purchases, is that the kind of thing an economist could do?

        MR. YOUNG:  Form.  Go ahead.

A.    I think so.  That sounds like a good article for an economist.  But maybe we should ask Dr. Hersh, if he's still on the call.

Q.    Speaking of Dr. Hersh, since you mentioned him:  I think you read his rebuttal report; correct?

A.    I did.

Q.    And you also cited in your materials relied on a paper that he co-authored; correct?

A.    That's correct.

Q.    You believe he's qualified as an economist --

philosophy.  I think that had to do with -- I'm not sure what it had to do with.  But anyway, bachelor of philosophy.

Q.   Not a science degree?

A.   Correct.

Q.   Have you ever published a peer-reviewed article?

A.   No.  You see most of the citations and chapters in books that I've done, but none of those were peer-reviewed articles.

Q.   Have you ever conducted empirical economic research?

A.   I have not.

Q.   Have you ever performed a regression analysis?

A.   I have not.

Q.   Have you ever performed econometric modeling?

A.   No.

Q.   Have you ever performed quantitative market impact studies?

A.   I'm not sure what that is, but I'm sure I did not.

Q.   Have you ever performed a survey -- of, for example, author-user behaviors?

A.   No.  I think I might have done surveys of my

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Mark Lawrence Seeley
Conducted on April 30, 2026                              96

Q.   And do you use Google for searching?                11:47:03

A.   I do.                                               11:47:06

Q.   Have you used any LLM to have it write a            11:47:13
draft of something for you, for example?                 11:47:16

A.   No.                                                 11:47:18

Q.   Have you used Microsoft Copilot?                    11:47:25

A.   No.  I think they tried to get me to use it,        11:47:30
but I didn't sign up for it or something.  I get         11:47:34
annoying messages about Copilot from time to time.       11:47:37

Q.   Other than the use in connection with search,       11:47:45
like Internet search, are you aware of any of the        11:47:48
other applications for which LLMs like ChatGPT or        11:47:50
Google Gemini can be used?                               11:47:58

A.   I'm not aware of the entirety of uses, but it       11:48:04
seems to me that there appear to be many uses.           11:48:07

        MR. YOUNG:  I'm going to interlineate an         11:48:11
objection to form.                                       11:48:13

Q.   And are you -- do you believe that any of           11:48:14
those uses of LLMs are socially beneficial?              11:48:16

        MR. YOUNG:  Objection, form.                     11:48:22

A.   It could be.  I'd probably need to have more        11:48:26
information to be able to make an opinion, which would   11:48:28
then be disagreed with by the Supreme Court.  But I      11:48:31
haven't seen that yet.                                   11:48:36

Q.   I think we touched on this earlier, but in          11:48:44

connection with your engagement in this matter, did you do any studies of your own to determine whether there had been any displacement of sales of any of the authors' books from any of the defendants' activities in this case?

MR. YOUNG:  Objection to form.  Go ahead.

A.   No, I did not do any economic studies in that regard.

Q.   And you did not do any surveys?

A.   No.

Q.   Do you believe that lost sales can be analyzed in an economic analysis?

MR. YOUNG:  Objection, form.

A.   Yes, I think there's a number of ways that that could be done, yes.

Q.   Did you review any of the royalty reports of any of the authors in this case?

A.   No.

MR. YOUNG:  Objection.  Objection to form.

A.   No.  I believe that was the subject of some discussion, it might have been in the Tucker expert report.  But I did not review them myself, no.

Q.   And you haven't -- you didn't review any data on the plaintiffs' book sales at all; right?

A.   Correct.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Mark Lawrence Seeley

Conducted on April 30, 2026                          102

Q.   And in that instance, the pirated copy substitutes for the purchased copy.  Right?

MR. YOUNG:  Objection, form.

A.   Correct.

Q.   Did you do anything to analyze whether anything that Mosaic ML or Databricks did caused any lost sales of any books to general consumers?

MR. YOUNG:  Objection, form.

A.   So again, I did not do any economic analysis. What my report really focuses on is what publishers are trying to do in terms of anti-piracy work to maintain normal markets.  Certainly the downloading and the use of copyrighted books has the potential to harm that market that you were referring to for the individual purchase by the general consumer.

Q.   Are you aware of any evidence in this case that that actually happened as a result of anything that the defendants in this case did?

MR. YOUNG:  Objection to form.

A.   So again, I wasn't asked to opine that, and I did not do any economic studies to that effect, no.

Q.   You're not aware of any evidence that a general consumer chose not to purchase a book because of anything that Mosaic or Databricks did; right?

MR. YOUNG:  Form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Mark Lawrence Seeley
Conducted on April 30, 2026                    103

A.   What I do know from the evidence in the case is that there were a number of users of the datasets put together by the defendants, and what none of us probably know is exactly what those users did with that content.  It's theoretically possible that one of them used it for exactly the purpose that you're talking about, to create a copy of a copyrighted work in a book and to read it and consume it.

Q.   So other than that theoretical possibility, though, you're not aware of any evidence that that actually happened?

A.   I'm not.

MR. YOUNG:  Objection to form.

