[Counsel on signature pages]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

*In Re Mosaic LLM Litigation*

Case No. 3:24-cv-01451-CRB
Consolidated with Case No. 3:24-cv-02653-CRB

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

Judge: Hon. Charles R. Breyer

Date:        October 30, 2026
Time:        10:00 a.m.
Location:  Courtroom 6, 17th Floor

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT....................vi

MEMORANDUM OF POINTS AND AUTHORITIES..................................................................1

I.      STATEMENT OF ISSUES TO BE DECIDED ........................................................1

II.     INTRODUCTION ...................................................................................................1

III.    FACTUAL BACKGROUND ..................................................................................3

       A.      Author Plaintiffs........................................................................................3

       B.      Defendants .................................................................................................3

       C.      Books3: A Pirate Library That Defendants Took for Free ........................4

       D.      Defendants Avoided Paying for Hundreds of Thousands of Books By Downloading Them for Free.....................................................................5

       E.      Defendants Created and Operated a Public Repository for Unauthorized Distribution of Plaintiffs' Books ...................................................6

       F.      Defendants Profited from Their Unlawful Acts.........................................8

IV.     LEGAL STANDARD FOR SUMMARY JUDGMENT, COPYRIGHT INFRINGEMENT, AND FAIR USE ....................................................................9

V.      ARGUMENT ........................................................................................................10

       A.      Plaintiffs Own Valid Copyrights.............................................................10

       B.      Defendants' Downloading of Permanent Copies of Plaintiffs' Works Without Paying Was Copyright Infringement..................................11

              1.      Defendants Reproduced Plaintiffs' Works by Obtaining Unauthorized Copies .................................................................11

              2.      Defendants' Unauthorized Downloading of Plaintiffs' Books Without Paying Was Not Fair Use As a Matter of Law ...........................................11

                   a.      Factor One: Databricks' Piracy was Non-Transformative and Commercial..................................................11

                   b.      Factor Two: Plaintiffs' Copyrighted Works are at the Core of Copyright ......................................................15

                   c.      Factor Three: Databricks Pirated Plaintiffs' Copyrighted Works in Their Entirety ............................................15

                   d.      Factor Four: Piracy Harms the Market for Plaintiffs' Copyrighted Works .................................................15

C.    Defendants' Creation and Operation of Libraries of Pirated Books Was Copyright Infringement...............................................................................................................17

    1.    Defendants Reproduced and Distributed Plaintiffs' Copyrighted Works in The Course of Creating and Operating Its Commercial Library ................17

    2.    Defendants' Creation and Operation of a Pirate Library Was Not Fair Use as a Matter of Law ...............................................................................................18

        a.    Factor One: Defendants Creation and Operation of a Commercial Library Was Non-transformative and Threatens the Book Market. 19

        b.    Factor Two: Plaintiffs' Copyrighted Works are at the Core of Copyright Protection..................................................................................22

        c.    Factor Three: Defendants Copied and Distributed Plaintiffs' Entire Works .......................................................................................................22

        d.    Factor Four: Defendants' Pirate Library Harms the Market for Plaintiffs' Copyrighted Works..........................................................23

VI.    CONCLUSION.................................................................................................................25

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ...................................................................... *passim*

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994 ............................................................................. 14

*Am. Soc'y for Testing & Materials v. UpCodes, Inc.*,
172 F.4th 253 (3d Cir. 2026) ........................................................................ 24

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ...................................................................................... *passim*

*Atl. Recording Corp. v. Anna's Archive*,
2026 WL 146201 (S.D.N.Y. Jan. 20, 2026) ................................................. 8

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) .......................................................................... 23, 25

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ........................................................ *passim*

*BMG Music v. Gonzalez*,
430 F.3d 888 (7th Cir. 2005) ........................................................................ 11, 12, 13, 16

*Campbell v Acuff Rose Music Inc.*,
510 U.S. 569 (1994) ...................................................................................... 12, 15, 22

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) ...................................................................... 11

*Dow Jones & Co., Inc. v. Harris*,
749 F. Supp. 3d 776 (W.D. Tex. 2024) ......................................................... 23

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020) ........................................................................ 9, 16

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
109 F.3d 1394 (9th Cir. 1997) ...................................................................... 15, 22

*DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*,
870 F.3d 978 (9th Cir. 2017) ........................................................................ 10

*Fox News Network, LLC v. TVeyes, Inc.*,
883 F.3d 169 (2d Cir. 2018) .......................................................................... 14, 18

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021)...................................................................................................20

*GoPro, Inc. v. 360Heros, Inc.*,
291 F. Supp. 3d 1060 (N.D. Cal. 2017) ...................................................................9

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) ..................................................................18, 19, 20, 23

*Hachette Book Grp., Inc. v. Internet Archive*,
664 F. Supp. 3d 370 (S.D.N.Y. 2023), *aff'd*, 115 F.4th 163 (2d Cir. 2024)................15, 19, 22

*Harper & Row Publishers, Inc. v. Nation Enters*,
471 U.S. 539 (1985)...............................................................................................17

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) ...................................................................14

*L.A. News Serv. v. Reuters Television Int'l, Ltd.*,
149 F.3d 987 (9th Cir. 1998) ..........................................................................2, 21, 23

*L.A. News Serv. v. Tullo*,
973 F.2d 791 (9th Cir. 1992) .......................................................................2, 20, 21, 22

*Leadsinger, Inc. v. BMG Music Pub.*,
512 F.3d 522 (9th Cir. 2008) ...................................................................................9

*McGucken v. Pub Ocean Ltd.*,
42 F.4th 1149 (9th Cir. 2022) ............................................................................16, 23

*Monge v. Maya Mags., Inc.*,
688 F.3d 1164 (9th Cir. 2012) ................................................................................10

*O'Neil v. Ratajkowski*,
563 F. Supp. 3d 112 (S.D.N.Y. 2021)) ....................................................................9

*Rearden LLC v. The Walt Disney Co.*,
2024 WL 3956318 (N.D. Cal. Aug. 26, 2024) ........................................................10

*Sedlik v. Drachenberg*,
2023 WL 6787447 (C.D. Cal. Oct. 10, 2023)...........................................................9

*Sony Corp. of Am. v. Universal City Studios*,
464 U.S. 417 (1984)...............................................................................................21

*Three Boys Music Corp. v. Bolton*,
212 F.3d 477 (9th Cir. 2000) ..................................................................................10

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000)........................................................18, 19, 23

*United States v. Slater*,
348 F.3d 667 (7th Cir. 2003) ...............................................................................10, 18, 19

*Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*,
447 F.3d 769 (9th Cir. 2006) ......................................................................................12, 13

**Federal Statutes**

17 U.S.C. § 106(1) ..............................................................................................................17, 18

17 U.S.C. § 106(3) ..............................................................................................................17, 18

17 U.S.C. § 107....................................................................................................................10, 11

17 U.S.C. § 107(4) ..............................................................................................................16, 23

17 U.S.C. § 501(b) .....................................................................................................................10

DMCA.............................................................................................................................................4

**Rules**

Fed. R. Civ. P. § 30(b)(6)...........................................................................................................7

Fed. R. Civ. P. § 56(a) ................................................................................................................9

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on October 30, 2026, at 10:00 a.m. or as soon thereafter as the parties may be heard, before the Hon. Charles R. Breyer, District Judge, U.S. District Court for the Northern District of California, in Courtroom 6 – 17th Floor, 450 Golden Gate Ave., San Francisco, CA 94102, Plaintiffs' Stewart O'Nan, Abdi Nazemian, Brian Keene, Rebecca Makkai, and Jason Reynolds (collectively, "Plaintiffs") will and hereby do move this Court for an order granting partial summary judgment against Defendants Databricks, Inc. and MosaicML, LLC.

Plaintiffs seek an order pursuant to Federal Rule of Civil Procedure 56 granting their Motion for Partial Summary Judgment, on the grounds that Defendants (1) infringed Plaintiffs' exclusive rights to reproduce their Copyrighted Works by unlawfully downloading those Works; and (2) infringed Plaintiffs' exclusive rights to reproduce and distribute their Copyrighted Works by uploading their Works to public storage repositories, by  making them available to third parties, and distributing them to third parties.

