JEDEDIAH WAKEFIELD (CSB No. 178058)
jwakefield@fenwick.com
FENWICK & WEST LLP
One Front Street, 33rd Floor
San Francisco, CA 94111
Telephone: 415.875.2300
Facsimile: 650.938.5200

DAVID HAYES (CSB No. 122894)
dhayes@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

*Attorneys for Defendants*
DATABRICKS, INC., and
MOSAIC ML, LLC, formerly MOSAIC ML, INC.

*Additional counsel listed on signature page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

*In Re Mosaic LLM Litigation*

Master File Case No. 3:24-cv-01451-CRB
Consolidated with Case No. 3:24-cv-02653-CRB

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: October 30, 2026
Time: 10:00 a.m.
Dept: Courtroom 6, 17th Floor
Judge: Hon. Charles R. Breyer

FENWICK & WEST LLP

## TABLE OF CONTENTS


Page

I. STATEMENT OF ISSUES RAISED BY PLAINTIFFS' MOTION .... 1

II. INTRODUCTION AND SUMMARY OF ARGUMENT .... 1

III. SUMMARY OF UNDISPUTED MATERIAL FACTS .... 3

A. Mosaic and Databricks .... 3

B. LLM Training .... 3

C. The Pile, RedPajama, and Books3 .... 3

D. Defendants' Uses of The Pile and RedPajama .... 4

E. Defendants did not "productize" RedPajama or The Pile, nor did they create a "commercial library." .... 5

F. Defendants did not conceal their use of Books3 or display knowledge of "illegal conduct." .... 7

G. Plaintiffs had no loss of book sales or traditional licensing revenue from Defendants' or their customers' conduct. .... 7

IV. ARGUMENT .... 9

A. Defendants' downloading of datasets including Plaintiffs' books for LLM training and research was fair use. .... 9

1. Factor One: The purpose and character of the use for which Defendants downloaded Plaintiffs' books favors fair use .... 9

a. Defendants' downloading of datasets containing Plaintiffs' books was necessary intermediate copying for a transformative use. .... 10

b. Defendants do not lose the benefit of fair use because they downloaded unauthorized, unpaid copies of Plaintiffs' books. .... 13

c. Plaintiffs' accusations of "piracy" are a factually unsupported red herring. .... 16

d. The commercial aspect of Defendants' LLM research and training does not weigh against fair use. .... 17

2. Factor Two: Defendants did not use Plaintiffs' books for their creative expression. .... 17

3. Factor Three: Defendants' copying of entire books within AI training datasets was reasonable to achieve a transformative purpose. .... 17

4. Factor Four: Defendants' use of datasets caused no market harm to Plaintiffs. .......... 18

B. Defendants' retention and limited sharing of access to datasets formatted for LLM training was not copyright infringement. .......... 19

1. Factor One: Defendants' retention and limited sharing of The Pile and RedPajama datasets was solely for a transformative use. .......... 19

a. Defendants did not operate any "library" of books. .......... 19

b. Defendants made interim copies of works available to select customers and a researcher for fair use purposes. .......... 22

2. Factors Two and Three favor fair use. .......... 24

3. Factor Four: Defendants' storage and limited sharing of The Pile and RedPajama caused no market harm to Plaintiffs. .......... 24

V. CONCLUSION .......... 25


FENWICK & WEST LLP

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001)....................14

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994)....................12

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023)....................9, 11, 17

*Atari Interactive, Inc. v. Teespring, Inc.*,
No. 19-cv-00111-JST, 2022 WL 1601420 (N.D. Cal. March 9, 2022)....................16

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014)....................12, 18

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015).................... *passim*

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025)....................15, 20

*Bartz v. Anthropic PBC*,
791 F. Supp. 3d 1038 (N.D. Cal. 2025)....................20

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)....................13, 17

*Chapman v. Maraj*,
No. 2:18-cv-09088-VAP-SSx, 2020 WL 6260021 (C.D. Cal. Sept. 16, 2020)....................16

*Columbia Pictures Industries, Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013).................... 14-15

*Fox News Network, LLC v. TVeyes, Inc.*,
883 F.3d 169 (2d Cir. 2018)....................12

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021)....................10-11, 13-15

*Hachette Book Group, Inc. v. Internet Archive*,
664 F. Supp. 3d 370 (S.D.N.Y. 2023)....................23

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025).................... *passim*

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003)....................12, 14

*L.A. News Serv. v. Reuters Television Int'l, Ltd.*,
149 F.3d 987 (9th Cir. 1998)....................23

FENWICK & WEST LLP

*L.A. News Serv. v. Tullo*,
973 F.2d 791 (9th Cir. 1992)....................23

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007)....................12, 14

*Progressive Sols., Inc. v. Stanley*,
No. 16-CV-04805-SK, 2018 WL 1989547 (N.D. Cal. Mar. 8, 2018)....................16

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992)....................11

*Tresona Multimedia v. Burbank High Sch. Vocal Music Ass'n*,
953 F.3d 638 (9th Cir. 2020)....................13, 18

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000)....................23

*United States v. Slater*,
348 F.3d 666 (7th Cir. 2003)....................23

*Wall Data Inc. v. Los Angeles County Sheriff's Department*,
447 F.3d 769 (9th Cir. 2006)....................15

**STATUTES**

17 U.S.C.

§ 106....................13
§ 107....................9, 10, 13, 18

**RULES**

Fed. R. Civ. P. 56....................9


FENWICK & WEST LLP

# TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| **Decl.** | **Supplemental Declaration of Jonathan Frankle, Ph.D.** (Supp. Frankle Decl.) |
| **Decl.** | **Declaration of Jedediah Wakefield** (Wakefield Decl.) |
| **1** | Excerpts from the transcript of the deposition of Plaintiffs' expert Shawn Shan, Ph.D., taken on June 8, 2026 |
| **2** | Excerpts from the transcript of the deposition of Plaintiffs' expert Mark L. Seeley, taken April 30, 2026 (with errata corrections by Mr. Seeley) |
| **3** | Excerpts from Volume I of the transcript of the Rule 30(b)(1) and 30(b)(6) deposition of Hanlin Tang, Ph.D., taken November 6, 2025 |
| **4** | Excerpts from the transcript of the Rule 30(b)(1) deposition of Scott Sovine, taken December 5, 2025 |
| **5** | Alaa Khaddaj, Logan Engstrom & Aleksander Mądry, *Small-to-Large Generalization: Data Influences Models Consistently Across Scale* (May 22, 2025) |
| **6** | Excerpts from the transcript of the deposition of Plaintiff Stewart O'Nan, taken June 27, 2025 |
| **7** | Excerpts from the transcript of the deposition of Plaintiff Rebecca Makkai, taken July 11, 2025 |
| **8** | Excerpts from the transcript of the deposition of Plaintiff Jason Reynolds, taken July 16, 2025 |
| **9** | Excerpts from the transcript of the deposition of Plaintiff Brian Keene, taken July 23, 2025 |
| **10** | Excerpts from the transcript of the deposition of Plaintiff Abdi Nazemian, taken September 18, 2025 |
| **11** | Excerpts from the transcript of the deposition of Plaintiffs' expert, Daniel Spulber, Ph.D., taken May 12, 2026 |
| **12** | Appendix H to the Expert Report of Shawn Shan, Ph.D., served on March 16, 2026 |

FENWICK & WEST LLP

**NOTICE OF OPPOSITION AND OPPOSITION**

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

Pursuant to Civil L.R. 56-1, **PLEASE TAKE NOTICE** that Defendants Databricks, Inc. (Databricks) and MosaicML, LLC, formerly MosaicML, Inc. (Mosaic) (together, Defendants) hereby oppose Plaintiffs' Motion for Partial Summary Judgment (Dkt. 323-3, as corrected by Dkt. 378 (Mot.)). This Opposition is based on the following Memorandum and Points of Authorities, the Supplemental Declaration of Jonathan Frankle, the Proposed Order, and all other materials submitted in connection with this Opposition; the records and docket in this matter, including Defendants' Motion for Summary Judgment (Dkt. 312-2), the Declaration of Dr. Michael Johnson (Dkt. 319-10) and Dr. Johnson's attached expert reports (Dkts. 319-11 & 319-12), the Declaration of Dr. David Evans (Dkt. 319-3) and Dr. Evans' attached expert reports (Dkts. 319-4 & 319-5), the Declaration of Dr. Catherine Tucker (Dkt. 319-15) and Dr. Tucker's attached report (Dkt. 319-16), the Declaration of Dr. Michael Sinkinson (Dkt. 319-13) and Dr. Sinkinson's attached report (Dkt. 319-14), and the Declaration of Dr. Jonathan Hersh (Dkt. 319-8) and Dr. Hersh's attached report (Dkt. 319-9); and any evidence and argument presented to the Court at the hearing on October 30, 2026, at 10:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Charles R. Breyer, located at Courtroom 6 – 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102.

