[Counsel on signature pages]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

*In Re Mosaic LLM Litigation*

Case No. 3:24-cv-01451-CRB
Consolidated with Case No. 3:24-cv-02653-CRB

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Judge: Hon. Charles R. Breyer

Date: October 30, 2026
Time: 10:00 a.m.
Location: Courtroom 6, 17th Floor

## TABLE OF CONTENTS


I. STATEMENT OF ISSUES TO BE DECIDED ....................................................... 1

II. INTRODUCTION ....................................................................................................... 1

III. FACTUAL BACKGROUND ...................................................................................... 4

A. Defendants Downloaded Free, Unauthorized Copies of Plaintiffs' Works .............. 4

B. Defendants Commercially Distributed Plaintiffs' Works ........................................ 5

C. Defendants Copied Plaintiffs' Works to Develop LLMs, Including One Designed to Write Stories like Plaintiffs' ........................................................................ 6

IV. LEGAL STANDARD ................................................................................................. 7

V. ARGUMENT ............................................................................................................... 7

A. Use #1: Defendants Have Failed To Meet Their Burden To Establish That Their Free Downloads of Plaintiffs' Books Were Fair Use. ............................................ 8

B. Use #2: Defendants' Reproduction and Distribution of Plaintiffs' Works to Create and Operate a Commercial Library Was Not Fair Use. ......................................... 10

C. Use #3: Defendants Cannot Establish That Their Reproduction of Plaintiffs' Books to Develop a "StoryWriter" LLM Was Fair Use. ................................................. 13

a. Factor One: The purpose and character of Defendant's use was to build a machine to generate fiction. ............................................. 14

i. There are genuine questions of fact on whether Defendants' use of Plaintiffs' works was non-transformative, substitutive, and commercial. ............................................ 14

ii. The so-called "intermediate copying" cases do not support Defendants' position. ....................................................... 17

b. Factors Two and Three weigh in Plaintiffs' favor. .......................... 19

c. Factor Four: Using Plaintiffs' works to build a fiction-writing machine has the potential to harm the market for books. ............... 19

i. There are genuine questions of fact on whether Defendants' conduct would result in market displacement and substitution. ........................................................................ 20

ii. There are genuine questions of fact on whether Defendants' conduct, if widespread, would deprive Plaintiffs of licensing revenue. ..................................................................... 24

D. Triable Questions Preclude Summary Judgment On Plaintiffs' Contributory and Vicarious Infringement Claims. ............................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records v. Napster*,
239 F.3d 1004 (9th Cir. 2001) ....1, 8, 10, 17

*ALS Scan, Inc. v. Cloudflare, Inc.*,
2017 WL 11579039 (C.D. Cal. June 1, 2017) ....25

*American Geophysical Union v. Texaco*,
60 F.3d 913 (2d Cir. 1994).... *passim*

*Andy Warhol Found. v. Goldsmith*,
598 U.S. 508 (2023).... *passim*

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015)....12, 18, 19

*Bartz v. Anthropic*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) .... *passim*

*BMG Music v. Gonzalez*,
430 F.3d 888 (7th Cir. 2005) ....8, 10

*Campbell v. Acuff-Rose Music*,
510 U.S. 569 (1994)....7, 19, 20, 25

*Cox Commc'ns, Inc. v. Sony Music*,
146 S. Ct. 959 (2026)....25

*Diversey v. Schmidly*,
738 F.3d 1196 (10th Cir. 2013) ....22

*Fox Film Corp. v. Doyal*,
286 U.S. 123 (1932)....19

*Fox News Network v. TVeyes*,
883 F.3d 169 (2d Cir. 2018)....8

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021)....7, 22, 23

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) ....2, 11, 17

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)....20, 24

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) ........................................ *passim*

*Los Angeles News Serv. v. Reuters Television*,
149 F.3d 987 (9th Cir. 1998) ........................................ 11

*Los Angeles News Service v. Tullo*,
973 F.2d 791 (9th Cir. 1992) ........................................ 9, 11, 13

*McGucken v. Pub Ocean Ltd.*,
42 F.4th 1149 (9th Cir. 2022) ........................................ 11, 13, 21, 24

*Monge v. Maya Mags., Inc.*,
688 F.3d 1164 (9th Cir. 2012) ........................................ 19

*Newegg Inc. v. Ezra Sutton, P.A.*,
2016 WL 6747629 (C.D. Cal. Sept. 13, 2016) ........................................ 7

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ........................................ 18

*Princeton Univ. Press v. Michigan Document Servs.*,
99 F.3d 1381 (6th Cir. 1996) ........................................ 12, 18

*Rookaird v. BNSF Ry. Co.*,
908 F.3d 451 (9th Cir. 2018) ........................................ 7

*Sega Enterprises v. Accolade*,
977 F.2d 1510 (9th Cir. 1992) ........................................ 17, 18, 23

*Thaler v. Perlmutter*,
130 F.4th 1039 (D.C. Cir. 2025) ........................................ 22

*Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*,
765 F. Supp. 3d 382 (D. Del. 2025) ........................................ 16

*UMG Recordings, Inc. v. MP3.Com*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000) ........................................ 11, 17

*Wyler Summit P'ship v. Turner Broad. Sys., Inc.*,
235 F.3d 1184 (9th Cir. 2000) ........................................ 15

**Statutes**

17 U.S.C. § 106 ........................................ 22

17 U.S.C. § 107 ........................................ *passim*

**Other Authorities**


Chakrabarty et al, *Generative AI Floods and Dilutes the Market for Books*, COLUM. L. RES. PAPER FORTHCOMING at 2-3, https://arxiv.org/pdf/2607.20349 (Aug. 3, 2026)..............21

How A.I. Books Sneak Their Way Into Stores, The New York Times, July 28, 2026 (accessed: https://www.nytimes.com/2026/07/28/books/ai-bookselling-amazon.html) .........21

Is This What Comes After AI Slop?, The Atlantic, July 27, 2026 (accessed: https://www.theatlantic.com/technology/2026/07/daggermouth-novel-bestseller-ai/688067/) ..............................................................................................................21

*Latent Space Podcast: MPT-7B and The Beginning of Context=Infinity* (May 20, 2023) available at https://tinyurl.com/LatentSpacePodcast ..................................................................7

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. STATEMENT OF ISSUES TO BE DECIDED

1. Whether Defendants have shown that their downloading of permanent copies of Plaintiffs' books free from the internet was fair use as a matter of law, where evidence shows that Plaintiffs' works were widely available for sale, that Defendants sought copies of Plaintiffs' works for the protected expressive elements, and that Defendants maintained copies of Plaintiffs' works in an internal library even after Defendants' alleged "transformative" use had been exhausted.

2. Whether Defendants' reproduction and distribution of Plaintiffs' works in the course of creating and operating a commercial library was fair use as a matter of law, where evidence shows that Defendants distributed Plaintiffs' works to third parties without any contractual or other restrictions and Defendants made Plaintiffs' works available for download on public electronic storage locations.

3. Whether Defendants' reproduction of Plaintiffs' works to develop large language models (LLMs), including a model designed specifically to generate book-length fiction stories within minutes, was fair use as a matter of law.

## II. INTRODUCTION

Defendants downloaded over 190,000 copyrighted books they decided were too expensive to buy. They gave them out free to paying customers, posted them on the internet, kept them permanently, and used them to create a "StoryWriter" model capable of generating an infinite volume of book-length fiction to compete against Plaintiffs' books. Defendants claim that each of these uses is fair. Just the opposite.

This case presents two open-and-shut instances of copyright infringement—downloading and maintenance of a commercial library—on which Plaintiffs have moved for summary judgment. The case also presents a third instance of infringement, Defendants' copying of Plaintiffs' novels to develop a novel-generating machine, that presents a series of contested factual questions that can only be resolved at trial.

The first infringement relates to Defendants' downloading of free copies of Plaintiffs' works online. Obtaining copyrighted works for free to avoid paying for them or for convenience is not allowed. That has long been true. *See, e.g., A&M Records v. Napster,* 239 F.3d 1004, 1015 (9th Cir. 2001). Defendants say their conduct was fair use because they eventually used the books for what was, in their view, fair use activity. That's irrelevant. Courts have consistently held that a downstream fair use purpose—even

something quintessentially fair, like news reporting or classroom teaching—does not excuse taking copyrighted books for free instead of paying a purchase price, subscription fee, or other customary compensation. *American Geophysical Union v. Texaco*, 60 F.3d 913, 924 (2d Cir. 1994). A contrary rule would justify theft of any copyrighted content by looking at the ultimate purpose and would turn copyright law on its head. Writing a critical review on Amazon does not justify stealing a book.

