JIM W. KO, SBN 038530 (AZ)
Ko IP & AI Law PLLC
4539 N 22nd St. #4410
Phoenix, AZ 85016
(480) 809-2247
jim@koailaw.com
*Admitted pro hac vice*

SABITA SONEJI, SBN 224262 (CA)
Tycko & Zavareei, LLP
1970 Broadway, Suite 1010
Oakland, CA 94612
(510) 254-6808
ssoneji@tzlegal.com

*Attorneys for Amicus Curiae The AI Rights Project*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| *In Re Mosaic LLM Litigation* | Case No.: 3:24-cv-01451-CRB<br>Consolidated with Case No.: 3:24-cv-02653-CRB<br><br>**[PROPOSED] BRIEF OF THE AI RIGHTS PROJECT AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS**<br><br>Hearing Date: October 30, 2026<br>Time: 10:00 a.m.<br>Judge: Hon. Charles R. Breyer<br>Location: Courtroom 6, 17th Floor |

## CORPORATE DISCLOSURE STATEMENT

The AI Rights Project is a nonprofit organization with no parent corporation, no stock, no shareholders, and no members.

## STATEMENT PURSUANT TO FED. R. APP. P. 29(a)(4)(E)

No party's counsel authored this brief in whole or in part. No party, party's counsel, or person other than The AI Rights Project and its counsel contributed money intended to fund the preparation or submission of this brief.

## TABLE OF CONTENTS


I. Interest of Amicus Curiae ..... 1

II. Introduction ..... 1

III. Summary of Argument ..... 2

IV. Argument ..... 3

A. Transformativeness doctrine presupposes a human creativity predicate that no court has directly examined ..... 3

1. The predicate never required examination, before AI ..... 4

2. Copyright has already examined the human-machine question once—in the copyrightability context ..... 5

3. *Bartz* assumed the equivalence without directly examining it ..... 5

4. *Google Books* never implicated the predicate ..... 7

5. Neither *Bartz* nor *Kadrey* examined the predicate—and this record squarely presents it ..... 8

B. The unprotectability of style does not resolve the question, because that proposition assumes a human learner ..... 9

C. The human creativity predicate also bears on whether a training-data licensing market is a cognizable market ..... 11

D. Where the human creativity predicate is displaced, extending fair use to reach the process is, at minimum, a choice for Congress ..... 13

V. Statement of Non-Position ..... 16

VI. Conclusion ..... 16

## TABLE OF AUTHORITIES

### CASES

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .......... 3, 12–15

*Authors Guild v. Google, Inc. (Google Books)*,
804 F.3d 202 (2d Cir. 2015) .......... 2, 4, 7–8

*Authors Guild v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) .......... 7

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) .......... *passim*

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006) .......... 13

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......... 2, 4, 6, 14

*Carpenter v. United States*,
585 U.S. 296 (2018) .......... 14

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) .......... 4, 6

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......... 14

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) .......... *passim*

*Mattel, Inc. v. MGA Ent., Inc.*,
616 F.3d 904 (9th Cir. 2010) .......... 9–10

*Mattel, Inc. v. Walking Mountain Prods.*,
353 F.3d 792 (9th Cir. 2003) .......... 4

*Nichols v. Universal Pictures Corp.*,
45 F.2d 119 (2d Cir. 1930) .......... 9–10

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) .................... 7

*Sega Enterprises Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992), as amended Jan. 6, 1993 .................... 7

*Seltzer v. Green Day, Inc.*,
725 F.3d 1170 (9th Cir. 2013) .................... 12

*Thaler v. Perlmutter*,
130 F.4th 1039 (D.C. Cir. 2025), *cert. denied*, No. 25-449 (U.S. Mar. 2, 2026). .................... 3, 5, 14

*Will v. Michigan Dep't of State Police*,
491 U.S. 58 (1989) .................... 14

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cl. 8 .................... 13–14

**STATUTES**

17 U.S.C. § 101 .................... 12

17 U.S.C. § 102(b) .................... 9

17 U.S.C. § 106 .................... 12–13

17 U.S.C. § 107 .................... 3, 14–15

17 U.S.C. § 111 .................... 15

17 U.S.C. § 114 .................... 15

17 U.S.C. § 115 .................... 15

**OTHER AUTHORITIES**

Robert Brauneis, *Copyright and the Training of Human Authors and Generative Machines*, 48 Colum. J.L. & Arts 1 (2024) .................... 10

