# EXHIBIT A

Benjamin S. Akley (State Bar No. 278506)
bakley@pryorcashman.com
**PRYOR CASHMAN LLP**
1901 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 683-6900

Frank P. Scibilia (*pro hac vice* admission pending)
fscibilia@pryorcashman.com
Joshua Weigensberg (*pro hac vice* admission pending)
jweigensberg@pryorcashman.com
Nathaniel Kazlow (*pro hac vice* admission pending)
nkazlow@pryorcashman.com
**PRYOR CASHMAN LLP**
7 Times Square, 40th Floor
New York, NY 10036
(212) 421-4100

*Counsel for the below-identified Amici*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| *In Re Mosaic LLM Litigation* | Master File Case No. 3:24-cv-01451-CRB<br>Consolidated with Case No. 3:24-cv-02653-CRB<br><br>Hon. Charles R. Breyer<br><br>**BRIEF OF THE RECORDING INDUSTRY ASSOCIATION OF AMERICA, AMERICAN ASSOCIATION OF INDEPENDENT MUSIC, SONGWRITERS OF NORTH AMERICA, BLACK MUSIC ACTION COALITION, MUSIC ARTISTS COALITION, NATIONAL ACADEMY OF RECORDING ARTS & SCIENCES, INC., AND ARTIST RIGHTS ALLIANCE AS *AMICI CURIAE* IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ....... ii

INTERESTS OF *AMICI CURIAE* ....... 1

SUMMARY OF ARGUMENT ....... 3

ARGUMENT ....... 3

I. OUTPUTS OF DEFENDANTS' AI MODELS SUBSTITUTE IN THE MARKET FOR THE COPIED WORKS ON WHICH THE MODELS WERE TRAINED ....... 3

II. DEFENDANTS' COPYING IMPAIRS AN EXISTING LICENSING MARKET FOR USE OF COPYRIGHTED WORKS FOR AI "TRAINING" ....... 8

A. A Functioning Market for Licensing Copyrighted Works For AI "Training" Already Exists ....... 9

B. Requiring Defendants to License Will Not "Grind Research to a Halt" ....... 11

C. Demonstrating Potential Harm to Licensing Markets Is Not "Circular" ....... 13

III. DEFENDANTS' "TRANSFORMATIVE" PRESUMPTION INCORRECTLY ELEVATES "TRANSFORMATIVENESS" TO A DISPOSITIVE DETERMINATION, CONTRARY TO *WARHOL* ....... 14

CONCLUSION ....... 15

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**


*A&M Recs., Inc. v. Napster, Inc.*,
114 F. Supp. 2d 896 (N.D. Cal. 2000),
aff'd in part, rev'd in part, 239 F.3d 1004 (9th Cir. 2001) ........ 11

*American Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994) ........ 8, 13

*Andy Warhol Found. For the Visual Arts v. Goldsmith ("Warhol")*,
598 U.S. 508 (2023) ........ *passim*

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ........ 7, 13, 15

Anthropic's Motion for Summary Judgment, *Bartz v. Anthropic PBC*,
No. 3:24-CV-05417-WHA (N.D. Cal. Mar. 27, 2025), Dkt. 122 ........ 13

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
758 F. Supp. 1522 (S.D.N.Y. 1991) ........ 11

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ........ 4, 8

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020) ........ 7

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) ........ 14

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) ........ 3, 5

*Infinity Broadcast Corp. v. Kirkwood*,
150 F.3d 104 (2d Cir. 1998) ........ 5

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) ........ *passim*

*McGucken v. Pub Ocean Ltd.*,
42 F.4th 1149 (9th Cir. 2022) ........ 5

*MGM Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005) ........ 11

*Peter Letterese & Assocs., Inc. v. World Institute of Scientology Enters.*,
533 F.3d 1287 (11th Cir. 2008) ........ 5

*Ringgold v. Black Ent. Television, Inc.*, 126 F.3d 70 (2d Cir. 1997) ........ 13

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) ........ 7, 8

*Seltzer v. Green Day, Inc.*, 725 F.3d 1170 (9th Cir. 2013) ........ 14

*Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*, 765 F.Supp.3d 382 (D. Del. 2025) ........ 8

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638 (9th Cir. 2020) ........ 13, 14

**STATUTES AND RULES**

17 U.S.C. § 107(4) ........ 4, 7

**OTHER AUTHORITIES**

4 Nimmer, Nimmer on Copyright, § 13.05[A][4] (2026) ........ 13

Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 Chi.-Kent J. Intell. Prop. 1 (2026) ........ 7

Matthew Sag, *Fairness and Fair Use in Generative AI,* 92 Fordham L. Rev. 1887 (2024) ........ 7

**WEBSITES**

THE ASSOCIATED PRESS, *ChatGPT-maker OpenAI signs deal with AP to license news stories* (July 13, 2023) available at: https://apnews.com/article/openai-chatgpt-associated-press-ap-f86f84c5bcc2f3b98074b38521f5f75a ........ 10

THE ATLANTIC, *The Atlantic announces product and content partnership with OpenAI* (May 29, 2024), available at: https://www.theatlantic.com/press-releases/archive/2024/05/atlantic-product-content-partnership-openai/678529/ ........ 10

CISAC, *Global economic study shows human creators' future at risk from generative AI* (Dec. 4, 2024), available at: https://www.cisac.org/Newsroom/news-releases/global-economic-study-shows-human-creators-future-risk-generative-ai ........ 6

DATABRICKS, *Databricks Grows >55% YoY, Surpasses $4.8B Revenue Run-Rate, and is Raising >$4B Series L at $134B Valuation* (December 16, 2025), available at: https://www.databricks.com/company/newsroom/press-releases/databricks-surpasses-4-8b-revenue-run-rate-growing-55-year-over-year ........ 12

