# EXHIBIT A

KIBLER FOWLER & CAVE LLP
Michael D. Kibler (SBN 243982)
mkibler@kfc.law
Dominique Caamano (SBN 301810)
dcaamano@kfc.law
Kevin J. Cammiso (SBN 316540)
kcammiso@kfc.law
11100 Santa Monica Blvd., Suite 600
Los Angeles, California 90025
Telephone: (310) 409-0400
Facsimile: (310) 409-0401

ASSOCIATION OF AMERICAN PUBLISHERS
Lucy Grace D. Noyola (appearance *pro hac vice*)
1730 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 220-4546
lnoyola@publishers.org

*Attorneys for Amici Curiae*
*Association of American Publishers, News/Media Alliance,*
*and International Association of Scientific, Technical & Medical Publishers*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

*In Re Mosaic LLM Litigation*

Case No. 3:24-cv-01451-CRB
Consolidated with Case No. 3:24-cv-02653-CRB

Hearing Date: October 30, 2026
Time: 10:00 a.m.
Location: Courtroom 6, 17th Floor

**BRIEF OF AMICI CURIAE ASSOCIATION OF AMERICAN PUBLISHERS, NEWS/MEDIA ALLIANCE, AND INTERNATIONAL ASSOCIATION OF SCIENTIFIC, TECHNICAL & MEDICAL PUBLISHERS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Judge: Hon. Charles R. Breyer

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... i
STATEMENT OF INTERESTS OF AMICI CURIAE ..... 1
SUMMARY OF ARGUMENT ..... 2
ARGUMENT ..... 3
I. Copying for AI Training Is Not a Transformative Use ..... 4
A. LLM developers use copyrighted works for their expressive content and for the same purpose as the original works. ..... 4
B. LLMs generate substitutes for copyrighted works ..... 5
C. No compelling justification exists for using expressive content to generate expressive content. ..... 7
II. Unlicensed AI Training Substantially and Adversely Harms the Markets for Copyrighted Works. ..... 8
A. Unlicensed uses of copyrighted works for AI training are cognizable market harms. ..... 9
B. A functioning market for licensing textual works for AI exists and is expanding. ..... 12
C. An AI licensing market benefits both the public and AI development. ..... 14
CONCLUSION ..... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8 ..... 3

**Cases**

*A.V. v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009) ..... 7

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994) ..... 11

*Anderson v. Stallone*, No. 87-0592, 1989 U.S. Dist. LEXIS 11109 (C.D. Cal. Apr. 25, 1989) ..... 6

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) ..... 2, 3, 4, 5, 6, 8

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) ..... 7, 9

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ..... 7

*Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025) ..... 6, 14

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) ..... 2

*BMG Music v. Gonzalez*, 430 F.3d 888 (7th Cir. 2005) ..... 11

*Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301 (4th Cir. 2010) ..... 8

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ..... 3, 4, 5, 7, 8, 9, 11, 14

*Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443 (9th Cir. 2020) ..... 8, 11

*Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163 (2d Cir. 2024) ..... 8

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) .......... 4, 8, 11

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) .......... 4, 6, 10, 14, 15

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) .......... 7

*Kienitz v. Sconnie Nation LLC*,
766 F.3d 756 (7th Cir. 2014) .......... 8

*Kirtsaeng v. John Wiley & Sons, Inc.*,
579 U.S. 197 (2016) .......... 14

*Mazer v. Stein*,
347 U.S. 201 (1954) .......... 3

*New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*,
904 F.2d 152 (2d Cir. 1990) .......... 2

*Penguin Random House LLC v. Colting*,
270 F. Supp. 3d 736 (S.D.N.Y. 2017) .......... 6

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) .......... 7

*Romanova v. Amilus Inc.*,
138 F. 4th 104 (2d Cir. 2025) .......... 5

*Salinger v. Colting*,
641 F. Supp. 2d 250 (S.D.N.Y. 2009) .......... 10

*SunTrust Bank v. Houghton Mifflin Co.*,
268 F.3d 1257 (11th Cir. 2001) .......... 2

*Twin Peaks Prods. v. Publ'ns Int'l, Ltd.*,
996 F.2d 1366 (2d Cir. 1993) .......... 6

*VHT, Inc. v. Zillow Grp., Inc.*,
918 F.3d 723 (9th Cir. 2019) .......... 9

**Statutes**

17 U.S.C. § 101 .......... 6

17 U.S.C. § 107 .......... 3, 7, 9

U.S. Const. art. I, § 8, cl. 8 .......... 3

**Other Authorities**

A. Feder Cooper & James Grimmelmann, *The Files Are in the Computer: On Copyright, Memorization, and Generative AI*, 100 Chi.-Kent L. Rev. 141 (2025) .......... 6

Daniel Gervais et al., *The Heart of the Matter: Copyright, AI Training, and LLMs*, 71 J. Copyright Soc'y 482 (2024) .......... 4

Paul Goldstein, *Copyright's Highway: From Gutenberg to the Celestial Jukebox* (rev. ed. 2003) .......... 15

H. Comm. on the Judiciary, 89th Cong., Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill (Comm. Print 1965) .......... 3

