HORVITZ & LEVY LLP
JEREMY B. ROSEN
505 Sansome Street, Suite 1550
San Francisco, CA 94111-3149
(415) 462-5600 • FAX: (844) 497-6592

HORVITZ & LEVY LLP
WARREN Y. CHU
3601 West Olive Avenue, 8th Floor
Burbank, California 91505-4681
(818) 995-0800 • FAX (844) 497-6592

Email: jrosen@horvitzlevy.com
wchu@horvitzlevy.com

Attorneys for Amici Curiae

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

*In re Mosaic LLM Litigation,*

Plaintiffs,

v.

DATABRICKS, INC.; and MOSAIC ML, LLC, formerly MOSAIC ML, INC.,

Defendants.

Master File Case No. 3:24-cv-01451-CRB

**MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF; [PROPOSED] BRIEF OF AMICI CURIAE PROFESSORS LINDA BLOSS-BAUM, JON M. GARON, PHILIPPA LOENGARD, ADAM MOSSOFF, LOREN E. MULRAINE, CHRIS NEWMAN, SEAN PAGER, ERIC PRIEST, ZVI ROSEN, MARK F. SCHULTZ, AND BHAMATI VISWANATHAN IN SUPPORT OF PLAINTIFFS**

**Hearing on Motions for Summary Judgment**
Date: October 30, 2026
Time: 10:00 a.m.
Dept: Courtroom 6, 17th Floor
Judge: Hon. Charles R. Breyer

# CORPORATE DISCLOSURE STATEMENT

Amici curiae Professors Linda Bloss-Baum, Jon M. Garon, Philippa Loengard, Adam Mossoff, Loren E. Mulraine, Chris Newman, Sean Pager, Eric Priest, Zvi Rosen, Mark F. Schultz, and Bhamati Viswanathan are individuals with no parent organizations, subsidiaries, or publicly traded ownership interests. Pursuant to the Court's June 22, 2026, Stipulation and Order Re Amici Curiae Briefs (Dkt. 302) and Federal Rule of Appellate Procedure 29(a)(4)(E), no counsel for a party authored the attached brief in whole or in part; no party or party's counsel contributed money intended to fund its preparation or submission; and no person other than amici or their counsel contributed money intended to fund its preparation or submission.

August 27, 2026

**HORVITZ & LEVY LLP**
JEREMY B. ROSEN
WARREN Y. CHU

By: ______________________
Jeremy B. Rosen

Attorneys for Amici Curiae
**PROFESSORS LINDA BLOSS-BAUM, JON M. GARON, PHILIPPA LOENGARD, ADAM MOSSOFF, LOREN E. MULRAINE, CHRIS NEWMAN, SEAN PAGER, ERIC PRIEST, ZVI ROSEN, MARK F. SCHULTZ, AND BHAMATI VISWANATHAN**

# TABLE OF CONTENTS

PAGE


TABLE OF AUTHORITIES .......... ii

MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF .......... 1

[PROPOSED] BRIEF OF *AMICI CURIAE* PROFESSORS LINDA BLOSS-BAUM, JON M. GARON, PHILIPPA LOENGARD, ADAM MOSSOFF, LOREN E. MULRAINE, CHRIS NEWMAN, SEAN PAGER, ERIC PRIEST, ZVI ROSEN, MARK F. SCHULTZ, BHAMATI VISWANATHAN IN SUPPORT OF PLAINTIFFS .......... 1

