CORYNNE MCSHERRY (CA Bar 221504)
corynne@eff.org
VICTORIA NOBLE (CA Bar 337290)
tori@eff.org
**ELECTRONIC FRONTIER FOUNDATION**
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

*Attorneys for Amici Curiae*
ELECTRONIC FRONTIER FOUNDATION AND
CHAMBER OF PROGRESS

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| *In Re Mosaic LLM Litigation* | Master File Case No. 3:24-cv-01451-CRB<br>Consolidated with Case No. 3:24-cv-02653-CRB<br><br>**BRIEF OF AMICI CURIAE ELECTRONIC FRONTIER FOUNDATION AND CHAMBER OF PROGRESS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: October 30, 2026<br>Time: 10:00 a.m.<br>Dept: Courtroom 6, 17th Floor<br>Judge: Hon. Charles R. Breyer |

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iii

INTEREST OF AMICI CURIAE ..... 1

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. CONDITIONING FAIR USE ON DATA PROVENANCE WOULD UNDERMINE ESTABLISHED FAIR USE RIGHTS AND THREATEN PUBLICLY BENEFICIAL USES. ..... 2

II. COPYRIGHT IS DESIGNED TO INHIBIT INFRINGEMENT, NOT CREATIVE COMPETITION. ..... 6

A. Copyright Law, Including Fair Use, Encourages the Proliferation of Non-Infringing Creative Works. ..... 7

B. Allowing Speculative Competitive Harms to Tilt the Fair Use Analysis Would Impede Publicly Beneficial Uses of General Purpose AI Tools. ..... 11

CONCLUSION ..... 15

# TABLE OF AUTHORITIES

## Cases

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
562 F.3d 630 (4th Cir. 2009) ........ 10

*Aalmuhammed v. Lee*,
202 F.3d 1227 (9th Cir. 2000) ........ 10

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ........ 3, 7

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) ........ 8, 9, 10

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ........ 2, 3

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ........ 3, 4, 9, 10

*Cox Comm'ns, Inc. v. Sony Music Ent.*,
146 S. Ct. 959 (2026) ........ 11

*Feist Publications, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ........ 7

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) ........ 3, 4, 7

*Harper & Row v. Nation Enterprises*,
471 U.S. 539 (1985) ........ 3

*Infinity Broad. Corp v. Kirkland*,
150 F.3d 104 (2d Cir. 1998) ........ 8

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) ........ 2

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) ........ 10

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ........ 10

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ........ 1, 2, 7

*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151 (1975) ........ 7, 9

*Warren Publ'g Co. v. Spurlock*,
645 F. Supp. 2d 402 (E.D. Pa. 2009) ........ 3

*Yonay v. Paramount Pictures Corp.*,
163 F.4th 685 (9th Cir. 2026) ........ 9

**Statutes**

17 U.S.C. § 102(b) ........ 9

**Other Authorities**

Agnel Philip & Lisa Song, *A Study of Mint Plants. A Device to Stop Bleeding. This Is the Scientific Research Ted Cruz Calls "Woke."* PROPUBLICA (Feb. 28, 2025) ........ 12

Andrew R. Chow, *AI's Influence on Music Is Raising Some Difficult Questions*, TIME (December 4, 2023) ........ 15

Angela Watercutter, *Why* The Andy Warhol Diaries *Recreated the Artist's Voice with AI*, WIRED (Mar. 9, 2022) ........ 14

Angela Yang, *Artist Charlie Puth Tapped as 'Chief Music Officer' of an AI Platform*, NBC NEWS (March 4, 2026) ........ 15

Ashim Mahara, *Cybersecurity Data Extraction from Common Crawl*, ARXIV (March 2025 ........ 5

*Be My AI*, BE MY EYES ........ 13

Charles Ornstein, *How ProPublica Uses AI Responsibly in Its Investigations*, PROPUBLICA (Mar. 13, 2025) ........ 12

Cheyenne M. Davis, *"This Is What Your Worlds Are Lacking": Artists Are Using AI to Create Fat, Black Sci-Fi and Fantasy Characters*, BUZZFEED NEWS (Feb. 25, 2023) ........ 14

Christoph Schuhmann, et al., *LAION-5B: An Open Large-Scale Dataset for Training Generation Image-Text Models*, ARXIV (Oct. 16, 2022) ........ 4

Daniil A. Boiko, et al., *Autonomous Chemical Research with Large Language Models*, NATURE (Dec. 20, 2023) ........ 12

Dave Gershgorn, *The Data that Transformed AI Research—and Possibly the World*, QUARTZ (July 20, 2022) ........ 5

Deni Ellis Béchard, *The Chemist Who Taught AI to Run the Lab*, SCIENTIFIC AMERICAN (Feb. 17, 2026) .......... 11

Ethan Toven-Lindsey, *How AI-Assisted Workflows Are Unlocking California Police Records*, CURRENT (Jan. 16, 2026) .......... 13

*Generative AI Raises Competition Concerns,* Federal Trade Commissionn (June 29, 2023) .......... 5

Gloria Liu, *The World's Smartest Artificial Intelligence Just Made Its First Magazine Cover*, COSMOPOLITAN (June 21, 2022) .......... 15

Hugo Laurençon, et al., *The BigScience ROOTS Corpus: A 1.6TB Composite Multilingual Dataset*, PROOCEEDINGS OF THE 36TH CONFERENCE ON NEURAL INFORMATION PROCESSING SYSTEMS (Mar. 7, 2023) .......... 5

*Introducing: Be My AI*, BE MY EYES (Aug. 7, 2023) .......... 13

James Love, *We Need Smart Intellectual Property Laws for Artificial Intelligence*, SCIENTIFIC AMERICAN (August 7, 2023) .......... 6

