Timothy W. Grinsell (CA State Bar No. 308703)
Robert W. Clarida (NY State Bar No. 2608958)
REITLER KAILAS & ROSENBLATT LLP
885 Third Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 209-3050
tgrinsell@reitlerlaw.com

Counsel for Amici Curiae The Authors Guild, Inc., the National Press Photographers Association, the American Society of Media Photographers, Romance Writers of America, Inc., the Digital Media Leadership Alliance, the Association of American Literary Agents, the American Society for Collective Rights Licensing, the Society of Composers & Lyricists, the Dramatists Guild of America, Inc., the Graphic Artists Guild, and American Photographic Artists

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| *In Re Mosaic LLM Litigation,* | Case No.: 3:24-cv-01451-CRB<br>Consolidated with Case No.: 3:24-cv-02653-CRB<br><br>***AMICI BRIEF* FOR THE AUTHORS GUILD, INC., THE NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, THE AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, ROMANCE WRITERS OF AMERICA, INC., THE DIGITAL MEDIA LEADERSHIP ALLIANCE, THE ASSOCIATION OF AMERICAN LITERARY AGENTS, THE AMERICAN SOCIETY FOR COLLECTIVE RIGHTS LICENSING, THE SOCIETY OF COMPOSERS & LYRICISTS, THE DRAMATISTS GUILD OF AMERICA, INC., THE GRAPHIC ARTISTS GUILD, AND AMERICAN PHOTOGRAPHIC ARTISTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: October 30, 2026<br>Time: 10:00 a.m.<br>Judge: Hon. Charles R. Breyer<br>Location: Courtroom 6, 17th Floor |

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

STATEMENT OF INTEREST OF *AMICI CURIAE* ........ 1

SUMMARY OF ARGUMENT ........ 4

ARGUMENT ........ 4

I. DEFENDANTS' REPRODUCTION OF LITERARY WORKS FOR PURPOSES OF TRAINING STORYWRITER WAS NOT FAIR USE ........ 4

A. Copying Literary Works for Purposes of Training StoryWriter is Not Transformative ........ 4

1. The Supreme Court's *Warhol* Decision Confirmed That A Superseding Use is Not Transformative Under §107(1) ........ 4

2. Defendants' Cited Authorities Are Inapposite ........ 5

B. Copying Literary Works for Purposes of Training StoryWriter Harms the Actual or Potential Market For or Value Of the Copied Literary Works ........ 6

1. Lost Licensing Opportunities Are Cognizable Market Harm ........ 6

2. Market Dilution Is Cognizable Market Harm ........ 7

3. Dilution Is Occurring in the Market for Literary Works ........ 9

4. Authors Are Being Harmed by Market Dilution, and AI Generated Books Intended to Substitute for Human Written Ones, Which Reduces Their Incentive to Create New Expression ........ 10

C. Copying Literary Works for Purposes of Training StoryWriter Does Not Serve the Purposes of Copyright, But Is Antithetical to Those Purposes ........ 12

CONCLUSION ........ 12

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*A.V. v. iParadigms, LLC*,
562 F.3d 630 (4th Cir. 2009) .......... 12

*American Geophysical Union v. Texaco*,
60 F.3d 913 (2d Cir. 1994) .......... 6

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) .......... 4, 5, 6

*Author's Guild Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) .......... 5, 12

*Cambridge Univ. Press v. Albert*,
906 F.3d 1290 (11th Cir. 2018) .......... 7

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......... 7, 8, 9

*Capitol Records LLC v. ReDigi Inc.*,
910 F.3d 649 (2d Cir. 2018) .......... 12

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) .......... 5, 6, 12

*Harper & Row v. Nation Enters.*,
471 U.S. 539 (1985) .......... 7

*Kadrey v. Meta Platforms*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) .......... 7, 8

*Monge v. Maya Magazine, Inc.*,
688 F.3d 1164 (9th Cir. 2012) .......... 6, 7

*Princeton Univ. Press v. Michigan Document Serv.*,
99 F.3d 1381 (6th Cir. 1996) *(en banc), cert. denied*, 520 U.S. 1156 (1997) .......... 6

