# Exhibit A

ERIC P. TUTTLE, State Bar No. 248440
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
701 Fifth Avenue, Suite 5100
Seattle, WA 98104-7036
Telephone: (206) 883-2500
Facsimile: (866) 974-7329
Email: eric.tuttle@wsgr.com

PAUL N. HAROLD, State Bar No. 301771
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1700 K Street NW
Washington, DC 20006
Telephone: (202) 973-8800
Facsimile: (866) 974-7329
Email: pharold@wsgr.com

*Attorneys for amici curiae the Computer and Communications Industry Association, A.I. Progress, Inc., and NetChoice, LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

*In re Mosaic LLM Litigation*

Master File Case No. 3:24-cv-01451-CRB
Consolidated with Case No. 3:24-cv-02653-CRB

**BRIEF OF THE COMPUTER AND COMMUNICATIONS INDUSTRY ASSOCIATION, A.I. PROGRESS, INC., AND NETCHOICE, LLC AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before: Hon. Charles R. Breyer

Date: October 30, 2026
Time: 10:00 a.m.
Location: Courtroom 6, 17th Floor

# TABLE OF CONTENTS

**Page**


INTRODUCTION AND SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 2

I. The Purpose of the Copyright Act, and of Fair Use in Particular, Is to Promote Progress—Not Protectionism. ........ 2

II. Training Generative AI Models Is a Transformative Use. ........ 7

III. Plaintiffs' Market Dilution Theory Misconstrues the Fair Use Inquiry and Is Antithetical to the Purposes of Copyright. ........ 11

CONCLUSION ........ 15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ... 7, 8

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) ... 8

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) ... 1, 8, 9

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ... 1, 6, 9, 14

*Burrow-Giles Lithographic Co. v. Sarony*,
111 U.S. 53 (1884) ... 5, 6

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ... 1, 7, 9, 10, 13

*Eldred v. Ashcroft*,
537 U.S. 186 (2003) ... 14, 15

*Feist Publ'ns Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ... 3, 7

*Fogerty v. Fantasy, Inc.*,
510 U.S. 517 (1994) ... 5

*Fox Film Corp. v. Doyal*,
286 U.S. 123 (1932) ... 3

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) ... 1, 2, 3, 4, 6, 7, 8, 12, 13

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) ... 1, 9, 11

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) ... 9

*Kepner-Tregoe, Inc. v. Leadership Software, Inc.*,
12 F.3d 527 (5th Cir. 1994) ... 12

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ... 9

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) ... 1, 14

*Sony Computer Ent., Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) ... 1, 2, 14

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ... 3, 4

*Stewart v. Abend*, 495 U.S. 207 (1990) ... 3

*Thaler v. Perlmutter*, 130 F.4th 1039 (D.C. Cir. 2025) ... 6

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975) ... 1, 2, 3, 12, 14

*United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948) ... 3

*Williams & Wilkins Co. v. United States*, 487 F.2d 1345 (Ct. Cl. 1973) ... 4

*Woodland v. Hill*, 136 F.4th 1199 (9th Cir. 2025) ... 12

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. art. I, § 8, cl. 8 ... 1, 2, 7, 12

17 U.S.C. § 106 ... 3

17 U.S.C. § 107 ... 3, 6, 13

## OTHER AUTHORITIES

Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 Chi.-Kent J. Intell. Prop. 1 (Feb 18, 2026) ... 14

H.R. Rep. No. 94-1476 (1976) ... 3

## INTRODUCTION AND SUMMARY OF ARGUMENT

The fair use doctrine exists to ensure that copyright's limited monopoly does not "stifle the very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994). Training a generative AI model is a paradigmatic application of that principle—and one already being deployed in a wide range of innovative contexts and applications. Developers engage in intermediate, non-expressive copying of works—not to enjoy, display, or distribute them, but to build a fundamentally new kind of tool: one that analyzes statistical relationships among words and word fragments to enable human users not only to create *new* expression, but also to answer factual research questions, detect fraud, classify and organize information, assist people with disabilities, and achieve many other goals.