Q.   And you're not aware of any evidence of a general consumer using the MPT model to try to read a book instead of buying one; right?

A.   I'm not aware of it.

MR. YOUNG:  Objection to form.

A.   Same or similar answer.

Q.   Let's go to Paragraph 7 at Page 2 of your report.  About halfway down in that paragraph you say that, "Databricks and Mosaic have been at the heart of this new model of piracy by downloading and using the Books3 dataset containing unauthorized copies of books, and by acting as a shadow library by

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Mark Lawrence Seeley

Conducted on April 30, 2026                                    107

A.   By infringing the copyright of the works in question, I suppose so.  I'm not sure that would be a wise thing to do.  But yes, I suppose so.

Q.   Unless it's fair use; right?

You are aware that in the Kadrey versus Meta case the court held that it was fair use to use the Books3 dataset to train the Llama model; correct?

MR. YOUNG:  Objection, form.

A.   I'm aware that there was that decision, I'm also aware that there are -- what? -- more than 30 cases pending in this environment.  So it seems to me to be somewhat early days.

Q.   You mentioned HuggingFace.  So at some point the Books3 dataset was made available for download from HuggingFace.com?

A.   That's my understanding, yes.

Q.   And HuggingFace is a website used by the AI development community; correct?

MR. YOUNG:  Objection to form.

A.   I think that it does indicate that somewhere, but I....

Q.   Do you consider HuggingFace itself to be a shadow library?

MR. YOUNG:  Objection, form.

A.   No, I don't think -- I think it's some type

of intermediary, and there may be something that attaches in terms of responsibilities and perhaps legal dimensions to that as an intermediary.  But no, I think it operates differently than a shadow library.

Q.   Do you believe that EleutherAI operates as a shadow library or something else?

MR. YOUNG:  Objection, form.

A.   Same answer for Eleuther.

Q.   Same for HuggingFace?

A.   Yes.

Q.   You mention in your report that the use of Books3 expanded together -- sorry, start that over.

You mention in your report that the use of Books3 expanded further when TogetherAI, an AI development company, released the RedPajama dataset in April 2023.  Do you recall that?

A.   That sounds correct, yes.

MR. YOUNG:  Objection, form.

Q.   And if you'd like, you can refer to Paragraph 38 of your report.

MR. YOUNG:  I was going to ask counsel where are you looking at.

Q.   And TogetherAI was, as you put it, an AI development company?

A.   Yes, that's what I said, yes.

12:06:02
12:06:06
12:06:09
12:06:12
12:06:18
12:06:21
12:06:23
12:06:23
12:06:25
12:06:30
12:06:37
12:06:41
12:06:44
12:06:47
12:06:53
12:06:58
12:07:00
12:07:01
12:07:02
12:07:05
12:07:07
12:07:08
12:07:18
12:07:24
12:07:25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Mark Lawrence Seeley
Conducted on April 30, 2026                          109

Q.   Are you aware that TogetherAI launched RedPajama with support from academic institutions?

A.   I'm not aware.

MR. YOUNG:  Objection, form.

A.   No.

MR. WAKEFIELD:  We can go to Tab 18.

(Exhibit 137 marked for identification.)

MR. YOUNG:  Why don't you take a skim through.

Q.   Okay, you have Exhibit 137 in front of you?

A.   I do.

Q.   And I'll represent that this is a page from the TogetherAI website announcing RedPajama.  Have you seen this before?

A.   I have not.

Q.   Would you consider TogetherAI to have operated what you call a shadow library?

MR. YOUNG:  Objection, form.

A.   Well, again, in terms of the characteristics of shadow libraries, what I've noticed on the third page -- fourth page -- no, third page, is a bit of ambiguity about where books come from.  So it is fairly specific about CommonCrawl, GitHub, Wikipedia, but it's a little bit unclear about what they mean when they just say "books."

So if one of the characteristics of shadow libraries, as I've said, is a lack of transparency about where their content is coming from and what the content is -- at least where the content is coming from, anyway -- then this has that characteristic. But it doesn't have the other characteristics that I associate with shadow libraries.

Q.   It's not operated in a country with no rule of law; right?

A.   Right.

MR. YOUNG:  Objection to form.

Q.   It doesn't hide the people behind it?

MR. YOUNG:  Objection to form.

A.   Right.

Q.   And to your knowledge did TogetherAI in releasing RedPajama provide any sort of searchable downloadable library of books?

MR. YOUNG:  Objection, form.

A.   I don't think they provided a database that a general consumer could search for books, no.

Q.   And speaking of the characteristics of the shadow libraries, there are acknowledgements -- if you go to Page 4 of 6 in Exhibit 137.

A.   I'm not seeing the pagination.

Q.   It's at the bottom right of the page.  It

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Mark Lawrence Seeley
Conducted on April 30, 2026                                        199

CERTIFICATE OF COURT REPORTER


        I, Alan H. Brock, Registered Diplomate Reporter and Notary Public, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my supervision; that reading and signing was not requested; and that I am neither counsel for nor related to nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 1st day of May, 2026.

        My commission expires March 25, 2027.




_____

Alan H. Brock, RDR, CRR