Plaintiffs' Motion for Partial Summary Judgment ("Motion") is based on this Notice of Motion and the accompanying Memorandum of Points and Authorities; the Declaration of William W. Castillo Guardado in Support of Plaintiffs Motion for Partial Summary Judgment, and the exhibits attached to the declaration; all pleadings and papers in this action, and oral argument of counsel.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    STATEMENT OF ISSUES TO BE DECIDED

1.    Whether Defendants' downloading of Plaintiffs' books from an unauthorized online source to avoid paying a purchase price was copyright infringement.

2.    Whether Defendants' reproduction and distribution of Plaintiffs' books to create and operate a commercial library on public cloud spaces, without any compensation to Plaintiffs, was copyright infringement.

### II.    INTRODUCTION

The undisputed facts show straightforward instances of copyright infringement at a massive scale. Defendants are Databricks, a $130+ billion technology company, and Mosaic, a startup that Databricks acquired in July 2023. Defendants downloaded copies of Plaintiffs' books—and over 190,000 others—from an unauthorized online source called "Books3" to avoid paying a purchase price. Defendants used these copyrighted books to create and stock a commercial library hosted on cloud storage platforms. This commercial library was a ██████████ that Defendants ████████████████████████ ██████████ Ex. 65;[1] Ex. 28 (Databricks Resp. to ROG 46); Ex. 49. While Defendants owned no copyright interest in Plaintiffs' Works, they still took the liberty of distributing their commercial library to third parties and made it public so that anyone could download Plaintiffs' Works, to use for whatever purpose, without paying Plaintiffs a cent.

There is no dispute of material fact on the elements of a *prima facie* case of copyright infringement. Defendants do not contest that Plaintiffs are legal or beneficial owners of the asserted Works. Nor can Defendants dispute that they copied Plaintiffs' Works for free and distributed them through public cloud spaces. Instead, Defendants invoke fair use. But there is nothing fair about Defendants' use here.

In evaluating a fair use defense, the focus is the "specific use" of a copyrighted work. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533 (2023). Where defendants have used copyrighted works in "multiple ways," the Court must evaluate each use separately, as "[t]he same copying may be fair when used for one purpose but not another." *Id*. Two of Defendants' uses of Plaintiffs' Works—

---

[1] All exhibit citations are to the Declaration of William W. Castillo Guardado filed concurrently herewith.

the initial free download and the reproduction and distribution of those Works to stock a commercial library—are not fair use as a matter of law.

*First,* the free downloads. Throughout the internet age, courts have consistently held that there is nothing "fair" about downloading unauthorized copyrighted content for free from the internet. In *A&M Records, Inc. v. Napster, Inc.,* the Ninth Circuit affirmed the district court's conclusion that Napster's end users enjoyed no fair use defense because they took "for free something they would ordinarily have to buy." 239 F.3d 1004, 1015 (9th Cir. 2001) (quotation omitted). In *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1015 (N.D. Cal. 2025), Judge Alsup confirmed that multibillion-dollar technology companies are subject to the same rules of copyright as everyone else. There, Anthropic, like Defendants here, claimed that its decision to download books for free from unauthorized sources (including Books3) was fair use because those books were later used for large language model training and research—a use that Defendants (incorrectly) claim is transformative. As *Bartz* recognized, any later use of the pirated books is irrelevant: "[T]he person who copies" a book from "a pirate site has infringed already, full stop . . . . Such piracy of otherwise available copies is inherently, irredeemably infringing even if the pirated copies are immediately used for the transformative use and immediately discarded." *Id*. at 1025. The *Bartz* decision—and the long line of decisions it follows—forecloses Defendants' effort to escape liability for their Napster-style downloading of pirated materials.

*Second*, the copying of Plaintiffs' Works to stock and operate a commercial library. This is even less defensible. Courts routinely reject fair use defenses when defendants share copyrighted works with third parties or make them available to the public. Defendants will claim that this is fair use based on speculation that those who accessed Plaintiffs' books used them for LLM training. This assertion, even if true, is irrelevant. The Ninth Circuit has repeatedly rejected the argument that an infringer can escape liability simply because third-party recipients of unauthorized copies may have engaged in fair-use activity. *See L.A. News Serv. v. Tullo*, 973 F.2d 791, 797 (9th Cir. 1992) (distribution of news clips to parties conducting "research, scholarship, and private study" was not fair use because "the ultimate use to which the customer puts the tape is irrelevant"); *L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 994 (9th Cir. 1998) ("[T]he question of whether defendants' copying and transmission of the works constitutes fair use is distinct from whether their subscribers' broadcasts of the works are fair use."). The

undisputed facts here establish a *prima facie* case of copyright infringement to which no fair use defense applies. The Court should enter summary judgment, finding that Defendants directly infringed Plaintiffs' Works when they: (1) downloaded free, pirated copies of Plaintiffs' works; and (2) copied them to stock a commercial library that it distributed to customers and made available to the public; and that neither use was fair.

To be sure, this case also presents a third, consequential liability issue that will be resolved after factfinding and at trial: Whether Defendants infringed Plaintiffs' copyrights when they used them to train a model called "StoryWriter" designed to write fictional stories like Plaintiffs' Works. This question will turn on a number of contested factual questions, including questions about the existence of a licensing market for AI training and the potential market impact if Defendants' conduct was widespread.

While Defendants' liability for its AI training use of Plaintiffs' Works presents multiple triable issues, Defendants' unlawful acquisition and operation of a commercial library do not. For that reason, the Court should grant partial summary judgment in Plaintiffs' favor on these two distinct instances of copyright infringement.

## III.   FACTUAL BACKGROUND

### A.   Author Plaintiffs

Plaintiffs are book authors and professional writers. Stewart O'Nan is a prolific author of literary and historical fiction. Ex. 35. Rebecca Makkai has written four novels, including a 2019 Pulitzer Prize finalist. Exs. 37, 30. Brian Keene writes horror novels and is a two-time winner of the Bram Stoker Award. Ex. 42. Abdi Nazemian is an award-winning young adult author. Ex. 69. Jason Reynolds is a #1 New York Times bestselling author and decorated young adult novelist. Ex. 38.

Each of the Plaintiffs is a legal or beneficial owner of the copyrights in one or more of the 28 books that Mosaic and Databricks ███████████████████████████. Ex. 1; Ex. 11 ¶ 14 (Shan Rep.). Each of the 28 books is available for sale in hard copy and e-book formats through Amazon and other retailers. Exs. 20, 21, 23-24 (Pl. Resp. to Interrog. Nos. 11); Ex. 22 (Pl. Resp. to Interrog. Nos. 14).

### B.   Defendants

Defendant Mosaic was ███████████████████████████ ███████████. Ex. 18 ¶ 10(a). Its core offering, ███████████████████████

████████████████████████████████[2] Ex. 4 (Tang Dep. Tr. Vol. 1) 44:21–45:7. Mosaic offered "████████████████████████████████████████████████ ███████████████████████████████████" Ex. 18 ¶ 33. Those LLMs were trained using Plaintiffs' Works. Ex. 11 ¶ 15.

Defendant Databricks, Inc. is a ██████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████" Ex. 12 ¶ 27; Ex. 17 ¶ 31. Databricks acquired Mosaic in July of 2023 for ████████. Ex. 57; Ex. 4 (Tang Dep. Tr.) 259:19–21, seeking to █████████████████████████████████████ ██████████. Ex. 5 (Frankle Dep. Tr.) 122: 5–13. In the acquisition, Databricks █████████ █████████. Ex. 4 (Tang Dep. Tr. Vol. 1) 38:1–39:1.

This brief will refer to Databricks and Mosaic as "Defendants" collectively and will name each entity separately where the distinction is relevant.