Dated: August 13, 2026

FENWICK & WEST LLP

By: */s/ Jedediah Wakefield*

Jedediah Wakefield (CSB No. 178058)
jwakefield@fenwick.com
Ryan Kwock (CSB No. 336414)
rkwock@fenwick.com
One Front Street, 33rd Floor
San Francisco, CA 94111
Telephone: 415.875.2300
Facsimile: 650.938.5200

David Hayes (CSB No. 122894)
dhayes@fenwick.com
Diana C. Buck (CSB No. 339314)

dbuck@fenwick.com
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

Jonathan T. McMichael (CSB No. 304737)
jmcmichael@fenwick.com
Deena Feit (admitted *pro hac vice*)
dfeit@fenwick.com
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone: 206.389.4510
Facsimile: 650.938.5200

Charles Moulins (admitted *pro hac vice*)
cmoulins@fenwick.com
Justine Vandermel (admitted *pro hac vice*)
justine.vandermel@fenwick.com
902 Broadway, 18th Floor
New York, NY 10010
Telephone: 212.430.2600
Facsimile: 650.938.5200

Zachary Harned (CSB No. 335898)
zharned@fenwick.com
730 Arizona Avenue, 1st Floor
Santa Monica, CA 90401
Telephone: 310.434.5400
Facsimile: 650.938.5200

*Attorneys for Defendants*
DATABRICKS, INC., and
MOSAIC ML, LLC, formerly
MOSAIC ML, INC.

FENWICK & WEST LLP

## I. STATEMENT OF ISSUES RAISED BY PLAINTIFFS' MOTION

1. Was Defendants' downloading of Large Language Model (LLM) training datasets containing Plaintiffs' books a separate "use" that triggers copyright infringement liability even if Defendants' ultimate use of the datasets for transformative LLM research and training was fair use?

2. Does Defendants' provision of access to specially formatted versions of those training datasets to select customers and a graduate student solely for their LLM training and research on Defendants' infrastructure give rise to liability for copyright infringement?

## II. INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs' Motion for partial summary judgment asks the Court to resolve a fair use case without grappling with the undisputed facts that actually govern the analysis: Defendants' LLM training and research were indisputably transformative uses of the artificial intelligence (AI) training datasets that allegedly contained Plaintiffs' 28 books, and there is no evidence that Defendants' conduct caused Plaintiffs any cognizable market harm.

Unable to rebut those facts, Plaintiffs try to make this case about everything *except* LLM training and research (Plaintiffs do not seek summary judgment as to those activities). Instead, their Motion attempts to slice the LLM training process into artificial pieces and improperly consider them separately, claiming that Mosaic's initial *acquisition* of datasets was a separate "use" giving rise to liability. But Supreme Court and Ninth Circuit authorities consistently recognize that it is fair use to make verbatim digital copies as an intermediate step to creating a transformative technology. Under that clear precedent, the initial copy—whether by download or otherwise—is not a separate "use" of the copyrighted work.

Nor do the facts support Plaintiffs' claim that Defendants built a "commercial library" of their books. Defendants shared access to preprocessed, infrastructure-specific copies of AI training datasets with only nine customers and one graduate student—all of whom were themselves engaged in LLM research and training using Defendants' infrastructure—so that they would not have to separately reformat publicly available datasets. Defendants charged nothing for that access, never marketed it, never "productized" the datasets, and never provided them to the broader public. And the datasets themselves bear none of the hallmarks of a "library:" they were not indexed, organized,

FENWICK & WEST LLP

or searchable by title, and they required multiple layers of technical manipulation—including writing and executing code—before any book could even in theory be found and rendered human-readable. Contrary to Plaintiffs' "library" claim, the evidence shows that Defendants merely retained copies of works made for a fair use purpose, and provided access to those copies to select third parties for that same purpose. As the Second Circuit held in *Authors Guild v. Google, Inc.*, 804 F.3d 202, 228-29 (2d Cir. 2015) ("*Google Books*"), such use does not give rise to copyright infringement liability.

Plaintiffs further premise their "library" claim on speculation that the cloud-storage repositories Defendants used *could* have been accessed by malicious actors who *might* have located Plaintiffs' books within the datasets, converted them into a human-readable format, and distributed them online as free market substitutes to Plaintiffs' works. But Plaintiffs' own technical expert has confirmed that there is no evidence of *any* malicious actors doing so. Unlike the "piracy" cases on which Plaintiffs rely, there is zero evidence that anyone, ever, accessed and used the training datasets to read a book. And Defendants' unrebutted economics analysis of book sales data and Plaintiffs' royalty statements further confirms that Defendants' conduct did not cause Plaintiffs any lost sales.

These undisputed facts, not Plaintiffs' characterizations of them, must drive the fair use analysis. Considered on that record, all four statutory factors favor Defendants. Defendants' downloading of training data was necessary intermediate copying in service of an undisputedly transformative end use—training LLMs to derive statistical patterns of language, not to reproduce or supplant Plaintiffs' creative expression. Defendants' limited, format-specific sharing with a handful of researchers and developers served that same transformative purpose and carried no realistic risk of substitution. And Plaintiffs have identified no evidence that Defendants' conduct caused them lost book sales, lost licensing revenue, or market harm under any cognizable theory.

For these reasons, elaborated below, the undisputed material facts entitle Defendants—not Plaintiffs—to summary judgment. The Court should deny Plaintiffs' Motion and grant Defendants' summary judgment motion in its entirety.

## III. SUMMARY OF UNDISPUTED MATERIAL FACTS

### A. Mosaic and Databricks

Mosaic was founded to reduce the cost of training AI models, including by publicly sharing AI research and offering a highly efficient platform for organizations to train their own AI models. Dkt. 319-7 (Frankle Decl.) ¶¶ 2-5. Databricks, which was founded by a group of researchers from UC Berkeley, acquired Mosaic in July 2023. *Id.* ¶¶ 6-7. Databricks offers companies a platform to manage and derive insights from their data, including by training AI models. *Id.* ¶ 7.

### B. LLM Training

The fundamental goal of LLM training is to develop a representation of the complex statistical patterns of language, which allows LLMs to generate novel and contextually relevant responses to never-before-seen user requests. Dkt. 319-10 (Johnson Decl.) ¶ 14. Three aspects of the training process are particularly salient here.[1] First, LLM training initially requires *copying* a vast and diverse corpus of textual data—the training process cannot begin without an initial, digital copy of any text on which the model will be trained. Johnson Decl. ¶¶ 26, 28-30, 32; Dkt. 319-12 (Johnson Rebuttal Report) ¶ 25. Second, LLM training *literally* transforms every word and symbol in the training corpus into numeric codes called "tokens." Johnson Decl. ¶¶ 18, 20-21, 33, 52. Third, LLM training subjects hundreds of billions of tokens (or more) to hundreds of billions of mathematical exercises. *Id.* ¶¶ 28, 34. The resulting model parameters reflect statistical inferences about language derived from the entirety of the training corpus, without "storing" the training data. *Id.* ¶¶ 13-14 & 58-63.

### C. The Pile, RedPajama, and Books3

Plaintiffs' claims center on two widely used AI training datasets called "The Pile" and "RedPajama," which Plaintiffs say contained unauthorized copies of their 28 books. It is undisputed that these datasets were created by legitimate, AI-focused organizations specifically for use in LLM training. The Pile was created by the non-profit group EleutherAI to enable LLM

---

[1] The steps of LLM training are described in detail in Defendants' motion for summary judgment and the accompanying Declaration of Michael Johnson. Dkt. 312-2 at 3-4; Johnson Decl. ¶¶ 18-24 & 31-36.



FENWICK & WEST LLP

research. Johnson Decl. ¶ 40. RedPajama was created through a partnership led by Together AI—a company focused on building open-source AI infrastructure—with the support of federal agencies and universities. *Id.* ¶ 39. The Pile and RedPajama each included a sub-dataset called Books3, which purportedly consists of approximately 196,000 books (including, allegedly, Plaintiffs' books). *Id.* ¶ 38. Both datasets also contained a vast amount of textual data other than books. *Id.* ¶¶ 39-40.