The second infringement is Defendants' creation and operation of what was effectively a commercial library. Defendants put copies of Plaintiffs' books on cloud storage spaces and distributed them to at least nine of their customers and a graduate student. Defendants set at least one of these cloud spaces as "Public," so that anyone with an Amazon Web Services account—which takes about as much time to create as a Gmail account—could also access Plaintiffs' books. The reason was commercial. Defendants sought to "productize" Plaintiffs' works and 190,000 others to promote their products and services.

This too is not fair use, and obviously so. *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 197 (2d Cir. 2024). A commercial distributor must justify its own copying under Section 107; it cannot borrow the supposed fair use of its downstream recipients. The Ninth Circuit has twice so held, in decisions Defendants do not cite. *Infra*, Section (V)(B). Nor have Defendants met their burden to show that each third party's use was fair. They cannot present evidence on the full scope of their distribution because they failed to preserve the records. Whatever purpose these third parties ultimately had, *Defendants'* decision to hand out copyrighted works free, without any restrictions, is not protected under the fair use doctrine.

The third infringement is Defendants' copying of Plaintiffs books to develop a Large Language Model ("LLM") designed to generate fiction books. The model was called StoryWriter and it generated book-length fiction in minutes. For this exercise, Defendants valued Plaintiffs' works for precisely what the Copyright Act protects—their characters, plot, prose, and other creative expression—because this is what enabled the machine to generate output of a quality that could actually compete with works by Plaintiffs and other fiction authors. This copying is not fair use because it exploits the Plaintiffs' creative expression in a way that threatens to displace the market for it and the value of it. At a minimum, a reasonable fact-finder could so conclude and that defeats summary judgment.

A litany of triable questions preclude summary judgment. The evidence shows an existing, well-established licensing market for the use of copyrighted works for LLM training. But even more important

is the widespread impact of training such powerful technology on Plaintiffs' creative expression with the explicit goal of developing a model that generates book-length works in the same genre. Defendants' internal documents, public statements, and experts confirm that StoryWriter could generate book-length outputs in a manner of minutes, that it could generate "gorgeous" prose that imitates human authorship, [redacted]. *See infra*, Section (V)(C)(c). The potential seismic impact from conduct like Defendants' is not hypothetical: their own expert acknowledges that the number of new books appearing on the market each month has tripled since ChatGPT's release in 2022. Ex. 46 ¶ 77 n.170; Ex. 60 at 2–3. Defendants have, in litigation, sought to retract many of their employees' past statements—or, in the case of their experts, past academic writings—but this presents credibility and evidentiary weight issues that can never be resolved on summary judgment.

Defendants ask this Court to ignore all of this evidence—and with it, to ignore the actual impact of widespread conduct like Defendants'. Defs.' Mot. (ECF No. 321) at 19. They argue that in considering the effects of Defendants' conduct, the Court may only consider evidence of harm perpetuated by disseminating substantially similar copies of Plaintiffs' works, even if the Defendants' exploitation threatens massive market dilution and displacement in other ways. Defendants divine this sweeping rule from cases addressing peculiar situations, such as where the reproduction of computer code was necessary to access unprotectible, functional elements of the copyrighted code.

But no controlling authority supports such a blinkered view of the fair use doctrine. Fair use asks a practical question: What happens to the incentive to write novels if conduct like this becomes the norm and is entirely uncompensated? Copyright exists to "provide an economic incentive to create original works," and the fair use analysis must therefore consider the extent to which secondary use "diminish[es] th[is] incentive." *Andy Warhol Found. v. Goldsmith*, 598 U.S. 508, 531, 535 (2023). Defendants advance a rigid rule that would resolve every AI case without considering the actual, practical impact of the use. "Courts can't stick their heads in the sand to an obvious way that a new technology might severely harm the incentive to create, just because the issue has not come up before." *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1055 (N.D. Cal. 2025).

When the record is viewed in the light most favorable to Plaintiffs, applying longstanding fair use principles, Defendants have not come close to meeting their burden to establish their affirmative defense

that using these books to train a model called StoryWriter is fair use as a matter of law. The evidence shows Defendants conscripted Plaintiffs' novels for their creative expression to build a machine whose announced purpose was to write novels in minutes at minimal cost. That is not fair use.

## III. FACTUAL BACKGROUND

Plaintiffs are award-winning authors and professional writers who authored and copyrighted 28 books that Defendants downloaded from the internet without payment. Defendants are Databricks, a $130+ billion technology company, and MosaicML, a startup Databricks acquired for $1.3 billion in July 2023.

### A. Defendants Downloaded Free, Unauthorized Copies of Plaintiffs' Works

*First,* Defendants downloaded Plaintiffs' works from the internet without payment. Ex. 1 (Shan Rep.) ¶ 14; Ex. 2 (Databricks Resp. to Interrog. No. 34). Defendants knew they could have purchased the books but decided not to. Pltfs. Mot. (ECF No. 379) at 5. [redacted] Defendants instead downloaded Plaintiffs' Works—and approximately 196,600 others—for free, in a file called "Books3" included in two larger datasets: "The Pile" and "RedPajama." Ex. 1 ¶¶ 17–26; Ex. 4 (Seeley Rep.) ¶¶ 35-36.

Public information made clear that Books3 came from Bibliotik, an infamous shadow library. Ex. 5. Books3's creator gave a literal middle finger to copyright law, posting a profane video under a fake hyperlink to the dataset's "DMCA policy." Ex. 4 ¶¶ 40 & n.48. Defendants knew of this illicit provenance. Jonathan Frankle—Databricks' Chief AI Scientist—maintained a "MosaicML Dataset Inventory" that described Books3 as "[f]iction and non-fiction books collected from torrent tracker; unknown author consent." Ex. 7. After they downloaded Plaintiffs' works, Defendants worried over the associated "copyright issues" and discussed whether they should "obfuscate" that they used them. Ex. 8, slide 26; Ex. 9. But despite these misgivings, they stayed the course.

Defendants downloaded Plaintiffs' works to create a central library, usable for whatever Defendants wanted. *See, e.g.*, Ex. 19 (Rao Dep.) at 144:25-145:15 ("internal research work"); Defs.' Mot. at 7–8 (Defendants distributed books to customers). Defendants categorized their library by genre—checking out specific books and making copies when they wanted them for special use cases (including building a

fiction-specific subset to encode a fiction-generating LLM), while leaving others behind for later use. *See* Ex. 10 at 3–4; Ex. 12 (Databricks Resp. to Interrog. No. 6); Ex. 1 ¶ 27; Ex. 21 ¶¶ 3–4. Even after they decided to stop using Plaintiffs' works for LLM training, Defendants never deleted the books—using them for commercial experiments, including research on Databricks' DBRX model. Ex. 11 (Frankle Dep.) at 217:20–218:4; Ex. 13 (Frankle Dec.) ¶ 33; Ex. 19 (Rao Dep.) at 130:14–23, 144:2–15.

### B. Defendants Commercially Distributed Plaintiffs' Works

*Second*, after downloading unauthorized copies of Plaintiffs' works without paying a cent, Defendants copied and distributed them directly to their customers for free, and made them available to the public for download. *See* Ex. 16 (Databricks Resp. to Interrog. Nos. 46 & 47).

In their own words, Defendants decided to "productize" their illicit copies. *See* Ex. 8 at slide 25; Ex. 15 at 16; Pltfs'. Mot. at 5–8 (explaining how Defendants made Plaintiffs' works available). Defendants did this because—in Frankle's words—there was a commercial demand for Plaintiffs' works: "customers asked us to provide training data for their LLM research and training." Ex. 13 ¶ 42. Giving customers "easy access" to datasets like The Pile was a valuable "product feature that [was] missing from [Mosaic's] cloud offering." Ex. 18 at 3–4. By streamlining data acquisition, Defendants reduced the "friction" associated with using their platform, which was "significantly better for broader adoption of [their] code & tools." *Id.* at 3. Despite Defendants' stated purpose of providing this library for "LLM research and training," they failed to impose *any restrictions* on how third parties could use or redistribute the commercial library—including access controls, use restrictions, or warnings about re-distribution. *See* Ex. 19 at 74:24–75:5; Ex. 20 at 94:8–95:6; Ex. 21 ¶ 28; Ex. 22 at 107:11–14; Ex. 23 at 72:25–73:1. When Defendants distributed Plaintiffs' works, the files were expressly labeled "public." *See* Ex. 54 at 1; Ex. 55 at 4.