Jim W. Ko, *The Human Baseline: Silent Recalibration and the Reanchoring of Legal Doctrine in the Age of AI* (SSRN 2026) .................... 1

Pierre N. Leval, *Toward a Fair Use Standard*,
103 Harv. L. Rev. 1105 (1990) .................... 4

U.S. Copyright Office, *Copyright and Artificial Intelligence, Part 2: Copyrightability* (Jan. 2025) ..... 5

## I. INTEREST OF AMICUS CURIAE

The AI Rights Project ("*AIRights*") is an independent, nonpartisan 501(c)(3) public-interest organization applying its Human Baseline Principle—a framework for identifying when AI systems displace the human-scale assumptions embedded in existing legal doctrine—to precedent-setting AI litigation. *AIRights* does not represent, and has no financial or client relationship with, any party to this litigation, and it takes no position on the parties' disputed factual record.

This case—whether training a language model on copyrighted works satisfies the transformative-use inquiry—is precisely the kind of question *AIRights's* mission addresses: whether a doctrine's human-scale assumptions extend to AI systems. *AIRights* offers the following analysis because it believes the Court would benefit from a perspective focused not on the outcome favored by either litigant, but on the doctrinal mechanism by which fair use is being asked to absorb a change in the underlying conditions the doctrine was built to govern.

## II. INTRODUCTION

This case presents the same fair-use question presented in *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025) and *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025)—whether training a large language model on copyrighted works satisfies the transformative-use inquiry central to fair use. Defendants ask this Court to resolve that question by extension, arguing that the foundation of *Bartz's* holding—that such AI training resembles human reading and learning—"applies with equal force" here. Defs.' Mot. for Summ. J. at 13 (Dkt. 321) (quoting *Bartz*, 787 F. Supp. 3d at 1021–22).

This brief addresses a narrower, threshold question the parties' briefing does not squarely present. Transformative-use doctrine, as it developed, presupposes something its cases never had to state: that for the purpose of creating new expressive material, the actor relating copied material to a new purpose exercised human creative judgment. This brief calls that presupposition the human creativity predicate. *See* Ko, *The Human Baseline: Silent Recalibration and the Reanchoring of Legal Doctrine in the Age of AI* (SSRN 2026). And where a court treats a machine process as satisfying that predicate by assuming it is equivalent to

human creative judgment—without examining whether the equivalence holds—this brief calls that move the equivalence assumption. Neither is a term any court has used; *AIRights* offers them not as existing doctrine but as analytical lenses. The Second Circuit has recognized that shorthand formulations in this area are "best understood as suggestive of a general direction, rather than as definitive descriptions," *Authors Guild v. Google, Inc. (Google Books)*, 804 F.3d 202, 216 n.18 (2d Cir. 2015)—and *AIRights* offers the human creativity predicate in precisely that spirit: not as a rule that decides cases, but as a lens that makes visible an assumption prior decisions had no occasion to examine.

The lens sharpens a specific question: whether *Bartz's* equivalence between machine training and human learning—which Defendants now ask this Court to adopt on a new record—survives direct examination, or whether adopting it would silently recalibrate fair use doctrine, extending its human creativity predicate to a process in which no such judgment operates, without any court having tested whether the doctrine retains its coherence once the predicate is assumed away.

## III. SUMMARY OF ARGUMENT

Two courts in this District have decided the fair-use question these facts present, and Defendants ask this Court to make it three by extension. The transformative-use holding *Bartz* reached, and that Defendants press here, rests on a premise no court has examined and this brief's framework identifies: the equivalence assumption that a machine's training on expressive works can be equated with a human's reading and learning from them. This brief supplies that examination, asking whether this assumption holds. The brief calls that missing term the human creativity predicate—the predicate on which the inquiry's coherence rests.

**Part A** locates the predicate in the case law and shows why no pre-AI decision had to test it. Transformative uses have historically come in two kinds: those, like *Campbell*, turning on an identifiable human choice about what to borrow and why; and those, like *Google Books*, where the copying ignored expression altogether and the predicate never mattered. AI training fits neither mold—it targets expression yet involves no human relating any work to a new end—and that is the novel configuration *Bartz* resolved by analogy and *Kadrey* left unexamined at the

predicate stage. A separate line of authority—*Thaler v. Perlmutter* on the copyrightability of AI-generated works—shows the Copyright Act does not equate machine output with human origination as a matter of course even when the two resemble each other.