DATABRICKS, *Databricks is Raising a Strategic Round of Funding at a $188 Billion Valuation* (July 16, 2026), available at: https://www.databricks.com/company/newsroom/press-releases/databricks-raising-strategic-round-funding-188-billion-valuation ........ 12

DEEZER NEWSROOM, *Deezer: AI music has surpassed 50% of new music uploads for the first time* (July 21, 2026), available at: https://newsroom-deezer.com/2026/07/ai-music-exceeds-50-percent-daily-uploads-deezer/ ........ 5

FINANCIAL TIMES, *Apple Music strikes new multiyear deals with major record labels* (Mar. 12, 2020), available at: https://www.ft.com/content/2b57fc8c-ef3b-40f5-83a5-2373ff203bfb?syn-25a6b1a6=1 ........ 12

FORTUNE BUSINESS INSIGHTS, *AI Training Dataset Market Size, Share & Industry Analysis* (July 6, 2026), available at: https://www.fortunebusinessinsights.com/ai-training-dataset-market-109241 ........ 10

LYRICFIND, *Publishing With LyricFind*, available at: https://www.lyricfind.com/publishing ........ 12

MERLIN, *Merlin and Udio Partner to Advance AI for Independent Music* (Jan. 20, 2026), available at: https://merlinnetwork.org/merlin-and-udio-partner-to-advance-ai-for-independent-music/ ........ 10

MUSIC BUSINESS WORLDWIDE, *After Universal, Warner, and Merlin Deals, Now Udio Inks Licensing Agreement With Kobalt* (Apr. 9, 2026), available at: https://www.musicbusinessworldwide.com/after-universal-warner-and-merlin-deals-now-udio-inks-licensing-agreement-with-kobalt/ ........ 10

MUSIC BUSINESS WORLDWIDE, *As GEMA Awaits Its Suno Copyright Verdict, the German Collecting Society Launches 'PLAI' – a Fully Licensed Dataset For Training AI Music Tools* (July 24, 2026), available at: https://www.musicbusinessworldwide.com/as-gema-awaits-its-suno-copyright-verdict-the-german-collecting-society-launches-plai-a-fully-licensed-dataset-for-training-ai-music-tools/ ........ 10

MUSIC BUSINESS WORLDWIDE, *Exclusive: Kobalt's AI Deal With Suno Rival ElevenLabs Guarantees Publishing 'Parity' With Recorded Music* (Aug. 5, 2025), available at: https://www.musicbusinessworldwide.com/kobalts-ai-suno-most-favored-nation/ ........ 10

MUSIC BUSINESS WORLDWIDE, *Major Music Publishers Ink AI licensing Deals With Lyrics and Music Data Company Musixmatch* (Oct. 15, 2025), available at: https://www.musicbusinessworldwide.com/major-music-publishers-ink-ai-licensing-deals-with-lyrics-and-music-data-company-musixmatch/ ........ 10

MUSIC BUSINESS WORLDWIDE, *UMG, Sony and Warner Strike Licensing Deals With New AI Music Platform KLAY* (Nov. 20, 2025), available at: https://www.musicbusinessworldwide.com/umg-sony-and-warner-strike-licensing-deals-with-new-ai-music-platform-klay/ .......... 10

MUSIXMATCH, *Musixmatch Business Solutions*, available at: https://about.musixmatch.com/business/overview .......... 12

THE NEW YORK TIMES, *The Times and Amazon Announce an A.I. Licensing Deal* (May 29, 2025), available at: https://www.nytimes.com/2025/05/29/business/media/new-york-times-amazon-ai-licensing.html .......... 10

REUTERS, Katie Paul & Anna Tong, *Inside Big Tech's Underground Race to Buy AI Training Data* (Apr. 5, 2024), available at: https://www.reuters.com/technology/inside-big-techs-underground-race-buy-ai-training-data-2024-04-05/ .......... 10

ROLLING STONE, *Jeff Goodell, Steve Jobs: Rolling Stone's 2003 Interview* (Oct. 6, 2011), available at: https://www.rollingstone.com/culture/culture-news/steve-jobs-rolling-stones-2003-interview-243284/ .......... 12

SPOTIFY, *Warner Music Group and Spotify Announce a New Multiyear Agreement* (Feb. 6, 2025), available at: https://newsroom.spotify.com/2025-02-06/warner-music-group-spotify-agreement/ .......... 12

TIME, *TIME and OpenAI Announce Strategic Content Partnership* (June 27, 2024), available at: https://time.com/6992955/time-and-openai-announce-strategic-content-partnership/ .......... 10

U.S. COPYRIGHT OFFICE, *Copyright and Artificial Intelligence Part 3: Generative AI Training (Prepublication Version)* (May 2025) ("Office AI Report"), available at: https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-Publication-Version.pdf .......... *passim*

UNIVERSAL MUSIC GROUP, *Meta and Universal Music Group Announce Expanded Global Agreement* (Aug. 12, 2024), available at: https://www.universalmusic.com/meta-and-universal-music-group-announce-expanded-global-agreement/ .......... 12

UNIVERSAL MUSIC GROUP, *Universal Music Group and Amazon Music Expand Global Relationship* (Dec. 23, 2024), available at: https://www.universalmusic.com/universal-music-group-and-amazon-music-expand-global-relationship/ .......... 12

UNIVERSAL MUSIC GROUP, *Universal Music Group and Stability AI Announce Strategic Alliance To Co-Develop Professional AI Music Creation Tools* (Oct. 30, 2025), available at: https://www.universalmusic.com/universal-music-group-and-stability-ai-announce-strategic-alliance-to-co-develop-professional-ai-music-creation-tools/ .......... 9

UNIVERSAL MUSIC GROUP, *Universal Music Group and Udio Announce Udio's First Strategic Agreements For New Licensed AI Music Creation Platform* (Oct. 29, 2025), available at: https://www.universalmusic.com/universal-music-group-and-udio-announce-udios-first-strategic-agreements-for-new-licensed-ai-music-creation-platform/ .......... 9