Pierre N. Leval, *Campbell as Fair Use Blueprint?*, 90 Wash. L. Rev. 597 (2015) .......... 7

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2026) .......... 11

U.S. Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training* (May 2025) (pre-publication) .......... 10

**STATEMENT OF INTERESTS OF AMICI CURIAE**

The Association of American Publishers, Inc. ("AAP") is a not-for-profit organization that represents approximately 120 book, journal, and education publishers in the United States on matters of law and policy, advocating for outcomes that incentivize the publication of creative expression, professional content, and learning solutions. AAP's members invest substantial time, expertise, and resources in the creation and distribution of works, including literature, scholarship, professional content, and scientific journals. AAP and its members have an interest in applying the fair use doctrine as a reasonable limitation on exclusive rights, consistent with the fundamental objectives of copyright law.

The News/Media Alliance ("NMA") is a nonprofit organization representing over 2,000 publishers in the United States and internationally, ranging from the largest news and magazine publishers to hyperlocal newspapers, and from digital-only outlets to papers who have printed news for centuries. NMA's membership accounts for nearly 90 percent of the daily newspaper circulation in the United States, and over 500 magazine and digital-only brands, whose content educates, informs, and entertains millions of Americans on a daily basis. As the leading voice for news, magazine, and digital publishers, NMA advocates for laws and policies that allow high-quality journalism to thrive, including a balanced interpretation of the fair use exception to copyright.

The International Association of Scientific, Technical & Medical Publishers ("STM") is the leading global trade association for academic and professional publishers. STM members represent learned societies, university presses, and private companies of all sizes in the academic and professional publishing industry. Its members collectively publish over 60 percent of all English language journal articles and tens of thousands of monographs and reference works. STM members' works include tens of thousands, if not millions, of the scientific articles, academic textbooks, and professional reference books implicated by AI training ingestion. STM actively represents the interests of its members as they relate to AI issues, and champions a vision of truthful, responsible, and reliable AI systems that use STM members' copyrighted content in AI training only with authorization, compensation, and attribution.[1]

[1] No party or its counsel authored this brief in whole or in part or contributed money toward the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

The Copyright Act reflects Congress's considered determination that exclusive rights, market-based licensing, and voluntary exchange will ordinarily encourage the creation and dissemination of expressive works. This legislative determination remains the same no matter how much technological innovation changes the way copyrighted works are created, distributed, or used. Using copyrighted works to train generative AI models should be treated no differently.

Fair use is a critical exception to exclusive rights that complements the goals of copyright. Publishers themselves regularly rely on fair use for uses such as reproducing copyrighted images as historical artifacts in documentary works, *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006), reproducing excerpts for purposes of criticism and biography, *New Era Publ'ns Int'l, ApS v. Carol Publ'g Grp.*, 904 F.2d 152 (2d Cir. 1990), and creating critical re-imaginings of fictional works through parody, *SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257 (11th Cir. 2001). These types of transformative uses of copyrighted works benefit the public by generating new insights and information about the works without prejudicing the copyright owners.

But uses that exploit expression in copyrighted works to generate outputs that convey their expressive content or otherwise serve as substitutes are neither transformative nor fair use. Substitution is "copyright's bête noire." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023). Where large language models (LLMs), such as the defendants', both share the same purpose as the copyrighted works on which they are trained and generate outputs that usurp markets that rightfully belong to copyright owners, the risk of substitution is high, and fair use should not apply to LLM training.

Moreover, the goals of copyright are undermined when fair use is applied to authorize the uncompensated appropriation of the creative labor of thousands, if not millions, of copyright owners where licensing is practical, beneficial, and commercially reasonable. Overly expansive interpretations of fair use displace the market mechanisms Congress established, replacing negotiated exchange with uncompensated (and uncredited) use and transferring value from the authors and publishers that invest in them to industries that neither incurred the costs nor assumed the risks of producing the underlying works.

This concern is particularly acute where courts are asked to extend fair use to novel technological uses while AI licensing markets are still developing. Fair use is not a roving license for courts to revise

the economic framework Congress implemented whenever new technologies emerge. In view of the need to fully consider the effect on the potential market for copyrighted works and the multiple market harms from the unrestricted and widespread use of copyrighted works for LLM training, *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994), courts should exercise caution to avoid foreclosing the development of voluntary licensing markets and unsettling the balance Congress established.[2]

**ARGUMENT**

Fair use should not frustrate the framework established by the Constitution and crafted by Congress. The Constitution empowers Congress to enact a statutory scheme to encourage and reward individual efforts in the creation and dissemination of creative works through the mechanism of exclusive rights. *See* U.S. Const. art. I, § 8, cl. 8 (granting Congress the power of securing copyrights to authors to "promote the Progress of Science and useful Arts"); *Mazer v. Stein*, 347 U.S. 201, 219 (1954) (explaining the "economic philosophy behind" the Copyright Clause is "the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors"). The fair use doctrine under 17 U.S.C. § 107 reflects a balance struck by Congress to recognize limited circumstances permitting the unauthorized uses of copyrighted works.