I. INTERESTS OF THE AMICUS CURIAE .......... 1

II. INTRODUCTION .......... 3

III. ARGUMENT .......... 4

A. The fundamental goals of copyright are to incentivize human creation. .......... 4

1. Copyright grants authors exclusive rights in their expression—including the right to say no. .......... 4

2. Threatening copyright incentives jeopardizes the creation of human-authored works. .......... 5

B. Fair use has never included categorical exceptions and must be applied case by case. .......... 7

1. There is no categorical exception for AI training. .......... 7

2. There is no categorical exception for intermediate copying. .......... 9

3. Transformative purpose varies depending on the facts. .......... 10

4. Transformativeness does not control the fair-use inquiry. .......... 11

5. Market harm includes harm to any potential market that is reasonable or likely to develop. .......... 12

IV. CONCLUSION .......... 14

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) .......... 13

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .......... *passim*

*Authors Guild v. Google, Inc.*
804 F.3d 202 (2d Cir. 2015) .......... 10

*Bartz v. Anthropic PBC*
787 F.Spp 3d 1007 (N.D. Cal. 2025) .......... 9

*Bateman v. Mnemonics, Inc.*,
79 F.3d 1532 (11th Cir. 1996) .......... 8

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......... 8, 10, 12, 13

*Castle Rock Ent., Inc. v. Carol Publ'g Grp.*,
150 F.3d 132 (2d Cir. 1998) .......... 13

*Granite Music Corp. v. United Artists Corp.*,
532 F.2d 718 (9th Cir. 1976) .......... 4

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) .......... 4, 7, 11, 12

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) .......... 5, 9

*Laws v. Sony Music Ent., Inc.*,
448 F.3d 1134 (9th Cir. 2006) .......... 4

*Lenz v. Universal Music Corp.*,
815 F.3d 1145 (9th Cir. 2016) .......... 7

*Mattel, Inc. v. Walking Mountain Prods.*,
353 F.3d 792 (9th Cir. 2003) ........ 7

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) ........ 9, 10

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ........ 6

*Thaler v. Perlmutter*,
130 F.4th 1039 (D.C. Cir. 2025) ........ 5

*Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*,
996 F.2d 1366 (2d Cir. 1993) ........ 13

*UMG Recordings, Inc. v. MP3.com, Inc.*,
92 F.Supp.2d 349 (S.D.N.Y. 2000) ........ 13

**Constitutions**

U.S. Const. art. I, § 8, cl. 8 ........ 4

**Statutes**

17 U.S.C. § 102(a) ........ 4

17 U.S.C. § 106 ........ 4

17 U.S.C. § 106(1)–(6) ........ 4

17 U.S.C. § 107 ........ 7, 8, 9, 12, 14

17 U.S.C. § 107(1) ........ 12

17 U.S.C. § 107(4) ........ 12

**Rules**

Fed. R. App. P. 29(a)(4) ........ 1

**Miscellaneous**

Barbara Bruni, *Training on Trial: Insights from Bartz and Kadry,* 73 J. Copyright Soc'y 261 (2026) .......... 5

BJ Ard, *Copyright's Latent Space: Generative AI and the Limits of Fair Use*, 110 Cornell L. Rev. 509 (2025) .......... 8

Daniel J. Gervais et al., *The Heart of the Matter: Copyright, AI Training, and LLMs*, 71 J. Copyright Soc'y 482 (2024) .......... 6

H.R. Rep. No. 94-1476 (1976) .......... 8

Katherine Lee, et. al, *Talkin' 'Bout AI Generation: Copyright and the Generative AI-Supply Chain*, 72 J. Copyright Soc'y 251 (2025) .......... 10

Mackenzie Caldwell, Note, *What Is an "Author"?—Copyright Authorship of AI Art Through a Philosophical Lens*, 61 Hous. L. Rev. 411 (2023) .......... 6

Tuhin Chakrabarty et al., *Generative AI Floods and Dilutes the Market for Books* 5 (Columbia L. Sch. Pub. L. Working Paper) .......... 6

U.S. Copyright Off., *Copyright and Artificial Intelligence, Part 3: Generative AI Training* (May 2025) .......... 11

Zvi S. Rosen, *The Future Was Then: The Recurrent History of AI Authorship*, 59 Ind. L. Rev. 701, 761 (2026) .......... 5

**MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF**

Pursuant to the Court's June 22, 2026 Stipulation and Order Re Amici Curiae Briefs (Dkt. 302) and Federal Rule of Appellate Procedure 29(a)(4), amici curiae Professors Linda Bloss-Baum, Jon M. Garon, Philippa Loengard, Adam Mossoff, Loren E. Mulraine, Chris Newman, Sean Pager, Eric Priest, Zvi Rosen, Mark F. Schultz, Bhamati Viswanathan respectfully move for leave to file the attached proposed brief in support of Plaintiffs' motion for partial summary judgment and in opposition to Defendants' motion for summary judgment. The proposed brief complies with the Court's page-limit and disclosure requirements.