Jason Stoughton, *Meet 'Coscientist,' Your AI Lab Partner*, U.S. NATIONAL SCIENCE FOUNDATION (Dec. 20, 2023) .......... 12

Jia Deng, et al., *ImageNet: A Large-Scale Hierarchical Image Database*, PROCEEDINGS OF THE 2009 IEEE CONFERENCE ON COMPUTER VISION AND PATTERN RECOGNITION (2009) .......... 4

Jordan G. Teicher, *When Photography Wasn't Art*, JSTOR DAILY (Feb. 6, 2016) .......... 2

Josh Richman, *Podcast Episode: AI on the Artist's Palette*, ELECTRONIC FRONTIER FOUNDATION (June 4, 2024) .......... 13

Josh Richman, *Podcast Episode: Building a Tactile Internet*, ELECTRONIC FRONTIER FOUNDATION (May 7, 2024) .......... 13

Kathryn Squyres, *California News Coalition Launches Database of Police Misconduct Records*, CURRENT (Aug. 25, 2025) .......... 13

Katrina Geddes, *Engineering Semiotic Democracy*, FIU L. Rev. (forthcoming 2026) .......... 10

Ken Shulman, *The Creative Future of Generative AI*, MASSACHUSETTS INSTITUTE OF TECHNOLOGY CENTER FOR ART, SCIENCE, AND TECHNOLOGY (Nov. 16, 2023) .......... 14

Livia Gershon, *Did Photography Really Kill Portrait Painting?* JSTOR DAILY (Sept. 13, 2022) .......... 2

Matthew Sag, *The False Hope of Content Licensing at Internet Scale*, PROMARKET (Nov. 19, 2025) .......... 5

*MyFriendBen Recognized in Forbes for Advancing AI Use in the Social Sector*, MYFRIENDBEN (Dec. 2, 2025) .......... 13

*Nettrice Gaskins' Deep Dream Featured Futurists*, SMITHSONIAN LEARNING LAB .......... 13

Oliver Bayley, *Autonomous Chemistry: Navigating Self-Driving Labs in Chemical and Material Sciences*, CELL (July 3, 2024) .......... 11

Petrina Kamya, et al., *PandaOmics: An AI-Driven Platform for Therapeutic Target and Biomarker Discovery*, 64 JOURNAL OF CHEMICAL INFORMATION AND MODELING 3961 (Feb. 26, 2024) .......... 12

PUBLICATIONS OFFICE OF THE EUROPEAN UNION, *Democratisation of AI through Open Data: Empowering Innovation* (Feb. 24, 2025) .......... 4

Rachel Gordon, *When AI Art Has No Author: MIT Study Finds Generated Images Often Can't Be Traced to Any Training Data*, MIT CSAIL (Aug. 18, 2026) .......... 6

Rowan Philp, *GIJN's Top Investigative Tools of 2024*, GLOBAL INVESTIGATIVE JOURNALISM NETWORK (Dec. 2, 2024) .......... 12

Savannah Walsh, *With Warren Jeffs in Prison for Sex Crimes,* Trust Me: The False Prophet *Exposes the Evil Man Who Took His Place*, VANITY FAIR (April 6, 2026) .......... 15

Stefan Baack, *A Critical Analysis of the Largest Source for Generative AI Training Data: Common Crawl*, ASSN. FOR COMPUTING MACHINERY 2199, 2201–02, 2204 (June 5, 2024) .......... 4

Shirin Anlen & Katerina Cizek, *The Synthesis: AI Is Everywhere, Even in Your Documentary*, INTERNATIONAL DOCUMENTARY ASSOCIATION (Nov. 5, 2024) .......... 14

Stefan Baack, *Training Data for the Price of a Sandwich*, Mozilla / (Feb. 6, 2024) .......... 5

Tatiana Flowers, *New Online Tool Helps Coloradans Quickly Determine Which Public Benefits They Might Be Eligible For*, COLORADO SUN (Jan. 5, 2024) .......... 13

*The Scope of Fair Use: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. 2 (2014) .......... 8

Theresa Schliep, *Copyright Head Touts 6,000 Registrations of Human-AI Works*, LAW360 (Apr. 21, 2026) .......... 10

Tyler McBrien, et al., *The Justice Department Erases History; Lawfare Restores It*, LAWFARE (May 29, 2026) .......... 12

*Women of Afrofuturism*, SFO MUSEUM ........ 13

Yanyun Fu, et al., *Intestinal Mucosal Barrier Repair and Immune Regulation with an AI-Developed Gut-Restricted PHD Inhibitor*, NATURE BIOTECHNOLOGY (Dec. 11, 2024) ........ 12

Zuojun Xu, et al., *A Generative AI-Discovered TNIK Inhibitor for Idiopathic Pulmonary Fibrosis: A Randomized Phase 2a Trial*, NATURE MEDICINE (June 3, 2025) ........ 12

## INTEREST OF AMICI CURIAE

The Electronic Frontier Foundation ("EFF") is a member-supported, nonprofit civil liberties organization that has worked for more than 30 years to protect free expression, access to knowledge, and innovation. EFF, its more than 30,000 members, and the community of technology users they represent have a strong interest in a copyright system that promotes the progress of science by balancing copyright incentives with countervailing constitutional interests. Consistent with this mission, EFF has participated, as counsel or amicus, in multiple copyright cases pertaining to new technologies; provides free legal counseling on copyright issues; and advocates for balanced copyright policy in legislative and regulatory arenas. EFF brings a critical and underrepresented perspective to its amicus advocacy work by keeping the public interest at the forefront and highlighting how judicial decisions may impact people other than commercial stakeholders or the immediate parties to a dispute.