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) .......... 5, 6

*Sony Comput. Ent. Inc. v. Connectix, Inc.*,
203 F.3d 596 (9th Cir. 2000) .......... 5, 6

*Sony Corp. of America v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) .......... 7

*Thomson Reuters Enterprise Centre GmbH v. Ross Intelligence Inc.*,
765 F. Supp. 3d 382 (D. Del. 2025) .......... 5, 6

*Walker v. University Books*,
602 F.2d 859 (9th Cir. 1979) .......... 6

**Statutes & Other Authorities:**

17 U.S.C. § 106 .......... 6

17 U.S.C. § 107(1).......... 4, 5

17 U.S.C. § 107(4).......... 6, 8, 9, 10

AI Licensing for Creative Works, https://copyrightalliance.org/artificial-intelligence-copyright/licensing/ .......... 6

Eric Topol, https://www.linkedin.com/posts/eric-topol-md-b83a7317_fraud-alert-i-have-nothing-to-do-with-these-activity-7361883236672720896-m7EH .......... 10-11

*Generative AI floods and dilutes the market for books* (T. Chakrabarty, X. Liu, J. Ginsburg, & P. Dhillon; arXiv:2607.20349v2 [cs.CL]).......... 9, 10

Jane Friedman, https://janefriedman.com/i-would-rather-see-my-books-pirated/ .......... 10

Stephanie Land, https://web.archive.org/web/20240401134908/https:/stephanieland.substack.com/p/amazons-pirated-copy-of-maid.......... 11

U.S. Copyright Office report, *Copyright and Artificial Intelligence, Part 3* (May 2025) .......... 6, 8

*Who Is Blake Whiting?* The American Scholar, April 16, 2026, *available at* https://theamericanscholar.org/who-is-blake-whiting/ .......... 10

**PRELIMINARY STATEMENT**[1]

The Authors Guild, Inc., the National Press Photographers Association, the American Society of Media Photographers, Romance Writers of America, Inc., the Digital Media Leadership Alliance, the Association of American Literary Agents, the American Society for Collective Rights Licensing, the Society of Composers & Lyricists, the Dramatists Guild of America, Inc., the Graphic Artists Guild, and American Photographic Artists (collectively, "*Amici*") respectfully submit this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment.

**STATEMENT OF INTEREST OF *AMICI CURIAE***

The *Amici* are organizations that represent the interests of writers and other creators.

Founded in 1912, *Amicus* The Authors Guild, Inc. (the "Guild") is a national non-profit association of over 18,000 professional, published writers of all genres including periodicals and other composite works. The Guild counts among its members the full spectrum of American authors, including novelists, historians, biographers, academicians, journalists, and other writers of nonfiction and fiction. The Guild works to promote the rights and professional interests of authors in various areas, including copyright, freedom of expression, and fair pay. Many Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. The Guild's members are the creators on the front line, fighting for their constitutional rights under copyright to reap financial benefits from their labors.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in the creation, editing and distribution of copyrighted works. NPPA's members include television and still photographers, editors, students, and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, as the *Voice of Visual Journalists*, NPPA has vigorously promoted and defended the rights of photographers and journalists, including copyright and freedom of the press in all its forms, especially as it relates to visual journalism.

---

[1] Neither the parties nor their counsel have authored this brief, and neither they nor any other person or entity other than counsel for *amici curiae* contributed money that was intended to fund preparing or submitting this brief. Counsel for Plaintiffs consent to the filing of this brief. Counsel for Defendants did not respond to *Amici*'s request for consent to file.

The American Society of Media Photographers ("ASMP") is a 501(c)(6) not-for-profit trade association, established in 1944 to protect and promote the interests of professional photographers who earn their living by making photographs intended for publication, licensing fees, and other compensation derived from the bundle of rights arising under the Copyright Act. With more than 7,400 Members worldwide working in every genre of photography, ASMP is a leading trade organization representing professional photographers' and visual creators' interests.

Romance Writers of America, Inc. ("RWA"), founded in 1980, is a nonprofit trade association, with a membership of more than 1,500 romance writers and related industry professionals, whose mission is to advance the professional interests of career-focused romance writers through networking and advocacy. RWA works to support the efforts of its members to earn a living, to make a full-time career out of writing romance – or a part-time one that supplements their main income.