Courts have consistently held that such transformative uses further the constitutional objective of promoting the "Progress of Science and useful Arts," even when the development process involves large-scale reproduction of copyrighted material. *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 30 (2021); *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015). The Ninth Circuit has long recognized that fair use protects copying of copyrighted content undertaken to create new tools and information-access technologies, even where the tools are ultimately used to create new works that represent competition for the rightsholder. *See Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1527-28 (9th Cir. 1992); *Sony Computer Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 603 (9th Cir. 2000). Two federal courts have now squarely addressed the question presented here—whether use of copyrighted material in the process of training a generative AI model is a fair use—and reached the same conclusion: It is. *See Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007 (N.D. Cal. 2025); *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025). This Court should join them.

*Amici curiae* submit this brief to address three points. First, the purpose of the Copyright Act in general, and the fair use doctrine in particular, is to promote "Progress." U.S. Const. art. I, § 8, cl. 8. Thus, copyright grants no exclusive right over all "uses" of a work, but instead grants limited exclusive rights to "serve the cause of promoting broad public availability of literature, music, and the other arts." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).

Affording fair use protection to generative AI training is fully consistent with that purpose. Plaintiffs' contrary argument—that AI training is antithetical to the purposes underlying fair use because it lacks human authorship at the output stage—misreads the doctrine's foundation, is inconsistent with settled law, and ignores how AI models actually work and how people use them.

Second, training a generative AI model is among the most clearly transformative uses a court has been asked to evaluate. The copyrighted works are not copied to be consumed or distributed; they are analyzed to extract statistical patterns that enable a tool to generate new text or other output at the direction of a human user. Both the purpose and the character of this use are categorically different from the original purpose and character of the underlying works.

Third, Plaintiffs' market-dilution theory of harm misconstrues the fourth fair use factor and is contrary to the purposes of copyright. Neither the Supreme Court nor the Ninth Circuit has ever adopted a theory under which the creation of new, non-infringing expression constitutes cognizable market harm. To the contrary, both courts have recognized that copyright does not confer a monopoly against competition; fair use exists to prevent incumbent rightsholders from strangling the technologies that others will use to add to the store of human creativity and expression. *E.g.*, *Google*, 593 U.S. at 35; *Connectix Corp.*, 203 F.3d at 603.

## ARGUMENT

### I. The Purpose of the Copyright Act, and of Fair Use in Particular, Is to Promote Progress—Not Protectionism.

Plaintiffs contend that using copyrighted works to train generative AI is inherently contrary to the purpose of fair use because "the fundamental purpose of the Copyright Act" is "the incentive for human creation," which the outputs of generative AI tools lack. ECF No. 403 ("Pls. Opp'n") at 22. Plaintiffs' argument misapprehends the purpose of copyright and fair use, as well as generative AI's function as a tool in assisting with, rather than replacing, human creativity.

The Constitution makes clear that copyright's exclusive rights are a means to serve the public end of "promot[ing] the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. As the Supreme Court explained in *Aiken*, "[c]reative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of

literature, music, and the other arts." 422 U.S. at 156. The "immediate effect" of copyright is to secure "a fair return for an 'author's' creative labor," but its "ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good." *Id.* And the Court has emphasized that this purpose has particular force in the face of new technology: When "technological change has rendered [the Act's] literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose." *Id.* The Court has reaffirmed that principle for nearly a century. *See, e.g.*, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 352-354, 364 (1991) (rejecting the so-called "sweat of the brow" doctrine that provided copyright protection solely as a "reward for the hard work" of authorship); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 158 (1948) ("The copyright law, like the patent statutes, makes reward to the owner a secondary consideration."); *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) (the "primary object" in conferring copyright monopoly is the public benefit). Consistent with this settled understanding of copyright's constitutional purposes, Congress codified fair use in the 1976 Copyright Act. *See* H.R. Rep. No. 94-1476 at 66 (1976) ("Section 107 is intended to restate the present judicial doctrine of fair use ….").

That is why the Copyright Act carefully balances incentives to authors—as one mechanism to promote publication—against other interests, including the public's access to information and the ability of others to build upon earlier work. The Act "has never accorded the copyright owner complete control over all possible uses of his work." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. at 432. Rather, the Act grants only certain enumerated rights, 17 U.S.C. § 106, and creates a limitation for fair uses, 17 U.S.C. § 107—even where those uses might diminish the incentives otherwise granted to authors. This design reflects a normative judgment: Copyright exists to serve the public's interest in access to a growing universe of useful information, and the exclusive rights the Act confers on authors are calibrated to that purpose.