### C.    Books3: A Pirate Library That Defendants Took for Free

This case concerns Defendants' obtaining, using, and distributing unauthorized copies of copyrighted books sourced from infamous ███████████████—modern-day Napsters for books. *See* Ex. 9 ¶ 22. ████████████████████████████████████████████████████████████ ████████████████████████████████████████. Ex. 9 ¶¶ 26-27; 31-32. Defendants acquired a dataset called "Books3," which is 196,640 books sourced directly from a shadow library called "Bibliotik." Exs. 9, 11 ¶¶ 35–36; ¶ 19. The creator of Books3, Shawn Presser, announced that Books3 was sourced from "all of bibliotik." Ex. 15 ¶ 24 & n.30; *see also* Ex. 82. Presser's announcement also provided a link to a "DMCA Policy" associated with Books3, which directed users to a video of a profane sex act, a joke confirming that Books3 openly flouts US Copyright law. Ex. 82; 9 ¶ 40 & n.48.

Books3 was incorporated into two larger datasets, The Pile and RedPajama. Ex. 11 ¶¶ 19; 23. The creators of The Pile described Books3 as a "copy of the contents of [] Bibliotik," and explained that they used Books3 because the Bibliotik corpus contains "a mix of fiction and nonfiction books[.]" Ex. 67.

---

[2] While the parties contest the nature of LLMs as part of their dispute over whether Defendants' use of Plaintiffs' works for training is fair use, it is undisputed that LLMs are a type of AI model which trains on text and which output text in response to user inputs. Ex. 11 ¶ 43.

██████████████████████████, and thus in both RedPajama and The Pile. Ex. 11 ¶ 14 ("████████████ ████████████████████████████").

Websites began taking down Books3 due to copyright concerns around July 2023; it is no longer included in RedPajama or The Pile. Ex. 11 ¶ 19 n.4.

**D.    Defendants Avoided Paying for Hundreds of Thousands of Books By Downloading Them for Free**

Defendants could have acquired Plaintiffs' Works and others lawfully. They had "███████████ ███████████" to "██████████████████████████████████" Ex. 3 (Blakeney Dep. Tr.) 189:9–11, 191:3–9. Ultimately, while Defendants were "██████████████████" for books, they decided that ██████████████████████████████████████████████████" Ex. 3 (Blakeney Dep. Tr.) 191:3–14.

So Defendants instead turned to piracy. In ██████████████████████████ The Pile and in ██████████████████ RedPajama. Exs. 11 ¶ 24, 43, 44.

Mosaic knew its conduct was illegal. One week after downloading RedPajama, Mosaic ████████ ███████████████████████████████████████:

- On ███████████, Mosaic ██████████████████████████████████████████." Ex. 51 ¶ 34.

- About a week later, on May 3, Mosaic noted that "███████████████████████████████ ██████████████" that it was the data source for the LLM. Ex. 34.

Around July 2023, websites began to remove Books3 due to reported copyright infringement. *See* Ex. 11 ¶ 19 n.4. ██████████████████████████████████████████ Ex. 66. ██████████ ██████████████████████████████████ Ex. 64 at 4. (███████████████████████████ ██████████████████████).

████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

**E.     Defendants Created and Operated a Public Repository for Unauthorized Distribution of Plaintiffs' Books**

One of the reasons Defendants downloaded Plaintiffs' Works (and hundreds of thousands of others) was that they wanted to "██████" them—that is, ████████████████████████████ ███████████████████████. *See* Exs. 51 at 33, 55 at 16. As early as ████████, Mosaic ████ ████████████ to cloud-storage "buckets" (*i.e.*, cloud storage folders) hosted by AWS and OCI. Exs., 11, 36, 73; Ex. 3 (Blakeney Dep.) 420:12–425:7.

███████████████████████████████████████████ ████████████████ Ex. 11 ¶ 14 (Shan Rep.). The plain text format is exactly what it sounds like—human-readable text of Plaintiffs' books. For example, a plain-text copy of Plaintiff Brian Keene's *Ghost Walk* found in Defendants' files can be viewed at Exhibit 48. ████████████████ ███████████████████████████████████████████ ███████████████████████████ Ex. 11 ¶ 45 (Shan Rep.); Ex. 74 (Havens Dep. Tr.) 32:21-33:2. All of the files are saved in a data format called "████████████" (MDS), which Mosaic ████████████████████████████. Ex. 11 ¶ 45 (Shan Rep.). ████████ ███████████████████████████████████████████ ███████████████████████. Ex. 11 ¶¶ 45, 87 (Shan Rep.). ████████████ ███████████████████████████████████████. Ex. 11 ¶¶ 45, 88–90; Ex. 10 ¶¶ 10–12.

Mosaic made its unauthorized library public for a commercial purpose: ██████████ ███████████████████████████████████████████ ████████" Ex. 65 at 3. Providing datasets publicly ████████████████████████ ███████████████████████████████████████" Ex. 52 at 1. By streamlining data acquisition, Defendants ████████████████████████████████████████ ████████████████████████████████████" Ex. 65 at 2. Defendants provided Plaintiffs' Works to their customers and made them available to the public in two ways.

*First,* Defendants ████████████████████████████████████████ ███████████████████████████████████████████



. Ex. 11 ¶¶ 66–68. Mosaic ██████████████████████████ ████████████████████████████████ Ex. 11 ¶¶ 54–59; Ex. 53 (confirming ██████████ ██████████████████████████████). At least ████████████ ██████████████████████████████ Ex. 63 (Mosaic co-founder Hanlin Tang ████████████████████████████████).

**Second,** ███████████████████████████████████. *See, e.g.,* Ex. 45 (██████ ██████████████████████████████). AWS buckets are private by default—allowing access only for those with specific credentials—but Defendants ████████ ████████████████████████████████████████████████. Ex. 11 ¶¶ 51, 60. Public buckets can be found by typing a URL into the AWS interface. Anyone with an ordinary AWS account who had the path ██████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████. *See* Ex. 10 ¶ 32 & n.46 (Shan Rebuttal Rep.), Ex. 11 ¶ 65 (Shan Rep.); Ex. 4 (Tang Dep. Tr. Vol. 1) 113:6–9; Ex. 60. Any person can set up an AWS account in minutes; it takes about as much time and information (name, email, credit card details) as setting up an Amazon Prime Account. ████████████████████████ █████████████████████████████████████.[3] Ex. 28 (Databricks Response to ROG 46). Defendants █████████████████████████████████████████. The opposite: ████████████████████████████████████ *See, e.g.,* Ex. 61. According to their Rule 30(b)(6) testimony, Defendants ████████████████████████ ████████████████████████████ Ex. 4 (Tang Dep. Tr., Vol. 1) 94:8-95:6; *see also* Ex. 10 ¶ 28 (Shan Rebuttal Rep.).

Defendants' public buckets were accessible not just to Defendants' customers and direct contacts, but also all current AWS users and any other person who took the few minutes to set up an AWS account.

---

[3] Those enterprise customers included: ██████████, Ex. 49 at -962, ██████████, Ex. 60, ████████, Ex. 46, ████████, Ex. 47, ████████, Ex. 50, ████████, Ex. 58, ████████████, Ex. 54, and ████████, Ex. 64. ████████. Ex. 72.

The buckets ████████████████████████████████████████████. Plaintiffs' expert Shawn Shan ████████████████████████████████████████████████. Ex. 10 ¶¶ 24–25 (Shan Rebuttal Rep.). Defendants' buckets ███████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████. Ex. 10 ¶ 25(Shan Rebuttal Rep.). Once located, accessing the books contained within the buckets is trivial.

Academic studies confirm that ████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████. Ex. 10 ¶ 26. These actors ███████████ ██████████████████████████████████████████████████████. Proprietors of illegal shadow libraries are exactly the types of actors who would target a public S3 bucket with hundreds of thousands of books. These actors are technically savvy. For example, actors working on behalf of Anna's Archive recently hacked Spotify to pirate millions of music files. *See Atl. Recording Corp. v. Anna's Archive*, 2026 WL 146201, at *1 (S.D.N.Y. Jan. 20, 2026) (issuing TRO against Anna's Archive post-hack). For such actors, ████████████████████████████████████████████████ ███████████████████████████. Ex. 10 ¶¶ 21, 23 (Shan Rebuttal Rep.).