Plaintiffs contend without evidentiary support that Defendants "sourced" the Books3 dataset from "shadow libraries." Mot. at 4. In fact, Mosaic downloaded RedPajama and The Pile from Hugging Face, a reputable online AI research platform that Plaintiffs' own technical expert uses. Frankle Decl. ¶ 9; Ex. 1 (Shan Dep.) at 147:12-148:17.[2] Plaintiffs' purported expert on "piracy" testified that Hugging Face is *not* a "shadow library," that EleutherAI and Together AI do *not* operate "shadow libraries," and that Defendants are not "shadow libraries." Ex. 2 (Seeley Dep.) at 107:17-108:10, 109:16-110:20, 169:17-24. That expert further testified that he had seen no evidence of Defendants obtaining any books from, contributing commercially or financially to, or encouraging or inducing anyone to use "shadow libraries." *Id.* at 177:14-25, 178:4-17, 180:4-6.

**D. Defendants' Uses of The Pile and RedPajama**

***Mosaic's Use of Books3 for AI Training and Research.*** Mosaic used components of RedPajama and The Pile—including Books3—as part of much larger datasets to train a series of LLMs called the "MosaicML Pretrained Transformer" (MPT) models, released between May and July 2023. Frankle Decl. ¶ 10 & *id.*, Exs. 2, 4, 6. Combined with other books, Books3 represented no more than 3.5% of the overall training data. Johnson Decl. ¶¶ 46-48. Mosaic released the MPT models for free as "open-source" technology on Hugging Face. Ex. 3 (Tang Dep. Vol. I) at 44:21-45:7; Frankle Decl. ¶¶ 5, 10-12. Defendants also used the datasets for internal LLM training-related research. Frankle Decl. ¶¶ 31-36. There is zero evidence that Defendants downloaded or used the datasets for any purpose other than LLM training and research.

***Defendants' Provision of Access to The Pile and RedPajama for LLM Training on Their Platforms***. Between approximately February 2023 and January 2024, Defendants provided nine

[2] All exhibits are attached to the accompanying Wakefield Declaration, unless indicated otherwise.



FENWICK & WEST LLP

business customers with links to specially formatted versions of RedPajama or The Pile in cloud-based storage locations on Amazon Web Services (AWS) or Oracle Cloud Infrastructure. Frankle Decl. ¶ 46. These customers were all engaged in LLM training or research on Defendants' infrastructure. *Id.* As Plaintiffs acknowledge, the datasets shared by Defendants had been preprocessed for use on Defendants' platform, including through conversion into a binary file format called the Mosaic Data Shard (MDS) format, as required for Defendants' training infrastructure. Mot. at 6; Frankle Decl. ¶¶ 41-47. Some of the shared data had also been tokenized. Frankle Decl. ¶ 41. Defendants shared The Pile and RedPajama "generally [] upon customer request" (Ex. 3 (Tang Dep. Vol. I) at 71:5-11), simply to save those customers the time and effort of downloading the datasets from public sources and converting them to the MDS format themselves. Frankle Decl. ¶¶ 41-42; Ex. 4 (Sovine Dep.) at 154:6-9. Databricks also provided the link to its preprocessed RedPajama dataset to a graduate student for his LLM research. Frankle Decl. ¶ 42; Ex. 5 at 26. There is no evidence that these ten recipients of links to Defendants' preprocessed LLM training datasets distributed them to anyone else.

### E. Defendants did not "productize" RedPajama or The Pile, nor did they create a "commercial library."

Defendants never "productized" RedPajama or The Pile. Mot. at 6, 9. Early in their history, Defendants discussed the *possibility* of "productizing" open-source datasets. Dkt. 379-1 (Guardado Decl.), Ex. 51; *id.*, Ex. 55 at 16.[3] But they never moved forward with that idea, and they never created a product or service offering paid access to The Pile or RedPajama. Supp. Frankle Decl. ¶ 8. Defendants undisputedly charged no fee for access to the MDS-formatted training datasets, and thus they earned no revenue—much less any profit—from that limited dataset sharing. Frankle Decl. ¶ 42; Supp. Frankle Decl. ¶ 8; Mot. at 7. Nor did Defendants use the datasets to "drive customers to [their] platform." Mot. at 20. Indeed, Defendants never advertised access to the datasets or used them in any marketing. Supp. Frankle Decl. ¶ 8.[4]

---

[3] *See* Dkts. 323 & 324 for exhibits to the Guardado Declaration.

[4] These facts defeat Plaintiffs' attempt to tie Mosaic's 2023 revenues to the purported "productization" of The Pile and RedPajama. Mot. at 9, 20. Plaintiffs also fail to show that Mosaic's possession of these datasets—which were available online for free—somehow influenced



FENWICK & WEST LLP

FENWICK & WEST LLP

Nor did Defendants create or operate a "commercial library on public cloud spaces." Mot. at 1. Mosaic downloaded and used RedPajama and The Pile for their intended purpose—LLM training and research. Frankle Decl. ¶¶ 8-9, 30-36; Dkt. 321-24 (Trott Decl.) ¶¶ 10, 14. Defendants stored the datasets for that same purpose—and that purpose only. They did not use RedPajama or The Pile to access (much less to read) any specific book, nor did they extract books from those datasets to create a general-purpose book library. Frankle Decl. ¶ 30.

Likewise, the datasets Defendants shared were not a "commercial library." The hallmark of any "library" of books is the ability to find and read specific books. But the datasets shared with customers had no search feature, and were broken up and formatted specifically for LLM training on Defendants' infrastructure—not for human reading. Frankle Decl. ¶¶ 41-42; Johnson Decl. ¶¶ 65-74. As discussed below, Defendants' *and Plaintiffs'* technical experts *agree* that *multi-step manipulation* is necessary to render MDS files into human-readable, "plain text" books. *Infra* at IV.B. Those experts also agree that the shared datasets were not organized into single book files or indexed to facilitate a search for specific books. *Id.*

Nor did Defendants "distribute" RedPajama and The Pile to the "broader community." Mot. at 14. Plaintiffs point to stray comments by Mosaic employees about *possibly* sharing the datasets publicly and make much of the fact that a data bucket in the AWS repository was configured to "Public – Requester Pays" access. *Id.* at 7, 14, 20. But it is undisputed that Defendants never actually shared the datasets with any "community"—they did not post links to them publicly or share them beyond the select customers and graduate student. Supp. Frankle Decl. ¶¶ 9-10.

Unable to show any broader sharing by Defendants, Plaintiffs instead speculate that malicious "bots" "trawl[ing]" AWS repositories could theoretically have accessed Defendants' version of RedPajama. Mot. at 8. But Plaintiffs' own technical expert expressly confirmed that there is *no* evidence that "bots," malicious actors, or members of the public accessed that dataset.

---

the price paid by Databricks to acquire Mosaic. *Id.* The testimony Plaintiffs cite establishes that Databricks paid for Mosaic's "technology and [] ability to efficiently train models"—not for two training datasets that were publicly available on Hugging Face in 2023. Guardado Decl., Ex. 4 (Tang Dep. Vol. I) at 258:12-17. Plaintiffs offer no evidence to the contrary.

Guardado Decl., Ex. 10 (Shan Rebuttal Report) ¶¶ 27-30. And there is no risk of that happening in the future, as Defendants have disabled external access.[5] *Id.* at ¶ 29.

**F. Defendants did not conceal their use of Books3 or display knowledge of "illegal conduct."**

Plaintiffs suggest that Mosaic concealed its use of Books3, pointing to internal discussions before the launch of the first MPT model about whether to disclose the use of Books3. Mot. at 5. But Mosaic ultimately *did* disclose the data mix for the MPT models, including its use of Books3, in a release announcement. Dkt. 321-8 at 2, 5 ("[MPT-7B-StoryWriter-65k+] was finetuned" on "excerpts of fiction books *contained in the books3 corpus*." (emphasis added)).

Plaintiffs also argue that Defendants "knew" that using Books3 violated copyright. Mot. at 5, 13. Not so. Plaintiffs cite internal reactions to this lawsuit and other copyright litigation against AI companies. Guardado Decl., Exs. 62 & 66. No one in those discussions claims that Defendants acted unlawfully. To the contrary, Jonathan Frankle (Databricks' Chief AI Scientist) described Plaintiffs' case as "pretty flimsy." *Id.*, Ex. 62 at 00048999. Plaintiffs nevertheless disparage Mr. Frankle for saying to an employee that "I'd rather you be a good capitalist than a good scientist." Mot. at 13. But the surrounding context of that communication shows that the participants were expressing frustration about AI companies becoming less transparent about their training data—which impedes scientific progress—to avoid the risk of meritless but expensive litigation. Guardado Decl., Ex. 62 at 00048999-00049003.