Anyone with the link, an AWS account, and a credit card could download these public books for a small fee. Ex. 20 at 113:6–9; Ex. 21 ¶ 32 & n.46. Even without the link, the buckets were easily discoverable using common open-source tools. Ex. 21 ¶¶ 24–32. Hackers and internet pirates—including the infamous shadow library Anna's Archive—commonly crawl AWS for public and misconfigured buckets, searching for free troves of data like Plaintiffs' works, made available by providers like Defendants. *Id.* [redacted]

### C. Defendants Copied Plaintiffs' Works to Develop LLMs, Including One Designed to Write Stories like Plaintiffs'

*Third*, beyond free downloading, enterprise distribution, and public dissemination, Defendants used Plaintiffs' works to demonstrate the promise of their commercial LLM-training enterprise. One of those "demo" models was an LLM called "StoryWriter" that was—in Defendants' words—"designed to read and ***write fictional stories*** with super long context lengths." Ex. 25 at 1 (emphasis added).

The process of training an LLM involves making copies of the training data—here, Plaintiffs' works—and repeatedly copying the content to train the LLM to accurately predict the next word. Ex. 1 ¶¶ 43–45. During training, LLMs review data to encode the ability to "generate[] coherent text that mimics the style, grammar, and factual content of the data on which [they were] trained." *Id.* ¶ 43. In Frankle's words, "what you put into the model is what you'll get out." Ex. 26 at 8. A successfully trained model exploits the expressive content of the text on which it is trained, picking up its expressive tendencies. Ex. 1 ¶¶ 43–45. By providing LLMs with countless copies of Plaintiffs' works, Defendants directed their LLMs to output text similar to Plaintiffs' works. This explains why the LLMs are capable of mimicking Plaintiffs' writing styles—a conclusion confirmed by Defendants' own expert. Ex. 21 ¶¶ 33–47; Ex. 27.

LLMs can be tailored to specific use cases through a special training phase called fine-tuning. Fine-tuning involves "taking a base model and training it for a specific capability or specific downstream purpose," using a "curated" dataset that is constructed for that purpose. Ex. 11 at 58:14–23 (first quote); Ex. 28 ¶ 23 (second quote). Defendants curated a fiction subset of Plaintiffs' works to fine-tune an LLM called "MPT-7B-StoryWriter-65k," or simply "StoryWriter." Defs.' Mot. at 6–7. Mosaic engineers deliberately chose "purity of data"—only non-"mature," copyrighted fiction works, Ex. 10 at 3—because "[m]ixing full books with academic papers might not help the model generate fiction prose." Ex. 30. To develop this curated dataset, Defendants looked up the ISBN—unique identifier—of each book and ran them through Google Books to "identify fictional works." Ex. 12 (Databricks Resp. to Interrog. No. 6).

As Defendants explained when they released the model, StoryWriter was deliberately fine-tuned on this curated fiction library to enable it to "generate entire novels (like the sequel to the Great Gatsby) in minutes." Ex. 43. Indeed, they proudly advertised that the model could "read *The Great Gatsby* and generate an epilogue" and presented that epilogue to the public as an example of StoryWriter's fiction

prowess. Ex. 56. Defendants internally celebrated StoryWriter's ability to generate such high-quality prose written in F. Scott Fitzgerald's voice—commenting "Fire," "I looooooove it," "This is so gorgeous," and "damnit if this didn't hit me right in the feels." Ex. 42. Attention quickly turned to real-world consequences: [redacted] A few weeks later, Frankle went on a podcast and said: "in hindsight, ... I might've gone with a different thing than a story writer. I might've gone with, you know, coder because **we seem to have no problem putting programmers out of work with these models.**" *Latent Space Podcast: MPT-7B and The Beginning of Context=Infinity* (May 20, 2023) available at https://tinyurl.com/LatentSpacePodcast (hereinafter "*Latent Space*"). But Defendants didn't go with "coder"—they went with StoryWriter, knowing the model might put Plaintiffs "out of work."

## IV. LEGAL STANDARD

Defendants concede that Plaintiffs have set forth a *prima facie* case of copyright infringement. They move for summary judgment on their fair use affirmative defense. The four fair use factors from 17 U.S.C. § 107 are:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

Defendants bear the burden of "establish[ing] a prima facie case for fair use." *Newegg Inc. v. Ezra Sutton, P.A.*, 2016 WL 6747629, at *1 (C.D. Cal. Sept. 13, 2016). They must show that "no reasonable trier of fact could find other than for" them. *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quotation omitted). Defendants will "have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 590 (1994). Genuine issues of material fact relevant to fair use must be resolved by a jury. *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 23–25 (2021).

## V. ARGUMENT

Fair use must be assessed with respect to each specific "use" of a copyrighted work, because "[t]he

same copying may be fair when used for one purpose but not another." *Warhol*, 598 U.S. at 533. Here, defendants made three distinct uses of Plaintiffs' works: they downloaded them to build a permanent library, they distributed them to third parties and made them available to the public, and they copied them to develop a fiction-generating LLM. Each must be analyzed on its own terms. On none of these three uses have Defendants carried their burden to establish fair use as a matter of law.

**A. <u>Use #1:</u> Defendants Have Failed To Meet Their Burden To Establish That Their Free Downloads of Plaintiffs' Books Were Fair Use.**

Plaintiffs' books were available for sale. Exs. 34–38. In lieu of paying for them or securing a license, Defendants downloaded them free from unauthorized sources. Exs. 1, 2 (Databricks Resp. to Interrog. No. 34). For decades, courts have rejected fair use when a party takes "for free something they would ordinarily have to buy." *Napster*, 239 F.3d at 1015 (quotation omitted); *BMG Music v. Gonzalez*, 430 F.3d 888, 890 (7th Cir. 2005). The evidence on each of the four factors is set forth in Plaintiffs' Motion, ECF No. 379. That evidence both defeats Defendants' motion and justifies summary judgment in Plaintiffs' favor.

Defendants' central argument is that their eventual use of books for LLM training and research makes their unlawful acquisition fair as a matter of law. Courts rejected this argument long before artificial intelligence. In *American Geophysical Union v. Texaco*, Texaco paid for a subscription to scientific journals, and its employees photocopied articles as personal desk references while conducting scientific research. 60 F.3d at 924. Texaco argued what Defendants argue here: That because its copying facilitated research—a use enshrined in Section 107's preamble—it was fair use. The Second Circuit disagreed:

> Texaco cannot gain fair use insulation for [its employee's] archival photocopying of articles (or books) simply because such copying is done by a company doing research. It would be equally extravagant for a newspaper to contend that because its business is "news reporting" it may line the shelves of its reporters with photocopies of books on journalism or that schools engaged in "teaching" may supply its faculty members with personal photocopies of books on educational techniques or substantive fields.

*Id.*; *see also Fox News Network v. TVeyes*, 883 F.3d 169, 178 n.4 (2d Cir. 2018) ("[t]hat a secondary use can facilitate research does not itself support a finding that the secondary use is transformative"). Defendants' so-called research purpose presents an even worse case for fair use than Texaco's. Unlike Defendants, Texaco paid for a subscription in the first place.

Defendants say that "no legal principle required" them to "begin the transformative process of LLM

training with authorized copies," as Section 107 addresses the "use made" of a work and not "each copy" made. Defs.' Mot. at 15. But *Warhol* requires courts to analyze each instance of copying separately, as "[t]he same copying may be fair when used for one purpose but not another."[1] 598 U.S. at 528. *Texaco* and its progeny reject Defendants' position: a copyist cannot rely on a downstream "research" purpose to bless myriad copies along the way. *Texaco,* 60 F.3d at 924. This is for good reason, especially in an internet age where every person with a nominally transformative purpose—such as writing a book review or developing a remix—could feasibly pirate unlimited copyrighted works. As *Bartz v. Anthropic* put it: "You can't just bless yourself by saying I have a research purpose and, therefore, go and take any textbook you want. That would destroy the academic publishing market if that were the case." 787 F. Supp. 3d 1007, 1025 (N.D. Cal. 2025) (quoting counsel for Anthropic).

Even taking Defendants' downstream use into account, their motion still fails because whether Defendants used Plaintiffs' works for exclusively LLM training is a hotly contested factual question. As in *Bartz*, Defendants' use of Plaintiffs' books was not limited to LLM training. Defendants "retained pirated copies even after deciding it would not use them or copies from them for training its LLMs ever again. *See* Ex. 19 at 130:14-23; Ex. 11 at 217:20–218:4; Ex. 59. They were acquired and retained, as a central library . . . ." *Id.* at 1026 (denying Anthropic's motion for summary judgment).