**Part B** turns to Defendants' backstop—that a model absorbs only unprotectable style. That defense rests on the same human-learner premise, in a different form. The principle that style is free to imitate developed entirely among human learners, whose limited recall keeps what they take at the level of general influence rather than specific expression. Whether a training system stays at that level or captures the particular expressive choices themselves is an empirical question about the technology, which the style proposition was never built to resolve.

**Part C** follows the same premise into the market inquiry. Here *Kadrey* did what *Bartz* did not. Confronting *Bartz's* comparison of AI competition to competition from teaching schoolchildren to write well, Judge Chhabria found the comparison inapt and treated market dilution as a cognizable harm. Whether a training-data licensing market is cognizable thus turns on the same characterization Part A isolates—whether the use is indifferent to expression or seeks it—informed by *Warhol's* boundary between a transformative use and the derivative-works right the statute keeps for owners. Defendants' position never confronts that characterization—yet it rests on an answer to it.

**Part D** asks what the Court should do if examination shows the predicate genuinely displaced. Copyright is Congress's domain by constitutional design, and § 107 of the Copyright Act speaks neither for nor against reaching a process no human creative judgment drives. Filling that gap by equating machine with human is not routine interpretation but structural revision—work reserved, at a minimum, to the legislature rather than accomplished by reading it into the statute's silence.

## IV. ARGUMENT

### A. Transformativeness doctrine presupposes a human creativity predicate that no court has directly examined

Fair use requires courts to analyze "the specific use" of a copyrighted work, since "[t]he same copying may be fair when used for one purpose but not another." *Andy Warhol Found. for*

*the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533 (2023). Applied to the decisions analyzing AI training as a transformative use, the transformativeness inquiry's human creativity predicate introduced above reveals a consistent pattern: it has been present in each of them, but directly examined in none. The progression of the case law shows why.

**1. The predicate never required examination, before AI**

The decisions finding transformative use reflect two structurally different patterns. In one, the finding requires identifying a human actor whose independent judgment—creative or functional—related copied material to a new purpose: a parodist's choice to comment on an original, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (crediting Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)); a photographer's choice to stage a product in a new visual and narrative context as social critique, *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 802 (9th Cir. 2003); and an engineering team's selection, from millions of available lines, of only the roughly 11,500 lines a new computing platform required, *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 30, 33 (2021). In the other—exemplified by *Google Books*, and addressed in Part IV.A.4, below—the finding requires no such human predicate inquiry at all, because the copying process never engaged with a work's expressive content in the first place.

In every case in the first category, the inquiry never had to ask whether human judgment—and not merely some functional analogue to it—is what the doctrine's terms presuppose when they require a work to add "something new, with a further purpose or different character," altering the original with "new expression, meaning, or message." *Campbell*, 510 U.S. at 579. Until this generation of cases, that predicate was simply a given.

*Bartz* and *Kadrey* present exactly this: a machine process that relates expression to new expression without any human judgment doing that relating. Both courts had every occasion to examine whether that absence is legally significant; neither did. This brief asks the Court to be the first that does.

### 2. Copyright has already examined the human-machine question once—in the copyrightability context

Copyright law has already confronted, directly, the question this brief asks the Court to examine: does a human-origination predicate embedded in the Act's vocabulary extend, by equivalence, to machines? On the authorship side, the answer is a firm no. In *Thaler v. Perlmutter*, the D.C. Circuit held that "the Copyright Act of 1976 requires all eligible work to be authored in the first instance by a human being," affirming the Copyright Office's refusal to register a work whose applicant conceded it was autonomously generated by an AI system with no human creative contribution. 130 F.4th 1039, 1041 (D.C. Cir. 2025), *cert. denied*, No. 25-449 (U.S. Mar. 2, 2026). The Copyright Office reached the identical conclusion independently, concluding that a work must reflect genuine human creative input to qualify for protection at all. U.S. Copyright Office, *Copyright and Artificial Intelligence, Part 2: Copyrightability*, at 7 (Jan. 2025).

The Act, in other words, does not let resemblance substitute for the human-origination predicate it requires—no degree of similarity between what a machine produces and what a human author would have produced closes that gap. *AIRights* does not suggest the authorship and fair use inquiries are identical, or that *Thaler* controls the outcome here—they are different provisions addressing different questions. It only asks the Court to give the analogous question the same direct examination, rather than resolve it by analogy.