WARNER MUSIC GROUP, *Warner Music Group and Stability AI Join Forces to Build the Next Generation of Responsible AI Tools For Music Creation* (Nov. 19, 2025), available at: https://www.wmg.com/news/warner-music-group-and-stability-ai-join-forces-to-build-the-next-generation-of-responsible-ai-tools-for-music-creation .......... 9

WARNER MUSIC GROUP, *Warner Music Group and Udio Collaborate to Build A New Licensed Music Creation Service* (Nov. 19, 2025), available at: https://www.wmg.com/news/warner-music-group-and-udio-collaborate-to-build-a-new-licensed-music-creation-service .......... 9

**INTERESTS OF *AMICI CURIAE*[1]**

*Amici curiae* ("Amici") represent the creators behind much of this country's most valuable music. Many have previously submitted comments to the U.S. Copyright Office on artificial intelligence ("AI") issues, and many are members of the Human Artistry Campaign. Amici represent many diverse segments of the music industry in the United States, and they are well positioned to address the market consequences for the broader creative ecosystem of unauthorized copying of copyrighted content to train AI models.

Like the authors and publishers of books, Amici's members, who develop, license, and protect expressive works, depend on copyright law's protections to ensure that those works are not copied for commercial purposes without authorization. They thus have a substantial interest in resisting efforts to degrade copyright protections and in preserving the integrity of the markets upon which all copyright owners rely. This brief therefore focuses on the fourth factor and the market harms caused by the unlicensed use of copyrighted works by AI developers, such as Databricks and Mosaic ("Defendants"), and counters Defendants' argument that their copying for AI "training" is "exceedingly" "transformative" and therefore "fair" under the first factor.

RIAA is a nonprofit trade organization that supports and promotes the creative and financial vitality of recorded music and the people and companies that create it. RIAA's several hundred members—ranging from major American music companies with global reach to artist-owned labels and small businesses—make up this country's most vibrant music community. They create, manufacture and/or distribute sound recordings representing the majority of all legitimate recorded music consumption in the U.S. and own copyrights and/or other exclusive rights in sound recordings embodying the performances of some of the most popular and successful recording artists of all time. RIAA has been actively involved in representing the interests of its members relating to AI issues.

A2IM is a not-for-profit organization that exists to support and strengthen the independent recorded music sector and the value of recorded music copyrights. A2IM represents the interests of

[1] No counsel for any party authored this brief in whole or in part, and no entity or person other than Amici, their members, or their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

hundreds of independently owned American small and medium-sized music labels in the marketplace, in the media, and on Capitol Hill. Billboard Magazine identified the independent music label sector as over 40% of the music industry's global recorded music revenue in 2020 based on copyright ownership.

SONA is an organization formed by and for professional songwriters, advocating on their behalf before legislative bodies, administrative agencies, and courts. SONA is an open and diverse community that unites enthusiastic music creators and thoughtful business leaders to create a unified voice to protect the rights of songwriters and their artistic expression and compensation. SONA represented its members in the recent U.S. Copyright Office Listening Sessions and continues to advocate for and educate songwriters about AI developments.

BMAC works to create a unified force of action focused on racial equity and justice within the music industry to improve communities and drive systemic change. BMAC advocates on behalf of artists, songwriters, producers, managers, agents, executives, and lawyers to create access, equity, and opportunity for artists and industry professionals. BMAC participated in the Copyright Office's Listening Sessions. In its ongoing fight for economic justice, AI is at the forefront of BMAC's agenda.

MAC was founded by music creators and industry leaders to advocate on pressing topics that impact music creators. MAC believes artists should have the opportunity to decide how best to protect the fate of their music, and that the advancement of AI can be a benefit to music creators and music lovers, but only if properly regulated so that artists' interests are protected.

The Academy is a 501(c)(6) nonprofit membership organization representing and advocating for the interests of thousands of recording artists, songwriters, producers, engineers, and other music professionals whose creative works are protected by copyright. The Academy has been actively engaged in AI issues on behalf of its members through public advocacy, industry dialogue, and educational programming, and has a direct interest in ensuring that copyrighted musical works are not copied for commercial AI training purposes without authorization.

ARA is a non-profit organization co-founded and run by dedicated artists that fights for the rights of working musicians in the modern music economy.

## SUMMARY OF ARGUMENT

Defendants' copying of Plaintiffs' copyrighted works for AI "training" is not fair use, particularly when analyzed under the fourth fair use factor.[2] The fourth fair use factor—long recognized as "undoubtedly the single most important element of fair use," *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985); *Andy Warhol Found. For the Visual Arts v. Goldsmith ("Warhol")*, 598 U.S. 508, 555 (2023)—examines the effect of unlicensed copying of protected works on "the potential market for or value of" those works.

Unlicensed copying of copyrighted expressive works—such as books, lyrics, and sound recordings—to develop generative AI causes significant injury to existing and potential markets for such works. By appropriating vast quantities of protected expression without consent, AI developers enable the creation of outputs that compete with, substitute for, and diminish demand for works that otherwise would be licensed, purchased, or commissioned. The fourth-factor inquiry encompasses such harms, including harms arising from outputs that may not substantially replicate any particular work but that nonetheless derive from the wholesale copying of copyrighted works. Unlicensed use of copyrighted works for AI "training" threatens a legitimate, growing market in which copyright owners license their works for that purpose, and assertions that such licensing markets are hypothetical or impracticable are belied by marketplace realities. And, it is not "circular" to recognize harm to an existing (even if relatively new) market, particularly where AI developers seek to displace negotiated licenses with uncompensated copying. Arguments that such use is "transformative" and therefore must be "fair" fall flat here, where copyrighted works are being used to "train" models like Defendants' to generate outputs of the same type as the copied training material.