The technological innovation of AI is no talisman for fair use. The fair use doctrine is intended to adapt—not yield—to changes in technology. Congress expected copyright protection to encompass new, and not yet understood, technologies, and drafted the Copyright Act with broad, technologically neutral rights and specific exceptions so that copyright owners could presumptively retain their exclusive rights even over new technological uses. *See* H. Comm. on the Judiciary, 89th Cong., Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill 14 (Comm. Print 1965).

Fair use should be decided on the facts of each case, with the statutory factors considered in view of copyright's purposes, *Warhol*, 598 U.S. at 550-51, and a step-by-step assessment of whether the challenged use "serves as a . . . substitute for a copyrighted work," *id.* at 555 (Gorsuch, J., concurring);

---

[2] While amici curiae support the plaintiffs' motion for summary judgment on their claims as to reproduction in connection with unauthorized acquisitions of training content and distribution, this brief focuses on the issue of fair use with respect to reproductions for AI training in opposition to the defendants' summary judgment motion.

*see also id.* at 536 n.12 ("While the first factor considers whether and to what extent an original work and secondary use have substitutable purposes, the fourth factor focuses on actual or potential market substitution."). When properly analyzed, LLMs, like those of the defendants, exploit copyrighted works for their expressive value for the same purpose, ultimately generating substitutes for the works used for training. Fair use should not sanction AI systems with an inherent "problem of substitution." *Id.* at 528.

## I. Copying for AI Training Is Not a Transformative Use.

The "central" question under the first fair use factor, "the purpose and character of the use," is whether the new use "serve[s] a purpose distinct from the original, or instead supersede[s] its objects." *Warhol*, 598 U.S. at 542 (quoting *Campbell*, 510 U.S. at 579). To be transformative, a secondary use requires more than mere innovation and must be justified. *See Warhol*, 598 U.S. at 543 n.18. A use that shares the purpose of an original work is more likely to be a "substantial substitute" for that work or its derivatives, "which undermines the goal of copyright." *Id.* at 531-32 (citation modified).

A generative AI model that sources expressive content to generate outputs containing expressive content is a tool with little transformative purpose. There is nothing fair about taking copyrighted works in their entirety and using them for the same purpose as the originals to produce substitute works.

### A. LLM developers use copyrighted works for their expressive content and for the same purpose as the original works.

AI developers highly value books, news, and other textual works for their expressive content. Protected expression encompasses an author's word choice and ordering, *see Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 544 (1985), which is precisely the "structure of language" LLM training seeks to capture at scale, Defs.' Mot. (Dkt. 321) at 12. According to the defendants, "LLM training require[s] the use of a massive, varied, and accurate textual corpus," *id.* at 5-6, so that LLMs can "generate relevant, helpful responses to widely varied input prompts," *id.* at 12. Training on a vast collection of expression enables LLMs to produce textual outputs that communicate information in ways that connect with users depending on their need, i.e., outputs that are similar to human-created content. *See Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1049 (N.D. Cal. 2025) ("[I]f [the defendant's] LLMs are to generate high-quality text, they need coherent, reasonably high-quality training data. In other words, they need high-quality expression."); Daniel Gervais et al., *The Heart of the Matter:*

*Copyright, AI Training, and LLMs*, 71 J. Copyright Soc'y 482, 505 (2024) ("[T]he reason for ingesting copyrighted works into the encoder layer of an AI model is directly and unequivocally due to its expressive and aesthetic value."); Leo Gao et al., *The Pile: An 800GB Dataset of Diverse Text for Language Modeling* 4 (Dec. 31, 2020), https://tinyurl.com/mrktp34k ("[B]ooks are invaluable for long-range context modeling research and coherent storytelling."). Published works that have benefited from substantial human investment in research, editing and peer review, and validation are especially valuable to AI developers.

LLM training involves the repeated copying of creative content without permission from millions of books, news websites, and other textual works so that LLMs can use copyrighted works for the same collective purpose: to communicate content that informs, educates, and entertains. And where the defendants' StoryWriter model was "designed to read and write fictional stories with super long context lengths," *see, e.g.*, Pls.' Opp'n (Dkt. 417) at 16 (quoting Ex. 25 at 1), the purpose is plainly the same. A secondary use that shares the objectives of the original works, as here, "supersede[s] the objects," even if they are "not perfect substitutes." *Warhol*, 598 U.S. at 536 (citing *Campbell*, 510 U.S. at 579).

**B. LLMs generate substitutes for copyrighted works.**

A use is transformative under the first factor only if it does not serve as a substitute for the original. *See Romanova v. Amilus Inc.*, 138 F. 4th 104, 110-11 (2d Cir. 2025). Consistent with their purpose, design, and training, LLMs can readily generate substitutes for the copyrighted works on which they are trained, resulting in non-transformative uses. Those substitutes can take the form of verbatim and near-verbatim copies, summaries and alternative versions of written works, knock-offs that copy expression and creative choices from original works, and derivative works exclusively reserved for rightsholders. LLMs' proven ability to generate outputs that substitute for, are derivatives of, or otherwise exploit the expressive content of the original works further demonstrates that LLMs are not highly transformative.