All parties consent to the filing. The proposed brief will assist the Court by providing a focused scholarly perspective on the Copyright Act's purposes, the use-specific nature of fair use, the limits of intermediate-copying precedents, and the market effects of using expressive books to develop generative AI.

The brief is relevant to the pending summary-judgment motions because it explains why the record cannot support a categorical fair-use rule for Defendants' copying and use of Plaintiffs' books, and why Plaintiffs' claims concerning unauthorized use of expressive works for model training should be evaluated under the traditional fact-specific fair-use inquiry. Amici respectfully request leave to file the attached brief.

August 27, 2026

**HORVITZ & LEVY LLP**
JEREMY B. ROSEN
WARREN Y. CHU

By: ______________________
Jeremy B. Rosen

Attorneys for Amici Curiae
**PROFESSORS LINDA BLOSS-BAUM, JON M. GARON, PHILIPPA LOENGARD, ADAM MOSSOFF, LOREN E. MULRAINE, CHRIS NEWMAN, SEAN PAGER, ERIC PRIEST, ZVI ROSEN, MARK F. SCHULTZ, AND BHAMATI VISWANATHAN**

HORVITZ & LEVY LLP
JEREMY B. ROSEN
505 Sansome Street, Suite 1550
San Francisco, CA 94111-3149
(415) 462-5600 • FAX: (844) 497-6592

HORVITZ & LEVY LLP
WARREN Y. CHU
3601 West Olive Avenue, 8th Floor
Burbank, California 91505-4681
(818) 995-0800 • FAX (844) 497-6592

Attorneys for Amici Curiae

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| *In re Mosaic LLM Litigation,*<br>Plaintiffs,<br>v.<br>DATABRICKS, INC.; and MOSAIC ML, LLC, formerly MOSAIC ML, INC.,<br>Defendants. | Master File Case No. 3:24-cv-01451-CRB<br>Consolidated with Case No. 3:24-cv-02653-CRB<br><br>**[PROPOSED] BRIEF OF *AMICI CURIAE* PROFESSORS LINDA BLOSS-BAUM, JON M. GARON, PHILIPPA LOENGARD, ADAM MOSSOFF, LOREN E. MULRAINE, CHRIS NEWMAN, SEAN PAGER, ERIC PRIEST, ZVI ROSEN, MARK F. SCHULTZ, AND BHAMATI VISWANATHAN IN SUPPORT OF PLAINTIFFS**<br><br>Hearing: Motions for Summary Judgment<br>Date: October 30, 2026<br>Time: 10:00 a.m.<br>Courtroom: 6, 17th Floor<br>Judge: Hon. Charles R. Breyer |

## I. INTERESTS OF THE AMICUS CURIAE

Amici are scholars and professors whose research focuses on copyright law. Their scholarship addresses copyright history, human authorship, and creative markets. Amici have no financial stake in the outcome and submit this brief to assist the Court with the scholarly and policy dimensions of the copyright questions

///

presented. All parties consent to the filing of this brief. Amici are listed in alphabetical order.