Chamber of Progress is a tech-industry coalition devoted to a progressive society and economy. Chamber of Progress backs public policies that will build a fairer, more inclusive country in which the tech industry operates responsibly and fairly, and in which all people benefit from technological leaps. Chamber of Progress seeks to protect Internet freedom and free speech, to promote innovation and economic growth, and to empower consumers. Many of Chamber of Progress' partners currently use, develop, and provide generative AI products and services.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Supreme Court has cautioned that where copyright law has not kept up with technological developments, courts should be careful not to expand the law on their own. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429–31 (1984). Plaintiffs ask this Court to ignore that caution and rewrite copyright law to include a new data provenance requirement, and to tilt the fair use analysis against the developer of a general-purpose tool if that tool might be used to create potentially competing *non-infringing* works.

The Court should refuse. The Constitution gives *Congress* the role of rewriting laws to address new technologies, including deciding whether those significant changes are needed at all. *Sony Corp. of Am.*, 464 U.S. at 431. And that legislative lag can be a feature, not a bug, when it comes to adapting copyright to new technologies. To take just one of many historical examples: Portrait artists once feared the camera would replace the paintbrush, because cameras could produce thousands of images in the time it would take a human to paint just one.[1] In practice, photography sparked a resurgence in portraiture painting and provided artists with a new revenue source by allowing them to capture and sell reproductions of their own artworks.[2]

AI tools are developing rapidly, and it is not yet clear whether or not new laws are needed. In the meantime, this Court should apply well-established copyright precedents which, construed in light of copyright's purpose, favor fair use here.

## ARGUMENT

### I. CONDITIONING FAIR USE ON DATA PROVENANCE WOULD UNDERMINE ESTABLISHED FAIR USE RIGHTS AND THREATEN PUBLICLY BENEFICIAL USES.

Several courts have held that model training and research are transformative purposes. *See, e.g., Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1021–22 (N.D. Cal. 2025); *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1044–45 (N.D. Cal. 2025). Plaintiffs seek to avoid that precedent by insisting that Defendants' transformative purpose is effectively irrelevant if a defendant did not license or otherwise lawfully acquire every intermediate copy contained in the training dataset. Plfs' Partial Mot. Summ. J. ("Plfs' Mot.") 13.[3]

There are multiple problems with this theory. *First,* Plaintiffs mistakenly rely on dicta in

---

[1] *See* Livia Gershon, *Did Photography Really Kill Portrait Painting?* JSTOR DAILY (Sept. 13, 2022), https://daily.jstor.org/did-photography-really-kill-portrait-painting/; Jordan G. Teicher, *When Photography Wasn't Art*, JSTOR DAILY (Feb. 6, 2016), https://daily.jstor.org/when-photography-was-not-art/.

[2] *Id.*

[3] Christoph Schuhmann, et al., *LAION-5B: An Open Large-Scale Dataset for Training Generation Image-Text Models*, ARXIV (Oct. 16, 2022), https://arxiv.org/abs/2210.08402.

*Bartz v. Anthropic* to support the proposition that no use of "pirated materials" can ever be fair. *Compare* Plfs' Mot. 2 *with Bartz*, 787 F. Supp. 3d at 1025–26. While Judge Alsup expressed "doubts" that even transformative uses of "copies from pirate sites" could ever be fair, he concluded that "this order need not decide this case on that rule." *Bartz*, 787 F. Supp. 3d at 1025–26. Thus, *Bartz* did not disturb the settled law holding that if a user's purpose is transformative, downloading a copy from an "unauthorized" third party source in service of that purpose is transformative as well. *See Kadrey*, 788 F. Supp. 3d at 1046 ("To say that [a party's] downloading was 'piracy' and thus cannot be fair use begs the question because the whole point of fair use analysis is to determine whether a given act of copying was unlawful.")

*Second*, notwithstanding Plaintiffs' attempted reframing, *see* Plfs' Opp'n to Defs' Mot. Summ. J. ("Plfs' Opp'n") 9–10, imposing a data provenance rule would inevitably revive "good faith" as part of the fair use analysis. The Supreme Court would frown on that revival. *Campbell v. Acuff-Rose Music* relegated that question to a mere footnote, suggesting that good or bad faith was no more relevant to the analysis of fair use than it is to a finding of infringement. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994); *see also Warren Publ'g Co. v. Spurlock*, 645 F. Supp. 2d 402, 417 (E.D. Pa. 2009) ("While the Supreme Court in *Harper & Row* stated that good faith and fair dealing were required for a finding of fair use, the Court's later decision in *Campbell* appeared to suggest, though not directly holding, that this was no longer true.") And while the Court did not explicitly overrule *Harper & Row* on this point in *Google v. Oracle*, it observed that *Campbell*'s "skepticism" was "justifiable." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 32 (2021). The Court's most recent fair use opinion ignores bad faith altogether in its analysis of the first statutory factor. *See generally, Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023). The message is clear: fair use, like copyright generally, "is not a privilege reserved for the well-behaved." *Google*, 593 U.S. at 32 (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1126 (1990)).

And a good thing, too. As one appellate judge has explained: "Fair use is not a doctrine that

exists by sufferance, or that is earned by good works and clean morals," but rather a public right "that is 'necessary to fulfill copyright's very purpose.'" *NXIVM Corp. v. Ross Inst.,* 364 F.3d 471, 485 (2d Cir. 2004) (Jacobs, J., concurring) (quoting *Campbell*, 510 U.S. at 575). Fair use cannot serve that purpose if acquiring copies without permission is enough to foreclose the defense. Nimmer offers a telling example:

> Imagine an undercover reporter who obtains access to a high politician's private writings under false pretenses—should the socially valuable revelations contained in those writings be lost to the public based on the circumstances of a lie having been told? Presumably, sound public policy counsels against that result.