The Digital Media Leadership Alliance ("DMLA") is a New York not for profit trade association of 48 companies, including Getty Images, Shutterstock and Alamy, operating throughout the visual media ecosystem, including some of the world's largest licensors and distributors of photography, illustration, video and other visual works, sound, as well as technology companies including Wirestock, Bria AI and MediaViz AI, developing tools for rights management, provenance, authentication, and responsible artificial intelligence. Collectively, DMLA member companies represent, license, distribute, or provide market access for the works of millions of photographers, illustrators, videographers, and other creators worldwide.

The Association of American Literary Agents ("AALA") is a 501(c)(6) organization of over 800 literary agency professionals. By requiring members to subscribe to its rigorous Canon of Ethics, the AALA upholds the highest ethical standards for agency professionals. Recognizing the historically exclusive nature of publishing, the AALA is also committed to engendering a more diverse, equitable, participatory, and inclusive publishing community. The AALA views the role of an agent as a staunch defender of creators' rights. As such, the AALA zealously protects the interests of not only its members but also their clients, the authors, illustrators, and literary rights holders whose creative works form the basis for the global publishing industry.

The American Society for Collective Rights Licensing ("ASCRL") is the largest not-for-profit trade association in the U.S. for photographers and illustrators and is the largest collective management society in the U.S. for this constituency. ASCRL distributes millions of dollars each year in collective rights revenue to U.S. and foreign visual authors. with works published in the United States. ASCRL is a zealous defender of the primary

rights of photographers and illustrators and promotes the collective administration of secondary rights as a means of advancing and preserving the marketplace for its photographer and illustrator members.

The Society of Composers & Lyricists ("SCL") is the primary organization for professional film, television, video game, and musical theatre composers and lyricists, and those working in the industry such as orchestrators, arrangers, music supervisors, music agents, music attorneys, music editors, copyists, recording engineers, and allied professions, with a distinguished 81-year history in the fine art of creating music for visual media. SCL members include the foremost professionals in their fields whose experience, expertise and advocacy are focused on artistic, technological, legislative, legal, newsworthy and other issues as they relate to media music creators.

The Dramatists Guild of America, Inc. (the "Guild") is a trade association that has been advocating for the professional interests of theater writers since 1912. The Guild formed the Dramatist Legal Defense Fund in 2009 to focus on the issues of copyright protection and free expression in the dramatic arts. The rights of dramatists to own their copyrights and to control their work are the founding principles on which the Guild is based, and these rights depend on a robust ecosystem of non-profit theaters around the country being able to produce new dramatic works in their communities that represent the full spectrum of American society.

The Graphic Artists Guild ("the Guild") is a national advocacy organization founded in 1967 that represents the professional interests of graphic artists, including illustrators, cartoonists, comic artists, animators, graphic designers, and web and production artists. For nearly six decades the Guild has worked to protect the economic and authorship rights of working artists, including through its industry standard Graphic Artists Guild Handbook: Pricing & Ethical Guidelines, now in its 17th edition. Many Guild members are authors, coauthors, and illustrators of literary works, including graphic novels, comics, and children's books, and earn their livelihoods licensing their creative work. The Guild's members face the same unlicensed copying and the same market dilution at issue in this case, in both the literary and visual art markets.

American Photographic Artists ("APA") is a 501(c)(6) not for profit organization run by, and for, professional photographers. Since 1981 APA has focused on the concerns of photographers working in the commercial advertising. corporate and editorial sectors. Recognized for its broad industry reach, APA works to champion the rights of photographers and image-makers worldwide and advocate on their behalf.

## SUMMARY OF ARGUMENT

The Defendants' asserted fair use defense must be rejected. The unauthorized reproduction and distribution of the Plaintiffs' copyrighted works was not a transformative use under governing U.S. Supreme Court precedent because the purpose of Defendants' StoryWriter platform was the same as, or highly similar to, the purpose of the Plaintiffs' works. The intermediate-copying cases on which Defendants rely are inapposite because they concerned reverse engineering that was functionally required to access the unprotected ideas embodied in computer programs; no such copying is necessary with respect to Plaintiffs' literary works. Defendants' conduct has harmed and will continue to harm the market for, and value of, Plaintiffs' works because (a) it bypasses the existing licensing market through which authors and publishers make their works available for AI training, (b) it is used to create direct market substitutes of Plaintiffs' works, and (c) it dilutes the market for Plaintiffs' works by flooding the book market with essentially cost-free AI-generated substitutes.