Against this backdrop, fair use "permits courts to avoid rigid application of the copyright statute" when it would suppress innovation and creativity. *Google*, 593 U.S. at 18 (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)). The Supreme Court has accordingly recognized that copyright does not grant incumbents a veto over new technologies merely because they introduce

competitive efficiencies or alter established markets. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. at 429.

History confirms the point. Nearly every major technological disruption in the production or distribution of creative works was met by predictions from incumbent rightsholders that the new technology would destroy creativity. The educational publishing industry worried that photocopiers and their widespread use by librarians and educators would eviscerate the market for their works, but the industry grew alongside photocopying and attendant benefits to science and scientific progress. *See Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 1353 (Ct. Cl. 1973). The movie and television industry predicted that home video recording would be its undoing; the Supreme Court held otherwise, *see Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. at 456 (holding that time-shifting via VCR was fair use), home video became one of Hollywood's most lucrative revenue streams, and the industry thrived. Today, Plaintiffs claim that generative AI models trained on their books will somehow replace human writers. Pls. Opp'n 13-14, 22. In each prior instance, the technology that incumbents opposed resulted not in less creativity, but in more—more creators, more works, more competition, and broader public access to new knowledge and information. Plaintiffs' arguments in this case are the latest iteration of a familiar and wrongheaded refrain.

The Supreme Court's decision in *Google LLC v. Oracle Am., Inc.* illustrates the point. Google duplicated thousands of lines of code from Oracle's Java SE application programming interface in the process of creating Android—a new platform for software developers building new applications in an entirely new computing environment: mobile devices. 593 U.S. at 11, 27-28. The Court found this use of code from the copyrighted API transformative because Google's purpose—creating a "distinct and different computing environment" for software development—was fundamentally different from Oracle's purpose in creating Java for desktops and laptops. *Id.* at 29-33. And the Court warned that allowing Oracle to "hold the key" to controlling all such developmental use risked harm to the public and could hinder "creative improvements" such as "new applications" and "new uses"—a result that "would interfere with, not further, copyright's basic creativity objectives." *Id.* at 35, 39. Just as allowing Oracle to lock up the Java API code

would have stifled the very creativity copyright is meant to foster, allowing copyright holders to lock up copyrighted works and prevent their use as training data would stifle the vast downstream creativity that generative AI enables.

Plaintiffs resist this conclusion by arguing that copyright fosters exclusively human authorship and that its fundamental purpose is to "presev[e] the incentive for human creation." Pls. Opp'n 22; *see also id.* at 13 (arguing that "'training generative AI models'" will "'undermine the incentive for human beings to create things the old-fashioned way'" (quoting *Kadrey*, 788 F. Supp. 3d at 1034-1035)). This argument mistakes one mechanism for incentivizing new works (granting limited rights to authors) with the purpose of the Copyright Act more generally—and, critically, with the purpose of the fair use doctrine, which limits those rights. Fair use is no mere carve-out; it is a mechanism affirmatively designed to serve copyright's broader constitutional purposes of promoting public access, downstream creativity, and progress. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994). Incentivizing human authorship—really, a *particular method* of human authorship—is not the test for fair use.

Plaintiffs' argument that a finding of fair use here would not promote human authorship also fails on its own terms. Plaintiffs ignore how people use AI models. Generative AI models are mere tools—built by human developers and deployed by human users who supply the initiative, intent, judgment, and editorial selection that drive the creative process. Researchers use large language models to synthesize scientific literature across disciplines. Lawyers and clinicians use long-context models to review voluminous case files and medical records—a capability Mosaic itself pioneered. *See* ECF No. 321 ("Defs.' Mot.") at 6. Educators use them to develop tailored instructional materials. Independent creators—authors, musicians, designers—use them to draft, revise, and polish their work. In each case, the human user remains the locus of creative decision-making; the model is the instrument.