When Databricks bought Mosaic, ████████████████████████████. *See* Ex. 62. Databricks ██████████████████████████████████████████████████ ████████████████████████████████" Exs. 58, 61, 64. Neither Defendant ████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████" Ex. 75 (Rao Dep. Tr.) 74:24–75:5. Nor has either Defendant ███████████████████████████████████████████████████████ ██████████████████████████████████████. Ex. 5 (Frankle Dep. Tr.) 217:20-218:4. The upshot of Defendants' business and ████████ decision to make its commercial library public was to make Plaintiffs' Works readily accessible to everyone.

### F.    Defendants Profited from Their Unlawful Acts

In 2023, Mosaic ████████████████████████████████████████. Ex.



4 (Tang Dep. Tr.) 257:20–258:9. Those services were . Ex. 55 at 16. Mosaic then . *See* Exs. 4, 51 at 33. (Tang Dep Tr.) 259:8–21. Databricks, in turn, realized substantial profits by stepping into Mosaic's shoes as a distributor of pirated works. Databricks' acquisition of Mosaic allowed it to Ex. 19 (Databricks Resp. to Interrog. Set 1, No. 5).

## IV.    LEGAL STANDARD FOR SUMMARY JUDGMENT, COPYRIGHT INFRINGEMENT, AND FAIR USE

***Summary Judgment.*** Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is "well established that a court can resolve the issue of fair use on a motion for summary judgment when no material facts are in dispute." *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008) (citations omitted).

***Copyright Infringement.*** Plaintiffs bear the burden of establishing copyright infringement. At summary judgment, plaintiffs must therefore show that there is no genuine dispute as to (1) ownership of a valid copyright and (2) the copying of protected elements of that work, such that judgment must be granted as a matter of law. *See, e.g.*, *GoPro, Inc. v. 360Heros, Inc.*, 291 F. Supp. 3d 1060, 1067–68 (N.D. Cal. 2017).

***Fair Use.*** Defendants bear the burden of proof on their fair use defense. *See Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020). Because fair use is an affirmative defense, when a plaintiff challenges it on summary judgment, the plaintiff is entitled to summary judgment when the plaintiff shows that there is an absence of "'evidence to support an essential element of the non-moving party's case.'" *Sedlik v. Drachenberg*, 2023 WL 6787447, at *3 n.4 (C.D. Cal. Oct. 10, 2023) (quoting *O'Neil v. Ratajkowski*, 563 F. Supp. 3d 112 (S.D.N.Y. 2021)). In determining whether a particular use is fair, courts consider four factors: (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and

(4) "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. The Ninth Circuit regards the first and the fourth factors as the most important in the fair use analysis. *See Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1171 (9th Cir. 2012).

## V.    ARGUMENT

Defendants wanted books, including Plaintiffs' Works, so they copied them for free instead of paying for them. Then, Defendants made more copies of the books to build a commercial library of their own to distribute Plaintiffs' Works to their customers and the public. These are two independent, unequivocal acts of copyright infringement.

The principal dispute is over fair use. But there are no triable questions of fact on this issue, at least as to Defendants' unlawful acquisition and distribution of Plaintiffs' Works. A court considering a fair use defense must address each "specific use" of a work separately. *Warhol*, 598 U.S. at 533. As to both of the uses addressed in this motion—Defendants' unauthorized acquisition and subsequent creation and operation of a commercial library built on pirated books—Defendants' fair use defense "barely pass[es] the straight-face test." *United States v. Slater*, 348 F.3d 666, 669 (7th Cir. 2003) (rejecting fair use defense in case involving downloading copyrighted software "with the goal of making vast amounts of copyrighted software freely—and thus unlawfully—available"). There is nothing fair about unmitigated and unauthorized downloading and distribution. The Court should grant summary judgment in Plaintiffs' favor because Defendants infringed Plaintiffs' copyrights by (1) downloading Plaintiffs' Works without compensation or a license; and (2) creating and operating a commercial library using Plaintiffs' Works.

### A.    Plaintiffs Own Valid Copyrights

"A requisite element of any claim for copyright infringement is ownership of the copyright at the time of the alleged infringement." *Rearden LLC v. The Walt Disney Co.*, 2024 WL 3956318, at *3 (N.D. Cal. Aug. 26, 2024). Both legal and beneficial owners can bring infringement actions. *See* 17 U.S.C. § 501(b); *DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978, 982–83 (9th Cir. 2017).

There is no genuine dispute that Plaintiffs are the owners of the copyrights in their Works and that they registered their Works with the Copyright Office within five years of publication. Ex. 1 (Plaintiffs' copyright registrations); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 488–89 (9th Cir. 2000) ("Registration is prima facie evidence of the validity of a copyright."). Plaintiffs also receive royalties for

their Works. Exs. 77-81 (Pls.' Supp. Resp. to Interrog. No. 4, 14)

**B.      Defendants' Downloading of Permanent Copies of Plaintiffs' Works Without Paying Was Copyright Infringement.**

The first "use" on which Plaintiffs are entitled to summary judgment is Defendants' unauthorized acquisition of their copyrighted Works. Under *Warhol*, a court must consider each use separately. 598 U.S. at 533. "Pirating copies to build a research library without paying for it, and to retain copies should they prove useful for one thing or another, was its own use—and not a transformative one." *Bartz*, 787 F. Supp. 3d at 1026 (citations omitted).

**1.      Defendants Reproduced Plaintiffs' Works by Obtaining Unauthorized Copies**

Mosaic downloaded Plaintiffs' Copyrighted Works without paying a dime. "[D]ownloading copyrighted material" is an "infringing act[]" that violates the copyright holder's "right to reproduction." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013) (citing 17 U.S.C. § 106(1)).

Mosaic downloaded two libraries, The Pile and RedPajama, containing unauthorized, unpaid-for copies of books, including all 28 of Plaintiffs' Works. Ex. 29 (Databricks Resp. to Interrog. No. 34)



(admitting that "                                                            "); Ex. 11, ¶ 42. Defendants admit that Mosaic "                                   . Ex. 29 (Databricks Resp. to Interrog. No. 34). And they admit that                          . Ex. 3 (Blakeney Dep. Tr.) 191:3–14.

It is also undisputed that Databricks                          . *See* Ex. 62 at 4–5 (Frankle: "                          "); Ex. 39.

**2.      Defendants' Unauthorized Downloading of Plaintiffs' Books Without Paying Was Not Fair Use As a Matter of Law**

"[D]ownloading full copies of copyrighted material without compensation to authors cannot be deemed 'fair use'" because it is infringement, plain and simple. *BMG Music v. Gonzalez*, 430 F.3d 888, 891 (7th Cir. 2005); *see also Napster*, 239 F.3d at 1019 (affirming that downloading pirated music files was not fair use). That is exactly what Defendants did here. Consideration of the four 17 U.S.C. § 107 factors confirms this conclusion.

**a.      Factor One: Databricks' Piracy was Non-Transformative and Commercial**

The first factor is the purpose and character of the use. Under this factor, courts consider whether a defendant had a sufficient "independent justification" for a use, *Warhol*, 598 U.S. at 547; whether and the degree to which a use is "transformative"—that is, whether it "adds something new, with a further purpose or different character, altering the first with new expression, meaning or message," *Campbell v. Acuff-Rose Music Inc.*, 510 U.S. 569, 579 (1994); and "the commercial nature of the use," *Warhol*, 598 U.S. at 532–33. A commercial use weighs more strongly against fair use if it is likely to substitute for the original. *Id.* A defendant's ability to identify "a particularly compelling justification" is necessary where "an original work and copying use share the same or highly similar purposes" or "where wide dissemination" of a secondary work would "otherwise run the risk of substitution for the original[.]" *Id.* at 532, 547.