**G. Plaintiffs had no loss of book sales or traditional licensing revenue from Defendants' or their customers' conduct.**

There is no evidence supporting Plaintiffs' argument that Defendants' actions "deprived Plaintiffs of the profits they should have earned from the sale of lawful copies" of their books or were "devastating to Plaintiffs' livelihood[s]." Mot. at 16, 24. Plaintiffs do not allege that

---

[5] Relatedly, Plaintiffs' complaint that Defendants have not deleted copies of The Pile and RedPajama is meritless. Mot. at 8. Defendants have disabled external access to the cloud-based repositories containing the datasets and, following the release of the MPT models, Databricks has not released any models trained on Books3. Supp. Frankle Decl. ¶ 11. Obviously, Defendants have preserved existing copies of the datasets because of this litigation.



FENWICK & WEST LLP

Defendants' LLMs produce any infringing outputs. Plaintiffs' technical expert, Dr. Shan, testified that there is no evidence of Defendants' LLMs generating outputs that are substantially similar to content in Plaintiffs' books. Ex. 1 (Shan Dep.) at 202:4-6. Defendants' expert Dr. Evans subjected the MPT models to robust "adversarial" testing to "extract" infringing outputs, yet he was unable to generate any protected content from Plaintiffs' books. Dkt. 319-3 (Evans Decl.) ¶¶ 22-30, 39, 46, 49-50. Separately, Plaintiffs do not allege, nor is there any evidence, that the nine customers with whom Defendants shared links to The Pile or RedPajama used them to create LLMs that produce infringing outputs. Thus, this case is *not* about LLMs that allegedly output full or partial copies of books that might substitute for the originals.

Plaintiffs further testified that they are unaware of any lost book sales caused by Defendants' LLMs. Ex. 6 (O'Nan Dep.) at 102:15-104:7 & 109:3-7; Ex. 7 (Makkai Dep.) at 112:4-113:10; Ex. 8 (Reynolds Dep.) at 89:9-90:8 & 132:23-133:5; Ex. 9 (Keene Dep.) at 216:15-217:4 & 251:15-252:4; Ex. 10 (Nazemian Dep.) at 185:7-25. Defendants' economics expert, Dr. Catherine Tucker, analyzed book sales rank data and Plaintiffs' royalty statements, and concluded that this empirical data is inconsistent with the notion that *any* of Defendants' conduct affected Plaintiffs' book sales. Dkt. 319-15 (Tucker Decl.) ¶¶ 25-33. Plaintiffs' economics expert submitted no opinion on that issue. Ex. 11 (Spulber Dep.) at 63:20-23.

Plaintiffs also testified that they are unaware of any lost revenue from Defendants' conduct in licensing markets traditionally associated with books, such as film adaptations or foreign translations. Ex. 6 (O'Nan Dep.) at 129:12-17; Ex. 7 (Makkai Dep.) at 185:15-186:14; Ex. 8 (Reynolds Dep.) at 115:18-118:10 & 132:23-133:5; Ex. 9 (Keene Dep.) at 246:12-247:11; Ex. 10 (Nazemian Dep.) at 136:20-139:21. Their economics expert provided no opinion about whether Defendants harmed Plaintiffs in the market for licensing books for secondary or derivative uses—other than a hypothetical market for licensing books as AI training data. Ex. 11 (Spulber Dep.) at 63:14-64:13. And their purported "piracy" expert likewise pointed to no evidence of lost sales or licensing opportunities for Plaintiffs' works. Ex. 2 (Seeley Dep.) at 96:25-97:25, 102:5-103:17. Nor could Plaintiffs identify any harm to their "livelihoods" caused by Defendants or Defendants' customers—they have not lost book deals, and they anticipate continuing to publish books. Ex. 6

FENWICK & WEST LLP

(O'Nan Dep.) at 139:1-4 & 135:11-19; Ex. 7 (Makkai Dep.) at 173:25-174:9 & 185:15-186:14; Ex. 8 (Reynolds Dep.) at 89:14-90:8 & 132:23-133:5; Ex. 9 (Keene Dep.) at 72:10-23, 216:15-217:4, 251:15-252:4; Ex. 10 (Nazemian Dep.) at 187:20-188:25, 193:3-13, 194:9-14.

## IV. ARGUMENT

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Plaintiffs cannot meet that standard here because, on the undisputed material facts, it is Defendants who are entitled to judgment as a matter of law.

### A. Defendants' downloading of datasets including Plaintiffs' books for LLM training and research was fair use.

Plaintiffs attempt to skew the fair use analysis by recasting Defendants' initial copying of datasets as a distinct "use," disembodied from its purpose. Mot. at 11-17. But that copying was a necessary, intermediate step in Defendants' ultimate use—LLM training and research. When considered in light of that ultimate purpose, the statutory factors decisively favor fair use.

#### 1. Factor One: The purpose and character of the use for which Defendants downloaded Plaintiffs' books favors fair use.

The first fair use factor "considers the reasons for, and nature of, the copier's use of an original work." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023). It assesses whether a copier used "an original work to achieve a purpose that is the same as, or highly similar to, that of the original work," or alternatively used the original work to create a transformative work that "adds something new, with a further purpose or different character." *Id.* The focus is thus on the ultimate *purpose* of use of the copyrighted *work*, not on individual *copies* of the work necessary to achieve that purpose. As Section 107 of the Copyright Act states, "the fair use of a copyrighted *work*, *including* such use by reproduction in *copies* … for *purposes* such as … research, is not an infringement of copyright." 17 U.S.C. § 107 (emphasis added).



FENWICK & WEST LLP

**a. Defendants' downloading of datasets containing Plaintiffs' books was necessary intermediate copying for a transformative use.**

Plaintiffs obscure that Defendants downloaded Plaintiffs' books—as part of much larger datasets—for a highly transformative use. That downloading was simply the initial, intermediate digital copying necessary for Defendants' ultimate fair use of the datasets for LLM research and training. As such, the downloading was an intrinsic component of Defendants' fair use.

As an initial matter, Plaintiffs' Motion fails to acknowledge the undisputed purpose of the copyrighted expression in Plaintiffs' books: human reading. There is *no evidence* that Defendants downloaded The Pile and RedPajama to read books (which were a tiny fraction of those datasets), or that anyone ever used Defendants' copies of those datasets to access—much less read—any specific book. Instead, Mosaic downloaded the datasets for a radically different use: LLM training and training-related research on Mosaic's infrastructure. Frankle Decl. ¶¶ 8-9, 11, 30; Trott Decl. ¶ 10. "There is no serious question" that using books for LLM training is "highly transformative." *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1044 (N.D. Cal. 2025). As detailed further in Defendants' summary judgment motion, the LLM training process transformed Plaintiffs' books by converting them into numerical tokens, aggregating them with hundreds of billions of other tokens, and deploying that vast universe of tokens in billions of mathematical exercises to iteratively compute numerical parameters. Dkt. 312-2 at 3-4. Through that process, Defendants transformed the training data, including Plaintiffs' books, into something completely different: a statistical model of language.

Rather than a distinct "use" (Mot. at 11-12), the initial download of training datasets was a form of necessary intermediate copying for Mosaic's ultimate, transformative use. "Downloading" is simply the creation of a reproduction—a digital copy—as Plaintiffs concede in their motion. *Id.* at 11 ("Defendants *[r]eproduced* Plaintiffs' [w]orks by [o]btaining [u]nauthorized [c]opies." (emphasis added)). And Plaintiffs' own technical expert agreed that "downloading [] raw text files" is "a necessary step in the LLM training." Ex. 1 (Shan Dep.) at 195:3-9.

Consistent with Section 107, courts recognize that intermediate copying is encompassed within fair use when it is necessary for an ultimate transformative use. *See, e.g.*, *Google LLC v.*



FENWICK & WEST LLP

*Oracle Am., Inc.*, 593 U.S. 1, 26-29 (2021); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520 (9th Cir. 1992). That principle plainly applies here, as Mosaic could not have trained its LLMs without first making a digital copy of the textual training data. Johnson Rebuttal Report ¶ 25. In fact, there was no way to use The Pile and RedPajama without first downloading them. Using those datasets—which were widely used by the AI research community—was necessary to make Mosaic's research transparent and reproducible, consistent with Mosaic's goal of advancing AI science. Frankle Decl. ¶¶ 8-9; Trott Decl. ¶ 10. Thus, Mosaic's downloading of the datasets was necessary intermediate copying to achieve a transformative purpose, not a distinct "use" to be analyzed in isolation.

In *Kadrey v. Meta*, the court rejected the argument that Meta's downloading of the plaintiffs' books "must be considered wholly separately" from LLM training. 788 F. Supp. 3d at 1047. The court held that, "[b]ecause Meta's *ultimate use* of the plaintiffs' books was transformative, so too was Meta's downloading of those books."[6] *Id.* at 1048 (emphasis added). That reasoning applies here.