Defendants' conduct here went further than Anthropic's: Databricks and Mosaic uploaded Plaintiffs' books to public cloud storage, made them widely available for download, and distributed them to third parties as a promotional tool for their platform—a use decidedly unfair in this Circuit. *See, e.g., Los Angeles News Service v. Tullo*, 973 F.2d 791, 792 (9th Cir. 1992); *infra* Section (V)(B). For this reason, Defendants' reliance on the *Kadrey* decision is unavailing. In that case, "all of the downloads the plaintiffs identify had the ultimate purpose of LLM training." *Kadrey*, 788 F. Supp. 3d at 1048. Not so here, as Defendants downloaded content for the independent purposes of distributing content and creating an internal central library stocked with Plaintiffs' books.

Defendants spill much ink about whether a copyist's "bad faith" should factor into the fair use

---

[1] Justice Sotomayor's majority opinion in *Warhol* considered the example of a critical book review that excerpted multiple passages from a book. Even in those circumstances, a court would be required to "consider each use within the whole [book review] to determine whether the copying is fair." *Id.* at 528.

analysis, insisting they obtained books from "research organizations" rather than "shadow libraries." Defs.' Mot. at 14–15. This is both irrelevant and genuinely disputed. It is irrelevant because an unauthorized copy does not become an authorized copy simply by virtue of the pedigree of its purveyor or the goodwill of the downloader. The Ninth Circuit held peer-to-peer downloaders liable because they "got for free" what they would "otherwise have to buy," not because they downloaded in bad faith. *Napster,* 239 F.3d at 1015; *BMG Music*, 430 F.3d at 890. The Texaco researchers infringed because their copying displaced subscription and licensing fees, not because the researchers had any malintent. *Texaco*, 60 F.3d at 931. The facts here tell the same story: as in *Bartz*, "the initial copies [of Plaintiffs' works] were pirated to create a central, general-purpose library, as a substitute for paid copies to do the same thing." *Bartz,* 787 F. Supp. 3d at 1026.

Defendants' argument, at best, presents a disputed question of fact because the origins of the Books3 library are, indeed, illicit. Books3 was originally sourced from a shadow library called Bibliotik—which Defendants knew, Ex. 7—and was taken down from Hugging Face and removed from The Pile dataset due to copyright concerns. Ex. 4 ¶ 19 n.4. These copyright issues led to debates within Mosaic over whether to "obfuscate that" their models were "finetuned on books3." Ex. 8 ¶ 34; Ex. 9.

The objective facts are undisputed. Defendants obtained books for free, from an unauthorized source, to avoid paying a purchase price. Ex. 2 at 20; Ex. 3 at 191:3–14; Exs. 34–38. That is, at a minimum, more than enough to defeat Defendants' summary judgment bid.

### B. <u>Use #2</u>: Defendants' Reproduction and Distribution of Plaintiffs' Works to Create and Operate a Commercial Library Was Not Fair Use.

The second use relates to Defendants' creation of a commercial library on public storage spaces. This is direct infringement of Plaintiffs' reproduction right (Defendants' reproduction of Plaintiffs' books onto the cloud storage) and distribution right (Defendants' actual distribution of Plaintiffs' books, and around 196,000 others, to third parties). Defendants directly distributed Plaintiffs' works to at least nine third parties—including a graduate student—without any contractual restrictions whatsoever. Ex. 16; Ex. 19 at 74:24–75:5. This is likely an undercount: Defendants deliberately set at least one of the cloud storage spaces to "public," so anyone in the world could access and download Plaintiffs' books and approximately [redacted]

52 at 392:3–11—any number of third parties could have downloaded Plaintiffs' books for any purpose.

There is no plausible fair use defense to this conduct. *See* Pltfs.' Mot. at 17–25. Defendants did not transform the copies used to stock their commercial library. Instead, they converted them into a "streaming" file format, akin to a .zip file designed to facilitate data downloading, that could be re-converted back to readable text with relative ease. Ex. 1 ¶¶ 45, 87; Ex. 21 ¶¶ 20–23. The use was commercial. Internal documents confirm that Defendants distributed these datasets and made them available to the "community" as a promo for their other products and services. Pltfs.' Mot. at 20. Courts have repeatedly held such bare format shifting to be unfair use, especially when done for a commercial purpose. *UMG Recordings, Inc. v. MP3.Com,* Inc., 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) ("retransmit[ing] in another medium" is "an insufficient basis for any legitimate claim of transformation"); *cf. Internet Archive*, 115 F.4th at 181.

The effect on the market is equally straightforward. The fourth factor asks what would happen if Defendants' challenged conduct became widespread. *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1163 (9th Cir. 2022). If everyone could do exactly as Defendants did here—send copies of Plaintiffs' works to enterprise customers and make those copies freely available to anyone with an Amazon Web Services account and a credit card—a reasonable factfinder could conclude that Plaintiffs' works would be unlawfully acquired by everyone in the AI industry, and freely available for consumption digital shelves of the likes of Library Genesis or Anna's Archive (sophisticated entities that routinely scrape books from the internet). Ex. 21 ¶¶ 32 & nn.44, 46; Ex. 57. Against this record, Defendants face a manifest failure of proof on their fair use defense. *See* Pltfs.' Mot. at 17–25 (addressing evidence on the four factors).

Defendants do not so much as attempt to argue that their creation and operation of a commercial library was necessary for any of *their own* allegedly fair use activity. Instead, Defendants argue that their distribution of Plaintiffs' books should be excused because the *recipients* used them for LLM training. But a commercial distributor cannot rely on the supposed fair use activity of a downstream recipient. That principle is well-settled. "News reporting" is an enumerated fair use in § 107's preamble, yet the Ninth Circuit has twice held that the commercial distribution of news footage to third party news organizations was not fair use as a matter of law. *Los Angeles News Serv. v. Reuters Television*, 149 F.3d 987, 990 (9th Cir. 1998); *Tullo*, 973 F.2d at 792. "Teaching" and "classroom use" are likewise enumerated in § 107, but it is copyright infringement for copy-shops to commercially distribute course packs to students for

classroom instruction. *Princeton Univ. Press v. Michigan Document Servs.*, 99 F.3d 1381, 1386–88 (6th Cir. 1996). If fair use does not excuse the commercial distribution of course packs to students in a classroom, it does not excuse the commercial distribution to AI companies for model training—especially, as in this case, with no contractual use restrictions whatsoever. Ex. 19 at 74:24-75:5.

Defendants' principal cited authority, *Google Books*, hurts their case. There, libraries purchased physical books for their shelves, took those books off their shelves, sent them to Google, and Google returned digital copies. Central to the Court's decision were two things: (1) that Google merely provided each library with "a digital copy of that library's ***already owned*** book"; and (2) that each library made contractual commitments to "use its digital copy only in a manner consistent with copyright law" and "to take precautions to prevent dissemination of their digital copies to the public at large." 804 F.3d at 229 (emphasis added). Unlike in *Google Books*—which "test[ed] the boundaries of fair use"—Defendants have not shown that any of the third party recipients of Plaintiffs' books "already owned" their works, or that they imposed any restrictions on third parties whatsoever. Instead, just the opposite. Ex. 19 at 74:24–75:5.

*Google Books* presents an independent reason why Defendants' fair use defense fails as a matter of law. Judge Leval's opinion recognized that a copyist may fail on the fourth factor where it "unreasonably exposed the rights holder to destruction of the value of the copyright resulting from the public's opportunity to employ the secondary use as a substitute for the purchase of the original," that is, exposure to the unreasonable risk of piracy. 804 F.3d at 227. The copyist bears the initial burden to show that its conduct did not create such a risk. *Id.* at 227-28 (describing burden shifting). In *Google Books,* Google introduced evidence that the "digital scans are stored on computers walled off from the public internet" and "protected by the same impressive security measures used by Google to guard its own confidential information." *Id.* Defendants have made virtually no attempt at such a showing here, and the overwhelming evidence shows that Defendant took affirmative steps to *expose* Plaintiffs works to public download. Defendants changed the settings on the public cloud spaces from private to public, Ex. 1 ¶¶ 51, 60-67; Ex. 11 at 55:13-18; they allowed third parties to download over a hundred thousand of books for minimal egress fees, *see* Defs.' Mot. at 7; Ex. 16; they imposed no restrictions on who could access the content or what they did with it, Ex. 19 at 74:24–75:5; and they uploaded the works to easily-locatable storage spaces often searched by nefarious actors such as hackers operating pirate sites. Ex. 21 ¶¶ 21–26. This is plainly evidence from

which a reasonable factfinder could conclude that Defendants' conduct, if widespread, would pose a serious risk to the market and value of Plaintiffs' works. *McGucken*, 42 F.4th at 1163.