### 3. *Bartz* assumed the equivalence without directly examining it

The *Bartz* court held that training an LLM on lawfully acquired books was "quintessentially transformative," reasoning that "[l]ike any reader aspiring to be a writer, Anthropic's LLMs trained upon works not to race ahead and replicate or supplant them — but to turn a hard corner and create something different." *Bartz*, 787 F. Supp. 3d at 1020–22. "[I]f someone were to read all the modern-day classics because of their exceptional expression, memorize them, and then emulate a blend of their best writing, would that violate the Copyright Act? *Of course not*." Defs.' Mot. for Summ. J. at 13 (quoting *Bartz*, 787 F. Supp. 3d at 1021–22).

That analogy is not one strand of the court's reasoning; it is the whole of it. The court answered each of the authors' arguments against transformativeness—that training memorized creative expression, that it reproduced protected elements, that its scale and commercial character distinguished it from human reading—by treating what is permissible for a human reader as dispositive of what is permissible for the machine. Remove the human-reader analogy and the transformativeness finding has no independent support.

The difficulty is that the same opinion describes the training process accurately, and its accurate description is irreconcilable with the analogy. The court characterized training as "the iterative, trial-and-error discovery of contingent statistical relationships between each word fragment and all other word fragments both within any work and across trillions of word fragments from other copied books." *Id.* at 1017–18. That is a description of a statistical process operating on tokenized data—a process in which no human relates any individual work to a new expressive purpose. The engineers who built the training pipeline made aggregate decisions about data-mix composition; they made no work-level creative judgment about any book—the kind of judgment whose identification did the analytical work in *Campbell* and *Oracle*. *Campbell*, 510 U.S. at 583–84 (locating transformative character in the parodists' purpose in relating the borrowed material to that new end); *Oracle*, 593 U.S. at 30, 33 ("only insofar as needed," the 11,500-of-2.86-million-lines selection). The court described a process with no human creative judgment at the level of any individual work, and then characterized that process as "like any reader aspiring to be a writer." *Bartz*, 787 F. Supp. 3d at 1022. The gap between the accurate description and the characterization is the equivalence assumption—and the opinion never examines whether it holds.

Defendants now ask this Court to adopt that same assumption on a new record, arguing that *Bartz's* reasoning "applies with equal force in this case." Defs.' Mot. for Summ. J. at 13. Each adoption compounds a predicate that has still never been tested, only assumed and reassumed. And the assumption has no evident limiting principle: a description true of "any reader aspiring to be a writer" is, at the same level of generality, true of any system that ingests copyrighted works and produces statistically different outputs—broad enough to cover

essentially any machine-learning application built on copyrighted data. That is precisely the logic Defendants ask this Court to apply here.

#### 4. *Google Books* never implicated the predicate

Defendants separately invoke *Google Books* among a series of cases addressing what their motion terms "necessary intermediate copies." *See* Defs.' Mot. for Summ. J. at 13–14, 22. *Google Books* and the search-and-access cases Defendants cite alongside it never implicated the human creativity predicate at all. In *Google Books* itself, the copying enabled a full-text search index that reported where terms appeared across millions of books—a use directed at information *about* the works, not at the expression *within* them. *See Google Books*, 804 F.3d at 217. In *Authors Guild v. HathiTrust*, the copies at issue were made for search, access for print-disabled patrons, and preservation against loss—uses that pointed to the works rather than drew upon their expressive content. 755 F.3d 87, 97, 101, 103 (2d Cir. 2014). *Perfect 10, Inc. v. Amazon.com, Inc.* is the same: Google's thumbnails served solely as pointers to full-sized images, never engaging what made those images expressive at all. 508 F.3d 1146, 1157, 1160, 1165 (9th Cir. 2007). Copying of functional material implicates the predicate no more than copying for search does: in *Sega Enterprises Ltd. v. Accolade, Inc.*, the copying reached only the unprotectable functional code needed for interoperability, not the expressive content of any work. 977 F.2d 1510, 1522–23 (9th Cir. 1992), as amended Jan. 6, 1993.