## ARGUMENT

### I. OUTPUTS OF DEFENDANTS' AI MODELS SUBSTITUTE IN THE MARKET FOR THE COPIED WORKS ON WHICH THE MODELS WERE TRAINED

Generative AI systems can cause enormous harm to creative industries because they are designed to generate works that serve as market substitutes for the copyrighted works copied by

[2] If Defendants' fair use arguments fail—and they should, for the reasons set forth herein—then Plaintiffs should be granted summary judgment on some, if not all, of their claims.

Defendants and other major technology companies in their so-called "training" of those generative AI systems. "Training" is simply a euphemism for making many copies of many copyrighted works to develop an AI model capable of generating expressive content that competes with the content that was copied. Large language models like Defendants' can generate a virtually unlimited amount of content of precisely the type that was copied, including entire works, without a license. Those AI-generated works reach the same consumers who would otherwise seek out human-created content. The resulting substitutional harm to human-authored, copyright-protected expressive content is real and severe.

Such substitutional harm must be considered under the fair use test's fourth factor, which looks to "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4). The statute does not limit which market "effects" of the use courts should consider. *See id*.; U.S. COPYRIGHT OFFICE, *Copyright and Artificial Intelligence Part 3: Generative AI Training (Prepublication Version)* (May 2025) ("Office AI Report") at 65 ("The statute on its face encompasses any 'effect' upon the potential market."). Nor is harm to the market for or value of the copied works limited to harm from works that are substantially similar to those that were copied.

Supreme Court precedent instructs courts to pay particular attention to the risk that a defendant's exploitation of a plaintiff's work will harm the plaintiff by making substitutes for the plaintiff's work available in the market. "[S]ubstitution," the Court explains, is "copyright's bête noire." *Warhol*, 598 U.S. at 528. Accordingly, the fourth factor looks to whether the conduct of the defendant, if "unrestricted and widespread," would have a "substantially adverse impact on the potential market for or the value of" the works that were copied, including in the form of substitution or "displacement" of the plaintiff's works. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590-92 (1994) (distinguishing between "potentially remediable displacement and unremediable disparagement").[3]

---

[3] "Harm" to a work resulting from a subsequent work that parodies or criticizes the original can also reduce demand, and such harm is not cognizable under the fourth factor. But generative AI does not involve "disparagement" or a similar type of harm because it typically does not comment on the protected works in any way, and AI developers claim all copying for "training" is fair use, even when it is not engaging in the kind of protected expression, such as parody and criticism, that the fair use test generally would allow.

Numerous courts have therefore considered whether a defendant's copying results in the creation of competing works, thereby risking market harm to a plaintiff by usurping demand for the copied works. *See, e.g.*, *Harper & Row Publishers, Inc.*, 471 U.S. at 566-67 (fair use "is limited to copying by others which does not materially impair the marketability of the work which is copied"); *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1164 (9th Cir. 2022) (defendant's article served as "a ready market substitute for McGucken's photos and the articles that would license them"); *Peter Letterese & Assocs., Inc. v. World Institute of Scientology Enters.*, 533 F.3d 1287, 1315 (11th Cir. 2008) (fair use primarily concerns the "adverse effect" of "market substitution."); *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998) (fourth factor concerns "secondary uses that, by offering a substitute for the original, usurp a market that properly belongs to the copyright-holder").

Generative AI has an unparalleled capacity to flood the market with substitutes for the creative works on which it has "trained." In the music industry, streaming platforms now feature millions of AI-generated songs. One platform disclosed last month that nearly one hundred thousand AI-generated music tracks are uploaded ***each day***, representing ***more than half*** of all new music uploads.[4] These market dynamics are increasingly detrimental to creators, as the volume of AI-generated tracks uploaded daily—which would not exist but-for the copyrighted works used to develop the AI model—at times now exceeds the number of uploaded tracks created by human creators.

Like the fiction stories that can be created by Defendants' AI model, these AI-generated music files are competing market substitutes for copyright-protected music. For example, some streaming music platforms distribute royalties to sound recording copyright owners by setting aside "pools" of revenue that are then allocated to copyright owners pro rata, based on each copyright owner's share of total "plays" of recordings on the service. When a copyright owner's share of total plays decreases because AI-generated recordings receive plays, human creators lose out. *See* Office AI Report at 65 (observing that "royalty pools can also be diluted").

---

[4] *See* DEEZER NEWSROOM, *Deezer: AI music has surpassed 50% of new music uploads for the first time* (July 21, 2026) ("Tracks detected as AI-generated reached its peak in June, representing more than 50% of total uploads of new music, with a monthly average of 90,000 tracks.").

Market substitution is likely to result in significant financial losses for copyright owners. One study estimates that generative AI may reduce revenues for creators by 24% in just the next two years.[5]

Assessing the harm that may result from such market substitution falls squarely within the scope of copyright's fair use analysis. Indeed, in *Kadrey v. Meta Platforms, Inc*., 788 F. Supp. 3d 1026, 1055 (N.D. Cal. 2025), Judge Chhabria expressly recognized the harm that generative AI systems' copying can have on the market for or value of copied works by "flood[ing] the market with competing works":

> [AI] involves a technology that can generate literally millions of secondary works, with a miniscule fraction of the time and creativity used to create the original works it was trained on. No other use – whether it's the creation of a single secondary work or the creation of other digital tools – has anything near the potential to flood the market with competing works the way that LLM training does.

One of the most alarming aspects of generative AI's capacity to harm markets for creative works is that such harm occurs even when AI outputs do not reproduce any part of the copyrighted works used in training. Judge Chhabria also recognized this threat in the *Kadrey* decision:

> [L]ess similar outputs, such as books on the same topics or in the same genres, can still compete for sales with the books in the training data. And by taking sales from those books, or by flooding stores and online marketplaces so that some of those books don't get noticed and purchased, those outputs would reduce the incentive for authors to create—the harm that copyright aims to prevent.