Studies have shown that LLMs can memorize and reproduce in outputs substantial portions of books that were used for training. *See* Xinyue Liu et al., *Alignment Whack-a-Mole: Finetuning Activates Verbatim Recall of Copyrighted Books in Large Language Models* 4 (Mar. 28, 2026) (preprint), https://tinyurl.com/bd6hxkjr ("[O]ur results demonstrate that frontier models store copies of books in a compressed format inside their weights and safety alignment, as currently implemented, does not prevent

the regurgitation of copyrighted content." (citations omitted)); Ahmed Ahmed et al., *Extracting Books from Production Language Models* 20 (Jan. 6, 2026), https://tinyurl.com/2wtzj7dm ("[L]ong-standing, clear, and sound technical facts remain: LLMs memorize portions of their training data, these memorized data are encoded in the model's weights, and, as we show here, it can be feasible to extract large quantities of in-copyright training data from production LLMs." (citations omitted)); A. Feder Cooper & James Grimmelmann, *The Files Are in the Computer: On Copyright, Memorization, and Generative AI*, 100 Chi.-Kent L. Rev. 141, 210 (2025) (concluding that a generative AI model "stores near-exact copies of portions of works it was trained on," regardless of its capability to output the works). The defendants claim that their models do not reproduce or enable retrieval of the plaintiffs' books, *see* Defs.' Mot. 12, but their expert employed a method that was "not a realistic simulation," Evans Decl. ¶ 32 (Dkt. 321-2), nor "naturally suited" for story generation tools such as the defendants', *see Liu* et al., *supra*, at 2-3.

LLMs also can be used and, in fact, are designed to create derivative works, which fall under the copyright owner's rights and require more to be transformative. *See Warhol*, 598 U.S. at 529 ("To preserve [the copyright owner's] right [to prepare derivative works], the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative."). Unauthorized derivative works include summaries, *see Twin Peaks Prods. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1373 (2d Cir. 1993) (guidebook recounting the first eight episodes of the "Twin Peaks" teleplay with "[e]very intricate plot twist and element of character development" in the same sequence as the teleplay); sequels, *see Anderson v. Stallone*, No. 87-0592, 1989 U.S. Dist. LEXIS 11109, at *24-25 (C.D. Cal. Apr. 25, 1989) (*Rocky IV* film containing the distinctive Rocky character with the same name, relationship, and experiences from prior *Rocky* films); and other adaptions, *see Penguin Random House LLC v. Colting*, 270 F. Supp. 3d 736, 748-49 (S.D.N.Y. 2017) (illustrated children's versions of four famous adult novels condensing, simplifying, and "basically retell[ing]" the plots of the original books); *see also* 17 U.S.C. § 101 (providing examples in definition of "derivative work"). The defendants' StoryWriter model was designed and developed so that it could generate novels and derivative works; questions as to the quality of any particular output does not make the output any less a derivative or have less of a substitutable purpose. *See, e.g.*, Pls.' Opp'n at 6 (citing Ex. 43).

*Kadrey* and *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025), are not controlling.

Those district court cases did not consider the ability of LLMs to generate substitutes of copyrighted works, such as derivative works, or the same facts present here when deciding transformativeness.

Because AI companies specifically extract and use protected manners of expression for the purpose of communicating expressive outputs, other cases cited by the defendants, *see* Defs.' Mot. 13-14, do not apply to their uses. Fair use has been found where copying enabled technological tools that analyze and provide new information about the individual copyrighted works or the corpus as a whole. *See, e.g.*, *Authors Guild v. Google, Inc.*, 804 F.3d 202, 217 (2d Cir. 2015) ("*Google Books*") ("allow[ing] readers to learn the frequency of usage of selected words in the aggregate corpus of published books in different historical periods"); *A.V. v. iParadigms, LLC*, 562 F.3d 630, 638 (4th Cir. 2009) (detecting plagiarism of students' written works). Fair use also has been found for search and retrieval tools that direct users to relevant works or portions of those works. *See, e.g.*, *Google Books*, 804 F.3d at 217-25 (displaying tiny book snippets with terms of interest); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97-101 (2d Cir. 2014) (listing books with terms of interest); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1155, 1164-68 (9th Cir. 2007) (displaying thumbnail, lower-resolution images as links to works); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-22 (9th Cir. 2003) (same).

But neither of those sets of cases involved copying that exploited expressive content for the purpose of generating expressive outputs. While LLM training may appear technically similar to the tools in those cases, LLMs have a fundamentally different relationship with copyrighted works as to what they extract and output and therefore can serve substitutes for the expressions in those works.