**Linda Bloss-Baum**, Director of the Business and Entertainment Program; Professorial Lecturer, Kogod School of Business, American University

**Jon M. Garon**, Associate Dean for Technology and Innovation; Director, Goodwin Program for Society, Technology, and the Law, Shepard Broad College of Law, Nova Southeastern University

**Philippa Loengard**, Executive Director of the Kernochan Center for Law, Media and the Arts; Lecturer in Law, Columbia Law School

**Adam Mossoff**, Professor of Law, Antonin Scalia Law School, George Mason University

**Loren E. Mulraine**, Professor of Law; Director of Music and Entertainment Law Studies, Belmont University College of Law

**Chris Newman**, Associate Professor of Law, Antonin Scalia Law School, George Mason University

**Sean Pager**, Professor of Law; Director, Intellectual Property, Information & Communications Law Program (IPIC); Associate Dean of Graduate & Online Studies, Michigan State University College of Law

**Eric Priest**, Professor of Law, University of Oregon School of Law

**Zvi Rosen**, Associate Professor of Law; Faculty Director of the Franklin Pierce Center for Intellectual Property, Franklin Pierce School of Law, University of New Hampshire

**Mark F. Schultz**, Goodyear Tire & Rubber Company Endowed Chair in Intellectual Property Law, Faculty Chair, IPPI: The IP Policy Institute, The University of Akron School of Law

///

///

**Bhamati Viswanathan**, Visiting Assistant Professor, Suffolk University Law School; Fellow, Columbia Law School, Kernochan Center for Law, Media and the Arts

## II. INTRODUCTION

Defendants seek an AI-training exemption that Congress never enacted, the Constitution does not recognize, and Supreme Court precedent forecloses. Labeling the copying "training" does not excuse the unauthorized reproduction of thousands of copyrighted books. If the Court accepts Defendants' position, authors will have no recourse when someone takes their work without permission, extracts its value, and builds a system that generates competing content—all without compensation.

Copyright exists to prevent that result. The Constitution empowers Congress to secure an author's exclusive rights in their writings to promote progress—including control over reproducing and adapting works for commercially significant purposes like AI development. Stripping authors of that control would erode the incentive structure that produces the high-quality works these systems depend on.

Fair use has never included categorical exceptions—not for "intermediate copying," not for "technology development," and not for "training." The Supreme Court confirmed in *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 n.4 (2023), that courts must evaluate each use on its own terms, weighing purpose, commerciality, and market effect. The same copying may be fair for one purpose and unfair for another. Using books to build a translation tool differs fundamentally from using them to build a system that generates competing prose. Defendants bear the burden of proving fair use, and the fourth factor considers markets that are reasonable or likely to develop—including existing licensing markets for AI training.

///

///

The question is whether taking authors' works without compensation, when lawful alternatives exist, can be fair use. It cannot. The Court should deny Defendants' categorical fair-use request and grant Plaintiffs' motion on the separate unauthorized downloading and distribution claims.

## III. ARGUMENT

### A. The fundamental goals of copyright are to incentivize human creation.

#### 1. Copyright grants authors exclusive rights in their expression—including the right to say no.

The Constitution authorizes Congress to secure to "Authors" exclusive rights in their "Writings" to promote the progress of science and useful arts. U.S. Const. art. I, § 8, cl. 8. Congress implemented that mandate by granting authors exclusive rights to reproduce their works and prepare derivative works. 17 U.S.C. §§ 102(a), 106(1)–(6). Those rights incentivize the creation and dissemination of human expression. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985) ("By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas.").

That incentive structure includes control over whether others may copy or reproduce a work. *Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006) ("'[T]he owner of copyright . . . has the exclusive rights to do and to authorize' others to display, perform, reproduce or distribute copies of the work, and to prepare derivative works." (quoting 17 U.S.C. § 106)). An author may authorize sales, license translations or adaptations, reserve a work for a later market, or *refuse* a proposed use. The right to say no is essential to the right Congress granted. *Granite Music Corp. v. United Artists Corp.*, 532 F.2d 718, 720 (9th Cir. 1976) ("A . . . copyright is an absolute right to prevent others from copying his work."). That control includes deciding whether a work may be used to train a generative AI system.

The regime is designed to encourage human authorship. Technological tools may assist authors, but copyright law preserves the conditions in which human authors create and receive the benefits of creation. *See Thaler v. Perlmutter*, 130 F.4th 1039, 1046 (D.C. Cir. 2025) ("The point, instead, is that the current Copyright Act's text, taken as a whole, is best read as making humanity a necessary condition for authorship under the Copyright Act."); *see also* Zvi S. Rosen, *The Future Was Then: The Recurrent History of AI Authorship*, 59 Ind. L. Rev. 701, 761 (2026) ("Copyright law has always been centered on human authorship . . . .").