4 NIMMER ON COPYRIGHT § 13F.05[E][2] n.245. This logic extends to necessary intermediate copying in the process of creating such a transformative work. *See Google*, 593 U.S. at 22 (collecting cases); *see also* Defs' Mot., 13–14 (same).

*Third*, creating an independent data provenance rule would have consequences far beyond this case. Until relatively recently, lack of access to adequate training data was a major impediment to participation in many areas of generative AI research.[4] To address this problem, nonprofits, researchers, and others constructed large datasets using data scraped from the open web—inevitably including copyrighted information—and made it available to the public.[5]

Democratizing participation in the field has led to rapid technological progress.[6] These open datasets, like LAION and Common Crawl, have allowed more researchers and startups to develop generative AI tools. ImageNet, an open dataset comprised of images scraped from public websites,[7]

---

[4] Christoph Schuhmann, et al., *LAION-5B: An Open Large-Scale Dataset for Training Generation Image-Text Models*, ARXIV (Oct. 16, 2022), https://arxiv.org/abs/2210.08402.

[5] Schuhmann, et al., *supra* note 5; Stefan Baack, *A Critical Analysis of the Largest Source for Generative AI Training Data: Common Crawl*, ASSN. FOR COMPUTING MACHINERY 2199, 2201–02, 2204 (June 5, 2024), https://dl.acm.org/doi/epdf/10.1145/3630106.3659033.

[6] *Id. See also, e.g.*, PUBLICATIONS OFFICE OF THE EUROPEAN UNION, *Democratisation of AI through Open Data: Empowering Innovation* (Feb. 24, 2025), https://data.europa.eu/en/news-events/news/democratisation-ai-through-open-data-empowering-innovation.

[7] Jia Deng, et al., *ImageNet: A Large-Scale Hierarchical Image Database*, PROCEEDINGS OF THE 2009 IEEE CONFERENCE ON COMPUTER VISION AND PATTERN RECOGNITION (2009), https://ieeexplore.ieee.org/document/5206848.

is widely regarded as one of the most important catalysts of the development of modern AI.[8] One study found that at least 64 percent of large language models ("LLMs") published between 2019 and 2023 were built using Common Crawl data, and that the availability of that data led to improved competition and transparency in LLM development.[9] Researchers have built on Common Crawl's work, creating specialized, high quality datasets that have provided the foundation for important cybersecurity research[10] and scientific advancements.[11] Plaintiffs' theory would put all of this at risk, because some portion of the collections in these data sets included infringing works—even where, as here, the Defendants had nothing to do with compiling those collections.

Plaintiffs' apparent response is that researchers should instead license the materials they use for training. Plfs' Opp'n. 24–25. This argument is both circular and functionally impracticable. As Professor Matthew Sag has explained, licensing "does not scale" because there aren't enough consolidated interests, with rights to large enough training datasets, to come to the table.[12] Common

---

[8] Dave Gershgorn, *The Data that Transformed AI Research—and Possibly the World*, QUARTZ (July 20, 2022), https://qz.com/1034972/the-data-that-changed-the-direction-of-ai-research-and-possibly-the-world; Timothy B. Lee, *How a Stubborn Computer Scientist Accidentally Launched the Deep Learning Boom*, ARS TECHNICA (Nov. 11, 2024), https://arstechnica.com/ai/2024/11/how-a-stubborn-computer-scientist-accidentally-launched-the-deep-learning-boom/.

[9] Stefan Baack, *Training Data for the Price of a Sandwich*, MOZILLA (Feb. 6, 2024), https://www.mozillafoundation.org/en/research/library/generative-ai-training-data/common-crawl/.

[10] Ashim Mahara, *Cybersecurity Data Extraction from Common Crawl*, ARXIV (March 2025), https://arxiv.org/abs/2602.22218.

[11] Hugo Laurençon, et al., *The BigScience ROOTS Corpus: A 1.6TB Composite Multilingual Dataset*, PROOCEEDINGS OF THE 36TH CONFERENCE ON NEURAL INFORMATION PROCESSING SYSTEMS (Mar. 7, 2023), https://www.semanticscholar.org/reader/16c64f74ce0e6a59b0709c0d8e66596a5bc08ed6.

[12] Matthew Sag, *The False Hope of Content Licensing at Internet Scale*, PROMARKET (Nov. 19, 2025), https://www.promarket.org/2025/11/19/the-false-hope-of-content-licensing-at-internet-scale/; *see also* U.S. FEDERAL TRADE COMMISSION, *Generative AI Raises Competition Concerns* (June 29, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/06/generative-ai-raises-competition-concerns ("The volume and quality of data required to pre-train a generative AI model from scratch may impact the ability of new players to enter the market," especially if rightsholders "leverage their control to dampen or distort competition in generative AI markets.").

Crawl, for example, contains more than 9.5 petabytes of data from every corner of the internet.[13] Establishing clearly lawful data provenance would require identifying and negotiating licenses with copyright owners for webpages of all kinds, many of which were scraped by third parties over a decade ago. That licensing quagmire would likely reduce the quality and usefulness of AI tools; licensing disputes could, for example, result in the exclusion relevant scientific materials from training datasets used in health research.[14] Datasets would necessarily exclude orphan works altogether. And even assuming it were possible to find all of the right licensing partners, a data provenance requirement would ensure that technological development stays in the hands of the very few companies that can afford to make those deals.