Authors are being harmed through lost sales, as they face market competition and reputational injury from AI-generated derivatives of their own works, and from spurious AI works falsely sold under the names of legitimate authors. The flood of AI-generated books that StoryWriter is designed to create undermines the basic Constitutional purpose of copyright and provides no offsetting copyright-related public benefit. To the contrary, Defendants' copying and its intended consequences harm the public, as well as authors, by polluting and cannibalizing the market for human-created authorship with badly written, un-vetted, falsely attributed AI output.

## ARGUMENT

### I. DEFENDANTS' REPRODUCTION OF LITERARY WORKS FOR PURPOSES OF TRAINING STORYWRITER WAS NOT FAIR USE

#### A. Copying Literary Works for Purposes of Training StoryWriter is Not Transformative.

##### 1. The Supreme Court's *Warhol* Decision Confirmed That A Superseding Use is Not Transformative Under §107(1).

In *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith,* 598 U.S. 508 (2023) ("*Warhol*") the U.S. Supreme Court recently confirmed that the focus of the transformative use inquiry is "whether the new use served a purpose distinct from the original, or instead superseded its objects. That was, and is, the 'central' question under the first factor." *Id.* at 1282-1283. *Warhol* frames this as a "matter of degree," not an either/or determination, *id.,* and requires courts to weigh the similarity of purpose and the commerciality of the use: "[i]f an original work and a

secondary use share the same or highly similar purposes, and the second use is of a commercial nature, the first factor is likely to weigh against fair use." *Id.* at 532-33.

Here, Defendants' copying was commercial, and served the specialized, superseding purpose of generating fiction through the StoryWriter platform. This cannot be deemed transformative under §107(1). *See also, Author's Guild Inc. v. HathiTrust,* 755 F.3d 87, 96 (2d Cir. 2014) (transformative work "serves a new and different function from the original work").

In the AI context, the Court in *Thomson Reuters Enterprise Centre GmbH v. Ross Intelligence Inc.*, 765 F. Supp. 3d 382 (D. Del. 2025) relied on this principle to reject an asserted fair use defense where defendant trained its AI legal research platform on content from the headnotes of the West case-law reporters. Under the first statutory factor, the Court applied *Warhol* to hold that the use was not transformative.

The *Ross* Court found that Ross and West both used the headnotes for "the same or highly similar purposes," *i.e.* to make a legal research tool, even though the West headnotes themselves did not appear in the output of Ross's tool.[2] Here, as in *Ross* (as also in *Warhol*) the Defendant's use had one purpose, and that purpose was highly similar to the purpose of plaintiff's works. Unlike a general-purpose AI tool, such as ChatGPT, which might be put to an infinite variety of end uses, Defendants' StoryWriter is purpose-built to create "stories," to be read by humans. Thus, as in *Ross* and *Warhol*, the use was superseding, not transformative.

**2. Defendants' Cited Authorities Are Inapposite.**

Defendants rely heavily on several so-called intermediate copying cases, including *Sony Comput. Ent. Inc. v. Connectix, Inc.*, 203 F.3d 596 (9th Cir. 2000)("*Sony v. Connectix*") and *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992)("*Sega*") and the U.S. Supreme Court's ruling in *Google LLC v. Oracle America, Inc.*, 593 U.S.1 (2021). This reliance is misplaced. As an initial matter, courts recognize without exception that unauthorized

---

[2] Unlike the StoryWriter product in this case, the Defendant's product in *Ross* was not a generative AI platform, but that has no bearing on the persuasive force of the Court's ruling in *Ross*. Defendant here engaged in exactly the same copying activity that Ross did, *i.e.* reproducing plaintiff's literary works to train an AI model, and selling that model to allow users to produce non-infringing, yet competing, output. This was held infringing because of its superseding purpose ("Ross took the headnotes to make it easier to develop a competing legal research tool. So Ross's use is not transformative"). *Ross* at 399. It is no less infringing here.