This is nothing new. The history of creative expression is the history of humans using ever-more-sophisticated tools to produce works of authorship. The photographer's camera, the writer's typewriter and word processor, the filmmaker's editing software, the musician's digital audio workstation, the graphic designer's software suite—each of these tools performs significant work

in service of the human creator's expressive vision. Generative AI is the latest iteration of this long tradition. Generative AI, like many tools before it, is a tool for computer-assisted human expression, not the computer's own expression.

The Supreme Court settled more than a century ago that creative works produced using new technologies remain the work of human authors. In *Burrow-Giles Lithographic Co. v. Sarony*, the Court upheld copyright in a photograph, rejecting the argument that photography involved a "merely mechanical" process incapable of supporting authorship. 111 U.S. 53, 59 (1884). The photographer's "selecti[on] and arrang[ement]" of the subject—positioning, lighting, costume—constituted the requisite "original intellectual conceptions." *Id.* at 58, 60. For the same reasons, works created by humans using generative AI tools remain eligible for copyright protection.

Plaintiffs invoke *Thaler v. Perlmutter*, 130 F.4th 1039 (D.C. Cir. 2025), Pls. Opp'n 22, for the proposition that "human authorship is [a] prerequisite for protection under the Copyright Act." Pls. Opp'n 22. But *Thaler* addressed only whether a machine itself could be listed as the sole author of a copyrighted work on a registration, and it expressly recognized that "[a]dhering to the human-authorship requirement does not impede the protection of works made with artificial intelligence." 130 F.4th at 1049. Authorship turns on the human contribution to a work, not on whether a machine was used in making it. *Thaler*'s narrow ruling in this rapidly evolving area of law provides no support for shutting down a revolutionary new outlet for human expression; it does not even purport to address fair use for training, which involves the use of inputs rather than authorship of outputs.

Moreover, the humans who build, deploy, and use these models do respond to economic incentives—and they are the very actors whose creative activity the Copyright Act is designed to promote. Developers invest substantial resources in training models. Researchers use them to accelerate scientific discovery and promote knowledge. Users employ them for a wide range of purposes, including to help them create works of authorship that they can publish, distribute, and commercialize. To restrict the ability of these actors to develop and use AI tools for public benefit would subordinate the constitutional purpose of copyright to the protection of incumbent business models. Fair use exists precisely to prevent that result. *See Google*, 593 U.S. at 34.

## II. Training Generative AI Models Is a Transformative Use.

Training a generative AI model is among the most clearly transformative uses courts have ever been asked to evaluate. *Bartz*, 787 F. Supp. 3d at 1033. The training process does not reproduce copyrighted works to perform, display, or distribute them to a new audience; instead, it analyzes these works to extract statistical patterns that enable generative AI models to perform a variety of novel tasks. Both the purpose and the character of this use are categorically different from the expressive purpose and character of the original works. Indeed, the Copyright Act and Supreme Court precedent compel the conclusion that training is transformative.

The first factor in the statutory fair use analysis—"the purpose and character of the use," 17 U.S.C. § 107(1)—turns primarily on whether the challenged use "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S at 579. "[I]t asks, in other words, whether and to what extent the new work is 'transformative.'" *Id*. In *Campbell*, the Supreme Court held that a rap artist's use of a country musician's song was transformative because it used the original work for a fundamentally different purpose: to comment on and criticize the original work. *Id.* at 580-81. The Court emphasized that the "more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.* at 579.

In *Google*, the Court confirmed that this transformative-use analysis is not limited to the context of creative commentary or traditional expressive arts. 593 U.S. at 11. There, Google's copying of code from Oracle's Java software to build the Android smartphone platform was highly transformative because Google's purpose—creating a new platform for software development on mobile devices—fundamentally differed from Oracle's purpose in creating Java for computers. *Id.* at 27-28. The Court reached this conclusion "even though Google's use was a commercial endeavor." *Id.* at 32. Crucially, the Court recognized that Google's copying to build a new tool served "the basic constitutional objective of copyright itself" (*id.* at 30): "'to promote the Progress of Science and useful Arts.'" *Feist*, 499 U.S. at 349 (quoting U.S. Const. art. I, § 8, cl. 8).