The law is clear: downloading a copyrighted work to avoid paying for it is non-transformative because it is inherently substitutive. The unlawful copy serves the "identical purpose as the original." *Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*, 447 F.3d 769, 778 (9th Cir. 2006). That has been the law for decades. In *Napster, Inc.*, the Ninth Circuit affirmed that Napster users—who downloaded copyrighted music through Napster's peer-to-peer network—committed non-transformative and substitutive copyright infringement. 239 F.3d at 1014-15 ("[D]ownloading MP3 files does not transform the copyrighted work."). Similarly, in *BMG Music*, the Seventh Circuit affirmed a district court's grant of summary judgment against an individual who downloaded permanent copies of hundreds of copyrighted songs to determine which ones she liked enough to buy at retail. 430 F.3d at 889–890. Judge Easterbrook explained that every download was independently substitutive: "A copy downloaded, played, and retained on one's hard drive for future use is a direct substitute for a purchased copy[.]" *Id.* at 890.

This long line of well-established case law is controlling here. Just like those who downloaded copyrighted content from Napster, the undisputed facts show that Mosaic ███████████ ███████████. Ex. 3 (Blakeney Dep. Tr.) 191:12–14 (stating that Databricks was "███████████████████████"). And it is undisputed that Defendants *could have* purchased lawful copies, and thus had no compelling justification to download copies for free. *See* Ex. 4 (Tang Dep. Tr.) 285:17–18 ("████████████ ██████████████████"); Exs. 20-21, 23-24 (Pls. Resp. to Interrog. No. 11); Ex. 22 (Pl. Resp. To Interrog. 14). (Plaintiffs' works were available for sale on Amazon); *see Warhol*, 598 U.S.

at 532, 547. Making free copies to avoid paying for copies is a nakedly commercial use and confirms Defendants' use was not transformative. *See Wall Data*, 447 F.3d at 779 ("A commercial use 'is demonstrated by a showing that repeated and exploitative unauthorized copies of copyrighted works were made to save the expense of purchasing authorized copies.'") (quoting *Napster*, 239 F.3d at 1015)). Defendants elected to download the books for free, and "piracy was the point: To build a central library that one could have paid for . . . but without paying for it." *Bartz*, 787 F. Supp. 3d at 1027.

Defendants' conduct is, in fact, worse than that of the internet pirates in *Napster* and *BMG* because it is far more commercial. Defendants here ███████████████████████████████████ ██████████████████████. Ex. 12, ¶ 21 & n.15. Mosaic's ██████████████ ████████████████████████████████████████████████████ ██████████████████████████" which are used by "customers." Ex. 56. What Defendants called ██████ ██████████████████████████. When one Databricks employee ██████████ █████████████████████████ of Books3, Databricks' Chief AI Scientist Frankle ██████ ████████████████████████████████████████████████████ ████████████████████████████████████" Ex. 62. Defendants' unquestionably ██████ ██████████████ commercial—and thus far less fair—than the that of the *Napster*- and *BMG*-era pirates.

Defendants will claim that their unauthorized downloading is protected fair use because, *after* they downloaded pirated copies, they used them for a supposedly "transformative" use—to maintain a library that Defendants used to LLM training and "research." But Judge Alsup squarely rejected this argument in *Bartz*, which involved the same Books3 dataset at issue here. As *Bartz* recognized, the act of "piracy of otherwise available copies" of books "is inherently, irredeemably infringing even if the pirated copies are immediately used for the transformative use and immediately discarded." 787 F. Supp. 3d at 1025. Like Anthropic, Defendants here downloaded Books3 to capitalize on a central library of books that it maintained permanently, even *after* Databricks ██████████████████████████████████ ██████. As in *Bartz*, Defendants decision of download Plaintiffs' Works to "build a research library without paying for it, and to retain copies should they prove useful for one thing or another, was its own use — and not a transformative one." *Id.* at 1026. This is not fair use.

One decision in this district—*Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal.

2025)—has held that the transformativeness of a party's downloading must be viewed with reference to the ultimate purpose for which the downloads were acquired. *Id.* at 1047. But *Kadrey*'s "ultimate use" test is of no help to Defendants here. For starters, unlike in *Kadrey*, where the court concluded that the sole purpose of Meta's downloading was for LLM training, 788 F. Supp. 3d at 1048, Defendants here acquired Plaintiffs' Works to put them to multiple *other* uses. Defendants admit they ██████████ ████████████████████████████████████████████ a purpose that is manifestly nontransformative. *See* Section V(B)(2)(a), *infra*; Ex. 49 at 4 (stating ██████████████████████ ████████████████████████████████ "); Ex. 40 (██████████████████████████████████ ██████ ); *see also* Ex. 41 (same). Furthermore, Databricks engineers ████████████████ ██████████████████████████████████████████████████████ ██████████████████████—the precise type of permanent "central library" use that Judge Alsup found nontransformative in *Bartz*. *See* Ex. 75 (Rao Dep. Tr.) 144:25-145:15 (██████████████ ██████████████ ); *Bartz*, 787 F. Supp. 3d at 1027.

In any event, the Supreme Court's *Warhol* decision requires a court to analyze each use separately, which requires separating the analysis of Defendants' initial downloading from its other downstream uses. *See Warhol*, 598 U.S. at 533 (fair use "requires an analysis of the specific 'use' of a copyrighted work . . . . The same copying may be fair when used for one purpose but not another."). Courts must construe the uses "narrowly enough to not 'swallow' distinguishable infringing uses." *Bartz*, 787 F. Supp. 3d at 1020 (quoting *Warhol*, 598 U.S. at 541).

The *Warhol* rule is well-settled. For decades, courts have routinely held that an arguably fair downstream use does not immunize first-order unlawful acquisition. In *Am. Geophysical Union v. Texaco Inc.*, for example, the Second Circuit explained that a company could not make unlimited photocopies of copyrighted articles solely because it did so in pursuit of "research." 60 F.3d 913, 924 (2d Cir. 1994). Under such a rule, "the concept of a 'transformative' use would be extended beyond recognition." *Id.* As the Second Circuit later reemphasized, "[t]hat a secondary use can facilitate research does not itself support a finding that the secondary use is transformative." *Fox News Network, LLC v. TVeyes, Inc.*, 883 F.3d 169, 178 n.4 (2d Cir. 2018). This makes not only doctrinal but practical sense: if anyone could steal and keep copies of copyrighted media so long as they claimed the intent to later make a transformative use, the

market for copyrighted media would entirely collapse, as explained further in the context of factor four below. Section V(B)(2)(d), *infra*.

Defendants wanted books but didn't want to pay for legal copies, so they downloaded pirated copies instead. The purpose and character of *that* use is expressly substitutive and commercial, not transformative. This factor thus weighs heavily against fair use.

> **b.    Factor Two: Plaintiffs' Copyrighted Works are at the Core of Copyright**

The second fair use factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. "Creative works," like books, receive greater protection than "informational and functional works," like computer code. *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997); *Hachette Book Grp., Inc. v. Internet Archive,* 664 F. Supp. 3d 370, 387 (S.D.N.Y. 2023), *aff'd*, 115 F.4th 163 (2d Cir. 2024) (explaining that books are "close to the core of copyright protection."). Plaintiffs' copyrighted works are thus entitled to significant protection, weighing against fair use. The second factor weighs particularly strongly against fair use in this case because Plaintiffs' Copyrighted Works were acquired specifically for their expressive content. *See* Ex. 2 (Chiley Dep. Tr.) 162:22–163:4 ("████████████████████████████ ███████████████████████████████████████.").

> **c.    Factor Three: Databricks Pirated Plaintiffs' Copyrighted Works in Their Entirety**

Under the third factor, courts consider whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole . . . are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586–87. "[C]opying an entire work militates against a finding of fair use." *Napster*, 239 F.3d at 1016 (citation omitted). Defendants ████████████████████████. *See* Ex. 11 ¶ 45 (Shan Rep). Factor three thus also weighs against fair use.