Plaintiffs wrongly argue that the Supreme Court's ruling in *Warhol* stands for the proposition that the initial acquisition or copying of a work is a separate "use." Mot. at 1, 10. But the Supreme Court in *Warhol* did not suggest that each step in a transformative process should be viewed as its own use. Instead, it looked at the *ultimate* use, holding that the first fair use factor "requires an analysis of the specific 'use' of a copyrighted work that is alleged to be 'an infringement,'" as "[t]he same copying may be fair when used *for one purpose but not another*." *Warhol*, 598 U.S. at 533 (emphasis added). Citing its own precedents, the Supreme Court then gave two examples of distinct "uses": "the use of a copyrighted work to advertise a product, even in a parody," versus "the sale of a parody for its own sake"; and "the recording of TV for a commercial or profit-making purpose," versus "private home use." *Id.* (citation modified). These

[6] The *Kadrey* court reasoned that "Meta's downloading is a different use from any copying done in the course of LLM training." 788 F. Supp. 3d at 1047. Defendants submit that, as a matter of law, downloading of books for LLM training is not a "different use," but rather constitutes necessary intermediate copying. The *Kadrey* court nevertheless reached the correct legal conclusion—that "downloading must still be considered in light of [Meta's] ultimate, highly transformative purpose: training [the] Llama [LLM]." *Id.*



FENWICK & WEST LLP

examples make clear that courts should separately analyze distinct *end-uses* of works for *different purposes*, not that each intermediate copy should be treated as a distinct "use."

Nor do Plaintiffs' other cases support isolating the initial acquisition of a work from the use made of it. Mot. at 14-15. In *Texaco*, an engineer photocopied scientific articles without authorization "*to have [them] available on his shelf* for ready reference if and when he needed to look at it." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 918 (2d Cir. 1994) (emphasis added). On that record, the defendant's copying was "merely an untransformed duplication." *Id.* at 923. But the *Texaco* court reached that conclusion by considering the ultimate purpose and use of the work, not by treating photocopying of an article as a distinct "use." In the *TVeyes* case, the defendant recorded Fox News programming to allow users to search for and view clips of that programming. *Fox News Network, LLC v. TVeyes, Inc.*, 883 F.3d 169, 173-75 (2d Cir. 2018). That ultimate use exceeded the bounds of fair use by allowing users to view up to ten minutes of copyrighted content without paying for it. *Id.* at 177, 179-80. That case actually supports Defendants, as the technology resulting from Mosaic's use—unlike TVeyes'—does not allow users to read any portion of Plaintiffs' books.

Plaintiffs also assert that the downloaded copies of their books were "inherently substitutive" and served an "identical purpose as the original[s]." Mot. at 12. If Plaintiffs mean to suggest that verbatim reproduction of books can never be transformative, decades of legal precedent beg to differ. Indeed, the Ninth Circuit has held that "even making an exact copy of a work may be transformative so long as the copy serves a different function than the original work." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (citing *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-19 (9th Cir. 2003)). Indeed, courts have held that it was fair use to make digital copies of *millions of books* to create a full-text searchable database and to display book snippets. *Google Books*, 804 F.3d at 214-25; *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 94-101 (2d Cir. 2014). Here, the downloaded copies of Plaintiffs' books served as back-end inputs into the transformative LLM training process—they did not function as human reading material. That use fits squarely within the long line of precedent allowing intermediate copying of entire works, including books, for a transformative purpose.

FENWICK & WEST LLP

Relatedly, Plaintiffs allege that Defendants created a "central library of books" with the datasets (Mot. at 13), but there is no evidence of that. Instead, uncontradicted evidence establishes that Defendants maintained copies of The Pile and RedPajama solely for LLM training and research. Frankle Decl. ¶ 30. Plaintiffs seek to undermine that evidence by pointing out that Databricks kept its copies of the datasets even after it "internally made the decision to stop using Books3 for training." Mot. at 13. But if making a copy is fair use, it is not infringement to keep it, as there is no exclusive right in *retention* or *storage* of copies. 17 U.S.C § 106 (defining exclusive rights). Nor is there any rule requiring destruction of all interim copies made for a fair use purpose.

In sum, Defendants' download of datasets containing Plaintiffs' books was intermediate copying for only one purpose: highly transformative LLM training and research.

**b. Defendants do not lose the benefit of fair use because they downloaded unauthorized, unpaid copies of Plaintiffs' books.**

Plaintiffs' core argument is that the fair use doctrine is unavailable because Defendants downloaded "unauthorized, unpaid-for copies" of Plaintiffs' books. Mot. at 11. But no such rule exists. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994) (fair use "is not to be simplified with bright-line rules.") Plaintiffs' argument contradicts controlling fair use authority.

Under the Copyright Act, the exclusive statutory rights granted to copyright owners are expressly *subject to*, and *limited by*, fair use. 17 U.S.C. § 106 ("Subject to section[] 107 [which codifies fair use] …."). As such, "a copyright holder cannot prevent another person from making a 'fair use' of copyrighted material." *Oracle*, 593 U.S. at 18. If a "use is otherwise fair, then no permission need be sought or granted." *Campbell*, 510 U.S. at 585 n.18. And fair use does not require *any* payment to the copyright owner. *Tresona Multimedia v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 652 (9th Cir. 2020) ("By definition every fair use involves some loss of royalty revenue …." (citation omitted)). Accordingly, Plaintiffs' notion that unpermitted and unpaid copying defeats fair use gets the law backwards—fair use allows precisely that.

Plaintiffs are also wrong that, "[t]hroughout the internet age, courts have consistently held that there is nothing 'fair' about downloading unauthorized copyrighted content for free from the internet." Mot. at 2, 12. Leading fair use cases hold precisely the opposite. Indeed, key features



FENWICK & WEST LLP

of the "internet age"—such as online search tools—exist *because* courts have allowed unauthorized and unpaid downloading for fair use purposes. For example, in *Kelly v. Arriba Soft Corp.*, the Ninth Circuit held that it was fair use for defendant Arriba to "download[] full-sized copies" of copyright-protected images, in vast quantities from across the internet, to create a search engine database displaying thumbnail-sized versions of images available online. 336 F.3d at 815, 822. Similarly, in *Perfect 10 v. Amazon*, it was fair use for Google to download online copies of Perfect 10's copyrighted images to create and operate a search engine that displayed thumbnail-sized versions of those images. *Perfect 10*, 508 F.3d at 1155-57, 1163-68. Some of Google's downloads came from websites that displayed Perfect 10's images without authorization—or, to use Plaintiff's label, they were "pirated." Google also displayed thumbnail images even after source images had been taken down. *Id.* at 1156. Nevertheless, the Ninth Circuit recognized that "Google's use of thumbnails is highly transformative," and its massive, unauthorized, unpaid downloading was therefore protected fair use. *Id.* at 1165.

The courts' approach to these cases is consistent with the broader principle, recognized by the Supreme Court, that the fair use analysis must account for "relevant circumstances, including 'significant changes in technology'" and "the realities of how technological works are created …." *Oracle*, 593 U.S. at 19, 23 (citation omitted). As the Ninth Circuit held in *Perfect 10*, fair use must be applied "flexibly in light of new circumstances," "especially during a period of rapid technological change." 508 F.3d at 1166 (citation omitted). The AI revolution plainly represents such a period of rapid technological change.

Plaintiffs' cases cited for the "downloading" argument are inapplicable because—unlike here—they involve the download or copying of protected works for consumptive, non-transformative uses. Mot. at 11-13. In *Napster,* users could easily find and download music to listen to it without buying a CD or authorized digital version. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001). Indeed, Napster provided "indexing and searching" functions for exactly that purpose. *Id.* at 1011-12. Similarly, in *BMG Music v. Gonzalez*, the defendant downloaded unauthorized copies of songs to listen to them, on a "try-before-you-buy basis." 430 F.3d 888, 890 (7th Cir. 2005). *Columbia Pictures Industries, Inc. v. Fung*—which did not discuss



FENWICK & WEST LLP

fair use—concerned vicarious infringement liability for providing services that allowed users to share unauthorized copies of movies and television shows via the BitTorrent file sharing protocol. 710 F.3d 1020, 1035-37 (9th Cir. 2013). And in *Wall Data Inc. v. Los Angeles County Sheriff's Department*, the defendant "created exact copies of [the plaintiff's] software" and "then put those copies to the identical purpose as the original software." 447 F.3d 769, 778 (9th Cir. 2006). In sum, all those cases are about downloading unpaid copies of works for their original, intended purpose—direct human consumption by listening to music, watching movies, and using software. They are thus irrelevant here, where Defendants and their customers did not download AI training datasets to read books.