Finally, Defendants suggest that it is *Plaintiffs'* burden to establish that the third party recipients committed infringement and did not exclusively engage in fair use, but that's backwards. Under *Tullo*, where a plaintiff seeks to hold a defendant "directly liable for its own infringements"—as opposed to "vicariously liable for alleged infringements of others"—"the ultimate use to which the [third party] puts the [work] is irrelevant."[2] 973 F.2d at 797. Rather, Defendants are "directly liable for [their] own infringements," such as their unauthorized copying and distribution of Plaintiffs' works. *Id.*

Even if it mattered, Defendants have not shown that all third party recipients exclusively engaged in fair use. For starters, any recipients would have downloaded books for free that "could have been bought at a bookstore," something that is "inherently, irredeemably infringing" even if the "copies are immediately used for the transformative use and immediately discarded." *Bartz*, 787 F. Supp. 3d at 1025. And [redacted] Even assuming all LLM training is fair use—it is not, *infra* Section C—Defendants have failed to establish that even a single third party recipient of Plaintiffs' works, let alone all of them, exclusively engaged in noninfringing use.

On this record, the Court cannot hold that Defendants' reproduction and distribution of Plaintiffs' works in the operation of its commercial library on public cloud spaces is fair use as a matter of law.

### C. <u>Use #3:</u> Defendants Cannot Establish That Their Reproduction of Plaintiffs' Books to Develop a "StoryWriter" LLM Was Fair Use.

In *Kadrey v. Meta*, the Court recognized that "in most cases" appropriating copyrighted works for large language model training will not be fair use. That is because "[g]enerative AI has the potential to flood the market with endless amounts of" material "using a tiny fraction of the time and creativity." "So by training generative AI models with copyrighted works, companies are creating something that often will dramatically undermine the market for those works, and thus dramatically undermine the incentive for human beings to create things the old-fashioned way." 788 F. Supp. 3d 1026, 1034–35 (N.D. Cal. 2025).

---

[2] For Plaintiffs' contributory infringement claim, Plaintiffs do bear the burden to establish that third parties committed infringement. This is addressed *infra* in Section (V)(D).

Defendants' use of Plaintiffs' books is the perfect example of what *Kadrey* considered to be a manifestly unfair use that threatens to dramatically undermine the incentives for human creation. Defendants copied novels to build a machine that generates novels. To do so, they focused on fiction because "what you put into the model is what you'll get out." Ex. 26. Defendants used a specially-curated fiction subset of their unlawfully-downloaded copyrighted works to design StoryWriter, Ex. 12, and the result was a model that could "generate entire novels … in minutes." Ex. 43.

The fair use question cannot be resolved in Defendants' favor on summary judgment. To adjudicate this defense, a jury will need to resolve myriad contested factual questions. These include: whether Defendants' reproduced Plaintiffs' works to exploit their protected, expressive elements, or whether the copying of those protected elements was only incidental; whether Defendants' models were capable of generating fiction that could compete in the market, as Defendants' own witnesses observed immediately after StoryWriter's release; and whether, and the extent to which, conscripting Plaintiffs' works in the development of fiction-writing models threatens to displace the market for Plaintiffs' works. The answers to these questions will depend on a battle of experts, fact witness credibility, and conflicting testimony and documentary evidence—none of which is the stuff of summary judgment.

#### a. Factor One: The purpose and character of Defendant's use was to build a machine to generate fiction.

The purpose of Defendants' copying was substitutive, and the character of that use—encoding Plaintiffs' expressive content into the model—confirms that Defendants exploited protected expression to achieve their purpose. Defendants fall far short of their burden on this factor.

##### i. There are genuine questions of fact on whether Defendants' use of Plaintiffs' works was non-transformative, substitutive, and commercial.

The Supreme Court has explained that where "an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying." *Warhol*, 598 U.S. at 532-33. An "independent justification . . . is particularly relevant to assessing fair use where an original work and copying use share the same or highly similar purposes, or where wide dissemination of a secondary work would otherwise run the risk of substitution for the original or licensed derivatives of it." *Id.* at 532. Here,

Defendants have no independent justification: their purpose was to create and disseminate a substitution machine to promote Defendants' commercial product. Ex. 51 ¶ 14; Ex. 45 at 61:1–22. At the very least, there are substantial disputes of fact as to whether that use is transformative or substitutive.

Defendants argue that their training had a "further purpose" because it added "something new"—namely, "new, mathematical representations of linguistic structure." Mot. at 2, 11. But even where a use "add[s] something new" to the copied work, that addition "alone does not render such use[] fair." *Warhol*, 598 U.S. at 529. Instead, "whether an allegedly infringing use has a further purpose or different character" than the original work "is a matter of degree." *Id.* at 525. The focus, as always, is on "the problem of substitution—copyright's bête noire. The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or 'supplan[t],' the work" and is thus less likely to be considered fair use." *Id.* at 528 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985)). A use that is "likely to provide the public with a substantial substitute for" the copyrighted work "undermines the goal of copyright." *Id.* at 531–32 (quotation omitted).

There is ample record evidence that confirms that Defendants' use here was precisely the type of non-transformative, substitutive, and commercial use that flunks the first factor. Defendants' copying was designed to mine the protected expression from Plaintiffs' novels to create a fiction-writing machine. As Plaintiffs' expert explains, LLM training involves optimizing the model to "accurately predict" the expressive content—the complex unity of words, word order, sentence, paragraph, and plot structure that make a book identifiably itself—found in Plaintiffs' works. Ex. 1 ¶ 44(ii). Plaintiffs' expert and Defendants' expert have both shown that—as a result of the optimization process—StoryWriter was much more capable than Defendants' general-purpose LLMs of mimicking the literary style of the books in its training data. Ex. 21 at ¶38–47, Ex. 27. That confirms that Defendants achieved the purpose recounted above; by specifically training StoryWriter on fiction books, Defendants specifically enabled the model to generate more compelling (and thus more competitive) fiction. Ex. 30. To be sure, Defendants dispute this. They argue that LLM training exploits only the "functional" properties of Plaintiffs' novels, only incidentally reproducing creative expression. Defs.' Mot. at 17. There is, at best, a classic issue of fact on this question, and "[w]eighing the credibility of conflicting expert witness testimony is the province of the jury." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 235 F.3d 1184, 1192 (9th Cir. 2000).

Defendants' use clearly implicates "the problem of substitution." *Warhol*, 598 U.S. at 528. Defendants usurped Plaintiffs' creative novels to create a novel-writing machine at virtually no cost and with no labor required. As one Mosaic co-founder put it, Mosaic used novels because "[t]he goal was to try to get a model that really was a story writer." *Latent Space.* Rao similarly agreed that "if you wanted to train a model to get really good at generating fiction books, you would want to train on a corpus of fiction books[.]" Ex. 19 at 157:16–20; *see also* Ex. 53 (advertising that StoryWriter could "[b]ring a novel to life ... without writing it."). Defendants publicly trumpeted that StoryWriter was "designed to read and write fictional stories with super long context lengths"—*i.e.,* book-length fiction. Ex. 25. Expert testimony—from both Plaintiffs and Defendants— likewise confirms that Defendants' use of Plaintiffs' expressive content increased StoryWriter's fiction-writing capabilities. *See, e.g.*, Ex. 50 at 63:10–13 (considering scenario where user did not want any fictional output from LLM and acknowledging that LLMs trained on "fictional material" would "produce output that is fictional"); Ex. 21 ¶ 40 ("Finetuning on copyrighted fiction did not simply make the model a better writer. It made the model write more like these specific Plaintiff authors."). In fact, by using fiction to build a StoryWriter, Defendants actually *harmed* the model's ability to handle general tasks. *See* Exs. 39, 40, 41, 58. That, alone, creates a dispute of fact over whether Defendants' purpose in copying Plaintiffs books was to create a substitution machine capable of supplanting Plaintiffs works. Because the purpose of Defendants' use was to build a machine "to make it easier to develop [] competing" books, their use "is not transformative," and certainly not so as a matter of law. *Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*, 765 F. Supp. 3d 382, 399 (D. Del. 2025).