As Judge Chhabria recognized in *Kadrey*—a case arising from materially similar facts—*Google Books's* indexing technology was "content agnostic": "[t]he database wouldn't work any better or worse if it contained books full of complete gibberish." 788 F. Supp. 3d at 1049. LLM training, he acknowledged, is different in exactly this respect: LLMs "need high-quality expression," and training depends on the expressive qualities of what it ingests. *Id. Bartz* accepted the same facts in its findings: Anthropic selected books "because of the creative expressions they contained," seeking "well-curated facts, well-organized analyses, and captivating fictional narratives." 787 F. Supp. 3d at 1017.

That difference is what makes the analogy to *Google Books* fail, and it turns on the interaction of two features rather than either alone. *Google Books* and LLM training share one: in

neither does a human exercise work-level creative judgment relating any individual work to a new purpose—both are automated processes operating at scale. But in *Google Books*, that absence was immaterial, because the copying never engaged the works' expression at all; the system was indifferent to whether any book was a masterpiece or gibberish. Expressiveness was not at issue, so the transformativeness finding never depended on human creative judgment, and its absence changed nothing. LLM training is the configuration *Google Books* was not: a process that engages works *for* their expression—that depends on expressive quality—while still lacking any human judgment relating those works to a new purpose.

That combination is what implicates the human creativity predicate. The transformativeness inquiry has always relied on human creative judgment to explain why drawing upon a work's expression for a new purpose is transformative rather than infringing. Where the copying is indifferent to expression, as in *Google Books*, that reliance never comes into play. Where the copying seeks expression, as in training, the reliance is squarely engaged—and the human judgment the inquiry has always depended on is exactly what is missing. Expressiveness alone does not defeat fair use; many transformative uses draw on highly expressive originals. Expression-seeking copying without human creative judgment is the distinct configuration the training cases present, and the one no prior transformativeness case had to confront.

#### 5. Neither *Bartz* nor *Kadrey* examined the predicate—and this record squarely presents it

Neither *Bartz* nor *Kadrey* examined whether the human creativity predicate is satisfied where copying seeks expression but no human judgment relates any work to a new purpose. *Kadrey* took the first step and stopped: Judge Chhabria recognized that training depends on expressive quality, but did not carry that recognition into the predicate inquiry—he treated the distinction he had drawn as not decisive. *Bartz* did not reach that step in its transformativeness analysis: the court accepted the expressive-selection facts in its statement of the record, then reasoned through Factor One by the human-reader analogy. In both, the same predicate went unexamined.

*AIRights* does not contend that examining the predicate compels any particular result on any record. It contends that the distinction *Kadrey* saw and *Bartz's* findings record is the distinction the transformativeness inquiry must examine—rather than notice and set aside, or accept and pass over—and that neither court did. Whether AI training should be treated as equivalent to human learning for purposes of fair use, and whether the doctrine retains its coherence if it is, are the questions the inquiry poses. This Court can be the first to address them directly.

**B. The unprotectability of style does not resolve the question, because that proposition assumes a human learner**

Defendants argue that even if their models can generate outputs "in the style of" Plaintiffs' books, that use "would be non-infringing because style is unprotectable." Defs.' Mot. for Summ. J. at 12 (citing 17 U.S.C. § 102(b); *Kadrey*, 788 F. Supp. 3d at 1045 ("[S]tyle is not copyrightable—only expression is.")). If that proposition were as categorical as stated, the expression-seeking character of AI training identified above would be legally irrelevant: however comprehensively a model extracts a work's expressive qualities, it would extract only unprotectable "style." The proposition is not that categorical, and the reason it is not returns to the same predicate the preceding sections identify.

Style's unprotectability is not a statutory command. The word "style" appears nowhere in § 102(b), which excludes from protection any "idea, procedure, process, system, method of operation, concept, principle, or discovery." 17 U.S.C. § 102(b). It is instead a judge-made rule of reason, tracing to Judge Hand's abstraction principle—that any work can be described at ascending levels of generality, and that at some level of abstraction the description captures only unprotectable ideas. *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930). The proposition performs an essential function: it keeps the general building blocks of creative work—genres, techniques, aesthetic approaches—free for others to use, so that later creators may learn from and build upon earlier ones. *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 913, 916 (9th Cir. 2010) (no designer may "monopol[ize]" a general aesthetic merely by expressing it first; "Degas can't prohibit other artists from painting ballerinas."). Enabling creators to learn

from one another in this way is not a grudging exception to copyright; it is among the purposes copyright exists to serve.