*Id.* at 1054. The Copyright Office agrees. It too has rejected the notion that the fourth factor, with its focus on substitution, somehow does not reach generative AI's exploitation of copyrighted works (*e.g.*, for "training") to create "outputs" that may only be similar in style to those works:

> The speed and scale at which AI systems generate content pose a serious risk of diluting markets for works of the same kind as in their training data. That means more competition for sales of an author's works and more difficulty for audiences in finding them. If thousands of AI-generated romance novels are put on the market, fewer of the human-authored romance novels that the AI was trained on are likely to be sold. . . . Market harm can also stem from AI models' generation of material stylistically similar to works in their training data.

Office AI Report at 65. As Judge Chhabria observed, while it may be "easier to conclude" that market harm exists when a generative AI system "is capable of regurgitating those books or generating

[5] CISAC, *Global economic study shows human creators' future at risk from generative AI* (Dec. 4, 2024).

substantially similar text," the market harm from non-identical output is also very real, and very much the type of harm that the fourth factor addresses. *Kadrey*, 788 F. Supp. 3d at 1054.

Some commentators (and Defs. Br. at 19) argue that the fair use market-harm analysis should distinguish between substitution from outputted works that are substantially similar to the works that were copied, on the one hand, and works that are not, on the other. In their view, substitution from works that are not substantially similar to the copied works, but that nevertheless could not have been created but for the copying, constitutes ordinary "competition" outside the scope of copyright law.[6] That is incorrect. The Copyright Act protects original expression, and AI developers reproduce entire copyrighted works during training, including all of their protected expressive elements, precisely because those expressive elements help generate outputs that are compelling to users. Accordingly, even if an AI system does not reproduce the protected expression in its outputs, the "training"-phase copying itself is *prima facie* infringement and therefore ***falls squarely within copyright's domain***. The AI developer then bears the burden of showing that its copying, if "unrestricted and widespread," would not harm the market for plaintiff's works, including by substituting for them. *Id.* § 107(4). *See also Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020) (defendants bear burden of proof on fair use defense).

In *Bartz v. Anthropic PBC*, Judge Alsup, citing *Sega Enters. Ltd. v. Accolade, Inc.*, found that generative AI systems' production of "alternative" writings does not "concern[] the Copyright Act," as in the Judge's view, it would be "no different than . . . [if] training schoolchildren to write well . . . result[ed] in an explosion of competing works." 787 F. Supp. 3d 1007, 1032 (N.D. Cal. 2025). Amici respectfully submit there are significant differences between the schoolhouse analogy and the generative AI arms race. As Judge Chhabria observed, "when it comes to market effects, using books to teach children to write"—which books are actually licensed or purchased by the schools, and are not unlawfully copied—"is not remotely like using [i.e., copying] books to create a product that a single

---

[6] *See* Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 Chi.-Kent J. Intell. Prop. 1, 6 (2026); *see also* Matthew Sag, *Fairness and Fair Use in Generative AI,* 92 Fordham L. Rev. 1887, 1919 (2024). Both authors base their arguments on the erroneous assertion that what generative AI takes from the works it copies in training is non-expressive and/or unprotectable. Professor Lee also incorrectly focuses on so-called "speech" of end users, ignoring the massive copying by AI developers.

individual could employ to generate countless competing works with a miniscule fraction of the time and creativity it would otherwise take." *Kadrey*, 788 F. Supp. 3d at 1036.

Defendants' presentation of the Ninth Circuit's decision in *Sega Enters. Ltd. v. Accolade, Inc.* as finding fair use where the express purpose of copying was to create new, non-infringing but competing products (*see* Defs. Br. at 19) also ignores that the nature of the copying was different in kind. There, plaintiff's creative content (*e.g.*, the audiovisual aspects of its video game software) was ***not*** copied—only its computer code was. *See generally*, 977 F.2d 1510 (9th Cir. 1992). Further, the purpose of such copying was to understand ideas and functional concepts to achieve technical operability with the plaintiff's hardware. *See id*. And the substance of defendant's creative video game content did not depend on its use of plaintiff's material. Other courts evaluating AI "training" as fair use have found such analogies to intermediate copying decisions like *Sega* "inapt" because "[f]irst and foremost, those cases are all about copying computer code." *Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*, 765 F.Supp.3d 382, 398 (D. Del. 2025). Those circumstances are a far cry from copying creative books or music to build a system capable of generating an endless stream of competing works.

## II. DEFENDANTS' COPYING IMPAIRS AN EXISTING LICENSING MARKET FOR USE OF COPYRIGHTED WORKS FOR AI "TRAINING"

The fourth factor requires courts to consider "'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590. The Copyright Office has stated that "a licensing market need not be long-standing or exhaustive . . . to be cognizable." Office AI Report at 67, n.381 (citing *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929 n.16, 930 (2d Cir. 1994)).

A functioning market for licensing copyrighted works for AI "training" already exists in the music industry and is expected to grow and develop as demand for high-quality expressive content increases. The industry has long maintained sophisticated systems for identifying rightsholders, obtaining authorization, and distributing royalties, enabling technology companies to efficiently license vast amounts of music. While Defendants protest that no specific licensing market exists for Plaintiffs' books at issue here, Amici respectfully submit that this Court should not take so narrow a view of the marketplace for expressive content for AI "training." Given the industry infrastructure

currently in place, the uncompensated use of musical works, lyrics, sound recordings, or books for "training" cannot be defended, as it bypasses established licensing regimes and undermines the rights of creators whose works generate value for AI developers.