### C. No compelling justification exists for using expressive content to generate expressive content.

Fair use generally applies only "to works whose very subject is the original composition and so necessitates borrowing from it." *Campbell*, 510 U.S. at 597 (Kennedy, J., concurring). The Copyright Act identifies paradigmatic examples of fair uses that provide insight or information about the original work or otherwise make the original expression an object of the new work. *See* 17 U.S.C. § 107 (referring to criticism, comment, news reporting, teaching, scholarship, and research). As Judge Leval observed, the purpose of transformative copying that results in fair use is "ordinarily to communicate some kind of commentary *about* the original or provide information *about* it." Pierre N. Leval, *Campbell as Fair Use*

*Blueprint?*, 90 Wash. L. Rev. 597, 609-10 (2015). The Supreme Court explained in *Campbell* that, if a new work "has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish)." 510 U.S. at 580. *Warhol* went further to state that a "particularly compelling justification is needed" where the defendant's use is "so similar" to the "typical use" of the original work. 598 U.S. at 547.

There is no apparent, let alone compelling, justification for AI training on expressive content to generate expressive content. The defendants have not shown why unauthorized copying of copyrighted works is necessary, especially with the risk of serving substitutes.[3] Certainly, no justification has been given for using any particular copyrighted work in the defendants' training sets. The general need for vast, diverse quantities of texts does not justify permitting the use of specific copyrighted works for training without the copyright owners' authorization.

## II. Unlicensed AI Training Substantially and Adversely Harms the Markets for Copyrighted Works.

Where the purpose of using copyrighted works for AI training is to exploit their expressive content to create substitute expressive content, the natural effect is to supplant and displace the markets that belong to the rightsholders. Those markets include the markets for actual and potential substitutes, including derivative works, and for AI licensing.

The fourth fair use factor, "the effect of the use upon the potential market for or value of the copyrighted work," is "undoubtedly the single most important element of fair use." *Harper*, 471 U.S. at 566; *accord Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024); *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014); *Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301, 312 (4th Cir. 2010). This is so regardless of how transformative LLMs are considered to be under the first factor. *See Warhol*, 598 U.S. at 536 n.12.

On its face, the statute is broad in scope, requiring courts to assess any "effect" on the potential

[3] "Not much about the fair use doctrine lends itself to absolute statements, but the Supreme Court and our circuit have unequivocally placed the burden of proof on the proponent of the affirmative defense of fair use." *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020).

market. 17 U.S.C. § 107(4). The relevant market harms include both harm to the original work and harm to the market for derivative works. *See Campbell*, 510 U.S. at 590. Market effects beyond those involving the parties or their particular uses are also relevant. Courts should also consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact." *Id.* (citation modified).

**A. Unlicensed uses of copyrighted works for AI training are cognizable market harms.**

Unauthorized copying for AI training harms the potential market and value of the copyrighted original if it results in widespread distribution of significant portions of the original, essentially providing a substantial substitute. As discussed above, unlike the copying in prior technological copying cases, LLM training results in outputs with substitutive content and does not favor a fair use finding.

*Google Books*, in particular, "test[ed] the boundaries of fair use." 804 F.3d at 206. There, the Second Circuit's fair use findings as to Google's search and snippet functions were premised on providing those functions "without providing the public with a substantial substitute for matter protected by the Plaintiffs' copyright interests in the original works or derivatives of them." *Id.* at 207. Critical to the court's ruling was the implementation of a variety of controls that were necessary to substantially protect against serving an effectively competing substitute for the copyrighted books. *See id.* at 222.

LLMs far exceed the fair use boundaries of *Google Books*, transgressing "into the outer space of fair use." *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 743 (9th Cir. 2019). Due to the design of the defendants' LLMs and the lack of necessary controls, AI training presents the very risks that *Google Books* warned against: "The larger the quantity of the copyrighted text the searcher can see and the more control the searcher can exercise over what part of the text she sees, the greater the likelihood that those revelations could serve her as an effective, free substitute for the purchase of the plaintiff's book." 804 F.3d at 222. A user-prompted AI tool that can generate outputs derived from expression in copyrighted works, such as summaries, translations, answers to questions, or newly-produced text, satisfies user demand for the works themselves to varying degrees. And, contrary to the defendants' argument, *see* Defs.' Mot. 10, 23, LLM outputs need not be substantially similar to the original works to result in market harm; imposing such a requirement would improperly conflate the standards for a claim of infringement and the affirmative defense of fair use.

Unquestionably, LLMs that output sequels, summaries, and other derivative works harm the rightsholder's derivative market. Generating a novel that "continues the story" of an original work and "similar widespread works could substantially harm the market for [the original work's] sequel or other derivative works, whether through confusion as to which is the true sequel or companion to [the original work], or simply because of reduced novelty or press coverage." *Salinger v. Colting*, 641 F. Supp. 2d 250, 267-68 (S.D.N.Y. 2009). The risk of market displacement due to consumer confusion as to authorship or reader overload is especially high with LLMs. Any uncertainty about the commercial success of a specific output does not dispel the potential market harm, especially where AI companies are unlikely to abandon the development of tools such as the defendants' StoryWriter model.

Moreover, as the U.S. Copyright Office has recognized: "The speed and scale at which AI systems generate content pose a serious risk of diluting markets for works of the same kind as in their training data. That means more competition for sales of an author's works and more difficulty for audiences in finding them." U.S. Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training* 65 (May 2025) (pre-publication). "[AI] involves a technology that can generate literally millions of secondary works, with a miniscule fraction of the time and creativity used to create the original works it was trained on. No other use—whether it's the creation of a single secondary work or the creation of other digital tools—has anything near the potential to flood the market with competing works the way that LLM training does." *Kadrey*, 788 F. Supp. 3d at 1055.