**2. Threatening copyright incentives jeopardizes the creation of human-authored works.**

Unlicensed mass copying for AI development threatens the incentive structure that sustains human-authored work. AI developers seek high-quality content because it produces better results than free works or machine-generated alternatives. *See Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1039 (N.D. Cal. 2025) (finding "books make for especially valuable training data" because they "maintain[] a particular style and coherent structure" and are "high quality in the sense that they generally are well written and use proper grammar (especially compared to text from the internet, which varies widely on these metrics)"). Yet copying those works without compensation extracts their value, dilutes their markets, and reduces the incentive to create the very works AI systems depend on. AI training "raises the classic problems of free riding and, over time, public-goods underproduction, which copyright was set up to solve in the first place." *See* Barbara Bruni, *Training on Trial: Insights from* Bartz *and* Kadrey, 73 J. Copyright Soc'y 261, 294 (2026).

This threat is not hypothetical. Recent empirical research shows that in the genre-fiction market, the share of top sales-rank positions held by fully human-authored works fell from approximately 88% in low-AI-exposure segments to

approximately 63% in segments with high AI penetration. *See* Tuhin Chakrabarty et al., *Generative AI Floods and Dilutes the Market for Books* 5 (Columbia L. Sch. Pub. L. Working Paper), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=7159278# (observing that AI-generated books dilute revenue and sales for human-authored books as they reach "commercial scale and the top ranks").

Unauthorized training would also undermine the emerging market for AI-training licenses. *See* Daniel J. Gervais et al., *The Heart of the Matter: Copyright, AI Training, and LLMs*, 71 J. Copyright Soc'y 482, 515–16 (2024) (concluding "licensing provides both parties with compliant access to high-quality works" and "reduce[s] uncertainty"). A robust licensing market would maintain incentives for human-authored works while supplying the high-quality inputs AI models require. But if widespread unauthorized copying is deemed fair use, these markets may cease to exist. *See, e.g.*, *id.* at 506 ("[I]f there is a market for licensing copyrighted work for ingestion in AI models, as clearly there is, then using such works . . . without authorization clearly deprives the rightsholder of potential licensing fees."). Publishers have already entered licensing agreements with AI developers—including OpenAI—for lawful access to training data. *Id.* at 506. Developers who bypass those markets by copying without permission undercut licensing revenue and threaten its continued viability.

Copyright's economic theory is straightforward.[1] Exclusive rights let authors recoup the investment required to create works. *See Sony Corp. of Am. v. Universal*

[1] To be clear, the economic theory of copyright is not the only one. Indeed, "the intertwined personality and communication theories considers creative work to be 'communication with the public' intertwined with the author's autonomy," and "[w]hen the author's works are circulated without permission or attribution, 'the personality of the author has been violated.'" Rosen, *supra*, at 761 (quoting Mackenzie Caldwell, Note, *What Is an "Author"?—Copyright Authorship of AI Art Through a Philosophical Lens*, 61 Hous. L. Rev. 411, 430 (2023)). These other theories of copyright should also be considered when evaluating the unauthorized use of copyrighted works.

*City Studios, Inc.*, 464 U.S. 417, 429 (1984) ("[Copyright's] limited grant . . . is intended to motivate the creative activity of authors and inventors by the provision of a special reward."); *Harper & Row*, 471 U.S. at 546 ("The rights conferred by copyright are designed to assure contributors to the store of knowledge a fair return for their labors."). Authors and publishers invest time and effort expecting copyright law to protect that investment. When others copy entire books without authorization or compensation, they capitalize on the works' expressive value without bearing any costs. *See* Bruni, *supra*, at 297 (explaining that when AI systems "absorb expressive value from copyrighted works" and the outputs end up in the public domain or are misappropriated by users who claim authorship over those outputs, "the creative ecosystem does not recover the value expended in producing the original works"). That threatens the "economic incentive to create and disseminate ideas" that copyright maintains. *Harper & Row*, 471 U.S. at 558.