## II. COPYRIGHT IS DESIGNED TO INHIBIT INFRINGEMENT, NOT CREATIVE COMPETITION.

Recently published research confirms that large generative models are unlikely to produce infringing works because the more data a generative model is trained on, the less any individual training example matters to any particular output.[15] Confronted with this practical reality, Plaintiffs advance the so-called "market dilution" theory: that building generative AI tools cannot be fair use because those tools might be encourage the proliferation of *competing* works. Plfs' Opp'n 20–22.

Accepting this theory would amount to more than a slight doctrinal shift; it would refocus the fair use analysis away from promoting new creativity and toward maximizing profit and control for rightsholders. That is not copyright's purpose. *Cf. Twentieth Century Music Corp. v.*

---

[13] Baack, Stephan, *Training Data for the Price of a Sandwich*, Mozilla (Feb. 6, 2024), *supra* note 6.

[14] *See* James Love, *We Need Smart Intellectual Property Laws for Artificial Intelligence*, SCIENTIFIC AMERICAN (August 7, 2023), https://www.scientificamerican.com/article/we-need-smart-intellectual-property-laws-for-artificial-intelligence/ ("When AI is used in hospitals and in gene therapy, do you really want to exclude relevant information from the training database?")

[15] Rachel Gordon, *When AI Art Has No Author: MIT Study Finds Generated Images Often Can't Be Traced to Any Training Data*, MIT CSAIL (Aug. 18, 2026), https://www.csail.mit.edu/news/when-ai-art-has-no-author-mit-study-finds-generated-images-often-cant-be-traced-any-training

*Aiken*, 422 U.S. 151, 156 (1975) ("Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts."); *see also Sony Corp. of Am*., 464 U.S. at 432 (copyright law "has never accorded the copyright owner complete control over all possible uses of his work").

In fact, whether considered under factors one or four, the market competition Plaintiffs fear is exactly the sort of downstream creativity that copyright, and particularly fair use, is intended to foster.

### A. Copyright Law, Including Fair Use, Encourages the Proliferation of Non-Infringing Creative Works.

Copyright law not only allows "but *encourages* others to build freely" on existing works. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349–350 (1991) (emphasis added). That is why copyright law targets *infringement*, *i.e*., the proliferation of identical or substantially similar works, not competition.[16] Accordingly, the factor one analysis assesses whether a secondary use has a new and/or significantly different purpose from that of the original work, such that it might be less likely impact the market for the work by serving as a substitute. *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 531–32 (2023).

With little hope of showing that training itself does not have a transformative purpose, Plaintiffs rely heavily instead on a radically distorted idea of "substitution." In copyright jurisprudence, that term is an analytical device to determine whether a *specific* secondary work is so similar to a *specific* original work that user might turn to that work instead. *Id.* at 533, 535 n.11. Plaintiffs' definition of substitutes to include all possible "fiction books" that may compete with their novels, Plfs' Opp'n 20–24, sweeps far beyond the close substitutes that courts have deemed non-transformative in prior cases. In *Warhol*, for example, the Supreme Court held that two specific "portraits of Prince used in magazines to illustrate stories about Prince" shared "substantially the same" purpose. *Warhol*, 598 U.S. at 535–36. Importantly, *Warhol* made clear

[16] Fair use is designed to protect competition by preventing "unrelated or illegitimate harms in other markets or to the development of other products." *Google*, 593 U.S. at 22.

that "the first factor does not ask whether a secondary use causes a copyright owner economic harm." *Id.*, at 536 n.12.

The implications of Plaintiffs' theory reach far beyond this case or AI in general. In 2014, for example, best-selling author Naomi Novik testified before Congress about how she developed her skills and style by writing fanfiction, a genre where fans use characters and worlds from an existing book, movie, show, or game to explore alternate plots or pair different characters together.

> We weren't simply retelling the old stories — we were creating new stories, and ones that weren't being told. We transformed the original work, and we transformed ourselves by doing so. We learned to think of ourselves as writers, artists, programmers, as creators. We took our craft seriously and so did our audience, and that audience was invaluable.…And the more I learned from that feedback, the more confidence I developed, the more I built my skills and my craft, the further I was able to take my work[.][17]

In other words, Novik "trained" on existing works, including fantasy works, and then went on to publish several fantasy novels herself that doubtless "competed" with the works on which she "trained." Her new works might even be "substitutes" in the sense that a reader might choose to buy her books instead of another fantasy novel involving, say, dragons. Under Plaintiffs' theory, that possibility would have tilted Factor One against fair use protections for the fiction she wrote as a fan. That outcome would hardly have served the purposes of copyright.

Plaintiffs' anti-competitive take on fair use fares no better under factor four. The factor four "market harm" analysis excludes harms that "occur in relation to interests that are not protected by the copyright." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 224 (2d Cir. 2015). The market for dissimilar works does not properly belong to the copyright holder because, by definition, such works do not embody protectible elements of the original. *See also Infinity Broad. Corp v. Kirkland*, 150 F.3d 104, 110 (2d Cir. 1998) (market harm only where secondary

---

[17] *The Scope of Fair Use: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. 2 (2014) (statement of Naomi Novik, Co-Founder, Org. for Transformative Works).

user "usurp[s] a market that properly belongs to the copyright-holder"); *Campbell*, 510 U.S. at 592–93, 593 n.24.

In *Authors Guild*, for example, the court explained that a tool built by Google could provide facts communicated in "snippets" of a book displayed to a user, even though this could potentially eliminate the need to obtain the book. *Authors Guild*, 804 F.3d at 224. The potential for lost sales does not "change the taking of an unprotected fact into a copyright infringement." *Id*. at 224. And because the "snippets" provided by Google were deemed unlikely to satisfy the user's "interest *in the protected aspect* of the author's work," the snippets did not "provide a significant substitute for the purchase of the author's book." *Id.* at 224–25.