copying constitutes a *prima facie* infringement of the reproduction and/or derivative work right under §106, even when such copying may be merely an "intermediate" step in creating a final product.[3]

*Sega, Sony v. Connectix* and *Google v. Oracle* do not question this conclusion. However, all three cases found fair use in the specific context of copying of computer programs for functional purposes, such as disassembling or "reverse-engineering" plaintiff's code to discover the unprotectable underlying ideas and functional elements embodied in it. The Court in *Ross* held these cases inapposite in light of *Warhol,* because

> the intermediate-copying cases (1) are computer-programming copying cases; and (2) depend in part on the need to copy to reach the underlying ideas. Neither is true here. Because of that, this case fits more neatly into the newer framework advanced by *Warhol*.

*Ross* at 399.

Here as in *Ross*, the Plaintiffs' works are literary texts, not software, and need not be copied to access their underlying ideas. Therefore, the intermediate copying cases are inapplicable.

### B. Copying Literary Works for Purposes of Training Story Writer Harms the Actual or Potential Market For or Value Of the Copied Literary Works.

#### 1. Lost Licensing Opportunities Are Cognizable Market Harm.

It is well-settled that courts may consider lost licensing opportunities as a form of market harm under § 107(4). *See Monge v. Maya Magazine, Inc.*, 688 F.3d 1164, 1182 (9th Cir. 2012) (no fair use where "licensing value" was "severely diminished"), *American Geophysical Union v. Texaco*, 60 F.3d 913, 929-930 (2d Cir. 1994) (considering lost license fee as market harm under fourth factor, where such licenses were readily available). *See also Princeton Univ. Press v. Michigan Document Serv.*, 99 F.3d 1381, 1386-87 (6th Cir. 1996) (*en banc*), *cert. denied*, 520 U.S. 1156 (1997) (rejecting contention that consideration of lost licensing revenues under fourth factor was "circular"); U.S. Copyright Office report, *Copyright and Artificial Intelligence, Part 3* (May 2025) at 71 ("Where licensing markets are available to meet AI training needs, unlicensed uses will be disfavored under the fourth factor").

In the context of using literary works to train AI models, an active licensing market presently exists, both for direct licenses from copyright owners and for licenses from collective licensing organizations.[4] Because many authors and publishers make such licenses available, the use of copyright owners' works without a license would

---

[3] *See, e.g., Walker v. University Books,* 602 F.2d 859, 864 (9th Cir. 1979)("[T]he fact that an allegedly infringing copy of a protected work may itself be only an inchoate representation of some final product to be marketed commercially does not in itself negate the possibility of infringement").

[4] See https://copyrightalliance.org/artificial-intelligence-copyright/licensing/

create direct market substitutes for the publishers' extensive licensed offerings. The fourth factor, "undoubtedly the single most important element of fair use," *Harper & Row v. Nation Enters.*, 471 U.S. 539, 566 (1985), would thus clearly "weigh heavily" against Defendants and "strongly disfavor fair use." *Cambridge Univ. Press v. Albert,* 906 F.3d 1290, 1302 (11th Cir. 2018).

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) and the Copyright Act both make clear, however, that an actual, current market for licensed uses need not exist in order for the fourth factor to weigh against fair use. The Act refers to the "*potential* market for, or value of" the copyrighted work, and *Campbell* recognizes that this market extends to any "market for potential derivative uses" that "creators of original works *would in general* develop or license others to develop." *Campbell*, 510 U.S. at 592 (emphasis added).[5]

**2. Market Dilution Is Cognizable Market Harm.**

This Court in *Kadrey v. Meta Platforms,* 788 F. Supp. 3d 1026 (N.D. Cal. 2025) identified a form of market harm that applies even to transformative uses: market dilution, *i.e.* the potential harm caused by a vast quantity of AI-generated output that is not similar enough to infringe the plaintiffs' works, but could nonetheless "compete with the originals and thereby indirectly substitute for them." *Id.* at 1051. The *Kadrey* Court reasoned as follows:

> Assume for this discussion that people can (or will soon be able to) use LLMs to generate massive amounts of text in significantly less time than it would take to write that text, and using a fraction of the creativity. People could thus use LLMs to create books and then sell them, competing with books written by human authors for sales and attention. Indeed, to some extent, this appears to be occurring already—one expert for the plaintiffs briefly discusses reports of AI-generated books "flooding Amazon." [Record citation omitted.] People might even be motivated to make those books available for free, given how easily it will presumably be to prompt an LLM to create them. Harm from this form of competition is the harm of market dilution.