Most recently, the Court reaffirmed that the "'central' question" for the first factor is whether the use "adds something new, with a further purpose or different character." *Andy Warhol*

*Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528 (2023) (quoting *Campbell*, 510 U.S. at 579). Cautioning that transformativeness requires more than the mere addition of "new expression" or a new aesthetic, *id.* at 525, the Court held that licensing a downscaled print of an Andy Warhol silkscreen of another artist's photograph of the musician Prince to serve as a magazine illustration depicting the musician was not transformative because in that instance the print was licensed for the exact same purpose as the original photograph. *Id.* at 529-33. Unlike Google's use of Oracle's code in "a new system created for new products," which was in a "distinct and different computing environment," *id.* at 533 n.8, the at-issue "environment" for the Warhol print and the original artist's photo were not in this case "distinct and different," *id.* at 536. *Warhol* therefore reemphasizes that the transformative-use inquiry is purpose-driven: Where the secondary use is for "substantially the same purpose" as the original, the use is not transformative. *Id.* at 526.

Plaintiffs read *Warhol* to mean that a use is non-transformative whenever the resulting technology could be used to produce works in the same general category as the originals, absent "independent justification." Pls. Opp'n 14-15. That inverts the inquiry. *Warhol* turned on the fact that the Warhol print and the original photograph were licensed for the identical use—magazine illustration of the same musician. 598 U.S. at 529-33. Here the original works are novels to be read; the challenged use is the derivation of statistical parameters that no author owns and no human can even read. Defs.' Mot. 11-13.

Taken together, these decisions establish that the transformative-use inquiry asks whether the secondary use serves a genuinely different purpose than the original did. Under this framework, the use of copyrighted works to train a generative AI model serves a different purpose than the original purpose of the works on which the model is trained.

A novel exists to entertain, to provoke thought, and to immerse a reader in a narrative—as Plaintiffs themselves testified. *See* Defs.' Mot. 12. A work of history or reportage exists to inform. A commentary exists to convey specific opinions and expressions to an audience. When developers train a generative AI model on these works, however, the purpose is not to read, enjoy, or convey the expression contained within them. Nor is the purpose of training to provide users with the very same novels, histories, or commentaries on demand; if that were the case, the goal

could be achieved through traditional databases and search algorithms, systems that are vastly simpler and require significantly less capital investment than the neural networks that underlie generative AI. Instead, the purpose is computational: to analyze statistical relationships among oceans of text fragments in order to create *new* products—generative AI models—that can offer the public creative and innovative uses not achievable by the copyrighted materials in the training data. *See Google*, 593 U.S. at 30.

This distinction mirrors a long line of cases establishing that non-expressive uses of expressive works are fair use. For example, in *Authors Guild, Inc. v. HathiTrust*, the Second Circuit ruled that creating a digital database of books to allow users to search for specific terms, and to facilitate access for print-impaired readers, was a transformative use because that use of the books served a different function from the original. 755 F.3d 87, 97-98 (2d Cir. 2014). Similarly, the Second Circuit evaluated Google's copying of tens of millions of books to enable "text mining" and "data mining" tools that track the statistical frequency of words over time, and found the use highly transformative because Google did not copy the books for consumption of their expressive content. *Authors Guild v. Google, Inc.*, 804 F.3d at 209, 217. The Ninth Circuit reached analogous conclusions regarding image search engines, holding that the reproduction of copyrighted images as thumbnails to facilitate a new method of finding information on the internet is a transformative purpose. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-19 (9th Cir. 2003). Training a generative AI model is the natural technological evolution of these judicially-endorsed, non-expressive uses of whole-work copies.

Recognizing that using copyrighted materials to train generative AI models involves fundamentally different purposes than those for which the original materials were created, courts in this district have correctly applied the Supreme Court's transformativeness framework to find that training is transformative. Judge Alsup recognized this distinction in *Bartz*, finding that Anthropic's use of copyrighted books to train its models was "quintessentially transformative" and "among the most transformative many of us will see in our lifetimes." 787 F. Supp. 3d at 1022, 1033. The purpose of using books to train models was not to "replicate or supplant them—but to turn a hard corner and create something different." *Id.* at 1022. Judge Chhabria reached the same

conclusion on the first factor in *Kadrey*, concluding there was "no serious question that Meta's use of the plaintiffs' books had a 'further purpose' and 'different character' than the books—that it was highly transformative." 788 F. Supp. 3d at 1044. "The purpose of Meta's copying was to train its LLMs, which are innovative tools that can be used to generate diverse text and perform a wide range of functions," Judge Chhabria reasoned, while "[t]he purpose of the plaintiffs' books, by contrast, is to be read for entertainment or education." *Id.*