> **d.    Factor Four: Piracy Harms the Market for Plaintiffs' Copyrighted Works**

The fourth and final factor is the effect of the copying on the "potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor encompasses both (1) "the extent of market harm

caused by the particular actions of the alleged infringer" and (2) "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original[.]" *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1163 (9th Cir. 2022) (quoting *Dr. Seuss*, 983 F.3d at 458) (cleaned up). In other words, this factor considers both the actual market harm caused by the defendant's actions and the potential market harm that would occur if everyone engaged in the same conduct. Considering both aspects, this factor weighs strongly against fair use for multiple independent reasons.

*First*, Defendants' particular actions directly harmed the market for Plaintiffs' Copyrighted Works. By pirating Plaintiffs' Copyrighted Works, Defendants deprived Plaintiffs of the profits they should have received from the sale of lawful copies. *See Napster*, 239 F.3d at 1017 ("Having digital downloads available for free on the Napster system necessarily harms the copyright holders' attempts to charge for the same downloads."); *BMG Music*, 430 F.3d at 890–91 ("[A]ll 1,000+ of [defendant's] downloads . . . undermined the means by which authors seek to profit."). Even Defendants' expert agrees. When asked ███████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ " Ex. 8 (Tucker Dep. Tr.) 204:23–205:6.

These concessions are common sense and underscore how straightforward this case is. No dispute exists that Defendants could have lawfully acquired Plaintiffs' Copyrighted Works. Defendants ███████ ██████████████████████████████████████████████ . *See* Ex. 9 ¶¶ 18–21; Exs. 20-21, 23–24 (Pls.' Resp. to Interrog. No.11.); Ex. 3 (Blakeney Dep. Tr) 191:12–14.[4] Or they could have negotiated licenses with Plaintiffs and other authors. As early as ██████████████ ███████████████ . *See* Ex. 31; Ex. 3 (Blakeney Dep. Tr.) 191:12–14. Piracy to avoid payment is not fair use.

*Second*, "unrestricted and *widespread conduct* of the sort engaged in by" Defendants would undoubtedly "create incentives to pirate intellectual property." *Dr. Seuss*, 983 F.3d at 461 (emphasis added). That is dispositive of Defendants' fair use defense as a matter of law. "[T]o negate fair use one need only show that if the challenged use 'should become widespread, it would adversely affect the *potential* market

---

[4] Whether Defendants' subsequent copying of Plaintiffs' works to develop a competing "StoryWriter" is fair use depends on several trial questions.

for the copyrighted work.'" *Harper & Row Publishers, Inc. v. Nation Enters*, 471 U.S. 539, 568 (1985) (quotation omitted).

Authorizing blatant piracy like Defendants' would erase modern copyright protections. It would permit anyone with some purportedly transformative later use in mind to pirate copyrighted media without recourse. A person who merely expressed an unconsummated intent to write a parody on Substack or review a book on Goodreads would be able to download a copy of that same book for free without consequence. As Judge Alsup stated in *Bartz*: "You can't just bless yourself by saying I have a research purpose and, therefore, go and take any textbook you want. That would destroy the academic publishing market if that were the case." 787 F. Supp. 3d at 1025 (quoting defense counsel); *id.* at 1033 ("stealing pirated copies of Authors' works plainly" reduced the "value of Plaintiffs' works through substitution in their traditional markets").

The crucial fourth factor thus strongly weighs against fair use. Defendants' "piracy of otherwise available copies is inherently, irredeemably infringing" regardless of whatever subsequent uses the copies were later put to. *Bartz*, 787 F. Supp. 3d at 1025.

### C. Defendants' Creation and Operation of Libraries of Pirated Books Was Copyright Infringement.

#### 1. Defendants Reproduced and Distributed Plaintiffs' Copyrighted Works in The Course of Creating and Operating Its Commercial Library

Defendants' unlawful conduct did not end after acquiring Plaintiffs' Copyrighted Works. Defendants then took pirated copies of Plaintiffs' Copyrighted Works, uploaded them to cloud storage locations such as ███████████████████████, and chose to make these repositories publicly available, exposing them to the public for download. Section III(E), *supra*. These are independent acts of infringement. The act of uploading to cloud storage created new copies of Plaintiffs' Copyrighted Works and is an infringement of the exclusive right to reproduce those works. 17 U.S.C. § 106(1). The act of distributing them to customers the public is an infringement of the exclusive right to *distribute* those works. 17 U.S.C. § 106(3).

There is no dispute of fact here either. Defendants admit that ███████████████ ████████████████████████. *See, e.g.*, Exs. 26, 25 (Mosaic Resps. to RFA 335-341;

Databricks Resp. to RFA 247-252). That violates the reproduction right because it involves creating additional unauthorized copies. *See* 17 U.S.C. § 106(1); *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 350 (S.D.N.Y. 2000). Defendants also admit . *See* Ex. 28 (Databricks Resp. to Interrog. No. 46; Databricks Resp. to Interrog. No. 47.) Defendants further admit that . *See, e.g.*, Ex. 25 (Databricks Resp. to RFA 281).

Defendants' creation and operation of a commercial library is also a violation of the Copyright Act's distribution right. *See* 17 U.S.C. § 106(3). Dissemination of illicit copies of Plaintiffs' Works is, unequivocally, unauthorized "distribution" of Plaintiffs' Works. *See Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 197 (2d Cir. 2024) (affirming violation of distribution right when defendant gave copyrighted works to unlimited third parties). So, too, is making an unauthorized library available to countless others—others who cannot be identified solely because Defendants failed to preserve the necessary logs. *See Napster*, 239 F.3d at 1014 ("Napster users who upload file names to the search index for others to copy violate plaintiffs distribution rights."). Defendants' straightforward copying and distribution of Plaintiffs' Works is copyright infringement as a matter of law.

### 2. Defendants' Creation and Operation of a Pirate Library Was Not Fair Use as a Matter of Law

Defendants' creation and operation of a commercial library was not fair use. Evaluating this "use" boils down to the simple question of whether a copyist may distribute copies of works freely to third parties—without any restrictions whatsoever—and host them on sites that allow any member of the public to download them at a nominal cost. The answer is very obviously no. Courts have rejected fair use defenses in materially identical cases for decades. *See, e.g., TVEyes, Inc.*, 883 F.3d at 181 ("commercially re-distributing" works "without payment or license" was not fair use); *Slater*, 348 F.3d at 669 (affirming denial of jury instruction on fair use when defendant "allowed members to obtain unlawful, digital duplicates of thousands of commercially available" works).

In *Internet Archive*, for example, the defendant "create[d] digital copies of the Works and

distribute[d] these copies to" third parties "in full, for free." 115 F.4th at 181. The Second Circuit held that creating and distributing digital copies of copyrighted works was not fair use, explaining that "large scale copying and distribution of copyrighted books without permission from or payment to" authors "would allow for widescale copying that deprives creators of compensation and diminishes the incentive to produce new works. This . . . is not an approach that the Copyright Act permits." *Id.* at 197.

In *UMG Recordings.*, MP3.com purchased CDs containing the plaintiffs' copyrighted works and "without authorization, copied their recordings onto its computer servers so as to be able to replay the recordings for its subscribers." 92 F. Supp. 2d at 350. MP3.com then advanced a fair use defense very similar to Defendants' defense here, arguing its use was transformative because changing CDs into MP3 format eliminated the burden of "lugging around the physical discs themselves." *Id.* at 351. The court soundly rejected that argument, explaining that "simply repackag[ing] those recordings to facilitate their transmission through another medium" is not transformative. *Id.* It was not a close call. *Id.* at 350 ("The complex marvels of cyberspatial communication may create difficult legal issues; but not in this case.").

In *United States v. Slater*, the defendant downloaded copyrighted software "with the goal of making vast amounts of copyrighted software freely—and thus unlawfully—available over the Internet." 348 F.3d 666, 667 (7th Cir. 2003). The Seventh Circuit emphatically rejected the argument that piracy and indiscriminate distribution of copyrighted works could be considered fair use: "It is preposterous to think that Internet piracy is authorized by virtue of the fair use doctrine." *Id* at 669.