The *Bartz v. Anthropic* case is likewise distinguishable on its facts. Mot. at 13-14, 17. The *Bartz* court held that it was not fair use for Anthropic "to amass a central library of 'all the books in the world' to retain 'forever,'" which would "be available for any number of further uses …." *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1014, 1026 (N.D. Cal. 2025). The court found that Anthropic had downloaded "over seven million copies of books" and saved them as "individual files" in easy-to-read "formats like .pdf, .txt, and .epub," to create a "general-purpose resource." *Id.* at 1014-15. On those particular findings, Anthropic's purpose for downloading books arguably remained tethered to their original purpose—human reading. By contrast, uncontradicted evidence shows that Defendants downloaded, maintained, and used The Pile and RedPajama—which contained a large amount of textual data other than books—solely for LLM training and research. Frankle Decl. ¶ 30. *Bartz* is therefore inapplicable.

Thus, Defendants are not foreclosed from invoking fair use because they copied Plaintiffs' books without authorization or payment; the doctrine exists precisely to allow *uncompensated*, *unlicensed* copying for transformative purposes, which serves the purposes of the Copyright Act by promoting the progress of science and the useful arts. *Oracle*, 593 U.S. at 30 (holding that using a copyrighted work "to create a new platform" "was consistent with that creative 'progress' that is the basic constitutional objective of copyright itself.").

FENWICK & WEST LLP

**c. Plaintiffs' accusations of "piracy" are a factually unsupported red herring.**

Plaintiffs' incantation of the pejorative terms "piracy" and "shadow libraries" is both factually unsupported and a red herring. There is no admissible evidence tying Defendants' use of The Pile and RedPajama to any illegal conduct. Plaintiffs rely on Internet lore that a certain Shawn Presser compiled Books3 using a "shadow library" called "Bibliotik" (Mot. at 4-5), but they premise that narrative entirely on unauthenticated, inadmissible hearsay evidence such as a social media post purportedly by Mr. Presser and "[p]ublicly available news stories."[7] Guardado Decl., Ex. 82; Ex. 2 (Seeley Dep.) at 189:24-191:3; *see, e.g.*, *Chapman v. Maraj*, No. 2:18-cv-09088-VAP-SSx, 2020 WL 6260021, at *4-5 (C.D. Cal. Sept. 16, 2020) (finding social media posts inadmissible hearsay).

Nor is there evidence that Defendants accessed "shadow libraries" or conferred a benefit on such libraries. Ex. 2 (Seeley Dep.) at 177:14-25, 178:4-17, 180:4-6. Defendants downloaded pre-existing digital copies of Plaintiffs' books from a legitimate research platform, as part of large, varied textual datasets compiled by reputable AI research organizations. *Supra* at III.C.

Plaintiffs' "piracy" rhetoric is particularly unhelpful because they define "piracy" as any copying without permission from the rightsholder. Ex. 2 (Seeley Dep.) at 12:14-25. Under that definition, a use is "still piracy even if it's fair use." *Id.* at 21:21-22:16. But again, that gets copyright law backwards. As the *Kadrey* court put it, "[t]o say that Meta's downloading was 'piracy' and thus cannot be fair use begs the question because the whole point of fair use analysis is to determine whether a given act of copying was unlawful." 788 F. Supp. 3d at 1046. The Court should thus ignore Plaintiffs' factually baseless and legally unsound "piracy" rhetoric.

---

[7] Throughout their Motion, Plaintiffs also improperly rely on unsworn expert reports introduced as attachments to an attorney declaration (*see* Guardado Decl., Exs. 10-12)—those are inadmissible and the Court should disregard them. *See Progressive Sols., Inc. v. Stanley*, No. 16-CV-04805-SK, 2018 WL 1989547, at *8 (N.D. Cal. Mar. 8, 2018) ("Unsworn expert reports prepared in compliance with Rule 26(a)(2) do not qualify as affidavits or otherwise admissible evidence for purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment."); *Atari Interactive, Inc. v. Teespring, Inc.*, No. 19-cv-00111-JST, 2022 WL 1601420, at *3 (N.D. Cal. March 9, 2022) (same).

**d. The commercial aspect of Defendants' LLM research and training does not weigh against fair use.**

Plaintiffs' hyperbolic accusation that Defendants' necessary intermediate copying was "nakedly commercial" misstates the record and, in all events, does not sway the fair use analysis. Mot. at 13. Mosaic used Plaintiffs' books to train its series of MPT models, which it released for free both to advance the science of AI development and to demonstrate the capabilities of Mosaic's AI-training platform. Frankle Decl. ¶¶ 10-13. It also shared access to pre-processed training datasets with customers, for free, for their own LLM research and training. The commercial aspect of such use "is not dispositive" because "it is to be weighed against the degree to which the use has a further purpose or different character." *Warhol*, 598 U.S. at 531. The highly transformative nature of Mosaic's and its customers' LLM training more than offsets any commercial motives.

In sum, Plaintiffs' efforts to shift the first factor inquiry away from Defendants' actual use of Plaintiffs' books by focusing on the initial acquisition of training data is contrary to well-established precedent, and it merely highlights that LLM training is indisputably transformative. The first factor strongly favors fair use.

**2. Factor Two: Defendants did not use Plaintiffs' books for their creative expression.**

The second factor considers the nature of the copyrighted works. Plaintiffs are correct that creative works like their books are "closer to the core of intended copyright protection" than functional works. Mot. at 15. But Defendants used the books to derive statistical information about language (which no author owns), not for their creative expression. And they did so to create an undeniably transformative technology. The second factor therefore weighs in favor of fair use.

**3. Factor Three: Defendants' copying of entire books within AI training datasets was reasonable to achieve a transformative purpose.**

The third fair use factor asks whether "the amount and substantiality of the portion" of the works used by Defendants was "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586. Plaintiffs' cursory discussion of this factor fails to even acknowledge Defendants' purpose. Mot. at 15. Defendants copied Plaintiffs' entire books to assemble a massive corpus of



FENWICK & WEST LLP

diverse text, as necessary for LLM training. Johnson Decl. ¶¶ 28-30. Plaintiffs' own technical expert acknowledged that books contribute functionally useful data to LLM training—"continuous prose with sustained narrative structure." Ex. 1 (Shan Dep.) at 216:11-16. Copying Plaintiffs' books in their entirety was therefore reasonably necessary for LLM training, and the third factor favors fair use. *See, e.g.*, *Kadrey*, 788 F. Supp. 3d at 1050.

**4. Factor Four: Defendants' use of datasets caused no market harm to Plaintiffs.**

The fourth factor looks to "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Plaintiffs contend that Defendants' downloading their books harmed "the sale of lawful copies." Mot. at 16. But Plaintiffs cite no evidence for that proposition, and their economist submitted no opinion on that topic. Ex. 11 (Spulber Dep.) at 63:20-23. By contrast, Defendants' economics expert provided unrebutted empirical data showing that Defendants' conduct did not harm Plaintiffs' sales. Tucker Decl. ¶¶ 25-33.

Plaintiffs' bare assertion of harm is circular, as it assumes that Defendants were required to purchase copies of the books for LLM training. That reasoning merely repackages Plaintiffs' flawed argument that "unpaid" copying precludes fair use. But again, no payment is due to copyright owners for a fair use. *Tresona*, 953 F.3d at 652. "The only market harms that count are the ones that are caused because the secondary use serves as a substitute for the original, not when the secondary use is transformative …." *HathiTrust*, 755 F.3d at 99. The loss of hypothetical book sales to Defendants for LLM training and research is therefore not a legally cognizable harm under the fourth factor. *Tresona*, 953 F.3d at 652 ("[A] copyright holder cannot prevent others from entering fair use markets merely by developing or licensing a market for … transformative uses of its own creative work.'") (citation modified). Plaintiffs also argue that "widespread" conduct like Defendants' would harm their book sales. Mot. at 16-17. But even "widespread" downloading of datasets to train LLMs that—like Mosaic's—do not produce infringing outputs would cause no market harm, as that activity does not create market substitutes. Because Defendants' use caused Plaintiffs no market harm, the fourth factor weighs strongly in favor of fair use.

FENWICK & WEST LLP

The balancing of all four factors compels the conclusion that Defendants engaged in fair use by copying datasets containing Plaintiffs' books, as an undisputably necessary step in creating transformative technology. The Court should therefore deny Plaintiffs' motion for summary judgment on infringement claims related to that conduct.