Defendants argue that StoryWriter is not *literally* a fiction book, and that their use of Plaintiffs' works was therefore transformative. Mot. at 11–12. That argument takes far too narrow a view of factor one, which asks about the *purpose and character* of the use—specifically, whether the use presents "the problem of substitution." *Warhol*, 598 U.S. at 528. Here, the substitutive purpose is evident because Plaintiffs' works were exploited to build a machine that generated competing works. *See Kadrey*, 788 F. Supp. 3d at 1045 n.6 ("Using copyrighted works to train" an LLM to "create works that competed with the originals" is "less transformative" because it has "the purpose and character of enabling an LLM to develop substitutive works."). And Defendants' argument that they "literally transformed Plaintiffs' works" by tokenizing them can be easily disposed of. The purpose behind tokenization is to encode the expressive

content of the underlying works in a machine-readable format so machines can ingest that content. Ex. 1 ¶ 45(ii). Retransmitting "in another medium" is "an insufficient basis for any legitimate claim of transformation." *See UMG*, 92 F. Supp. 2d at 351; *Internet Archive*, 115 F.4th at 181.

Defendants' use also served a clearly commercial purpose: To promote capabilities of Mosaic's AI training platform. *Id*. The evidence confirms this concession. Defendants proudly presented StoryWriter—a "model designed to read and write fictional stories"—as an example of Mosaic's "state-of-the-art" features, highlighting "[t]he value of [Mosaic's] cost-efficient gen-AI platform" in a customer pitch deck. Ex. 44 at 8–9. Courts in this Circuit have long held that far less commercial activity should be considered commercial for the fair use analysis. *Napster*, 239 F.3d at 1015 ("Direct economic benefit is not required to demonstrate a commercial use. Rather, repeated and exploitative copying of copyrighted works, even if the copies are not offered for sale, may constitute a commercial use.").

Defendants trained StoryWriter on books because they wanted to build a model that was "really a story writer." *Latent Space*. They achieved this goal at the expense of the "generalized" performance they belatedly claim to value—repeatedly noting that the "fiction" on which StoryWriter was trained came with a "negative effect on some of its other capabilities," Exs. 39, 40, 41, & 58—and used the fiction-optimized model to market their business. There are, at minimum, genuine, material disputes of fact on whether the purpose and character of Defendants' use was non-transformative and substitutive.

**ii. The so-called "intermediate copying" cases do not support Defendants' position.**

Defendants cite a series of cases where technology companies copied creative works for their non-expressive functional elements, in service of a purpose entirely unrelated to the market for these works. Defendants claim that under these cases, fair use excuses all copying of creative works so long as the copying is an "intermediate step to creating a transformative technology." Defs.' Mot. at 13. These cases establish no such rule.

The cases on which Defendants rely endorse a different, narrower principle: Where a party copies a work for a content-agnostic purpose entirely divorced from the work's protected, creative expression, that is transformative. In *Sega Enterprises v. Accolade*, for example, copying the computer program at issue was "the only way to gain access to *the ideas and functional elements*" of the work, and was thus

considered fair use. 977 F.2d 1510, 1527 (9th Cir. 1992) (emphasis added). Moreover, the *Sega* court found significant that, by refusing to license copying of these functional elements, the copyright holder was preventing interoperability with competing products. 977 F.2d at 1527. Likewise, in *Perfect 10, Inc. v. Amazon.com, Inc.*, the copying of images served no "entertainment, aesthetic, or informative function," but instead turned a thumbnail image into a "pointer directing a user to a source of information." 508 F.3d 1146, 1165 (9th Cir. 2007). On the other hand, where parties make "intermediate" copies for the purpose of exploiting the creative content that the Copyright Act protects, absent a compelling justification, such copying is not fair use. This includes copies of scientific articles made by Texaco's scientists in the course of conducting research, or course-packs of copyrighted material to be employed for classroom use. *Texaco*, 60 F.3d at 924; *Princeton*, 99 F.3d at 1383. This distinction makes sense in light of the purpose of the Copyright Act: the author is granted "a limited monopoly over the expression" contained in a work, not functional elements or facts. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 224 (2d Cir. 2015).

This principle does not help Defendants' case here. A mountain of internal documents, expert testimony, and fact witness testimony exists in this record from which a reasonable juror could conclude that Defendants derived value from the expressive elements of Plaintiffs' novels, and that any functional elements were copied only incidentally. *See, e.g.,* Ex. 1 ¶ 44(ii); Ex. 19 at 157:16–20; Ex. 21 at ¶¶ 38–47, Ex. 27; Ex. 30; Exs. 39–41; Ex. 53; Ex. 58 ; *Latent Space*. Defendants may disagree, but they do not come close to rebutting this evidence beyond any dispute of fact. Defendants may argue at trial that they appropriated Plaintiffs' works for their nonexpressive elements, but there is *certainly* a dispute of fact on that question. Defendants' "intermediate" copying cases do not move the needle on factor one.

Both parties cite *Kadrey v. Meta* and *Bartz v. Anthropic* throughout their briefing, and Defendants cite both cases for the premise that LLM training is transformative. The facts of both cases, however, were different than this one. In *Kadrey*, the at-issue LLMs were "used to generate diverse text and perform a wide range of functions." 788 F. Supp. 3d at 1044. There was no "indication that … Meta developed [its LLM] with the purpose of enabling it to create books that compete with the plaintiffs'[.]" *Id.* at 1045. And in *Bartz*, "Anthropic's LLMs trained upon works not to race ahead and replicate or supplant them," but to "create something different." 787 F. Supp. 3d at 1022. The opposite is true here: Defendants used stolen novels to create a machine calibrated specifically to generate novels. As Judge Chhabria recognized in

*Kadrey*, when an LLM is "designed to be used to create works . . . that competed with the originals without being substantially similar," the LLM is likely "less transformative." *Id.* n.6. This case presents exactly the "less transformative" situation contemplated by *Kadrey*, and, at most, confirms why the winner on the first factor (and the degree of weight it gets) cannot be decided at summary judgment without resolving disputed factual questions about the role of Plaintiffs' novels in the training and fine-tuning process.

**b. Factors Two and Three weigh in Plaintiffs' favor.**

The second and third factors weigh against fair use here, although they are not typically the most important. *Cf. Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1171 (9th Cir. 2012). First, Plaintiffs' works are at the core of copyright protection, Pltfs.' Mot. at 15, and Defendants engaged in "verbatim copying" to exploit that expressive content and develop StoryWriter to generate competitive works. Defs.' Mot. at 17.

Nor was Defendants copying "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586. Defendants emphasize that Plaintiffs' works made up a "small fraction of a massive training corpus," that they contributed "near-zero value to LLM training," and that they would simply avoid using Plaintiffs' works if required to pay for them. Defs.' Mot. at 2, 21. That's wrong. The evidence demonstrates that Defendants trained their LLMs on Plaintiffs' books *because of their value as books*. *See supra* Section (V)(C)(a); Ex. 45 at 154:15-18; 162:15-163:4 (describing books as high-quality datasets). And even if it were true, Defendants would not be entitled to a fair use defense, because their copying would by no means be "reasonable in relation to" *any* purported purpose, *Campbell*, 510 U.S. at 586, and they would be unable to show any "justification" for their copying. *Warhol*, 598 U.S. at 532 (emphasizing that a substitutive use requires "independent justification" for copying); *Google Books,* 804 F.3d at 215 ("the would-be fair user of another's work must have justification for the taking."). Either way, factor three favors Plaintiffs.

**c. Factor Four: Using Plaintiffs' works to build a fiction-writing machine has the potential to harm the market for books.**

Copyright law grants humans exclusive rights in the works they create so they will continue to have "an economic incentive to create original works, which is the goal of copyright." *Warhol*, 598 U.S. at 535. "The sole interest of the United States and the primary object in conferring the monopoly [of copyright] lie in the general benefits derived by the public from the labors of authors." *Fox Film Corp. v. Doyal,* 286 U.S. 123, 127 (1932). To that end, the fourth fair use factor considers both the "extent of market harm

caused by the particular actions of the alleged infringer" and "whether unrestricted and widespread conduct of the sort engaged in by the defendant … would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (quotation omitted). "[T]o negate fair use one need only show that if the challenged use *should* become widespread, it would adversely affect the potential market for the copyrighted work." *Harper & Row*, 471 U.S. at 568 (quotation omitted).

Here, Defendants have failed to carry their burden of proof on factor four because they have presented *no* evidence on what would happen to the market for books if their conduct were widespread. Defendants' expert agreed that she did not consider what would happen "if the development of models designed to generate long-form fiction improved and became widespread" and instead considered only "particular MPT3 models." *See* Ex. 22 at 130:22–131:4. By contrast, Plaintiffs have presented a substantial amount of evidence from which a reasonable juror could conclude that, if Defendants' conduct were widespread, it would significantly harm the market for Plaintiffs' books (1) by forcing Plaintiffs to compete with AI-generated works for sales, and (2) by eliminating the need to purchase Plaintiffs' works in the market for AI training data. That is dispositive at the summary judgment stage.