Every case articulating that proposition, however, arose in a single setting: one human learning from another. *Mattel v. MGA* concerned a human designer who studied a competitor's dolls and designed her own. *Nichols* concerned a playwright. The proposition developed as it did because, until recently, human learning was the only learning there was—and human learning has a structural feature the proposition quietly depends on. A human learner absorbs a style through the ordinary limits of human perception and memory: she takes in an impression, not a comprehensive high-fidelity record of every expressive choice a body of work contains. Those cognitive limits confine what a human can extract to the level of abstraction—the general approach, the felt influence—while the specific expressive choices that constitute the style remain beyond comprehensive capture. And because her own creative judgment mixes inseparably with whatever she absorbs, her output transforms the influence rather than reproducing it. For a human, "learning a style" therefore *necessarily* means taking the unprotectable abstraction and producing something new. The proposition that style is free to learn from is safe precisely because, for a human, learning a style could never mean anything else.

AI-scale training is the first mechanism capable of severing that necessity. It is not subject to the cognitive limits that confined human style-learning to the abstraction. *See* Robert Brauneis, *Copyright and the Training of Human Authors and Generative Machines*, 48 Colum. J.L. & Arts 1, 45–57 (2024) (concluding that generative model training transcends the human limitations of memory, perception, and cognitive capacity that underlie the structure of copyright's exclusive rights, such that computer processing cannot be treated as the functional equivalent of human reading or learning). To the extent a training process reaches beyond the general aesthetic to encode the specific expressive choices a body of work contains—comprehensively, and in a form optimized to reproduce a source's stylistic signature—it does something no human learner could do, and something the unprotectability proposition never had

occasion to address. Which of those a given system does is a question about how the system works—not one the proposition answers.

That is why the "style is unprotectable" maxim does not resolve this case. Defendants invoke the idea-expression dichotomy, but that dichotomy distinguishes the free abstraction from the protected specifics—and it is the protected specifics, not the free abstraction, that expression-seeking extraction is capable of reaching. That unanswered question is the same one the preceding sections identify: whether a use that engages a work for its protected expression, through a process in which no human creative judgment relates that expression to a new purpose, is transformative. The unprotectability of style, like the transformativeness of training, was settled in a world where the only learner was human. Neither settles what follows when the learner is not.

### C. The human creativity predicate also bears on whether a training-data licensing market is a cognizable market

The equivalence assumption Part A identifies at Factor One reappears at Factor Four. In *Bartz*, the court held that competitive displacement from AI-generated outputs is not cognizable market harm, reasoning that authors' concern about "an explosion of works competing with their works" was "no different than it would be if they complained that training schoolchildren to write well would result in an explosion of competing works." *Bartz*, 787 F. Supp. 3d at 1031–32. The Copyright Act, the court concluded, "seeks to advance original works of authorship, not to protect authors against competition." *Id.* Defendants invoke that holding here to defeat Plaintiffs' market-dilution theory. Defs.' Mot. for Summ. J. at 19 (quoting *Bartz*, 787 F. Supp. 3d at 1031–32). But the analogy on which the holding rests—equating the market effect of machine training with the market effect of teaching schoolchildren to write—is the same machine-human equivalence assumption Part A identifies.

Judge Chhabria rejected that analogy directly in his summary judgment opinion in *Kadrey*, issued only two days after *Bartz's*. Addressing *Bartz's* schoolchildren reasoning, he explained that "using books to teach children to write is not remotely like using books to create a product that a single individual could employ to generate countless competing works with a

minuscule fraction of the time and creativity it would otherwise take." 788 F. Supp. 3d at 1035–36. The analogy was "inapt," he concluded, and "not a basis for blowing off the most important factor in the fair use analysis." *Id.* at 1036. He accordingly treated market dilution as a cognizable Factor Four harm—granting summary judgment to Meta only because the plaintiffs there had not developed the evidentiary record to support it. Two judges of this District thus divided on the precise point this brief identifies: whether the market consequence of machine training may be assumed equivalent to that of ordinary human learning, or whether that equivalence must be examined. Defendants ask this Court to adopt the reasoning *Kadrey* rejected.