### A. A Functioning Market for Licensing Copyrighted Works For AI "Training" Already Exists

Defendants' argument that no market for licensing copyrighted works as "training data" exists or is likely to develop is incorrect. Defendants misrepresent the state of licensing creative works for AI "training," as both the Copyright Office and Amici have explained. Office AI Report at 68 n.388 (citing A2IM-RIAA Joint Initial Comments at 23, 25 ("[T]he recorded music industry has all the necessary systems and infrastructure already in place to make obtaining advance consent demonstrably feasible."); *id.* at 67 n.384 (citing NMPA Initial Comments at 19 ("The market is not merely a 'potential' or theoretical market the existence or feasibility of which is open to debate; it is an actual market . . . . Music companies are currently licensing works for use in training AI models.")); *id.* at 70 (Copyright Office concluding that "markets [for licensing copyrighted works for AI "training"] exist or are 'reasonable' or 'likely to be developed,'" particularly with respect to music content).

Major music industry stakeholders have already executed landmark licensing agreements authorizing the use of copyrighted works to "train" music-oriented AI systems, providing compelling evidence that licensing is a feasible and scalable solution across content sectors and among commercial participants. Universal Music Group and Warner Music Group have entered into agreements with Stability AI, a "multi modal" generative AI company, and Udio, an AI music generator, to develop AI music creation products "trained" on licensed music.[7] Merlin Network, a music licensing partner for independent record labels and distributors, and music publisher Kobalt reached similar agreements

---

[7] UNIVERSAL MUSIC GROUP, *Universal Music Group and Stability AI Announce Strategic Alliance To Co-Develop Professional AI Music Creation Tools* (Oct. 30, 2025); WARNER MUSIC GROUP, *Warner Music Group and Stability AI Join Forces to Build the Next Generation of Responsible AI Tools For Music Creation* (Nov. 19, 2025); UNIVERSAL MUSIC GROUP, *Universal Music Group and Udio Announce Udio's First Strategic Agreements For New Licensed AI Music Creation Platform* (Oct. 29, 2025); WARNER MUSIC GROUP, *Warner Music Group and Udio Collaborate to Build A New Licensed Music Creation Service* (Nov. 19, 2025).

with Udio.[8] KLAY Vision Inc. has entered into AI licensing deals with UMG, WMG, and Sony Music Entertainment to develop an AI music platform "trained entirely on licensed music."[9] Kobalt also entered into a licensing agreement with ElevenLabs for an AI music platform to be "trained on cleared catalog from Kobalt."[10] Last month, the German collecting society GEMA announced it had created a dataset of copyright-cleared music content for licensing to train AI models.[11] Lyrics have also been licensed: Musixmatch has signed lyric licensing deals with several music publishers to "ensure the writers of today and tomorrow are compensated for their creative works . . . in the dynamic, AI-powered world that is rapidly emerging."[12]

Outside the music industry, AI companies have similarly found it feasible and desirable to license textual works from major publications and online platforms for AI "training." Public reporting has confirmed that OpenAI entered into licensing deals with numerous news outlets and platforms, including the Associated Press, Time, and The Atlantic.[13] Amazon has agreed to license editorial content from the New York Times for use in "training" Amazon's AI platforms.[14]

The market for licensing copyrighted works as "training" data is also highly lucrative. Researchers estimate it to be valued at over $3 billion and anticipate it could exceed $30 billion by 2034.[15] The rapid development of this licensing market disproves Defendants' claim that this market

---

[8] MERLIN, *Merlin and Udio Partner to Advance AI for Independent Music* (Jan. 20, 2026); MUSIC BUSINESS WORLDWIDE, *After Universal, Warner, and Merlin Deals, Now Udio Inks Licensing Agreement With Kobalt* (Apr. 9, 2026).

[9] MUSIC BUSINESS WORLDWIDE, *UMG, Sony and Warner Strike Licensing Deals With New AI Music Platform KLAY* (Nov. 20, 2025).

[10] MUSIC BUSINESS WORLDWIDE, *Exclusive: Kobalt's AI Deal With Suno Rival ElevenLabs Guarantees Publishing 'Parity' With Recorded Music* (Aug. 5, 2025).

[11] MUSIC BUSINESS WORLDWIDE, *As GEMA Awaits Its Suno Copyright Verdict, the German Collecting Society Launches 'PLAI' – a Fully Licensed Dataset For Training AI Music Tools* (July 24, 2026).

[12] MUSIC BUSINESS WORLDWIDE, *Major Music Publishers Ink AI licensing Deals With Lyrics and Music Data Company Musixmatch* (Oct. 15, 2025).

[13] THE ASSOCIATED PRESS, *ChatGPT-maker OpenAI signs deal with AP to license news stories* (July 13, 2023); TIME, *TIME and OpenAI Announce Strategic Content Partnership* (June 27, 2024); THE ATLANTIC, *The Atlantic announces product and content partnership with OpenAI* (May 29, 2024).

[14] THE NEW YORK TIMES, *The Times and Amazon Announce an A.I. Licensing Deal* (May 29, 2025).

[15] REUTERS, Katie Paul & Anna Tong, *Inside Big Tech's Underground Race to Buy AI Training Data* (Apr. 5, 2024) (researchers have "put the market at roughly $2.5 billion now and forecast it could grow close to $30 billion within a decade."); FORTUNE BUSINESS INSIGHTS, *AI Training Dataset Market Size,*

does not and supposedly cannot exist. (Defs. Br. at 20-22.) As the Copyright Office has recognized, "licensing markets are available to meet AI training needs," and thus "unlicensed uses"—including unsanctioned AI "training"—are "disfavored under the fourth factor." Office AI Report at 70.

**B. Requiring Defendants to License Will Not "Grind Research to a Halt"**

Defendants and other AI companies have contended that the market for licensing creative content for AI "training" cannot develop because it is difficult, if not impossible, to identify and license works from copyright owners at scale. (Defs. Br. at 21.) *See also* Office AI Report at 69 n.396 (citing, *inter alia*, Anthropic Initial Comments at 9; OpenAI Initial Comments at 13). Based on this, they posit that requiring permission from and payment to rightsowners "would be devastating to the progress of science and the useful arts that the Copyright Act serves to promote" and would "grind research to a halt." (Defs. Br. at 2.) These arguments are wrong, both legally and factually.