The harmful market effects of LLM outputs are real and significant. The number of e-books published per month has tripled since the release of ChatGPT. *See* Imke Reimers & Joel Waldfogel, *AI and the Quantity and Usage of Creative Products: Have LLMs Boosted Creation of Valuable Books?* 2, 4 (Nat'l Bureau of Econ. Rsch., Working Paper No. 34777, 2026), https://tinyurl.com/48e3v44m. Reports of blatant AI-generated rip-offs abound at the largest book marketplace and are quickly spreading to other booksellers. *See* CT Jones, *Amazon Is the World's Biggest Online Book Marketplace. It's Filled with AI Knockoffs*, Rolling Stone (Oct. 27, 2025), https://tinyurl.com/4jvrpy4r; Devesh Beri, *Apple Books Is Getting Flooded With AI-Generated Plagiarism*, ExtremeTech (June 29, 2026), https://tinyurl.com/47vkuemz; Chrissy Callahan, *Savannah's Book Became Part of a Copycat Scam. How to Spot AI-Generated, or Fake, Books Online*, Today (Feb. 27, 2024), https://tinyurl.com/yc8pv35p.

Consumers are confused and overwhelmed, and copyright owners are losing revenues and market visibility to the flood of AI-generated books and other text.

A recent study also has confirmed that market dilution is occurring. "Per-book revenue fell most in the genres where AI text had diffused the most. These patterns are consistent with dilution as each book earns less after substitutable books crowd a market." Tuhin Chakrabarty et al., *Generative AI Floods and Dilutes the Market for Books* 10 (Aug. 3, 2026), https://tinyurl.com/445zpp6f. "Hence, generative AI reshaped the book market without competing on quality at all, displacing revenue and top ranks through sheer volume of books alone." *Id.; see also* Alex Reisner, *The End of Publishing as We Know It,* The Atlantic (June 25, 2025), https://tinyurl.com/5n6trmpd (describing similar phenomenon for website publishing).

For the AI licensing market to be cognizable, it should be one that "creators of original works would in general develop or license others to develop." *Campbell*, 510 U.S. at 592; *see also Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929-30 (2d Cir. 1994) (considering markets that are "traditional, reasonable, or likely to be developed"). The existing and ever-expanding AI licensing market as discussed below is far from the type of "theoretical market" where the concern of "circularity" arises. *See* 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13F.08[B] (2026). "This is not a case where the copyist's work fills a market that the copyright owner will likely avoid, as is true for 'a lethal parody' or 'a scathing theater review.'" *Dr. Seuss Enters.*, 983 F.3d at 460 (quoting *Campbell*, 510 U.S. at 591-92). And there is no evidence of market failure that would necessitate a fair use finding.

Rather, legitimate licensing channels have been made available to and accepted by those who wish to access and use copyrighted materials. Fair use should not be used to displace a "fully functioning market that encourages the creation and dissemination" of creative works, *Harper*, 471 U.S. at 566 n.9, or to allow AI companies that refuse to participate in the marketplace—and instead resort to piracy or other misconduct to acquire training content—to thwart the development of the growing AI licensing market, *see BMG Music v. Gonzalez*, 430 F.3d 888, 891 (7th Cir. 2005) ("Copyright law lets authors make their own decisions about how best to promote their works; copiers . . . cannot ask courts (and juries) to second-guess the market and call wholesale copying 'fair use.'").

### B. A functioning market for licensing textual works for AI exists and is expanding.

Exclusive rights under the Copyright Act anticipate that mutually beneficial agreements for most uses of copyrighted works will be reached through the marketplace. Licensing copyrighted works is a well-established and adaptable mechanism that benefits copyright owners who invest in human ingenuity, research, judgment, expertise, and creativity in the creation of those works. Indeed, a viable market for licensing copyrighted works has expanded along with AI, while accommodating different applications. Direct licensing deals between copyright owners and AI developers are on the rise. *See AI Licensing by Copyright Owners*, Copyright All., https://tinyurl.com/54ucpbkv (last visited Aug. 21, 2026). Numerous AI licensing agreements have been publicly reported for textual works across a wide range of uses from LLM training to retrieval-augmented generation ("RAG") to AI search and product integration; deals have been struck with AI companies such as Amazon,[4] Bria,[5] Consensus,[6] Dow Jones,[7] Google,[8] Meta,[9]

---

[4] *See, e.g.*, Michael M. Grynbaum & Cade Metz, *The Times and Amazon Announce an A.I. Licensing Deal*, The N.Y. Times (May 29, 2025), https://tinyurl.com/bdeuxdrw; *Condé Nast U.S. Brands to Be Part of Amazon's New Alexa AI Assistant Technology*, Condé Nast (Feb. 26, 2025), https://tinyurl.com/5yvrpaf2.

[5] *See, e.g.*, Press Release, News/Media All., *News/Media Alliance Partners with Bria AI to Launch Industry-Leading AI Licensing Agreement* (Mar. 23, 2026), https://tinyurl.com/43dukbb9.