Acknowledging these risks does not give authors control over styles, ideas, facts, or independent works. Nor does it condemn every AI use. It concerns only unauthorized copying of expressive works for commercial purposes—a use Defendants cannot justify under fair use. With copyright's essential incentives at stake, the Court should reject any categorical exemption for unauthorized commercial copying.

### B. Fair use has never included categorical exceptions and must be applied case by case.

#### 1. There is no categorical exception for AI training.

Applying 17 U.S.C. § 107 ("Section 107") requires "case-by-case analysis and a flexible balancing of" the four nonexclusive factors. *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 800 (9th Cir. 2003). The party invoking fair use bears the burden of proving it. *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153 (9th Cir. 2016) ("[T]he burden of proving fair use is always on the putative

infringer." (quoting *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1542 n.22 (11th Cir. 1996)). Congress deliberately left room for different results on different facts. *See* H.R. Rep. No. 94-1476, at 66 (1976) ("[T]he endless variety of situations and combinations of circumstances that can rise in particular cases precludes the formulation of exact rules in [section 107]."). And the Supreme Court has refused to let any single factor or label control. *see Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994) ("All [factors] are to be explored, and the results weighed together, in light of the purposes of copyright.").

Defendants' characterization of their copying as "AI training" does not govern this inquiry. That label can apply to uses with materially different purposes and effects. Ingestion for a nonprofit search or accessibility project may be fair use, whereas a commercial system that generates competing expressive works may not be. *Warhol*, 598 U.S. at 533 ("The same copying may be fair when used for one purpose but not another."); *see also* BJ Ard, *Copyright's Latent Space: Generative AI and the Limits of Fair Use*, 110 Cornell L. Rev. 509, 595 (2025) ("Some forms of AI training may qualify as fair under this test insofar as they exploit the value of styles and subject matters that authors cannot monopolize. Courts nonetheless face hard questions where the exploitation of seemingly non-authorial value imperils wider fields of creative endeavor."). A categorical rule would freeze the doctrine in precisely the way Congress sought to avoid. *See* H.R. Rep. No. 94-1476, at 66 (1976) ("[Congress] endorse[d] . . . fair use['s] purpose and general scope . . . but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change.").

This Court should reject any analysis that begins and ends with the word "training." Obtaining the books, retaining or sharing copies, using them to develop a model, and deploying that model are each distinct uses requiring separate analysis. *Warhol*, 598 U.S. at 533 ("[F]air use . . . requires an analysis of the specific 'use' of

a copyrighted work that is alleged to be 'an infringement.'" (quoting 17 U.S.C. § 107)). Defendants collapse those uses into a single category and ask the Court to declare it fair use because their ultimate purpose was training their large language model. The Court should follow *Warhol* and evaluate each use on its own terms.

Recent district court decisions confirm this approach. In *Bartz v. Anthropic PBC*, the court held that unauthorized acquisition of Books3—one of the datasets at issue here—was not fair use, even though training itself might be transformative. 787 F. Supp. 3d 1007, 1013 (N.D. Cal. 2025). Judge Alsup distinguished between the initial piracy and subsequent training: "Pirating copies to build a research library without paying for it, and to retain copies should they prove useful for one thing or another, was its own use—and not a transformative one." *Id.* at 1026. In *Kadrey*, the court found fair use only after finding no evidence of market harm on the specific record. 788 F. Supp. 3d 1026, 1060. The court noted that this "conclusion may be in significant tension with reality, but it's dictated by the choice the plaintiffs made to put forward two flawed theories of market harm while failing to present meaningful evidence on the effect of training LLMs like Llama with their books on the market for those books." *Id.* at 1057. Neither decision created a categorical rule. Both applied Section 107 to specific facts and recognized that different facts could yield different results.