"Adapting" fair use to look beyond legally cognizable harms, as Plaintiffs urge, Plfs' Opp'n 22, could eviscerate not only the fair use doctrine, but also other limits, such as merger and *scenes-a-faire*, that work specifically to prevent rightsholders from unfairly suppressing competition by claiming broad ownership over tropes, genres, styles, and so on. 17 U.S.C. § 102(b); *Yonay v. Paramount Pictures Corp*., 163 F.4th 685, 692 (9th Cir. 2026). After all, if a model was trained on a Bridgerton novel—among millions of other works—and was later used by a third party to produce romance novels, *and* fans decided to buy those random "romance novels" instead of works produced by a bestselling author they know and love, that might harm author Julia Quinn's bottom line. But the question under copyright law is whether protectable aspects of those new works are substantially similar to a Bridgerton novel—a question that cannot be answered in the abstract and does not depend on how the works were created. If the answer to that question is no, Julia Quinn has no right under copyright law to prevent these competing books from entering the market, nor any right to compensation even if that competition impacted her book sales.

Nor is this proposed adaptation necessary to serve copyright's purpose. *Contra* Plfs' Opp'n 22. To be sure, the purpose of copyright may be "to stimulate artistic creativity for the general public good." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975) at 156. But as decades

of case law applying fair use protections to a broad swath of non-expressive uses shows, that is not the same as "to stimulate the creation of particular kinds of new copyrightable works." *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165–66 (9th Cir. 2007) (incorporating images into electronic reference tool had immense public benefits); *see also Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818–19 (9th Cir. 2003) (improving access to information on the internet); *Authors Guild.*, 804 F.3d at 209, 216–18 (identifying books of interest). *A.V. ex rel. Vanderhye v. iParadigms*, *LLC*, 562 F.3d 630, 640 (4th Cir. 2009) (plagiarism detection software). These holdings reflect, as they must, a determination that those uses also served the purposes of copyright, whether or not they were tied to the creation of new copyrightable works. *See Campbell.*, 510 U.S. at 569, 578 (fair use requires courts to examine four statutory factors and weigh them together "in light of the purposes of copyright.")

Further, while Plaintiffs portray works generated using AI tools as orthogonal to *human* creativity, Plfs' Opp'n 22, in fact "AI-generated works," are more commonly "AI-*assisted* works":

> AI-generated works do not spontaneously spring into existence. A human user must possess an idea, express that idea in one or more prompts, and continue prompting the AI system until it produces the desired result. There is still a discursive, relational, dialogic exchange taking place between creator and audience, just with the assistance of a machinic intermediary. In this sense, AI-generated expression is still a dialogue between humans, just through the medium of AI.

Katrina Geddes, *Engineering Semiotic Democracy*, FIU L. Rev. (forthcoming 2026) (manuscript at 22).[18] The creators of AI-assisted creative works are all "authors," as surely as Dorothea Lange, Marcel Duchamp, or Georgia O'Keefe. *Aalmuhammed v. Lee*, 202 F.3d 1227, 1233 (9th Cir. 2000) (defining an "author" as the person "who superintended the whole work, the 'master mind'"). The Copyright Office recognizes as much, having registered more than 6,000 works like these.[19]

*Finally,* Plaintiffs' first and fourth factor "substitution" theories also collapse direct and secondary liability. On Plaintiffs' theory, if third parties can use a tool to generate "competing"

---

[18] Available at https://ssrn.com/abstract=4865510.

[19] Theresa Schliep, *Copyright Head Touts 6,000 Registrations of Human-AI Works*, LAW360 (Apr. 21, 2026), https://www.law360.com/articles/2468321.

works, then that supposed harm tilts fair use against the creators of the tool. Plfs' Opp'n 15, 22. But responsibility for what third parties do with a tool—including using it as a "novel-generating machine"—is considered under doctrines of contributory or vicarious liability, not fair use. And as the Supreme Court recently held in *Cox Communications, Inc. v. Sony Music Entertainment*, "a company is not liable as a copyright infringer for merely providing a service to the general public with knowledge that it will be used by some to infringe copyrights." *Cox Comm'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959, 964 (2026). Eroding the distinction between secondary and direct liability here would threaten publicly beneficial uses with no benefit to anyone but Plaintiffs.

### B. Allowing Speculative Competitive Harms to Tilt the Fair Use Analysis Would Impede Publicly Beneficial Uses of General Purpose AI Tools.

Insulating copyright owners from competition from noninfringing works created using AI models would result in significant collateral damage to creators, academic researchers, journalists, nonprofits, and individuals who use generative AI models for all kinds of publicly beneficial activity: art, scientific research, news reporting, government accountability, improving accessibility for people with disabilities, and more. A few of many examples:

***Scientific research.*** Scientific researchers have used third party AI models to drive important research advancements and democratize science. In chemistry, for example, integrating LLMs into automated labs can reduce barriers to entry, accelerate discoveries, reduce toxic chemical exposures, and enable research that would have been impossible otherwise.[20] For example, researchers at Carnegie Mellon University developed "Coscientist," a research tool that plans and performs chemistry experiments using OpenAI's GPT-4, a model that was trained on

[20] Oliver Bayley, *Autonomous Chemistry: Navigating Self-Driving Labs in Chemical and Material Sciences*, CELL (July 3, 2024), https://www.cell.com/matter/fulltext/S2590-2385(24)00322-9; Deni Ellis Béchard, *The Chemist Who Taught AI to Run the Lab*, SCIENTIFIC AMERICAN (Feb. 17, 2026), https://www.scientificamerican.com/article/how-one-chemist-is-using-ai-and-robots-to-automate-lab-experiments/.