*Id.* at 1052.

Meta argued in *Kadrey* that such market dilution "does not count under the fourth factor," that only "regurgitated" or substantially similar output could cause cognizable market harm - "[b]ut that can't be right," the Court concluded:

---

[5] This remains true even where a particular author or publisher has chosen *not* to license their works for AI training, or for any other use; the business judgment of the copyright owner should be respected. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 447 (1984)("It is not the role of the courts to tell copyright holders the best way for them to exploit their copyrights"); *see also, Monge v. Maya Magazines, Inc.,* 688 F.3d 1164, 1182 (9th Cir. 2012) (copyright owner has exclusive right to determine "when, whether and in what form to release" its work into new markets).

> [L]ess similar outputs, such as books on the same topics or in the same genres, can still compete for sales with the books in the training data. And by taking sales from those books, or by flooding stores and online marketplaces so that some of those books don't get noticed and purchased, those outputs would reduce the incentive for authors to create—the harm that copyright aims to prevent. . . . Such competing AI-generated works might create only indirect substitution. But indirect substitution is still substitution: If someone bought a romance novel written by an LLM instead of a romance novel written by a human author, the LLM-generated novel is substituting for the human-written one.

*Id.* at 1054.

Accordingly, *Kadrey* concluded that "it seems likely that market dilution will often cause plaintiffs to decisively win the fourth factor – and thus win the fair use question overall – in cases like this." *Id.* Part 3 of the U.S. Copyright Office report entitled *Copyright and Artificial Intelligence*, ("Report"), issued prior to the *Kadrey* decision, reached the same conclusion:

> The speed and scale at which AI systems generate content pose a serious risk of diluting markets for works of the same kind as in their training data. That means more competition for sales of an author's works and more difficulty for audiences in finding them. If thousands of AI-generated romance novels are put on the market, fewer of the human-authored romance novels that the AI was trained on are likely to be sold. Royalty pools can also be diluted.

Report at 65.

This Court's emphasis on market dilution in *Kadrey,* and the observations of the Copyright Office in the Report, are fully consistent with the language of § 107(4). The statute broadly requires courts to consider potential harm to the "market for or value of" the copyrighted work, and that value would be directly diminished by the forms of dilution identified in *Kadrey* and the Report. If a reader buys an LLM-generated novel rather than a human-authored one on which the LLM has been trained, as *Kadrey* posits, the market for the human author's work is cognizably harmed.

Moreover, Supreme Court precedent requires courts to consider the effects that could arise if the defendant's conduct were to be "unrestricted and widespread" *Campbell v. Acuff-Rose Music,* 510 U.S. 569, 590 (1994) ("whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market" for the original). Therefore, even though Defendants' training data in this case may not have been widespread enough to include *all* novelists' works, the market-harm analysis must consider

the training data to have been "unrestricted," under *Campbell*. Therefore, both the statute and the caselaw require the Court to weigh § 107(4) in favor of Plaintiffs.

**3. Dilution Is Occurring in the Market for Literary Works.**

This Court need not speculate about the harm that AI-generated text is doing to the market for authors' original works. The damage is demonstrably real. On July 26, 2026, a group of respected economists and a distinguished copyright scholar published an empirical study that "sets out to measure what generative AI has done to a real book market once its output reached the catalog and competed for sales." *Generative AI floods and dilutes the market for books* (T. Chakrabarty, X. Liu, J. Ginsburg, & P. Dhillon; arXiv:2607.20349v2 [cs.CL])("Study") at 1. The Study, which examined books sold between 2023 and mid-2026, identified an enormous increase of titles, many containing substantial AI text, and sharply declining revenue per book across all titles. It concluded that "books with no AI text lose the most ground in genres with high AI diffusion," *id.* It is the authors who actually write their own books, whom the Constitution sought to incentivize, who suffer the most from this onslaught of AI-generated competition.