The transformative use inquiry exists to ensure that the limited monopoly of copyright does not "stifle the very creativity which that law is designed to foster." *Campbell*, 510 U.S. at 577. The real-world applications of generative AI models powerfully illustrate the transformativeness of the use. Mosaic was founded to reduce the cost and computing power required to train AI models, and it released the MPT models free of charge as open-source tools for the research community, publishing their code and weights for an audience of developers and researchers rather than consumers. Defs.' Mot. 3, 6. That practice is the foundation of an entire scientific ecosystem: open-weight model releases and openly documented training corpora are what allow university labs, non-profit research institutes, and resource-constrained organizations to reproduce results, audit model behavior, study bias and safety, and build on one another's work. Open models are in turn adapted to purposes no novel or other literary work could serve: analyzing genomic and clinical-trial data, translating low-resource languages, powering assistive technologies for people with disabilities, detecting fraud in financial data, furthering AI research, and reviewing the voluminous legal and medical records that long-context models—a capability in which Mosaic was among the industry leaders—were built to process. Defs.' Mot. 6. Enterprises, hospital systems, and public agencies use platforms like Defendants' to train and deploy models on their own proprietary data, without ever exposing that data to a third party. Defs.' Mot. 3. None of these applications share any connection or purpose with the original expressive use of the copyrighted works in the training data, and exemplify the very definition of adding "a further purpose or different character" to existing copyrighted works. *Campbell*, 510 U.S. at 579.

This Court should reject Plaintiffs' incorrect analysis of the transformativeness inquiry and join *Bartz* and *Kadrey* in finding that training generative AI models is a transformative use.

## III. Plaintiffs' Market Dilution Theory Misconstrues the Fair Use Inquiry and Is Antithetical to the Purposes of Copyright.

Plaintiffs miss the mark in arguing that the fourth fair use factor cuts against AI training because generative AI models might create "AI-generated competing works" that dilute the market and indirectly substitute for their works. Pls. Opp'n 20-24. Recognizing "market dilution" as a form of market harm under factor four would undermine the fundamental purpose of copyright law to promote progress and run headfirst into decades of Supreme Court and Ninth Circuit authority recognizing that copyright owners do *not* enjoy the right to exclude competition beyond a work's specific, copyrightable expression. The fourth fair use factor—harm to the market for the copyrighted work—has never been understood to reach competitive pressure from works that are not substantially similar to the copyrighted work and therefore do not substitute for it. And there is good reason to proceed cautiously through this uncharted territory, as stretching the market harm inquiry beyond its traditional contours threatens the First Amendment and the Progress Clause.

Plaintiffs argue that Defendants' "models could replace Plaintiffs as writers" and that there could be "an unmitigated flood of AI-generated books that compete with Plaintiffs' works." Pls. Opp'n 20-22. In support, Plaintiffs point to Judge Chhabria's decision in *Kadrey* where he opined in dicta that "using copyrighted books to train an [AI model] might harm the market for those works [] by helping to enable the rapid generation of countless works that compete with the originals, even if those works aren't themselves infringing." *Kadrey*, 788 F. Supp. 3d at 1052. He deemed "[h]arm from this form of competition" as "the harm of market dilution," and became the only court to propose such a theory (although he found it had not been established on the record before him). *Id.* This Court should not accept Plaintiffs' invitation to apply that reasoning.

Recognizing theoretical market harm from works that are not "substantially similar" to a plaintiff's work, Opp'n 22, cannot be squared with the Constitutional foundations or underlying purposes of copyright law and the fair use doctrine to promote—rather than restrict—expression. Such a view would transform copyright from a statute designed to foster the creation of new works into one that stifles competition. Copyright "serve[s] the cause of promoting broad public availability of literature, music, and the other arts." *Aiken*, 422 U.S. at 156. Thus, copyright

protection, which exists "to stimulate artistic creativity for the general public good" (*id.*), extends only to "Authors['] … respective Writings," rather than to concepts and ideas. U.S. Const. art. I, § 8, cl. 8. Indeed, copyright law has never been understood to stretch so far as to condemn works that do not actually infringe on specific expression. *See Woodland v. Hill*, 136 F.4th 1199, 1206 (9th Cir. 2025) (infringement requires a showing of "copying of constituent elements of the work that are original"); *Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 538 (5th Cir. 1994) (copyright injunction may extend to "only those future versions … *that are substantially similar*" to the infringed work) (emphasis added)). Fair use reflects this balance and "permits courts to avoid rigid application of the copyright statute." *Google*, 593 U.S. at 18.