As these cases make clear, the creation and operation of a library for distributing copyrighted works to third parties is not fair use. The same is true here. Consideration of the four fair use factors confirms this straightforward conclusion.

a.   **Factor One: Defendants Creation and Operation of a Commercial Library Was Non-transformative and Threatens the Book Market.**

The first factor—the purpose and character of the use—weighs heavily against fair use as a matter of law. ***First***, there is no question that Defendants' commercial library, if widely disseminated, would pose a significant "risk of substitution" for Plaintiffs' Works. By sending Plaintiffs' Works to their customers, Defendants obviated the need for those customers to purchase them—directly substituting for Plaintiffs' sales. And to make matters worse, the hundreds of thousands of books in Defendants' unauthorized library

could ████████████████████████████████████████████████████████████, creating the obvious and unreasonable risk that third parties might download works from Defendants' library and make them further available to others, possibly through known pirate sites. Section III(E), *Supra.*

**Second,** against this substantial risk of substitution, Defendants must offer some compelling, cognizable justification for their decision to operate a commercial library that includes Plaintiffs' copyrighted Works. *See Warhol* 598 U.S. at 547. There is none. The record shows that Defendants' creation and operation of an unauthorized library was purely commercial. Section III(E), *Supra.* Defendants ████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████████ Ex. 65. Defendants "████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████ " Ex. 4 (Tang Dep. Tr.) 70:22–71:4. Prior to its acquisition, Mosaic "██████████████████████████████████████████████████████████████████

███████████████████████████ " Ex. 7 (Tang Dep. Tr.) 449:19–22. That strategy paid off: Mosaic ████

██████████████████████████████████████████████████████████████████████████

████████ . Ex. 4 (Tang Dep. Tr.) 258:3–5; 259:8–21. The creation and operation of a library containing Plaintiffs' copyrighted Works to ████████████████████████████████████████████████████ is "unabashedly commercial." *L.A. News Serv. v. Tullo*, 973 F.2d at 797–98 (quotation omitted).

**Third,** Defendants' use is entirely non-transformative. "[T]he word 'transformative' . . . describe[s] a copying use that adds something new and important." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 30 (2021). Defendants "create[d] digital copies of the Works and distribute[d] these copies to" third parties "in full, for free." *Internet Archive*, 115 F.4th at 181. The copies did not provide "criticism, commentary, or information about the originals. Nor [did] they add something new, with a further purpose or different character, altering the originals with new expression, meaning or message." *Id.* (quotation omitted, cleaned up). There was nothing transformative in this use.

Defendants repeat the mantra that their distribution was "████████████████████████████ ███████████████████████████████ . *See, e.g.* Ex. 28 (Databricks Resp. to Interrog. No. 46.) But such

downstream usage has no legal significance.[5] The Ninth Circuit has repeatedly rejected the argument that distribution is authorized if done to enable a later purportedly fair use. In *L.A. News Serv. v. Tullo*, the defendant, a company that recorded news broadcasts and sold clips to interested individuals and businesses, argued that its conduct was fair use because "its clients used the tapes for 'research, scholarship and private study," which are themselves fair uses. 973 F.2d 791, 797 (9th Cir. 1992). The Ninth Circuit disagreed, explaining that in direct copyright infringement cases involving a violation of the distribution right, "the ultimate use to which the customer puts the tape is irrelevant, as is the use [defendant's] customers make of the tapes [defendant] sells." *Tullo*, 973 F.2d at 797 (citing *Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417 (1984) ).

This same question arose again in *Reuters*, 149 F.3d at 987. The defendant, another news recording and redistribution company, argued that "if a broadcaster's use of the [copyrighted broadcasts] for news reporting may constitute fair use, then 'it is obvious that the transmission of such Works to a broadcaster for such purpose cannot be deemed an infringement.'" *Id*. at 994 (cleaned up, quoting defendant). The Ninth Circuit again rejected that argument, making two points: first, that "the unauthorized copying of the works" was a separate infringement, and second, that "the question of whether defendants' copying and transmission of the works constitutes fair use is distinct from whether the [defendant's customers'] broadcasts of the works are fair use." *Id*.

This line of authority is especially applicable here because Defendants ███████████
███████████████████████████████████████████. While Defendants may speculate that customers used Plaintiffs' Copyrighted Works solely for so-called ████████
██████, there is no record evidence on that issue. Defendants ████████████████
████████████████████████████████████████████████████████████████████.
Ex. 75 (Rao Dep. Tr.) 74:24–75:5 ("███████████████████████████████████████████
████████████████████████████████████████████"). This is reason alone to reject Defendants' argument.

The rule set forth by *Tullo* and *Reuters* is a crucial backstop for copyright law. Were the rule

---

[5] Nonetheless, as Plaintiffs will show at trial, Defendants' use of copyrighted works to train LLMs is an independent act of infringement and not a fair use.

otherwise, any savvy black marketeer could commit unlimited acts of piracy on the reed-thin assertion that some customer could use the pirated works for a legitimate purpose, like research, parody, or—according to Defendants in this case—LLM training. This would cause an explosion in piracy with predictable deleterious effects on the markets for copyrighted works. Section V(B)(2)(d), *supra*.

Because Defendants' creation and operation of an unauthorized library with Plaintiffs' Works lacks any cognizable justification—let alone a compelling one—and is non-transformative, the first factor of the fair use analysis weighs sharply against fair use and is independently dispositive of the fair use analysis.

### b.    Factor Two: Plaintiffs' Copyrighted Works are at the Core of Copyright Protection

As explained in Section V(B)(2)(b), *supra*, creative works, like Plaintiffs' books, are at the core of copyright protection. *See Dr. Seuss*, 109 F.3d at 1402; *Internet Archive,* 664 F. Supp. 3d at 187. This factor again weighs strongly against fair use.

### c.    Factor Three: Defendants Copied and Distributed Plaintiffs' Entire Works

Under the third factor, courts consider whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole . . . are reasonable in relation to the purpose of the copying," *Campbell*, 510 U.S. at 586–87, and copying an entire work militates against a finding of fair use. *See Napster*, 239 F.3d at 1016. As explained in Section V(B)(2)(a), *supra*, Defendants' purpose here was to access the expressive content without paying—and there is no dispute that Defendants distributed Plaintiffs' Works in full.

This factor weighs even more strongly in Plaintiffs' favor when considering Defendants' use of Plaintiffs' Works to create and operate a commercial library. A key question under the third factor is "the amount and substantiality of what is thereby made accessible to a public [in any purported secondary use] for which it may serve as a competing substitute [for the primary use, i.e. reading the books]." *Bartz*, 787 F. Supp. 3d at 1030 (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015)). This is because "[t]he larger the amount, or the more important the part, of the original that is copied, the greater the likelihood that the secondary work might serve as an effectively competing substitute for the original, and might therefore diminish the original rights holder's sales and profits." *Authors Guild*, 804 F.3d at 221. Because Defendants distributed hundreds of thousands of books—including Plaintiffs' Works—to their

customers and the public, their use is highly likely to "substitute for the original" and diminish Plaintiffs' sales and profits. This factor therefore weighs strongly against fair use.

#### d.    Factor Four: Defendants' Pirate Library Harms the Market for Plaintiffs' Copyrighted Works

The fourth and final factor is the effect of the copying on the "potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). As noted, this factor includes both harm to the potential market or value of the copyrighted work actually caused by the infringer and whether unrestricted widespread conduct of the sort would impact the potential market or value of the work. *McGucken*, 42 F.4th at 1163. This factor again weighs strongly against fair use for multiple independent reasons.