**B. Defendants' retention and limited sharing of access to datasets formatted for LLM training was not copyright infringement.**

Plaintiffs also seek summary judgment for direct copyright infringement based on attorney argument that Defendants created and operated a "pirate" or "commercial" library.[8] Mot. at 18. The evidence simply does not back up that claim. Instead, it shows that Defendants shared links with nine customers and a graduate student to versions of the datasets that had been compiled and formatted specifically for training LLMs using Defendants' efficient infrastructure. The format of that data would not allow any ordinary consumer to find or read Plaintiffs' books. Assessed on the evidence rather than Plaintiffs' rhetoric, the statutory factors continue to decisively favor fair use.

**1. Factor One: Defendants' retention and limited sharing of The Pile and RedPajama datasets was solely for a transformative use.**

**a. Defendants did not operate any "library" of books.**

The hallmark of any "library" is the ability to find and read books. Nothing Defendants did served that purpose. <u>First</u>, Defendants shared access to The Pile and RedPajama in a format customized for LLM training on Defendants' infrastructure. The datasets were the antithesis of a conventional reading "library" because they were not indexed or organized to facilitate searching for a specific book, and were not in a readable format. Johnson Decl. ¶¶ 73-74. Both Plaintiffs' and Defendants' technical experts *agree* that identifying a specific book within the datasets required a multi-step, makeshift method that entails significant technical sophistication. Johnson Rebuttal Report ¶¶ 52-54; Guardado Decl., Ex. 11 (Shan Opening Report) ¶¶ 28-41 (describing Dr. Shan's steps to try to find books in the datasets). For example, Plaintiffs' technical expert's method entails

[8] Plaintiffs do not seek summary judgment on their claims for contributory infringement and inducement of infringement, which are also premised on Defendants' limited sharing of access to training-formatted datasets. Those claims fail for the reasons set forth in Defendants' summary judgment motion. Dkt. 312-2 at 22-25.

downloading an entire massive dataset and then performing "a technical search using binary hash matching" or "an analysis of the metadata found within the datasets." Shan Opening Report ¶ 28.

Moreover, the "hash matching" method requires *beginning* the search with a complete digital copy of the book (*see* Shan Opening Report ¶ 29), which no consumer would do—why search for a copy of a book you already have? A user would then need to perform multiple steps, including digitally modifying their copy of the book, generating hash codes for both the book and the untokenized training data, and then comparing the book's hash codes to the untokenized dataset's hash codes. *Id.* ¶¶ 32-36. For a tokenized dataset, a user would also have to first detokenize the data "back into readable English" using a tokenizer, and then apply hash matching methods across fragmented "shards" of data. *Id.* ¶ 37. Alternatively, a user could download an entire dataset and then conduct a "manual inspection" of "structured metadata fields" from terabytes of data (to the extent the dataset even contained such fields). *Id.* ¶ 41. On their face, neither method is feasible for someone simply looking to find and read a book for free. Indeed, the *Bartz* court expressly held that Books3 metadata *does not* allow for reliable identification of specific books. *Bartz v. Anthropic PBC*, 791 F. Supp. 3d 1038, 1051 (N.D. Cal. 2025) (declining to certify a Books3 class in part because "[t]he books downloaded as part of Books3 came with fewer fields of metadata … and as a result the identification of titles and authors would be too problematic.").

Even if someone could somehow locate a specific book in one of the datasets, they would still need to convert the data into a readable format through multiple steps of technical manipulation. Some of the datasets contain tokenized MDS files, which are—per Plaintiffs' description—"machine readable text" only. Mot. at 6. To render such text human-readable, someone would undisputably need to obtain and run a tokenizer. Dkt. 319-11 (Johnson Opening Report) ¶¶ 252-53; Shan Rebuttal Report ¶ 15.

Even untokenized data in MDS format is *not* "plain text," as Plaintiffs falsely argue. Mot. at 6. Rather, as Plaintiffs' technical expert Dr. Shan explained, obtaining a human-readable version requires "*converting* [the] MDS files back into the original plain text of Plaintiffs' books." Shan Rebuttal Report ¶ 12 (emphasis added); Shan Opening Report ¶ 88; Johnson Opening Report ¶¶ 246-251, 256-260. While Dr. Shan, who holds a doctorate in computer science, characterizes

FENWICK & WEST LLP

that process as "trivial," he admits that it entails multiple steps, including writing and running Python code. Performing those steps requires—in Dr. Shan's words—the skillset of an "undergraduate student who has taken an introductory Python course and reads [Defendants'] official documentation." Shan Rebuttal Report ¶ 13; Johnson Rebuttal Report ¶¶ 61-64; Ex. 12 (Dr. Shan's purported ChatGPT instructions on Python coding and other steps required to convert an MDS file into human-readable format). Thus, it is undisputed that both tokenized and untokenized book data in MDS format are unreadable without overcoming technical barriers. Unsurprisingly, there is no evidence that anyone, other than Plaintiffs' technical expert, ever did so or even tried to do so.

Dr. Shan identifies two datasets ("Datasets '23 and '24") that supposedly contain "plain text files of books." Shan Rebuttal Report ¶ 14. But he concedes that Defendants used those two datasets only internally for LLM training, and that Defendants did *not* include them in any cloud-based repositories shared with third parties. Shan Opening Report ¶ 27. Those datasets are thus irrelevant to Plaintiffs' claims that Defendants shared a "commercial library."

Brushing these undisputed facts aside, Plaintiffs' counsel submits as Exhibit 48 a purported "plain-text copy of Plaintiff Brian Keene's *Ghost Walk* found in Defendants' files" by their expert Dr. Shan, implying that Defendants shared that plain-text book with third parties. Mot. at 6; Guardado Decl. ¶ 50 & Ex. 48. But that description of Exhibit 48 is simply false. Plaintiffs and Dr. Shan concede that "*[a]ll of the files*" uploaded by Defendants to the cloud-based repositories were in the MDS format. Mot. at 6; Shan Opening Report ¶ 27. And Dr. Shan further concedes that MDS files can be viewed as "plain text" only *after* technical conversion. Shan Rebuttal Report ¶¶ 12-13. He therefore cannot have "found" that "plain text" document in any "files" that Defendants provided to customers. Indeed, Dr. Shan has not authenticated that document or ever presented it as something he "found" in "Defendants' files." Plaintiffs' characterization of that unauthenticated document is thus contradicted by their own evidence. The only logical conclusion is that Plaintiffs' counsel or their expert *converted* the file into "plain text" themselves.

<u>Second</u>, Defendants did not conduct widespread or for-profit dissemination of The Pile and RedPajama to businesses or consumers. Mot. at 19-20. While Mosaic at one point considered



FENWICK & WEST LLP

FENWICK & WEST LLP

potentially "productizing" some specially formatted, open-source datasets for paid use, it never did so. Supp. Frankle Decl. ¶¶ 6-8. No one ever paid Defendants for access to their copies of The Pile or RedPajama, and Defendants never publicly advertised access to those datasets. *Supra* at III.E.

Defendants did maintain RedPajama in an AWS repository configured to "Public – Requester Pays" but—as Plaintiffs concede—this repository could not be accessed unless a user already had the specific link. Mot. at 7; Shan Opening Report ¶ 61; Frankle Decl. ¶ 45. Defendants never posted the link publicly, nor did they share it beyond a handful of customers and one graduate student. Frankle Decl. ¶¶ 45-48. While Plaintiffs mischaracterize that AWS repository as "easily findable" (Mot. at 8), Dr. Shan confirms the opposite. Indeed, he employed a targeted, highly technical search to locate the repository, using an "open-source S3 enumeration tool" and an "S3 scanner" "to run an S3 scan searching for 'mosaicml'" from an AWS account. Shan Rebuttal Report ¶¶ 24, 32. Dr. Shan tacitly conceded that no ordinary consumer could have discovered the datasets in this manner, claiming only that "technically skilled actors" with malicious intent "could discover and access the [data] buckets." *Id.* ¶ 32. There is no evidence that anyone did so.

**b. Defendants made interim copies of works available to select customers and a researcher for fair use purposes.**

On the undisputed record, Defendants shared access to interim copies of Plaintiffs' books with a handful of third parties for their own LLM training and research, which is a transformative use. *Supra* at IV.A(1). Indeed, Plaintiffs concede that Defendants "provide[d] datasets in a convenient format" customized for use on Defendants' infrastructure, so that its nine customers could "more easily" use that infrastructure. Mot. at 20. Plaintiffs *do not* contend that Defendants' customers used the datasets for anything other than LLM training or research, or that they created LLMs which can produce outputs that infringe Plaintiffs' books. *Id.* at 19-22.