**i. There are genuine questions of fact on whether Defendants' conduct would result in market displacement and substitution.**

The first market harm is the "harm of market dilution." *Kadrey*, 788 F. Supp. 3d at 1052. Logically, "similar outputs" to Plaintiffs' works that come from LLMs like StoryWriter "can still compete for sales with the books in the training data. And by taking sales from those books," those AI-generated competing works "reduce the incentive for authors to create—the harm that copyright aims to prevent." *Id.* at 1054. This case presents the scenario *Kadrey* contemplated would require trial on factor four: one in which the defendants use copyrighted works to "train an LLM" that helps "enable the rapid generation of countless works that compete with the originals, even if those works aren't themselves infringing." *Id.* at 1052.

This harm is happening now—due to the proliferation of general-purpose LLMs, Ex. 60 at 2–3—and will get severely worse if Defendants' particular conduct in this case becomes widespread. Defendants' expert agrees that "the advent of LLMs has had a large impact on the production of new books," with the "number of new titles appearing each month nearly tripl[ing] between 2022 and late 2025[.]" Ex. 46 ¶ 77 n.170 (citation omitted). Public research confirms that a significant number of new releases are AI-

generated.[3] And LLMs designed to generate fiction, like StoryWriter, will only exacerbate the problem by creating works that are stylistically-similar to Plaintiffs' works. Ex. 21 at ¶¶ 38–47; 27. That, alone, creates a dispute of fact over whether Defendants' use of Plaintiffs' works in this case, if unrestricted and widespread, *McGucken*, 42 F.4th at 1163, would enable an unmitigated flood of AI-generated books that compete with Plaintiffs' works, thus harming the market for those works.

As explained above, StoryWriter was designed to generate a specific genre: fiction. It was calibrated to do so, to the point of negatively impacting the model's performance on other tasks. *See* Exs. 39, 40, 41, 58. And Defendants repeatedly emphasized to their customers and to the public that the model was designed to "write fictional stories." Ex. 25; 44. Defendants' retroactive and self-serving statement that StoryWriter's *Great Gatsby* epilogue "did not make sense as fiction," Defs.' Mot. at 7, is in stark contrast to how their engineers described it at the time: "Fire," "I looooooove it," "This is so gorgeous," and "damnit if this didn't hit me right in the feels." Ex. 42.[4] Defendants even proudly sent their *Gatsby* epilogue to a reporter, explaining that "we need to really give [the press] pictures of what's possible now with our model family" and broadcasting that StoryWriter "will allow end users to generate entire novels (like the sequel to the Great Gatsby) in minutes." Ex. 43. Frankle later explained that there were even better examples of StoryWriter's prowess: "There are a bunch of epilogues floating around internally at Mosaic. … There was one where, you know, it's Gatsby's funeral and then Nick starts talking to Gatsby's Ghost, and Gatsby's father shows up … It was very plot heavy, like this is what comes next." *Latent Space*.

[redacted] Frankle doubled down, explaining that a model named "coder" might have been less controversial because "we seem to have no problem putting programmers out of work with

---

[3] *See* Chakrabarty et al, *Generative AI Floods and Dilutes the Market for Books*, COLUM. L. RES. PAPER FORTHCOMING at 2–3, https://arxiv.org/pdf/2607.20349 (Aug. 3, 2026) (explaining that 20% of sampled self-published books are more than 25% AI-generated); *See*, "How A.I. Books Sneak Their Way Into Stores," The New York Times, July 28, 2026 (accessed: https://www.nytimes.com/2026/07/28/books/ai-bookselling-amazon.html); "Is This What Comes After AI Slop?" The Atlantic, July 27, 2026 (accessed: https://www.theatlantic.com/technology/2026/07/daggermouth-novel-bestseller-ai/688067/).

[4] This evidence contradicts Defendants' argument that StoryWriter was actually bad at what it was designed to do (writing fiction). In any event, that is irrelevant. The question is whether Defendants' use of Plaintiffs' works for LLM training had "the purpose and character of enabling an LLM to develop substitute works," not whether Defendants *effectively* did so. *Kadrey*, 788 F. Supp. 3d at 1045 n.6.

these models**.**" *Latent Space*. Defendants knew their models could replace Plaintiffs as writers. This creates a dispute of fact over whether their use of Plaintiffs' works to train StoryWriter harms the market for books.

Defendants' principal response to this evidence is to ask the Court to ignore it altogether. **First,** they argue that market displacement is not a cognizable harm under factor four.[5] But Section 107 does not limit the types of harm that can be taken into account. To the contrary, it is well established that fair use is a "flexible" concept that should be adapted to new contexts, *Oracle*, 593 U.S. at 20, and that the four fair use factors are "non-exclusive." *Diversey v. Schmidly*, 738 F.3d 1196, 1203 (10th Cir. 2013). Any ambiguity should be resolved in favor of preserving the incentive for human creation, the fundamental purpose of the Copyright Act. *Warhol*, 598 U.S. at 535; *cf. Thaler v. Perlmutter*, 130 F.4th 1039, 1045 (D.C. Cir. 2025) (human authorship is prerequisite for protection under the Copyright Act). The creation of a novel technology built to enable an unmitigated flow of competitive, machine-generated works into the market for Plaintiffs' works is precisely the type of harm that this "flexible concept" must consider.

Defendants' **second** argument is that the only cognizable factor four harm is harm caused by distribution of substantially similar works. That confuses the requirements for establishing copyright *infringement*, 17 U.S.C. § 106, with questions of fair use, 17 U.S.C. § 107. For a *prima facie* case, Plaintiffs must establish substantial similarity; that is clearly established here because, in developing StoryWriter, Defendants reproduced exact or near-exact copies of Plaintiffs books downloaded from the internet. *See* Defs.' Mot. at 17 (admitting to "verbatim copying"). That is separate from the factor four question, which asks how the "use" (here, copying to develop a novel-generating machine) affects the "potential market for or value of the copyrighted work," if we assume the use was widespread. 17 U.S.C. § 107(4). The evidence above shows a significant impact. *See Kadrey*, 788 F. Supp. 3d at 1054 ("indirect substitution is still substitution: If someone bought a romance novel written by an LLM instead of a romance novel written by a human author, the LLM-generated novel is substituting for the human-written one.").

---

[5] Defendants' lead authority for this argument is a March 2026 update to the Patry treatise. *See* Defs.' Mot. at 19 (quoting Patry on Copyright ("Patry") § 10:155.40 (Mar. 2026 Update)). The document is worth reading in full. The second-to-last sentence reads: "This is nuts." *Id.* The same update also incorrectly describes the concept of "market dilution" as a "never adopted theory," even though *Kadrey* adopted the theory months earlier. A separate update accused Judge Alsup of "manipulat[ing]" the proceedings in *Bartz v. Anthropic*. This is not reliable legal authority.

*Bartz*'s contrary treatment of market harm, *see* 787 F. Supp. 3d at 1032, does not control here. While much of Judge Alsup's opinion is consistent with longstanding principles of fair use, *Bartz*'s holding on market dilution rests on the same confusion between infringement and fair use detailed above. *See id.* at 1021 ("Authors challenge only the inputs, not the outputs, of these LLMs"). To the extent *Bartz* can be read to suggest that displacement of authors' works resulting from LLM construction is categorically non-cognizable, that error rests on a flawed premise. LLMs are machines capable of generating an infinite amount of content, with minimal effort and at minimal cost; they are not children learning how to read and write. Defs.' Mot. at 2 (emphasizing that LLMs encode "statistical patterns" about their training data). However many times a person reads *The Great Gatsby*, that person cannot generate a competing full-length book in Fitzgerald's style in minutes, or generate text in his voice at the click of a button. *Cf*. Ex. 43.

Finally, *Bartz's* sole citation for its market dilution holding was *Sega*, 977 F.2d at 1523–24. *See Bartz*, 787 F. Supp. 3d at 1032. Seeking to bolster *Bartz*, Defendants also cite *Oracle*, 593 U.S. at 39. But *Sega* and *Oracle* do not preclude consideration of the ultimate dilutive effects of Defendants' use. In both cases, the plaintiffs used copyright to exercise a monopoly over the functional or non-expressive elements of computer code. *See Sega*, 977 F.2d at 1527 (disassembly was "the only way to gain access to the ideas and functional elements embodied in [the] copyrighted computer program"); *Oracle*, 593 U.S. at 3 ("Google copied these lines not because of their creativity or beauty but because they would allow programmers to bring their skills to a new smartphone computing environment."). Here, the market dilution that harms Plaintiffs stems from StoryWriter's ability to generate an infinite number of works of a quality that could compete with Plaintiffs' works—a capability that resulted from Defendants' exploitation of the creative expression in Plaintiffs' novels on which StoryWriter was trained. Ex. 30.