The disagreement is not only about market dilution from outputs. It bears equally on Defendants' categorical objection to a training-data licensing market on the input side—the objection that recognizing such a market would be circular. Defendants argue such a market is "irrelevant" as a matter of law, because recognizing it would "eviscerate fair use" by letting Plaintiffs "monopolize a market for transformative uses." Defs.' Mot. for Summ. J. at 18. That characterization does real work: it treats an author's exclusive right to authorize uses of her own work as market monopolization in the antitrust sense, rather than as the ordinary operation of the § 106 rights every copyright holder holds. The principle Defendants invoke is a real one—a market cognizable under Factor Four must be "traditional, reasonable, or likely to be developed," not merely any transaction a rightsholder wishes to charge for. *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013). But whether the principle applies here depends on a characterization Defendants' own "monopolize" formulation assume rather than establish.

The Supreme Court has located the relevant line directly. Transformative use and derivative work are not different markets; they are two ends of one continuum, distinguished only by degree. The Copyright Act reserves to owners the right to prepare derivative works—works in which the original is "recast, transformed, or adapted," 17 U.S.C. § 101—and *Warhol* accordingly cautioned that "an overbroad concept of transformative use . . . would narrow the copyright owner's exclusive right to create derivative works," holding that the "degree of transformation required to make 'transformative' use of an original must go beyond that required

to qualify as a derivative." *Warhol*, 598 U.S. at 529. A use that engages a work for its expressive value, to produce outputs that draw on that value, may fall on the derivative side of that line—and a market for licensing such a use is not the circular, fair-use-swallowing hypothetical Defendants describe, but the derivative-works market § 106(2) already reserves to owners, cognizable under Factor Four even before it is fully developed. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614–15 (2d Cir. 2006).

Which characterization is correct—expression-indifferent use, for which no such market is cognizable, or expression-seeking use, for which one may be—is the identical question Part A poses. Defendants' Factor Four argument does not avoid that question; it presupposes an answer to it. Their circularity objection assumes the use is transformative, and the schoolchildren analogy they invoke assumes machine competition is equivalent to human competition—both assumptions that *Kadrey* shows are contestable and that Part A shows are unexamined. *AIRights* takes no position on whether a training-data market exists on this record, or on how the characterization should ultimately come out. The point is only that the same equivalence cannot be permitted to resolve Factor Four by assumption when Part A shows it must be examined at Factor One.

**D. Where the human creativity predicate is displaced, extending fair use to reach the process is, at minimum, a choice for Congress**

The preceding Parts identify a presupposition the transformativeness inquiry has always carried but never had to state: that the actor relating copied material to a new purpose exercises human creative judgment. This Part addresses what follows for the Court's institutional role if examination bears that out on this record—if the human creativity predicate is displaced rather than satisfied. The consequence is not that the fair-use defense necessarily fails. It is that the step required to sustain it—treating a machine-scale process as equivalent to the human creative reuse the inquiry was built to evaluate—is a structural extension of the doctrine that belongs, at minimum, to Congress.

The starting point is the constitutional allocation. Copyright is a domain the Framers committed to the legislature: Congress holds the power "[t]o promote the Progress of Science

and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. The Clause names the means as well as the end: progress is promoted by securing rights to *authors*, and an author must be human. *Thaler*, 130 F.4th at 1041. The Supreme Court has stated the condition in the same terms—fair use furthers copyright's goal "to promote the progress of science and the arts, without diminishing the incentive to create," *Warhol*, 598 U.S. at 531—a sentence *Bartz* quoted with its concluding clause emphasized, 787 F. Supp. 3d at 1022, and that Defendants quote while addressing only its first half. Defs.' Mot. for Summ. J. at 10.

Congress exercised that power in the 1976 Copyright Act, and § 107 codifies fair use in terms that presuppose a human actor. The enumerated purposes—criticism, comment, teaching, scholarship, research—are human communicative activities. The transformativeness inquiry asks whether a use adds "something new, with a further purpose or different character," a formulation that, as Part A explains, presupposes an actor whose judgment does the relating. *Campbell*, 510 U.S. at 579. The statute does not speak to whether a machine-scale process that engages expression without such judgment comes within the defense; it neither authorizes that extension nor forecloses it. That silence is the interpretive space this brief addresses.