For one, courts have held that there is no such thing as "fair use by reason of necessity." *See, e.g.*, *Basic Books, Inc. v. Kinko's Graphics Corp*., 758 F. Supp. 1522, 1535 (S.D.N.Y. 1991) (rejecting fair use argument that requiring licenses to reproduce excerpts of books in course packs would "halt the educational process"). And courts addressing fair use defenses in the context of unlicensed AI training have acknowledged that an adverse decision would not stifle innovation but would instead obligate AI companies to secure licenses and provide compensation to rights holders for the use of their copyrighted works, which compensation is an "incentive[] for artists to create original works in the first place." *Warhol*, 598 U.S. at 549; *Kadrey*, 788 F. Supp. 3d at 1038 ("The consequence will often be that the defendant needs to pay the copyright owner for a license that grants them permission to do whatever they were doing."). Ultimately, the false choice AI developers pose between compliance with copyright law and technological progress is a tired policy argument previously made by mass infringers like Napster and Grokster but rejected by the courts. *See A&M Recs., Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 911-25 (N.D. Cal. 2000), *affirmed in part, reversed in part, and remanded for modification of injunction by* 239 F.3d 1004 (9th Cir. 2001); *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005);

---

*Share & Industry Analysis* (July 6, 2026) ("The global AI training dataset market size was valued at USD 3.59 billion in 2025 and is projected to grow . . . to USD 23.18 billion by 2034.").

*Basic Books*, 758 F. Supp. at 1535. Rather than hindering scientific progress, curbing illegal practices by bad actors allows responsible, licensed technology-driven business models to thrive.[16]

In any event, as shown above, large scale licensing is practicable and is happening. And Defendants can plainly afford to compensate copyright owners. Just weeks after Defendants filed their motion, Databricks announced it was raising money at a $188 billion valuation—a 40% increase from just eight months earlier.[17] Requiring Defendants to pay for licenses will not "be devastating to the progress of science"—it will incentivize human creation. *See Warhol*, 598 U.S. at 549 ("It will not impoverish our world to require AWF to pay Goldsmith a fraction of the proceeds from its reuse of her copyrighted work."). Companies "will only be forced to stop" their unlicensed training on copyrighted works "if they're unwilling . . . to pay for the right to do it." *Kadrey*, 788 F. Supp. 3d at 1038.

Defendants are wrong that a market for licensing books for AI training "could not exist given the insurmountable transaction costs that any AI developer would face in attempting to individually license the massive amount of works necessary to train an LLM." (Defs. Br. at 2.) Music content is regularly licensed to technology companies for digital uses, demonstrating that large-scale licensing is practicable and commercially viable. Companies operating music streaming services and social media platforms, including Google, Apple, Amazon, Spotify, and Meta, have negotiated and entered into licenses for tens of millions of sound recordings.[18] Digital lyrics services have also licensed the lyrics to millions of songs.[19] That certain works may be harder to license does not entitle anyone to use all

---

[16] Jeff Goodell, *Steve Jobs: Rolling Stone's 2003 Interview*, ROLLING STONE (Oct. 6, 2011) (quoting Steve Jobs: "If copyright dies, if patents die, if the protection of intellectual property is eroded, then people will stop investing. That hurts everyone. . . . It is corrosive to one's character to steal. We want to provide a legal alternative.").

[17] DATABRICKS, *Databricks is Raising a Strategic Round of Funding at a $188 Billion Valuation* (July 16, 2026); DATABRICKS, *Databricks Grows >55% YoY, Surpasses $4.8B Revenue Run-Rate, and is Raising >$4B Series L at $134B Valuation* (Dec. 16, 2025).

[18] *See, e.g.*, SPOTIFY, *Warner Music Group and Spotify Announce a New Multiyear Agreement* (Feb. 6, 2025); FINANCIAL TIMES, *Apple Music strikes new multiyear deals with major record labels* (Mar. 12, 2020); UNIVERSAL MUSIC GROUP, *Universal Music Group and Amazon Music Expand Global Relationship* (Dec. 23, 2024); UNIVERSAL MUSIC GROUP, *Meta and Universal Music Group Announce Expanded Global Agreement* (Aug. 12, 2024).

[19] MUSIXMATCH, *Musixmatch Business Solutions*; LYRICFIND, *Publishing With LyricFind*.

copyrighted works for free. Requiring Defendants to license—or exclude works they cannot lawfully obtain—promotes the goals of copyright law, and would not slow technological advancement.

**C. Demonstrating Potential Harm to Licensing Markets Is Not "Circular"**

Proponents of fair use seeking to avoid liability have argued that a licensing market for the use of copyrighted creative content in AI "training" is not cognizable and that arguments around the licensing market for "training" data are "circular" because "in every fair use case, the 'plaintiff suffers a loss of a potential market if that potential [market] is defined as the theoretical market for licensing' the use at issue in the case." *See Kadrey* 788 F. Supp. 3d at 1052, quoting *Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 652 (9th Cir. 2020). They ignore a fundamental point: as shown above, the market for licensing works for AI "training" is not "theoretical" but real.

One can "avoid the vice of circularity" by considering "traditional, reasonable, or likely to be developed markets"—as opposed to merely hypothetical or theoretical ones—when evaluating the effect of a use upon a potential market. *Ringgold v. Black Ent. Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997). Thus, courts have long found cognizable licensing markets that developed in response to new technology. In *American Geophysical Union*, which considered the then-novel photocopier, the Second Circuit found that Texaco's unlicensed photocopying of articles caused market harm because publishers had licensed that use, even though that market, like the photocopier, was relatively new. 60 F.3d at 930. To address the "circularity" concern, the court advised that courts should not "automatically . . . conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use." *Id.* at 929–31, 929 n.17. Therefore, a court evaluating fair use should not look to whether the use harmed a hypothetical or theoretical market, but instead whether it served as a substitute in a market that the copyright owner reasonably expected to exploit. *See* 4 Nimmer, Nimmer on Copyright, § 13.05[A][4] (2026).