[6] *Announcing Our Partnership with Sage Publishing*, Consensus (Jan. 13, 2026), https://tinyurl.com/3exh48k6.

[7] *See, e.g.*, Press Release, Dow Jones, *Dow Jones Factiva Surpasses 8,000 Licensed Sources for GenAI Use* (Jan. 20, 2026), https://tinyurl.com/7m6mwccb.

[8] *See, e.g.*, Robby Stein and Jaffer Zaidi, *Supporting the Web with New Features and Partnerships*, Google (Dec. 10, 2025), https://tinyurl.com/kbxdj3zz; Sarah Perez, *NotebookLM Adds Featured Notebooks from The Economist, The Atlantic, and Others*, TechCrunch (July 14, 2025), https://tinyurl.com/bdfd4x6y; Matt O'Brien, *Google Signs Deal with AP to Deliver Up-to-Date News Through Its Gemini AI Chatbot*, The Associated Press (Jan. 15, 2025), https://tinyurl.com/5775zdxe.

[9] *See, e.g.*, Amanda Meade, *News Corp Is Essentially an AI 'Input Company', Chief Executive Says, After US$150m Deal with Meta*, The Guardian (Mar. 3, 2026), https://tinyurl.com/bdz8unxs; *Bringing More Real-Time News and Content to Meta AI*, Meta (Dec. 5, 2025), https://tinyurl.com/mt56ber4.

Microsoft,[10] OpenAI,[11] OpenEvidence,[12] Particle News,[13] Perplexity,[14] Potato,[15] and ProRata.[16] Researchers further estimate that the AI training market for licensing is currently valued at $7.47 billion and is projected to rapidly grow to $52.4 billion in a decade. *See AI Training Dataset Market Size, Share, Growth, Trends and Industry Analysis, By Type (Text, Image/Video, Audio), By Application (IT, Automotive, Government, Healthcare, BFSI, Retail & E-commerce, Others), Regional Insights and Forecast From 2026 to 2035*, Bus. Rsch. Insights (Aug. 3, 2026), https://tinyurl.com/ms2psvys.

To be sure, the AI licensing market is continuing to evolve as different frameworks are explored and offered. For example, the Copyright Clearance Center, which has long provided a wide range of licensing solutions, now offers collective licenses designed for AI systems. *Annual Copyright License*, Copyright Clearance Ctr., https://tinyurl.com/34xenap2 (last visited Aug. 24, 2026). Publishers are also

---

[10] *See, e.g.*, Tim Frank, *Building Toward a Sustainable Content Economy for the Agentic Web*, Microsoft Advert. (Feb. 3, 2026), https://tinyurl.com/yn67ye9j; Hannah Miller & Dina Bass, *Microsoft Signs AI-Learning Deal with News Corp.'s HarperCollins*, Bloomberg (Nov. 19, 2024), https://tinyurl.com/5hzrdz2w; Press Release, Informa, *Informa PLC* 3 (May 8, 2024), https://tinyurl.com/ra95ukx8.

[11] *See, e.g.*, Jonathan Gillham, *OpenAI Partnerships List*, Originality.AI (Sep. 22, 2025), https://tinyurl.com/2s47b5dh.

[12] *See, e.g.*, Press Release, OpenEvidence, *OpenEvidence and the JAMA Network Sign Strategic Content Agreement* (June 5, 2025), https://tinyurl.com/5n94p6bw; Press Release, OpenEvidence, *OpenEvidence and NEJM Group, Publisher of the New England Journal of Medicine, Sign Content Agreement* (Feb. 19, 2025), https://tinyurl.com/y6xzd4rh.

[13] *See, e.g.*, Charlotte Tobitt, *The Observer Signs Deal to Appear on AI News Platform Particle*, Press Gazette (Oct. 23, 2025), https://tinyurl.com/bd2xca4w.

[14] *See, e.g.*, *Perplexity Expands Publisher Program with 15 New Media Partners*, Perplexity (Dec. 5, 2024), https://tinyurl.com/2u6t9x9e; *Introducing the Perplexity Publishers' Program*, Perplexity (July 30, 2024), https://tinyurl.com/4wa8aku5.

[15] Press Release, Wiley, *Wiley Launches New Partnership Innovation Program to Deliver AI Advantages for Researchers and Practitioners* (Oct. 17, 2024), https://tinyurl.com/mprwau5s.

[16] *See, e.g.*, *ProRata AI Signs Partnerships with More than 500 Publications, Giving Gist.ai One of the Largest Licensed Content Libraries in Generative AI Search*, Bus. Wire (June 6, 2025), https://tinyurl.com/2s43mcxe; Sam Quigley, *News/Media Alliance Announces AI Licensing Partnership with ProRata*, News/Media All. (Mar. 26, 2025), https://tinyurl.com/y4ycxcbn; *ProRata Announces Gist.ai, New AI Search Engine Based Entirely on High-Quality Licensed Content*, Bus. Wire (Dec. 9, 2024), https://tinyurl.com/247hurau.

entering into partnerships with AI content management platforms to license catalogs of textual works. *See, e.g.*, Ed Nawotka, *Princeton University Press Partners with Cashmere on AI Licensing*, Publishers Weekly (Aug. 3, 2026), https://tinyurl.com/3hckamu4; Jessica Davies, *Publishers Quietly Cut 'Six-Figure' Deals via Snowflake's AI Licensing Platform*, Digiday (May 29, 2026), https://tinyurl.com/mwye98ky.