**2. There is no categorical exception for intermediate copying.**

"Intermediate copying" is not a categorical defense either. Defendants invoke intermediate-copying cases to justify their unauthorized use, but courts recognize that internal copies can infringe even when the eventual product differs from the copied material. *See Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518–19 (9th Cir. 1992). Whether a particular intermediate copy is fair use depends on the facts.

The cases Defendants invoke involved copying for limited, non-substitutive purposes. In *Sega*, the defendant copied video-game software to understand the functional requirements needed to make its own games work on that gaming system. 977 F.2d at 1526. Importantly, the defendant "sought only to become a legitimate competitor in the field of Genesis-compatible video games" and did not copy any "characteristics of the game program as experienced by the user that determine the program's commercial success." *Id.* at 1523. In *Authors Guild v. Google, Inc.*, Google scanned books to create a search index returning only limited snippets. *See* 804 F.3d 202, 208 (2d Cir. 2015). The Second Circuit held that Google's "snippet function d[id] not give searchers access to effectively competing substitutes." *Id.* at 224. The function did "not threaten the rights holders with any significant harm to the value of their copyrights or diminish their harvest of copyright revenue." *Id.*

Where the system is designed to generate expressive works in the same market as the inputs, however, the analysis must differ. *See* Katherine Lee, et. al, *Talkin' 'Bout AI Generation: Copyright and the Generative AI-Supply Chain*, 72 J. Copyright Soc'y 251, 370 (2025) (explaining the logic of *Authors Guild* "does not work for generative-AI models that can generate expressive works" because such models can produce outputs that "will incorporate copyrighted material that will be seen by humans").

**3. Transformative purpose varies depending on the facts.**

The first factor of fair use asks, in part, whether the secondary use merely supersedes the original or "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 579. "[I]t asks, in other words, whether and to what extent the new work is 'transformative.'" *Id.* "If an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first

factor is likely to weigh against fair use, absent some other justification for copying." *Warhol*, 598 U.S. at 532–33.

The Court should ask what the model was built to do and whether that purpose shares the original works' market or audience. *See* Ard, *supra*, at 515 (explaining "an AI model's purposes may be indeterminate at the time of training" but courts have been evaluating "whether the use substitutes for the original"). If the end product competes in the same market, commerciality weighs against fair use. *See Warhol*, 598 U.S. at 537 ("The undisputed commercial character of [defendant]'s use, though not dispositive, 'tends to weigh against a finding of fair use.'" (quoting *Harper & Row*, 471 U.S. at 562)).

Translation illustrates this point. A model used to translate an article serves a different purpose by conveying its content in another language. *See* U.S. Copyright Off., *Copyright and Artificial Intelligence, Part 3: Generative AI Training* (May 2025) at 45 (explaining "a language model can be used to help learn a foreign language by chatting with users on diverse topics and offering corrective feedback," which is "distinct from the purpose of the copyrighted works [it was] trained on"). That translation does not compete with the original in its language market. Such a use may have a strong fair-use argument. But a model trained on novels to generate novels or story-like prose uses the source works to acquire capabilities valuable in the exact same market. *See* Chakrabarty et al., *supra*, at 1 (observing that "books with no detected AI text lost the most ground in genres with high AI diffusion" and AI-generated books "tak[e] more of the scarce top-rank positions once held by books with no detected AI text").

### 4. Transformativeness does not control the fair-use inquiry.

Transformativeness is relevant but not dispositive for even the first factor, let alone fair use generally. *Warhol* rejected an approach that would let a new meaning or message swallow the author's derivative-work right. 598 U.S. at 529 ("[A]n

overbroad concept of transformative use, one that includes any further purpose, or any different character, would narrow the copyright owner's exclusive right to create derivative works."). All four factors must be weighed together. *See* 17 U.S.C. § 107; *Campbell*, 510 U.S. at 578 ("[T]he four statutory factors . . . . are to be explored, and the results weighed together, in light of the purposes of copyright.").