copyrighted works.[21] Researchers have also used generative AI tools to develop new medicines, including breakthrough treatments for inflammatory bowel disease and idiopathic pulmonary fibrosis, a fatal lung disease.[22]

***Investigative journalism.*** Journalists use commercial LLMs like ChatGPT, Claude, and Perplexity to analyze large volumes of data and assist with investigative reporting.[23] For example, *ProPublica* reporters used one of OpenAI's GPT model to analyze thousands of National Science Foundation grants that Senator Ted Cruz identified as "woke," and identify numerous grants that had nothing to do with the ideological themes Senator Cruz claimed.[24] The legal publication *Lawfare*, used Anthropic's Claude to restore and archive recently deleted Department of Justice website materials regarding criminal prosecutions against people who participated in the January 6 attack on the U.S. Capitol.[25] The California Reporting Project, a collaboration of more than 40 California news organizations, used OpenAI's GPT models to build a first-of-its-kind searchable

---

[21] Daniil A. Boiko, et al., *Autonomous Chemical Research with Large Language Models*, NATURE (Dec. 20, 2023), https://www.nature.com/articles/s41586-023-06792-0; Jason Stoughton, *Meet 'Coscientist,' Your AI Lab Partner*, U.S. NATIONAL SCIENCE FOUNDATION (Dec. 20, 2023), https://www.nsf.gov/science-matters/meet-coscientist-your-ai-lab-partner.

[22] Zuojun Xu, et al., *A Generative AI-Discovered TNIK Inhibitor for Idiopathic Pulmonary Fibrosis: A Randomized Phase 2a Trial*, NATURE MEDICINE (June 3, 2025), https://www.nature.com/articles/s41591-025-03743-2; Yanyun Fu, et al., *Intestinal Mucosal Barrier Repair and Immune Regulation with an AI-Developed Gut-Restricted PHD Inhibitor*, NATURE BIOTECHNOLOGY (Dec. 11, 2024), https://www.nature.com/articles/s41587-024-02503-w; Petrina Kamya, et al., *PandaOmics: An AI-Driven Platform for Therapeutic Target and Biomarker Discovery*, 64 JOURNAL OF CHEMICAL INFORMATION AND MODELING 3961 (Feb. 26, 2024), https://pubs.acs.org/jcisd8/article/64/10/3961/982810/PandaOmics-An-AI-Driven-Platform-for-Therapeutic.

[23] *See, e.g.,* Charles Ornstein, *How ProPublica Uses AI Responsibly in Its Investigations*, PROPUBLICA (Mar. 13, 2025), https://www.propublica.org/article/using-ai-responsibly-for-reporting; Rowan Philp, *GIJN's Top Investigative Tools of 2024*, GLOBAL INVESTIGATIVE JOURNALISM NETWORK (Dec. 2, 2024), https://gijn.org/stories/top-investigative-journalism-tools-2024/.

[24] Agnel Philip & Lisa Song, *A Study of Mint Plants. A Device to Stop Bleeding. This Is the Scientific Research Ted Cruz Calls "Woke."* PROPUBLICA (Feb. 28, 2025), https://www.propublica.org/article/ted-cruz-woke-grants-national-science-foundation.

[25] Tyler McBrien, et al., *The Justice Department Erases History; Lawfare Restores It*, LAWFARE (May 29, 2026), https://www.lawfaremedia.org/article/the-justice-department-erases-history--lawfare-restores-it.

public database containing approximately 1.5 million pages of police misconduct and use-of-force records.[26]

***Accessibility for people with disabilities.*** Generative AI-powered tools, when designed safely and inclusively, can help make the world more accessible for people with disabilities. For example, Be My AI, uses OpenAI's GPT models to provide visual descriptions for people who are blind or have low vision.[27]

***Direct service nonprofits.*** Nonprofits of all kinds are using AI to help serve low-income communities. For example, MyFriendBen uses Anthropic's Claude to help connect low-income families to public benefits they are entitled to but have not yet claimed.[28]

***Visual art.*** Artists have used AI to create innovative visual art, often using the tools to reimagine mainstream popular culture imagery through a more inclusive lens. For example, acclaimed digital artist Nettrice Gaskins uses AI to create Afrofuturist art, including a series of portraits exhibited by the Smithsonian Arts + Industries Building, and a portrait of Octavia Butler now on display at the San Francisco Airport as part of the "Women of Afrofuturism" exhibition.[29]

---

[26] Ethan Toven-Lindsey, *How AI-Assisted Workflows Are Unlocking California Police Records*, CURRENT (Jan. 16, 2026), https://current.org/2026/01/how-ai-assisted-workflows-are-unlocking-california-police-records/; Kathryn Squyres, *California News Coalition Launches Database of Police Misconduct Records*, CURRENT (Aug. 25, 2025), https://current.org/2025/08/california-news-coalition-launches-database-of-police-misconduct-records/.

[27] Josh Richman, *Podcast Episode: Building a Tactile Internet*, ELECTRONIC FRONTIER FOUNDATION (May 7, 2024), https://www.eff.org/deeplinks/2024/05/podcast-episode-building-tactile-internet; *Be My AI*, BE MY EYES, https://www.bemyeyes.com/bme-ai/; *Introducing: Be My AI*, BE MY EYES (Aug. 7, 2023), https://www.bemyeyes.com/blog/introducing-be-my-ai/.