The corpus of the Study was "self-published genre fiction sold primarily on Amazon," as the authors noted that self-publishing "constitutes the bulk of U.S. book production." *Id.* at 2:

> When a large supply of cheap-to-produce titles enters a market faster than the sales, revenue and top ranks available to absorb them, the return and attention left for the average title both fall. We call this dilution. . . . Our findings reveal a market remade by scale. Books with substantial AI text enter the catalog far faster than the revenue available to absorb them, *push down the return that each title earns*, and contest the top ranks, while the books with AI text that succeed draw most heavily on the distinctive language of existing books. This restructuring of a creative labor market bears directly on the market-effect question now central to copyright law.

*Id.* (emphasis added).

The share of total sales of AI-generated books, defined as books whose text is more than 25% AI-generated, rose "from near zero in early 2023 to roughly 20% by 2026 Q2 . . . while the share of new top-25 [AI-generated] entrants rose from near zero to 31%." *Id.* at 4. The result of this massive incursion of AI text into the book market is that "[f]ar more books now compete for revenue that grew at a fraction of that pace, so the revenue each selling book earns has fallen." *Id.* Specifically, the Study observes that during the 2023-2026 period, the total catalog of literary works available on Amazon.com grew by 38.3x, while sales grew by only 7.3x, see Study at 6, Fig, 2.A. As a result, "revenue per book declined." *Id.* at 8.

Significantly, the Study concluded that the success of AI-generated texts in this marketplace "does not depend on the quality of what AI produces." *Id.:*

> [A]s substitutable books crowd a market, each one earns less. Generative AI thus reshaped this market without competing on quality at all, displacing revenue and top ranks through sheer volume of books alone.

*Id.* at 9.

Moreover, the most successful AI-generated books were those that copied the greatest amount of "rare language" from human-authored books: "Among the highest earners, books that contain substantial AI text reused rare language from existing books at higher rates than the top-selling books with no AI text." *Id.*

The ultimate conclusion of the Study is that "books with 'no AI text' … as a category, *earned less* than human-written books earned *before AI-content books began to compete with them." Id.* at 10 (emphasis added). This delta, the difference between what human authors earned from their works pre-AI and post-AI, is exactly the market harm recognized under §107(4).

**4. Authors Are Being Harmed by Market Dilution, and AI Generated Books Intended to Substitute for Human Written Ones, Which Reduces Their Incentive to Create New Expression.**

Authors spend their lives honing their craft and building subject matter expertise. It is profoundly distressing for an author who has invested enormous resources into their craft over the decades to see AI generated knockoffs in the marketplace. Journalist Andrew Lawler, writing about the "reshuffling" of his many articles into AI generated books published on Amazon by a non-existent historian "Blake Whiting," characterized the problem as "word-laundering on a truly industrial scale," as opposed to "plagiarism in the old-fashioned sense, in which a few sentences or paragraphs are lifted from a previously published work." *Who Is Blake Whiting?* The American Scholar, April 16, 2026, *available at* https://theamericanscholar.org/who-is-blake-whiting/.

Authors Guild members regularly contact its staff to report knockoff AI-generated books based on their works on Amazon and other online retailers. Such predation of human authored works takes a few different forms. The first is straight up impersonation – someone takes a well-known author's name and starts publishing AI slop under it, capitalizing on the writer or expert's reputation. This can happen to well-known authors and ordinary working writers alike. For instance, writer Jane Friedman last year reported finding a cache of "garbage books" published under her name on Amazon. https://janefriedman.com/i-would-rather-see-my-books-pirated/. Eric Topol,

a well-known physician and public health expert, also had a well-publicized incident when he found dozens of AI generated books attributed to him, ranging from cookbooks to a memoir. https://www.linkedin.com/posts/eric-topol-md-b83a7317_fraud-alert-i-have-nothing-to-do-with-these-activity-7361883236672720896-m7EH. Authors of memoirs are easy victims of unauthorized AI generated biographies, such as Stephanie Land, the best-selling author of "Maid," who reported finding several AI generated biographies that were cribbed from her memoir. https://web.archive.org/web/20240401134908/https:/stephanieland.substack.com/p/amazons-pirated-copy-of-maid.