Plaintiffs' dilution theory would brush aside the balance reflected in the Constitution and decades of copyright jurisprudence by recognizing purported "harms" to authors from competing *new* expression—indeed, harms to authors whose works have not been copied at all—thus advancing the very stifling and expression-suppressing effect fair use is intended to prevent. A generative AI model may help people create new stories that compete with books that were not used for training just as well as it helps create competitors to books that were. But dilution theory disregards completely whether the new books reproduced any protectable elements at all and condemns them simply because they might compete for story time. If accepted, that would be an extraordinary expansion of copyright law. On Plaintiffs' theory, the millions of authors whose books were never used to train have the same dilution grievance as Plaintiffs whose books were. If the asserted harm occurs whether or not the plaintiff's work is used, it is not harm caused by the use of the copyrighted work—which is what § 107(4) asks.

Consistent with the limited purposes in copyright, the fourth fair use factor—harm to the market for the copyrighted work—has never been understood to recognize as harmful the competitive pressure introduced by original, noninfringing works that do not *directly* substitute for the subject work. The fourth fair use factor is intended to assess the harm to "the potential market" for "*the* copyrighted work." 17 U.S.C. § 107(4) (emphasis added). The question is whether *this* use substitutes for *these* works, not whether a category of technology may over time affect a market in which these and other works compete.

While the Supreme Court has explained that "[t]he fourth statutory factor focuses upon the 'effect' of the copying in the 'market for or value of the copyrighted work,'" *Google*, 593 U.S. at 35 (quoting 17 U.S.C. § 107(4)), it has also made clear that not all market harms are cognizable. In particular, the Court has repeatedly rejected efforts to expand the meaning of the fourth factor to preclude competition from transformative uses. In *Campbell*, for example, the Court held that it was fair use to publish a parody song despite the risk that such a song could "kill[] demand for the original." 510 U.S. at 591-92 (noting that when a "lethal parody," like a critical movie review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act). The Court reasoned that not all uses "affect the market for the original in a way cognizable under [the fourth] factor" because not all market harms are "cognizable under the Copyright Act," especially "when … the second use is transformative" as opposed to "mere duplication of the entirety of an original." *Id.*

Decades later, the Supreme Court in *Google* again rejected an effort to preclude a transformative use on the basis of market harm. 593 U.S. at 40. There, the Court held that it was fair use for Google to copy software code in pursuit of developing a new mobile operating system that, to have any chance of success, needed to attract developers familiar with the copied code. *See id.* at 29-33. The Court warned against letting Oracle control downstream "creative improvements" such as "new applications" and "new uses" under the guise of copyright. *Id.* at 39. That "would interfere with, not further, copyright's basic creativity objectives." *Id.* Indeed, the Court specifically rejected the myopic view that "a potential loss of revenue" is sufficient to establish a cognizable market harm—"even if directly translated into foregone dollars"—because such an "'all or nothing' [approach] would [not] be faithful to the Copyright Act's overall design." *Id.* at 23, 35. Rather, courts must "consider not just the amount but also the source of the loss" and "take into account the public benefits the copying will likely produce," such as "concern for the creative production of new expression." *Id.* at 35. Dilution theory cannot be reconciled with *Campbell* and *Google* because it penalizes a quintessentially transformative use, *see supra*, precisely *because* it will facilitate the "broad public availability of literature, music, and the other arts" by enabling

users to create new expression that may compete with the existing body of information. *Aiken*, 422 U.S. at 156.