Defendants operated as a clearinghouse for pirated works, redistributing Plaintiffs' Copyrighted Works free of charge to a variety of third parties, including the public at large, █████████. That is outright substitution, which harms the market for Plaintiffs' Works. *See* Ex. 8 (Tucker Dep. Tr.) 204:23–205:6 (Defendants agreeing that piracy of Plaintiffs' books without payment fails to reward them for their creative efforts). "[I]t is difficult to compete with free," and Defendants shared Plaintiffs' works at no cost. *Internet Archive*, 115 F.4th at 190. That, alone, diminishes Plaintiffs' sales and profits, and is sufficient to defeat Defendants' fair use defense on the fourth factor, as it "necessarily harm[s] the copyright holders' attempts to charge for the same downloads." *Napster*, 239 F.3d at 1017*; see also Reuter*s, 149 F.3d at 994 (holding that permitting a defendant to use the copyrighted footage of the plaintiffs "would result in a substantially adverse impact on the potential market for the original works" because it would obviate the need for third parties "to purchase [the footage] from [plaintiffs], thus lessening the market for [plaintiffs'] footage"); *UMG Recordings*, 92 F. Supp. 2d at 352 (rejecting fair use defense because distribution of copyrighted music harmed the music market because it "directly derives from reproduction of the plaintiffs' copyrighted works"); *see also Dow Jones & Co., Inc. v. Harris*, 749 F. Supp. 3d 776, 786 (W.D. Tex. 2024) (granting summary judgment to the plaintiff on fair use and concluding that distribution of "wholesale copies of articles obviated any need for recipients to visit the WSJ or Barron's sites to seek the original work").

The market effect is even more stark when one considers, as the fourth factor requires, what would happen if Defendants' conduct was widespread. Imagine a world where everyone, including technology

companies, large and small, could host the full text of Plaintiffs' Works—and hundreds of thousands of others—on publicly accessible cloud storage spaces, with no access restrictions whatsoever. That would be devastating to Plaintiffs' livelihood and would serve as a massive boon to notorious pirate sites like ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████. Ex. 10 ¶ 26 (Shan Rebuttal Rep.). It would also undercut Plaintiffs' (and Plaintiffs' publishers') ability to generate income from the most traditional markets for these works— print and e-book sales—because ███████████████████████████████████████████ ███████████████████████████████████████████████████████. Ex. 10 ¶ 26 (Shan Rebuttal Rep.). Even Defendants' expert Dr. Hersh admits this: "███████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████." Ex. 15 ¶ 10.

Substantial empirical literature—cited by experts on both sides—confirms the unremarkable proposition that piracy harms creators. ████████████████████████████████████████ ███████████████████████████████████████████" Ex. 9 ¶ 19. Defendants' expert cites literature documenting ████████████████████████████████████████████████████████████████ ████████████████████████████████. Ex. 15 ¶¶ 42-43. Plaintiffs' expert agrees. Ex. 9 ¶ 19. That evidence proves the obvious: limiting the distribution of pirated books increases the legitimate sales of those books. On the flip side, finding Defendants' conduct to be a fair use (therefore sanctioning conduct that makes works publicly accessible) would harm the market for Plaintiffs' copyrighted Works. "[I]f the [works] can be obtained for free . . . consumers will be less incentivized to purchase the [works] from [Plaintiffs] for a fee." *Am. Soc'y for Testing & Materials v. UpCodes, Inc.*, 172 F.4th 253, 269 (3d Cir. 2026). This factor weighs strongly fair use because Defendants' conduct—if widespread—would virtually guarantee that pirate sites have a steady supply of bootleg books to offer the consuming public free of charge.

Those cases that have found a defendant's conduct to be fair use only underscore how manifestly unfair Databricks and Mosaic's conduct is here. In *Authors Guild v. Google*, for example, Judge Leval recognized:

If, in the course of making an arguable fair use of a copyrighted work, a secondary user unreasonably exposed the rights holder to destruction of the value of the copyright resulting

from the public's opportunity to employ the secondary use as a substitute for purchase of the original (even though this was not the intent of the secondary user), this might well furnish a substantial rebuttal to the secondary user's claim of fair use.

804 F.3d 202, 227 (2d Cir. 2015). Google's fair use defense nonetheless succeeded in that case because its book-scanning project was "walled off from public Internet access" and "protected by the same impressive security measures" that the company used "to guard its own confidential information. *Id.* at 228. This case is literally the opposite of *Authors Guild*: Defendants' commercial library with Plaintiffs' books was fully accessible on the public internet, ███████████████████████████████████ ██████████████, and actively distributed their commercial library to third parties ███████████. This is precisely the type of unreasonable exposure to piracy that Judge Leval's opinion in *Authors Guild* recognizes is a "theoretically sound" rebuttal to fair use.

\*    \*    \*

In sum, Defendants' creation and operation of a commercial library consisting of Plaintiffs' Works violated Plaintiffs' rights to copy and distribute their Works. Defendants' conduct was undoubtedly substitutive and plainly harmed the market for Plaintiffs' Works. The Court should grant summary judgment against Defendants on its fair use defense as to its creation and operation of a commercial library.

## VI.    CONCLUSION

Plaintiffs respectfully request that the Court enter summary judgment against Defendants on liability, on the grounds that Defendants (1) committed direct copyright infringement by downloading copies of Plaintiffs' Works free of charge; and (2) committed direct copyright infringement by creating and operating an unauthorized commercial library that contained Plaintiffs' Works.

Dated: July 20, 2026

Respectfully submitted,

By: */s/ Joseph R. Saveri*

Joseph R. Saveri (SBN 130064)
Christopher K.L. Young (SBN 318371)
Elissa A. Buchanan (SBN 249996)
William W. Castillo Guardado (SBN 294159)
Drew Moss Morgan (SBN 366901)
**SAVERI LAW FIRM, LLP**
550 California Street, Suite 910
San Francisco, CA 94104
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
cyoung@saverilawfirm.com
eabuchanan@saverilawfirm.com
wcastillo@saverilawfirm.com
dmorgan@saverilawfirm.com

Avery M. Wolff (admitted *pro hac vice*)
**SAVERI LAW FIRM, LLP**
780 Third Avenue, Suite 1200
New York, NY 10017
Telephone: (646) 641-0876
awolff@saverilawfirm.com

Matthew Butterick (SBN 250953)
1920 Hillhurst Avenue, #406
Los Angeles, CA 90027
Telephone: (323) 968-2632
Facsimile: (415) 395-9940
Email: mb@butticklaw.com

Bryan L. Clobes (admitted *pro hac vice*)
Mohammed A. Rathur (admitted *pro hac vice*)
Nabihah Maqbool (admitted *pro hac vice*)
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 South LaSalle Street, Suite 3210
Chicago, IL 60603
Telephone: (312) 782-4880
bclobes@caffertyclobes.com
mrathur@caffertyclobes.com
nmaqbool@caffertyclobes.com

Case No. 3:24-cv-01451-CRB                    26
PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

Justin A. Nelson (admitted *pro hac vice*)
Alejandra C. Salinas (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Rohit D. Nath (SBN 316062)
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
RNath@susmangodfrey.com

Elisha Barron (admitted *pro hac vice*)
Craig Smyser (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P**
One Manhattan West, 51st Floor
New York, NY 10019
Telephone: (212) 336-8330
ebarron@susmangodfrey.com
csmyser@susmangodfrey.com

Jordan W. Connors (admitted *pro hac vice*)
Trevor D. Nystrom (admitted *pro hac vice*)
Dylan Salzman (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
jconnors@susmangodfrey.com
tnystrom@susmangodfrey.com
dsalzman@susmangodfrey.com

Rachel J. Geman (admitted *pro hac vice*)
Danna Z. Elmasry (admitted *pro hac vice*)
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
rgeman@lchb.com
delmasry@lchb.com

Anne B. Shaver
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ashaver@lchb.com

Betsy A. Sugar (admitted *pro hac vice*)
Kenneth S. Byrd (admitted *pro hac vice*)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
222 2nd Avenue S. Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000
bsugar@lchb.com
kbyrd@lchb.com

*Counsel for Individual and Representative
Plaintiffs and the Proposed Class*