As the Second Circuit held in *Google Books*, making interim copies of works for fair use and then sharing those interim copies for further fair use does not give rise to copyright infringement. 804 F.3d at 228-29 (holding that it was fair use for Google to make digital copies of books to create a transformative database, *and* that providing digital copies of books to third parties to facilitate their own fair use was also not an infringement). With no evidence, Plaintiffs argue

that the dataset sharing created a "substantial risk of substitution," for example if "[p]roprietors of illegal shadow libraries" had accessed and misused the shared copies. Mot. at 8, 19-20. But that is mere speculation, and Plaintiffs' own expert confirmed there is no evidence of that happening. Shan Rebuttal Report ¶¶ 27-30. The *Google Books* court specifically declined to impose copyright liability "based on *the mere speculative possibility*" that a third party may have misused an interim copy shared for further fair use. 804 F.3d at 229 (emphasis added). That reasoning applies here.

Plaintiffs' authorities are inapposite because they involved widespread distribution of works in user-friendly formats for consumption of expressive content (reading books, listening to music, using software), not the limited sharing of works in non-consumptive, intermediate formats for a fair use purpose. Mot. at 19-22. In *Hachette Book Group, Inc. v. Internet Archive*, the defendant made millions of books available through a library that allowed patrons to select books organized "in popular categories," which could then be read on a "BookReader web browser platform" or downloaded as a "PDF or ePub version of the ebook." 664 F. Supp. 3d 370, 375-76 (S.D.N.Y. 2023). The *Hachette* defendant thus operated a service that, unlike Defendants' datasets, bore the classic hallmarks of a library—straightforward searchability and formatting conducive to immediate reading. In *UMG Recordings, Inc. v. MP3.Com, Inc.*, the defendant offered copies of musical recordings for online listening by consumers. 92 F. Supp. 2d 349, 350-51 (S.D.N.Y. 2000). In *United States v. Slater*—a criminal case—defendants belonged to an organization called "Pirates With Attitudes," which was dedicated to the unauthorized dissemination of copyrighted software. 348 F.3d 666, 667 (7th Cir. 2003). None of these cases involve sharing interim copies of works for a downstream transformative purpose only. They are therefore irrelevant.

Relatedly, courts decided the *Reuters* and *Tullo* cases (Mot. at 20-22) on the principle that the defendants could not rely on their customers' potential downstream fair use to justify their own *non-transformative* use of copied works, which served the same purposes as the originals (licensing video recordings of newsworthy events). *L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 994 (9th Cir. 1998); *L.A. News Serv. v. Tullo*, 973 F.2d 791, 792-93 (9th Cir. 1992). Here, by contrast, Defendants used Plaintiffs' books as part of a corpus of data for a highly transformative purpose, and provided access to select AI developers and a graduate student for that purpose only.

In sum, Defendants did not make copies of Plaintiffs' books to operate an online "library." Rather, they shared datasets that had been formatted specifically for LLM training on Defendants' infrastructure with a select group of third parties engaged in precisely that transformative activity. As in *Google Books*, that limited sharing for further fair use does not undermine Defendants' transformative purpose and use, and the first factor weighs heavily in favor of fair use.

**2. Factors Two and Three favor fair use.**

As shown above, Defendants used Plaintiffs' books as a small portion of a vast collection of text to derive statistical information about language—not to exploit any book's expressive content. Copying those datasets, including the books they contained, was necessary to assemble that massive, varied, and accurate corpus of data needed to create a transformative new technology. *Supra* IV.A. That same reasoning applies to Defendants' limited sharing of dataset access, which served solely to facilitate further LLM research and training on Defendants' training infrastructure.

**3. Factor Four: Defendants' storage and limited sharing of The Pile and RedPajama caused no market harm to Plaintiffs.**

On the fourth factor, "where a defendant introduces evidence of a lack of market harm, 'and the plaintiff fails to introduce empirical evidence countering such a showing, the fourth factor should be weighed in the defendant's favor.'" *Kadrey*, 788 F. Supp. 3d at 1056 (citing *Patry on Fair Use* § 6:13 (2025 ed.)). On this Motion, Plaintiffs contend that the storage and limited sharing of datasets harmed the consumer market for their books by making free substitutes available. Mot. at 23-25. But there is no evidence of anyone using the datasets as substitutes for any books. Defendants' expert evidence undermines any claim of substitution or loss of book sales caused by Defendants' conduct, and Plaintiffs' economics expert made no effort to counter that showing with any empirical evidence. *Supra* at III.G. The fourth factor thus weighs in Defendants' favor.

Unable to point to any actual substitution, Plaintiffs speculate that malicious actors "crawl[ing] the internet" *could* have discovered Defendants' cloud-based AWS repository and "used [the datasets] to stock Napster-style pirate sites." Mot. at 24. But again, Plaintiffs' expert confirmed there is *no evidence* of that happening. Shan Rebuttal Report ¶¶ 27-30. Defendants' uncontradicted expert evidence undercuts that speculation, as empirical data is inconsistent with

*any* statistically significant loss of book sales after the dataset sharing. Tucker Decl. ¶¶ 25-33. As a practical matter, it would have made little sense for anyone to randomly "crawl" AWS buckets for The Pile and RedPajama when those datasets were freely available on the Hugging Face platform, in a format that was not preprocessed for use on Defendants' infrastructure only.

Plaintiffs also label Defendants' dataset sharing as "piracy" and therefore inherently harmful to the market. Mot. at 23-25. But as Defendants' expert Dr. Jonathan Hersh explained, "piracy" requires empirically verifiable consumer substitution and lost sales of the "pirated" works. Dkt. 319-8 (Hersh Decl.) ¶¶ 19-37. There is no evidence of that here.[9]

Finally, relying on *Google Books*, Plaintiffs argue that they have rebutted fair use by showing that Defendants exposed their books to a *risk* of piracy. Mot. at 24-25. But the *Google Books* court was referring to the *future* "risk that hackers might gain access and make the books widely available," where Google was indefinitely storing digital copies of books. 804 F.3d at 227. Here, Dr. Shan confirmed that Defendants have adequately "restricted the [AWS] bucket to deny external access." Shan Rebuttal Report ¶ 29.

In sum, the unrebutted evidence shows that Defendants' storage and limited sharing of training-formatted datasets has not harmed Plaintiffs' books in the consumer market. The fourth factor thus weighs in favor of fair use. Balancing the four factors compels the conclusion that Defendants' conduct, considered as a whole, was fair use.

## V. CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for partial summary judgment in its entirety.

Dated: August 13, 2026 FENWICK & WEST LLP

By: */s/ Jedediah Wakefield*
Jedediah Wakefield (CSB No. 178058)

---

[9] Plaintiffs cite Dr. Hersh's report for the criteria that make substitution more likely (Mot. at 24), but they fail to acknowledge that Dr. Hersh found those criteria unmet in this case. Hersh Decl. ¶¶ 20-21. Plaintiffs also say Dr. Tucker testified that Plaintiffs were harmed by piracy. Mot. at 16. But Dr. Tucker merely agreed to an abstract, uncontroversial proposition: "So I think you're asking me if something happens where no one is paid, is there no financial reward. And I would agree with that proposition." Guardado Decl., Ex. 8 (Tucker Dep.) at 205:3-6.

FENWICK & WEST LLP

jwakefield@fenwick.com
Ryan Kwock (CSB No. 336414)
rkwock@fenwick.com
One Front Street, 33rd Floor
San Francisco, CA 94111
Telephone: 415.875.2300
Facsimile: 650.938.5200

David Hayes (CSB No. 122894)
dhayes@fenwick.com
Diana C. Buck (CSB No. 339314)
dbuck@fenwick.com
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

Jonathan T. McMichael (CSB No. 304737)
jmcmichael@fenwick.com
Deena Feit (admitted *pro hac vice*)
dfeit@fenwick.com
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone: 206.389.4510
Facsimile: 650.938.5200

Charles Moulins (admitted *pro hac vice*)
cmoulins@fenwick.com
Justine Vandermel (admitted *pro hac vice*)
justine.vandermel@fenwick.com
902 Broadway, 18th Floor
New York, NY 10010
Telephone: 212.430.2600
Facsimile: 650.938.5200

Zachary Harned (CSB No. 335898)
zharned@fenwick.com
730 Arizona Avenue, 1st Floor
Santa Monica, CA 90401
Telephone: 310.434.5400
Facsimile: 650.938.5200

*Attorneys for Defendants*
DATABRICKS, INC., and
MOSAIC ML, LLC, formerly
MOSAIC ML, INC.

FENWICK & WEST LLP