*Bartz* also differs from this case because even assuming that *Bartz*'s market dilution analysis was correct, this case has different facts—namely, the creation of a particular model fine-tuned on fiction books designed specifically to generate competing books. And while Defendants again insist that StoryWriter was incapable of generating prose that could compete in the market for books, that is a classic factual dispute inappropriate for summary judgment. This dispute, in fact, will require a jury more than most, since Defendants' contemporaneous reactions to StoryWriter-generated fiction ("so gorgeous," "damnit if this didn't hit me right in the feels," Ex. 42) stands in sharp contrast to its made-for-litigation statements

downplaying StoryWriter's capabilities. And Defendants' narrow focus on only the outputs of Defendants' LLMs again gets the operative question—the impact on the market for Plaintiffs' works if Defendants' use were to become *widespread*—wrong. *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1163 (9th Cir. 2022).

*Third*, Defendants argue that Plaintiffs have failed to identify empirically lost sales. That is not the question under factor four. *See Harper & Row*, 471 U.S. at 568 ("[T]o negate fair use one need only show that if the challenged use *should* become widespread, it would adversely affect the potential market for the copyrighted work." (quotation omitted)). To be sure, past lost sales (and actual, demonstrable harm to a market) can defeat fair use defense. But the effect on the market can also be shown on a forward-looking basis, based on a forecast of what the "unrestricted and widespread" use would do to the market for the work. In *McGucken* the Ninth Circuit reversed the district court's finding of fair use when the defendant republished the Plaintiffs' copyrighted photographs, concluding that while "the record reflects little direct evidence of actual market harm," if companies were to reproduce the plaintiffs' works without restriction, "[t]he harm to the market for licensing McGucken's photos would be immense." 42 F.4th at 1163.

So too here. The question is not whether StoryWriter in isolation can be traced to lost sales. Instead, it is the effect on the market if everyone could conscript novels to train a novel-generating machine. Based on the evidence in this record, the impact on the market in that world is clearly significant.

**ii. There are genuine questions of fact on whether Defendants' conduct, if widespread, would deprive Plaintiffs of licensing revenue.**

Defendants' use of Plaintiffs' books to train LLMs also deprived Plaintiffs of the opportunity to participate in the market for licensing such data. There was and is such a market. As Plaintiffs' expert explains, at least eight licensing agreements to date have involved books for AI training. Ex. 49 ¶¶ 136–154. Defendants concede that their competitors have licensed thousands of books to use in AI training. Defs.' Mot. at 21-22 (quotation omitted). And Defendants' own expert, Dr. Sinkinson, admitted in his deposition that his report identified "at least ten agreements that include licensing of books for AI training data[.]" Ex. 50 at 147:18-23. Defendants, however, simply chose not to engage in this licensing market. They admit that they didn't want to pay what they believed Plaintiffs would charge and thus refused to license Plaintiffs' works. Ex. 3 at 191:3-14. A reasonable jury could thus find that Defendants deprived Plaintiffs of the opportunity to participate in the market for licensing their works.

Defendants contend that harm to the market for licensing Plaintiffs' books as data to train LLMs is not legally cognizable because Plaintiffs cannot monopolize the market for "transformative uses of [their] own creative work." Defs.' Mot. at 20 (quotation omitted). That is incorrect for two reasons. First, Defendants agree that they copied Plaintiffs' works "verbatim"—showing that Plaintiffs do not claim harm to a market for a "transformative use," but to the market for their original creative works. Second, factor four considers market harm to both the original market and the markets that "creators of original works would in general develop or license others to develop." *Campbell*, 510 U.S. at 592; *Texaco,* 60 F.3d at 931 ("traditional, reasonable, or likely to be developed markets" are "legally cognizable" and "[t]he vice of circular reasoning arises only if the availability of payment is conclusive against fair use"). As explained above, this market already exists and continues to grow. Harm in the market for licensing one's works is a legally relevant harm under fair use factor four.

**D. Triable Questions Preclude Summary Judgment On Plaintiffs' Contributory and Vicarious Infringement Claims.**

Defendants have not met their summary judgment burden on Plaintiffs' contributory infringement claim. Defendants copied Plaintiffs' works on cloud storage spaces that Defendants used to provide their clients free access to Plaintiffs' works. That is a "service tailored to infringement," or at least a reasonable juror could easily conclude as much. *Cox Commc'ns, Inc. v. Sony Music*, 146 S. Ct. 959, 967 (2026). Defendants argue that their clients who downloaded these works were engaged in fair use, but—as addressed above—downloading books for free, when they are otherwise available for sale, is not fair use. *Supra* Section (V)(A). In any event, fair use is an affirmative defense, and Defendants have put forth little—if any—evidence regarding the conduct of the recipients of their distribution, let alone evidence sufficient for the Court to conclude that all of those third parties were engaged in fair use as a matter of law. *See* Ex. 19 at 74:24-75:5; Ex. 20 at 94:8-95:6; *see also* Ex. 21 ¶ 28; Ex. 22 at 107:11-14; Ex. 23 at 72:21-73:1; *ALS Scan, Inc. v. Cloudflare, Inc.,* 2017 WL 11579039, at *12 (C.D. Cal. June 1, 2017) (in contributory infringement case, defendant must "demonstrate the primary infringers' unauthorized copying" is fair use).

If there are disputes of fact over whether Mosaic committed copyright infringement, there are disputes of fact over whether Databricks—as its corporate parent, with the "right and ability" to supervise its conduct—is vicariously liable. *Napster*, 239 F.3d at 1022.

Dated: August 13, 2026

Respectfully submitted,

By: /s/ Rohit Nath

Joseph R. Saveri (SBN 130064)
Christopher K.L. Young (SBN 318371)
Elissa A. Buchanan (SBN 249996)
William W. Castillo Guardado (SBN 294159)
Drew Moss Morgan (SBN 366901)
**SAVERI LAW FIRM, LLP**
550 California Street, Suite 910
San Francisco, CA 94104
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
cyoung@saverilawfirm.com
eabuchanan@saverilawfirm.com
wcastillo@saverilawfirm.com
dmorgan@saverilawfirm.com

Avery M. Wolff (admitted *pro hac vice*)
**SAVERI LAW FIRM, LLP**
780 Third Avenue, Suite 1200
New York, NY 10017
Telephone: (646) 641-0876
awolff@saverilawfirm.com

Matthew Butterick (SBN 250953)
1920 Hillhurst Avenue, #406
Los Angeles, CA 90027
Telephone: (323) 968-2632
Facsimile: (415) 395-9940
Email: mb@buttericklaw.com

Bryan L. Clobes (admitted *pro hac vice*)
Mohammed A. Rathur (admitted *pro hac vice*)
Nabihah Maqbool (admitted *pro hac vice*)
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 South LaSalle Street, Suite 3210
Chicago, IL 60603
Telephone: (312) 782-4880
bclobes@caffertyclobes.com
mrathur@caffertyclobes.com
nmaqbool@caffertyclobes.com

Justin A. Nelson (admitted *pro hac vice*)
Alejandra C. Salinas (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Rohit D. Nath (SBN 316062)
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
RNath@susmangodfrey.com

Elisha Barron (admitted *pro hac vice*)
Craig Smyser (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P**
One Manhattan West, 51st Floor
New York, NY 10019
Telephone: (212) 336-8330
ebarron@susmangodfrey.com
csmyser@susmangodfrey.com

Jordan W. Connors (admitted *pro hac vice*)
Trevor D. Nystrom (admitted *pro hac vice*)
Dylan Salzman (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
jconnors@susmangodfrey.com
tnystrom@susmangodfrey.com
dsalzman@susmangodfrey.com

Rachel J. Geman (admitted *pro hac vice*)
Danna Z. Elmasry (admitted *pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
rgeman@lchb.com
delmasry@lchb.com

Anne B. Shaver
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ashaver@lchb.com

Betsy A. Sugar (admitted *pro hac vice*)
Kenneth S. Byrd (admitted *pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Avenue S. Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000
bsugar@lchb.com
kbyrd@lchb.com

*Counsel for Individual and Representative Plaintiffs and the Proposed Class*