Where the applicability of a statute to an unanticipated circumstance turns on a structural feature the enacted text presupposes, courts have long declined to resolve the openness by assuming the feature away. Federalism clear-statement rules require unmistakable congressional direction before a statute is read to work a structural change in the federal-state balance. *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991). Sovereign-immunity canons require unequivocal language before a waiver is inferred. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989). And where technological change has unsettled a doctrine's practical assumptions, the Supreme Court has treated the resulting question as one warranting direct analysis rather than mechanical extension of precedent built for different conditions—as it did in declining to extend the third-party doctrine to comprehensive digital location tracking. *Carpenter v. United States*, 585 U.S. 296, 313–16 (2018). These canons do not govern § 107 of their own force; they

illustrate a settled practice of preserving a statute's structural conditions and leaving their displacement to the institution empowered to make it.

The allocation is reinforced by the difference between what a court and what Congress can do with a question of this kind. A court resolving a fair-use defense decides the case before it: the copying is infringing or excused. Congress has repeatedly met disruptive copying technologies with tailored statutory schemes rather than open-ended extension of an equitable defense—from the mechanical compulsory license that answered the player piano and carried forward to sound recordings, 17 U.S.C. § 115, to the § 111 cable retransmission license, and the § 114 license for digital audio transmission. Each followed the same sequence this case presents: a new technology of reproduction outran the existing statute, courts gave the bounded answers the tools before them allowed, and Congress supplied the structural regime—a compulsory license, an administered royalty, a compensated right of access—that adjudication could not.

Those precedents differ from AI training in ways that matter, and the differences cut in favor of legislative resolution rather than against it. Each involved the reproduction or retransmission of identified, individual works substantially intact, and each resolved toward compensated permission—the copyright owner could not refuse, but was paid. Machine-scale training is not verbatim reproduction of any single work, and this brief takes no position on what a calibrated response to it should be. The point is only institutional: the tools these schemes deploy—rate-setting, compulsory licensing, safe harbors, statutory conditions on access—are refined instruments Congress has built before and can adapt or extend again, drawing the fine-grained distinctions a new technology requires. A court weighing a § 107 defense holds none of them; it has only the binary of infringement or excuse. That a machine-scale process differs from every copying technology Congress has yet addressed is not a reason for a court to resolve the difference by analogy—it is the reason the difference belongs to Congress to weigh, and not to a court to assume away.

The condition *Warhol* states is not incidental to the technology at issue. Defendants describe Plaintiffs' books as having "diversified" their training materials "with high-quality examples of edited, contemporary, long-form prose." Defs.' Mot. for Summ. J. at 17. A rule that

diminishes the incentive to produce such work erodes the input on which the technology depends. Nor is the consequence of a ruling symmetric. A holding that this use is not fair leaves every legislative option open. A holding that it is fair removes the entitlement on which a compulsory license or conditioned safe harbor would operate, and reverses which party must obtain legislation to change the default. And while Congress can restore a right that has been withdrawn, it cannot legislate into existence the works that were never written.

## V. STATEMENT OF NON-POSITION

Consistent with the limited and specific purpose of this brief, *AIRights* does not address, and takes no position on, the following:

- Defendants' alleged acquisition and distribution of unauthorized copies to build and operate a research library, or Plaintiffs' related contributory infringement and inducement claims;
- Whether a training data licensing market exists on this record, its scale, or whether market dilution from Defendants' outputs has been shown—Part IV.C addresses only the legal characterization of those questions, not what the evidentiary record shows; and
- Any other claim, defense, or issue raised in the parties' cross-motions not specifically addressed above.

## VI. CONCLUSION

*AIRights* urges no outcome; it asks only that the threshold question be examined rather than assumed. The transformativeness inquiry Defendants invoke carries a presupposition it never had to state—that a human creative judgment relates the copied work to a new purpose—and the AI training cases are the first to present a process in which no such judgment operates while the copying still reaches for expression. *Bartz* and *Kadrey* resolved the transformative-use question without examining this presupposition.

This Court, reaching the question third, is positioned to examine what the first two did not. *AIRights* respectfully submits that before machine-scale training is treated as equivalent to the human creative reuse the doctrine was built to evaluate, the Court should examine whether

the human creativity predicate is satisfied on this record—and that, should the predicate prove displaced, the extension of fair use to reach that process is a choice the Constitution assigns, in the first instance, to Congress.

Dated: August 26, 2026

Respectfully submitted,

KO IP & AI LAW PLLC

By: /s/ Jim W. Ko

Jim W. Ko, SBN 038530 (AZ)
4539 N 22nd St. #4410
Phoenix, AZ 85016
(480) 809-2247
jim@koailaw.com
*Admitted pro hac vice*

*Attorney for Amicus Curiae The AI Rights Project*