Viewed in this context, the cases most often cited by AI companies in support of "circularity" (*see*, *e.g.*, Defs. Br. at 18-20, *Bartz v. Anthropic PBC*, No. 3:24-CV-05417-WHA (N.D. Cal. Mar. 27, 2025), Dkt. 122) are inapposite, as they involved only speculative potential markets with no history of licensing—far from the marketplace for AI "training" licenses that has developed and is growing. For

example, in *Tresóna Multimedia, LLC*, 953 F.3d at 651, the Ninth Circuit found that no potential licensing market existed for the nonprofit use of snippets of musical works in new student choral arrangements. In *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013), plaintiff conceded his work's value was unaffected by a band's brief display of his illustration during a live performance and presented no evidence regarding a licensing market for this type of use. And in *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 22, 38 (2021), the Supreme Court limited its decision to the type of computer code at issue, and distinguished computer code from expressive works. Moreover, the evidence showed that, "at a minimum, it would have been difficult for Sun to enter the smartphone market."

These cases—none of which concerned an actual, non-hypothetical market—demonstrate that "circularity" fears fall away when potential markets are limited to those that are "traditional, reasonable, or likely to develop." Such decisions show that even a transformative use is not necessarily fair if it results in the creation of substitutive works that impair the market for or value of the works copied.

## III. DEFENDANTS' "TRANSFORMATIVE" PRESUMPTION INCORRECTLY ELEVATES "TRANSFORMATIVENESS" TO A DISPOSITIVE DETERMINATION, CONTRARY TO *WARHOL*

Defendants' and other developers' reliance on pre-*Warhol* decisions, including those addressed *supra* in Section II.C, incorrectly suggests that a finding of "transformativeness" precludes consideration of market harm under the fourth factor and is dispositive as to fair use. This position is at odds with *Warhol*, which both narrowed the meaning of "transformative" and clarified that a finding of "transformativeness" does not lead ineluctably to a conclusion that the use was fair. *See* 598 U.S. at 525-532. In doing so, it is Defendants, not Plaintiffs, who advance a "circular" argument. Defendants presume that the use of expressive works for training AI systems is *per se* transformative, without inquiring into the purpose of that use, and then elevate that presumption to a dispositive conclusion of fair use, bypassing the requisite fourth factor analysis altogether, all contrary to *Warhol*.

Defendants' presumption is also incorrect. While Defendants contend that their LLM training process "transformed . . . Plaintiffs' books[] into something much greater than the sum of [their] parts: a statistical representation of language," and therefore their models serve a different purpose from the books they copied in "training" the model (Defs. Br. at 12), that characterization overlooks the ultimate

purpose for which Defendants designed and deployed their models. For example, Defendants fine-tuned at least one model on a corpus of fiction and then directed it to generate an epilogue to *The Great Gatsby*. (Defs. Br. at 6.) That use demonstrates that the model was developed to generate new, expressive literary works, drawing in part on unauthorized copies of Plaintiffs' copyrighted fiction.[20]

Defendants' description of their models as embodying only a mathematical representation of language also obscures the fundamentally expressive nature of the output those models are intended to produce. The value of the training process derives from the copyrighted expression that Defendants copied, and the ***purpose*** of the resulting model is to generate competing expressive works in the same creative domain as the works on which it was trained. *See Kadrey*, 788 F. Supp. 3d at 1059 ("No matter how transformative LLM training may be, it's hard to imagine that it can be fair use to use copyrighted books to develop a tool to make billions or trillions of dollars while enabling the creation of a potentially endless stream of competing works that could significantly harm the market for those books."). This case therefore differs materially from *Bartz*, where the court concluded that the use of copyrighted works to train an LLM was "quintessentially transformative" because the purpose was to create something meaningfully different from the original works. 787 F. Supp. 3d at 1022. Here, by contrast, Defendants trained and fine-tuned models to generate new fictional expression, including works closely related to and derived from existing literary works. Where the challenged use enables the production of substitute expressive content in the same market as the copyrighted works, Amici respectfully caution this Court not to let claims of "transformativeness" swallow the fair use inquiry.

## CONCLUSION

For the foregoing reasons, Amici respectfully request that the Court deny Defendants' motion and grant Plaintiffs' motion.

[20] Defendants' assertion that they once prompted their model to generate an epilogue for *The Great Gatsby* and it generated one that supposedly "did not make sense as fiction" because Gatsby (like Schrodinger's Cat) was both dead and alive, carries no weight. In fact, it shows that Defendants' model can and does create substitutive works of fiction derived from the works Defendants copied. And, of course, AI developers are continuously working to eliminate mistakes and nonsensical responses.

Dated: August 27, 2026

Respectfully submitted,

**PRYOR CASHMAN LLP**

*s/ Benjamin S. Akley*
Benjamin S. Akley (State Bar No. 278506)
1901 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 683-6900
bakley@pryorcashman.com

Frank P. Scibilia (*pro hac vice* admission pending)
Joshua Weigensberg (*pro hac vice* admission pending)
Nathaniel Kazlow (*pro hac vice* admission pending)
7 Times Square, 40th Floor
New York, NY 10036
(212) 421-4100
fscibilia@pryorcashman.com
jweigensberg@pryorcashman.com
nkazlow@pryorcashman.com

*Counsel for Amici*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on August 27, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send Notices of Electronic Filing to all counsel of record.

*s/ Benjamin S. Akley*
Benjamin S. Akley