In any event, the developing nature of the AI licensing market does not diminish the need for the court to consider the harm of the defendants' conduct, and similar unrestricted and widespread conduct by others, to potential markets. *See Campbell*, 510 U.S. at 590-91. *Kadrey* and *Bartz* failed to apply or even acknowledge these requirements when addressing the AI licensing market.

**C. An AI licensing market benefits both the public and AI development.**

As the Supreme Court has explained: "[C]opyright law ultimately serves the purpose of enriching the general public through access to creative works. The statute achieves that end by striking a balance between two subsidiary aims: encouraging and rewarding authors' creations while also enabling others to build on that work." *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 204 (2016) (citation modified). Recognizing an AI licensing market promotes the purpose of copyright in several ways.

First and foremost, licensing encourages and rewards creativity and the dissemination of both new and previously-published works by allowing for compensation (and attribution) to authors and publishers. The U.S. publishing industry supports an extensive network of American businesses and thousands of jobs, with books and course materials generating over $33 billion in 2025. *See* Press Release, Ass'n of Am. Publishers, *AAP StatShot Annual Report: Publishing Revenues Totaled $33.4 Billion for Calendar Year 2025* (Aug. 10, 2026), https://tinyurl.com/5n65n32s. Newspaper publishers contributed over $20 billion to the economy in 2025, *see U.S. Newspaper Market* (2025-2030), Grand View Rsch., https://tinyurl.com/48xadwtx (last visited Aug. 26, 2026), while magazine and periodical publishers' revenues are expected to amount to $39.3 billion in 2026, *see Magazine & Periodical Publishing in the US Industry Data and Analysis*, IBIS World (Feb. 2026), https://tinyurl.com/4tz3xr5d. The publishing industry is an integral part of broader U.S. copyright industries, which in 2023 collectively contributed more than $2 trillion to the U.S. gross domestic product. Jéssica Dutra & Robert Stoner, Int'l Intell. Prop. All., *Copyright Industries in the U.S. Economy: The 2024 Report* 8 (2025), https://tinyurl.com/4k23ffay.

The revenues publishers earn through the licensing and distribution of their works are used to compensate authors and invest in the next generation of books, journalism, and other textual works.

Second, licensing provides AI developers authorized access to human-created works and high-quality content. Using unauthorized content from online or questionable sources carries the risk of tainting training sets with low-quality, such as AI-generated, text. For AI to flourish, licensing is needed to ensure humans continue to be incentivized to create so that the well of human creation does not run dry and AI companies have reliable access to content that improves model performance.

Third, licensing enables a competitive and innovative system built upon copyrighted works. Without licensing, participation in AI innovation would be limited to only large, well-integrated firms that already have advantages over smaller firms and startups, including having the funds and infrastructure to acquire and build massive training datasets. Stronger copyright protection "may galvanize the market forces needed to reduce transaction costs," such as offering pricing options based on customer usage, Paul Goldstein, *Copyright's Highway: From Gutenberg to the Celestial Jukebox* 202-07 (rev. ed. 2003), thus promoting the permissioned use of copyrighted works to more AI developers.

Finally, AI development will not be halted by allowing the licensing market to develop. Databricks recently was valued at $188 billion. Press Release, Databricks, *Databricks Is Raising a Strategic Round of Funding at a $188 Billion Valuation* (July 16, 2026), https://tinyurl.com/cjcrexba. Investors of Anthropic are targeting a $2 trillion valuation, the largest ever for an initial public offering. Jon Markman, *Anthropic Eyes $2 Trillion in October IPO, A Record-Breaking Debut*, Forbes (Aug. 13, 2026), https://tinyurl.com/44dmders. In view of the scale of revenues, valuations, and capital investments involving AI, the *Kadrey* court aptly called concerns about disruption to AI development "ridiculous": "If using copyrighted works to train the models is as necessary as the companies say, they will figure out a way to compensate copyright holders for it." 788 F. Supp. 3d at 1036. If not, or if there are other reasons companies should not compensate copyright owners, that is a policy decision for Congress, not courts, to decide.

**CONCLUSION**

The Court should deny the defendants' motion for summary judgment and find that their unauthorized use of copyrighted works for AI training is not fair use.

Dated: August 27, 2026

By: */s/ Lucy Grace D. Noyola*

Lucy Grace D. Noyola (appearance *pro hac vice*)
ASSOCIATION OF AMERICAN PUBLISHERS

Michael D. Kibler
Dominique Caamano
Kevin J. Cammiso
KIBLER FOWLER & CAVE LLP

*Attorneys for Amici Curiae Association of American Publishers, News/Media Alliance, and International Association of Scientific, Technical & Medical Publishers*