Some commentators contend that a finding of transformative purpose should be dispositive of fair use in the AI context. But *Warhol* expressly rejected that approach: "*Campbell* cannot be read to mean that § 107(1) weighs in favor of any use that adds some new expression, meaning, or message. Otherwise, 'transformative use' would swallow the copyright owner's exclusive right to prepare derivative works." 598 U.S. at 541. Transformativeness cannot be dispositive here.

#### 5. Market harm includes harm to any potential market that is reasonable or likely to develop.

Factor four of the fair use inquiry examines the effect of the use on the potential market for or value of the copyrighted work. 17 U.S.C. § 107(4). It "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590. Market substitution is "copyright's bête noire." *Warhol*, 598 U.S. at 528. The Supreme Court has called factor four "undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566.

Defendants' claim that there is no cognizable market harm is wrong. Factor four reaches harm to "the potential market for or value of the copyrighted work," including markets the copyright owner is entitled or likely to develop. 17 U.S.C. § 107(4); *see Harper & Row*, 471 U.S. at 568. For training, the relevant market is not limited to book sales. The question is whether the challenged use appropriates a

market the copyright owner could reasonably enter, not whether the owner has already entered it. *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1377–78 (2d Cir. 1993) (holding a summary guide "that reports the plot [of tv episodes] in such extraordinary detail as to risk impairment of the market for the copyrighted works themselves or derivative works that the author is entitled to license" weighed against fair use). The absence of a fully developed licensing market does not defeat the claim. Factor four protects *potential* markets, not just existing ones.

A rightsholder's refusal to license is irrelevant to this inquiry. Copyright protects the owner's choice to retain exclusivity. *Castle Rock Ent., Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 145–46 (2d Cir. 1998) (holding "copyright law must respect th[e] creative and economic choice" not to exploit a specific derivative market). A defendant cannot defeat market-harm claims by pointing to the owner's failure to develop every potential licensing arrangement. The right to exclude includes the right to reserve a market for future exploitation, and factor four protects that right. *See A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1027 (9th Cir. 2001) (explaining copyright holder's exclusive rights "include the right, within broad limits, to curb the development of such a derivative market by refusing to license a copyrighted work or by doing so only on terms the copyright owner finds acceptable" (quoting *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F.Supp.2d 349, 351 (S.D.N.Y. 2000)).

Defendants cannot reverse the burden of fair use by demanding Plaintiffs prove the precise number of lost sales or a fully developed licensing market before Defendants explain why their unauthorized use is justified. Fair use is an affirmative defense, and Defendants bear the burden of proving it. *See Campbell*, 510 U.S. at 590 ("Since fair use is an affirmative defense, its proponent would have difficulty

///

carrying the burden of demonstrating fair use without favorable evidence about relevant markets." (footnote omitted)).

## IV. CONCLUSION

The Court can recognize AI's public benefits without granting an exemption. Fair use permits certain uses, but it does not—and should not—place the cost of technological progress on uncompensated authors. The proper response is to apply Section 107 to the particular uses proved in this case, not to declare a new copying category outside the statute. For these reasons, amici curiae Professors Zvi Rosen and Mark F. Schultz respectfully request that the Court (1) deny Defendants' motion to the extent it seeks a categorical ruling that copying Plaintiffs' books for model training, research, or development was fair use; (2) grant Plaintiffs' motion on the distinct unauthorized downloading, copying, and distribution uses to the extent the record is undisputed; and (3) apply Section 107 to the particular uses and facts in the record.

August 27, 2026

**HORVITZ & LEVY LLP**
JEREMY B. ROSEN
WARREN Y. CHU

By: Jeremy B. Rosen

Attorneys for Amici Curiae
**PROFESSORS LINDA BLOSS-BAUM, JON M. GARON, PHILIPPA LOENGARD, ADAM MOSSOFF, LOREN E. MULRAINE, CHRIS NEWMAN, SEAN PAGER, ERIC PRIEST, ZVI ROSEN, MARK F. SCHULTZ, AND BHAMATI VISWANATHAN**