[28] Tatiana Flowers, *New Online Tool Helps Coloradans Quickly Determine Which Public Benefits They Might Be Eligible For*, COLORADO SUN (Jan. 5, 2024), https://coloradosun.com/2024/01/05/my-friend-ben/; *MyFriendBen Recognized in Forbes for Advancing AI Use in the Social Sector*, MYFRIENDBEN (Dec. 2, 2025), https://www.myfriendben.org/myfriendben-recognized-in-forbes-for-advancing-ai-use-in-the-social-sector/.

[29] *Women of Afrofuturism*, SFO MUSEUM, https://www.sfomuseum.org/sites/default/files/2025-12/Extended-Labels-Women-of-Afrofuturism-251219.pdf; *Nettrice Gaskins' Deep Dream Featured Futurists*, SMITHSONIAN LEARNING LAB, https://learninglab.si.edu/collections/nettrice-gaskins-deep-dream-featured-futurists/rU3KpCRiL5QvqTg2#r/1428914; Josh Richman, *Podcast*

Another Afrofuturist, Alex Smith, uses generative AI to depict more inclusive science fiction worlds, featuring queer, plus-sized Black superheroes.[30]

***Documentary filmmaking.*** Documentarians are using AI tools at every stage of the filmmaking process—from research to production to editing—and when used responsibly, for appropriate purposes, and with full transparency, AI can be a powerful creative tool in this context.[31] For example, a *Netflix* documentary series, *The Andy Warhol Diaries*, brought the late artist's words to life by using AI to "read" them in Warhol's own, robotic voice—an interesting extension of Warhol's robot-like public persona, which he cultivated through decades of press interviews, an iconic robot self-portrait, and an animatronic replica of himself.[32] Ana Miljački, a professor of architecture at MIT, used generative AI to create a "non-liner documentary" film on Yugoslav World War II memorials and the values they embodied.[33] Multiple documentarians have also used AI to protect vulnerable subjects by digitally altering (rather than blurring) their identifying facial features, while still showing the emotions on their faces. For example, documentary director Rachel Dretzin used AI to tell the true story of how a pedophilic cult leader was brought to justice, while protecting the identities of the young girls he sexually abused and

---

*Episode: AI on the Artist's Palette*, ELECTRONIC FRONTIER FOUNDATION (June 4, 2024), https://www.eff.org/deeplinks/2024/05/podcast-episode-ai-artists-palette.

[30] Geddes, manuscript at 32; Cheyenne M. Davis, *"This Is What Your Worlds Are Lacking": Artists Are Using AI to Create Fat, Black Sci-Fi and Fantasy Characters*, BUZZFEED NEWS (Feb. 25, 2023), https://www.buzzfeednews.com/article/davisc0994/ai-art-fat-black-sci-fi-fantasy-characters.

[31] Shirin Anlen & Katerina Cizek, *The Synthesis: AI Is Everywhere, Even in Your Documentary*, INTERNATIONAL DOCUMENTARY ASSOCIATION (Nov. 5, 2024), https://www.documentary.org/column/synthesis-ai-everywhere-even-your-documentary.

[32] Angela Watercutter, *Why* The Andy Warhol Diaries *Recreated the Artist's Voice with AI*, WIRED (Mar. 9, 2022), https://www.wired.com/story/andy-warhol-diaries-artificial-intelligence-voice/.

[33] Ken Shulman, *The Creative Future of Generative AI*, MASSACHUSETTS INSTITUTE OF TECHNOLOGY CENTER FOR ART, SCIENCE, AND TECHNOLOGY (Nov. 16, 2023), https://arts.mit.edu/mit-generative-ai-art/.

trafficked.[34]

***Magazine cover art.*** A team of editors, AI researchers, and a digital artist created used an AI image generator to design a cover of *Cosmopolitan* magazine.[35]

***Music.*** Multiplatinum singer-songwriter Charlie Puth has used Moises, an AI tool, for years, including to help him experiment with musical arrangements for his new album and rehearse his performance of the national anthem at the Super Bowl.[36] AI company Bronze works with musicians like Disclosure and Jai Paul to create songs that never sound the same when played back twice, with the goal of challenging audience conceptions of what music could be.[37]

Given this range of experimentation, courts should be reluctant to decide in advance what tools do and do not foster "human creativity."

## CONCLUSION

For the reasons stated above, we urge the Court to grant Defendants' motion for summary judgment.

Dated: August 27, 2026

By: /s/ Corynne McSherry

Corynne McSherry
Victoria Noble
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

---

[34] Savannah Walsh, *With Warren Jeffs in Prison for Sex Crimes,* Trust Me: The False Prophet *Exposes the Evil Man Who Took His Place*, VANITY FAIR (April 6, 2026), https://www.vanityfair.com/hollywood/story/trust-me-the-false-prophet-warren-jeffs-sam-bateman-flds-director-interview.

[35] Gloria Liu, *The World's Smartest Artificial Intelligence Just Made Its First Magazine Cover*, COSMOPOLITAN (June 21, 2022), https://www.cosmopolitan.com/lifestyle/a40314356/dall-e-2-artificial-intelligence-cover/.

[36] Angela Yang, *Artist Charlie Puth Tapped as 'Chief Music Officer' of an AI Platform*, NBC NEWS (March 4, 2026), https://www.nbcnews.com/pop-culture/pop-culture-news/charlie-puth-chief-music-officer-ai-platform-moises-rcna261429.

[37] Andrew R. Chow, *AI's Influence on Music Is Raising Some Difficult Questions*, TIME (December 4, 2023) https://time.com/6340294/ai-transform-music-2023/.

*Counsel for Amici Curiae*
*Electronic Frontier Foundation and*
*Chamber of Progress*