AI generated content can be deceptive in other ways too, such as using a similar cover design on the same subject as a well-known book or as "companion books" to a successful new or anticipated release. Almost every new book with large pre-sales has one or more AI-generated books on the same subject, or using the same title or a similar author name, that is made available as soon as the human written books is published – with the clear intent to siphon sales from it by using metadata that ensures the AI books appear in search results for the human authored book.

In some cases, the targeted books and articles are on highly specialized topics and the product of years of careful study, such as the works of Eric Cline, a historian, archaeologist, professor and author of the popular *1177 B.C.: The Year Civilization Collapsed*, published by Princeton University Press. Cline's book has been the target of dozens of AI-generated knockoffs, including *1177 BC Revisited: Technology, Trade, and the Bronze Age Collapse; The Untold Story of Ancient Civilizations' Greatest Catastrophe* by Blake Whiting. When the Authors Guild complained to Amazon about these books, they were taken down, but then put back up with slight changes, such as using a slightly modified author name—for instance, "Brendol Whiting" was used at one point in place of "Blake Whiting." The knockoffs of Cline's books also included books that took his book's title word for word while omitting the punctuation.

The AI knockoffs reported to the Authors Guild are just the ones that authors have found and taken the time to report. It is impossible to know the precise frequency of such books in the Amazon marketplace because the books can be quickly reused or regenerated in ways that might evade detectors, creating an endless whack-a-mole scenario. When these books are purchased in place of the human, expert author's book, the value of the author's investment – time, resources, and labor – is diminished. What's more, there is an undeniable psychological and reputational impact on an author who has spent their lifetime developing their voice or building expertise in a subject only to have their work replaced by AI generated knockoffs that do not include citations, are not factually vetted, and contain all sorts of errors. The substitution of sales from authoritative, well-researched, and well-written books to dubious AI

generated books not only impacts the author, but is a risk overall to the availability of reliable, authoritative, and factually accurate knowledge to the public. The problem of AI knockoffs is not limited by genre. Fiction writers who spend years constructing imaginative worlds and defining their own unique voices and styles are as vulnerable to copycat books. The AI deluge is indiscriminate.

### C. Copying Literary Works for Purposes of Training StoryWriter Does Not Serve the Purposes of Copyright, But Is Antithetical to Those Purposes.

When evaluating an asserted fair use defense, courts also may consider the public benefit that flows from a defendant's use. *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021)*; Capitol Records LLC v. ReDigi Inc.*, 910 F.3d 649, 661 (2d Cir. 2018) (no cognizable public benefit, where copying "encroach[es] on the commercial entitlements of the rights holder"). Cases weighing public benefits in defendant's favor, *e.g.*, creating a searchable text database for scholars, *Author's Guild Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014), or for detecting academic plagiarism, *A.V. v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009), or the reproduction of computer code for purposes of reverse engineering, *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021), all differ from this case in one critical respect – these activities do not create market substitutes for plaintiffs' works.

As the Supreme Court held in *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1 (2021) at 35–36, public benefits must be "related to copyright's concern for the creative production of new expression." Thus, any asserted public benefits flowing from Defendants' copying must not be allowed to overcome the fundamental goal of copyright, to provide an incentive for creators. Defendants' StoryWriter does not serve that purpose, but instead directly undermines the incentive that the Constitution empowered Congress to create. Accordingly, public benefit cannot provide any basis on which this Court can hold Defendants' copying to be a fair use.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Plaintiffs' Motion dated June 29, 2026, the Defendants' motion for summary judgment should be denied in all respects.

Dated: August 27, 2026

Respectfully submitted,

*/s/ Timothy W. Grinsell*

Timothy W. Grinsell
Robert W. Clarida
**REITLER KAILAS & ROSENBLATT LLP**
885 Third Avenue, 20th Floor
New York, NY 10022
Tel: (212) 209-3050
tgrinsell@reitlerlaw.com

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney admitted to practice before this Court, certifies that on August 27, 2026, he caused a true and correct copy of the foregoing document to be served using the Court's electronic filing system, which will send electronic notification of such filing to all parties that have appeared in this action.

/s/ Timothy W. Grinsell
Timothy W. Grinsell