The Ninth Circuit has also long rejected copyright as a means of controlling competition. In *Sony Computer Ent., Inc. v. Connectix Corp*., the court held that it was fair use to copy code from the plaintiff's gaming devices to create a competing gaming system. 203 F.3d at 607. The court reasoned that creating "a legitimate competitor in the market for [gaming] platforms" is fair use despite "some economic loss by [plaintiff] as a result of this competition" because "copyright law [] does not confer [] a monopoly" to control "the market" for competing devices. *Id.*; *see also Sega Enters.*, 977 F.2d at 1523 ("a use which simply enables the copier to enter the market for works of the same type as the copied work" does not cause cognizable market harm). Plaintiffs' dilution theory is premised on the same market control theory that the Ninth Circuit has rejected.[1]

As Judge Alsup explained in *Bartz*, "the fourth factor focuses on *actual* or *potential* market substitution" and "points against fair use when a copyist makes copies available that displace demand for copies the copyright owner already makes available or readily could." 787 F. Supp. 3d at 1031. But Plaintiffs' dilution theory does something different:

> [The plaintiffs'] complaint is no different than it would be if they complained that training schoolchildren to write well would result in an explosion of competing works. This is not the kind of competitive or creative displacement that concerns the Copyright Act. The Act seeks to advance original works of authorship, not to protect authors against competition.

*Id.* at 1032. Neither Plaintiffs' nor *Kadrey*'s discussion of dilution seriously contends with this or other precedent.

---

[1] Plaintiffs suggest that *Sega* and *Google* are confined to the copying of "functional or non-expressive elements of computer code." Pls. Opp'n 23. But the principle those cases apply is not limited to code. *Sega* held that "a use which simply enables the copier to enter the market for works of the same type as the copied work" is not cognizable harm, 977 F.2d at 1523, and *Google* warned against allowing a rightsholder to "hold the key" to downstream "new applications" and "new uses," 593 U.S. at 35, 39. These cases turned on the difference between substituting for a work and competing with it, not on the fact that the copyrighted work was computer code. In any event, in this case, the statistical patterns extracted during AI training are themselves factual, non-expressive elements contained within plaintiffs' works, and copying the entire work as an intermediary step was necessary to access those unprotectible elements, just as was the case in *Sega* and *Connectix*.

Finally, the Court should not take lightly the serious implications for expression that dilution theory invites by treating as a societal evil the greater and more efficient production of new, non-infringing expression. While "copyright's built-in free speech safeguards are generally adequate to address" First Amendment rights, that presumption does not hold—and further First Amendment scrutiny is required—when the "traditional contours of copyright protection" have been altered. *Eldred v. Ashcroft*, 537 U.S. 186, 221 (2003); *see generally* Edward Lee, *Copyright Dilution Under Constitutional Scrutiny*, 25 Chi.-Kent J. Intell. Prop. 1 (Feb. 18, 2026). Plaintiffs appear to have no evidence of a competing work generated by Defendants' models, resorting instead to generic press clippings. *See* Pls. Opp. 20-21; Defs.' Mot. 8, 19. But their dilution theory would nonetheless condemn the new, non-infringing works that users may create with such tools, and the messages they convey, as harmful—a grave and troubling expansion of the "traditional contours of copyright protection." *Eldred*, 537 U.S. at 221. Importantly, AI tools can be used to create new content that expresses ideas that are different and even oppose the ideas expressed in copyrighted works used for training. Expanding copyright in the manner Plaintiffs suggest would effectively allow copyright holders to use their copyrights to interfere with the creation of original works with different or opposing points of view, a result that would be starkly inconsistent with the First Amendment.

The Court need not engage in a detailed First Amendment analysis because longstanding copyright jurisprudence makes clear that it would be antithetical to the Progress Clause and fair use doctrine to allow copyright owners to suppress technology that enables the creation of competing but non-infringing speech. Plaintiffs' dilution theory can and should be rejected on that basis alone.

## CONCLUSION

The Court should hold that training a generative AI model on copyrighted works is a fair use.

Respectfully submitted,

Dated: August 27, 2026

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ *Eric P. Tuttle*
Eric P. Tuttle
eric.tuttle@wsgr.com
Paul N. Harold
pharold@wsgr.com

*Attorneys for amici curiae the Computer and Communications Industry Association, A.I. Progress, Inc., and NetChoice, LLC*