JEDEDIAH WAKEFIELD (CSB No. 178058)
jwakefield@fenwick.com
FENWICK & WEST LLP
One Front Street, 33rd Floor
San Francisco, CA 94111
Telephone: 415.875.2300
Facsimile: 650.938.5200

DAVID HAYES (CSB No. 122894)
dhayes@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

*Attorneys for Defendants*
DATABRICKS, INC., and
MOSAIC ML, LLC, formerly MOSAIC ML, INC.

*Additional counsel listed on signature page*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

*In Re Mosaic LLM Litigation*

Master File Case No. 3:24-cv-01451-CRB
Consolidated with Case No. 3:24-cv-02653-CRB

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE TESTIMONY OF SHAWN SHAN, PH.D.**

Date: October 30, 2026
Time: 10:00 a.m.
Dept: Courtroom 6, 17th Floor
Judge: Hon. Charles R. Breyer



FENWICK & WEST LLP

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..................................................................................................... 1

II. ARGUMENT ........................................................................................................... 1

A. Neither Dr. Shan nor ChatGPT is qualified under Rule 702 to offer expert opinions on literary evaluation. .................................................................. 1

1. The purported "general acceptance" of using "LLM-as-judge" does not save Dr. Shan's specific application here. ........................................... 2

2. Dr. Evans did not "confirm" reliability; he expressly refuted it. ................ 3

3. ChatGPT is nothing like Microsoft Excel or the other validated tools Plaintiffs cite. ......................................................................... 4

4. Rule 703 does not permit outsourcing the expert judgment to ChatGPT. ................................................................................ 6

B. Dr. Shan's conclusions about "style memorization" are unreliable because he identifies no protected expression that was purportedly "memorized," and even the ChatGPT scores on which he relies do not support his conclusions. ................................................................................ 8

C. Dr. Shan's opinions are also unreliable because his experiments lacked controls. ................................................................................ 10

III. CONCLUSION ........................................................................................................ 12

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013)........................................................................................ 12

*BladeRoom Group Ltd. v. Facebook, Inc.*,
No. 5:15-CV-01370-EJD, 2018 WL 1611835 (N.D. Cal. Apr. 3, 2018)................................. 8

*Cadena v. Am. Honda Motor Co., Inc.*,
No. 18-CV-04007-MWF, 2025 WL 3483436 (C.D. Cal. Dec. 3, 2025) ................................. 8

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014)......................................................................................... 4

*Elosu v. Middlefork Ranch Inc.*,
26 F.4th 1017 (9th Cir. 2022) ........................................................................................ 10

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ....................................................................................................... 9

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06-MD-1175, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014),
*report and recommendation adopted*, No. 06-MD-1775, 2015 WL 5093503
(E.D.N.Y. July 10, 2015) ............................................................................................... 12

*Kohls v. Ellison*,
No. 24-CV-3754, 2025 WL 66514 (D. Minn. Jan. 10, 2025).................................................. 6

*Murray v. Southern Route Maritime SA*,
870 F.3d 915 (9th Cir. 2017)........................................................................................... 2

*NXP USA, Inc. v. Impinj, Inc.*,
No. 2:20-CV-01503-JHC, 2023 WL 3933877 (W.D. Wash. June 8, 2023)........................ 7, 8

*Pelican Int'l v. Hobie Cat Co., Inc.*,
655 F. Supp. 3d 1002 (S.D. Cal. 2023)............................................................................ 8

*Seither & Cherry Quad Cities, Inc. v. Oakland Automation, LLC*,
Nos. 23-CV-11310, 23-CV-11342, 2025 WL 2105286
(E.D. Mich. July 28, 2025)............................................................................................... 5

*United States v. Anderson*,
171 F.4th 232 (3d Cir. 2026)....................................................................................... 4, 5

*United States v. Gissantaner*,
990 F.3d 457 (6th Cir. 2021)....................................................................................... 4, 5



FENWICK & WEST LLP

*United States v. Hermanek*,
289 F.3d 1076 (9th Cir. 2002) ..... 5

*United States v. Morgan*,
292 F. Supp. 3d 475 (D.D.C. 2018), *aff'd*, 45 F.4th 192 (D.C. Cir. 2022) ..... 4

*United States v. Nelson*,
533 F. Supp. 3d 779 (N.D. Cal. 2021) ..... 4

*United States v. Wong*,
No. 3:24-CR-139, 2026 WL 1632879 (M.D. Pa. June 5, 2026) ..... 4

**RULES**

Fed. R. Evid. 702 ..... *passim*

Fed. R. Evid. 703 ..... 6, 7, 8

FENWICK & WEST LLP

FENWICK & WEST LLP

## I. INTRODUCTION

Plaintiffs' opposition (Dkt. 389, "Opp.") never confronts the fundamental problem with Dr. Shan's testimony: that he outsourced the expert work on literary comparisons to ChatGPT. Dr. Shan—a computer scientist with no credentials in literary analysis—fed a prompt he did not write into ChatGPT, asked it to assume the role of an "expert literary critic" to evaluate passages, and then accepted every score ChatGPT output as his expert opinion without change or verification. He exercised no independent expert judgment as Rule 702 requires. And while Plaintiffs argue that "LLM-as-judge" is an established methodology, they fail to identify any publication suggesting that anyone has used ChatGPT as Dr. Shan did here. Accepting Plaintiffs' position would mean that any computer-scientist expert could prompt an LLM on any subject matter, accept the output, and pass it off as their expert opinion in court. Rule 702 does not permit this.

Dr. Shan's opinions are also unreliable because his conclusion that the MPT models "memorized" writing style is exactly that—a bare conclusion with no reliable support. Indeed, even the unreliable ChatGPT "scores" on which he relies show no such thing. He also failed to include an experimental control that would support his opinions that the alleged presence of Plaintiffs' books in the training data *caused* a change in those scores. The Court should exclude Dr. Shan's unreliable opinions.

## II. ARGUMENT

### A. Neither Dr. Shan nor ChatGPT is qualified under Rule 702 to offer expert opinions on literary evaluation.

The steps Dr. Shan took to reach his opinions are undisputed and are described in Defendants' opening brief. Dkt. 308 ("Mot.") at 3-4; Opp. at 4-5. Dr. Shan's purported "methodology" violates Rule 702 because he has no "knowledge, skill, experience, training, or education" to form opinions about the *literary* judgments in his report and, even if he did, he performed no expert analysis of his own in any event. Mot. at 7-11.

Plaintiffs make several arguments in defense of Dr. Shan's opinions. None withstands scrutiny.

**1. The purported "general acceptance" of using "LLM-as-judge" does not save Dr. Shan's specific application here.**

Plaintiffs devote four pages of their opposition to arguing that "LLM-as-judge" is an "established evaluation methodology in the published literature" and satisfies each of the factors set forth in *Murray v. Southern Route Maritime SA*, 870 F.3d 915 (9th Cir. 2017). Opp. at 8-11. These arguments are irrelevant because none of the purported examples of "acceptance" of an LLM-as-judge methodology (*id.* at 9-10) relates to how Dr. Shan used it here.

Indeed, Plaintiffs fail to identify even a single study or academic paper describing or validating Dr. Shan's specific methodology, such as the prompt he used with ChatGPT, the four criteria he asked ChatGPT to evaluate, or the scoring of those criteria. Plaintiffs point to no publication showing that an LLM can reliably perform author-specific literary "style" matching, no benchmark establishing what a "correct" score would be, and no study validating the causal inferences and conclusions he draws from those scores. The record contains no example in peer-reviewed literature or anywhere else of anyone, ever, doing what Dr. Shan did here.

The studies Plaintiffs do cite only underscore the shortcomings in Dr. Shan's approach. Every cited paper (1) validated the LLM "judge" against *human* reviewers who provided *independent* scores or conducted parallel human evaluation; (2) quantified the LLM "judge's" agreement with, the uncertainty around, or the distribution of those scores using standard statistical metrics; and (3) involved entirely different subject matter. For example, the primary paper cited by Plaintiffs and Dr. Shan, Zheng et al., tested the LLM "judge" on questions that included "Given that $f(x) = 4x^3 - 9x - 14$, find the value of $f(2)$"—a mathematical equation with an objectively correct, precisely measurable answer that could be verified. *See* Dkt. 308-8 (Zheng et al.) at 2-3.[1] Even then, the LLM judge initially failed 70% of the time on math questions. *Id.* at 6. Dr. Shan skipped all these safeguards for his own version of "LLM-as-judge" testing, simply assuming that if academic researchers used LLMs to judge *different subject matter* under *different conditions* with

[1] The Chiang paper Plaintiffs cite (Opp. at 10) even involved the testing of four separate LLMs-as-judge. That paper found that for two of the four LLMs, their judgments did not align with the human judgments of the task. Dkt. 389-4 (Nath Decl., Ex. C) at 4-6. Dr. Shan disclosed no such investigations of different LLMs to confirm that GPT-5.4 would align with human judgments on this task.

FENWICK & WEST LLP

*human validation*, he could trust ChatGPT to act as judge of anything, with no human validation required at any step.

As Defendants showed in the opening brief, holding that Dr. Shan's methodology satisfies Rule 702 would allow "any expert in one field . . . to be an expert in any field." Mot. at 11. Plaintiffs have no substantive response; they state that they are asking the Court to find only that Dr. Shan "properly used an established methodology in his field . . . to evaluate the outputs of different LLMs." Opp. at 13. But if the "methodology" is Dr. Shan's use of ChatGPT as a literary expert to evaluate newly generated passages on a 5-point scale, that methodology is *not* established, and indeed, there is nothing in the record showing that it has ever been done before. And if the "methodology" is a computer scientist feeding a prompt to an LLM, asking the LLM to evaluate some chosen subject matter as an "expert," and porting the results into an expert report, acceptance of that methodology would eviscerate Rule 702.

**2. Dr. Evans did not "confirm" reliability; he expressly refuted it.**

Plaintiffs next argue that Dr. Evans "used the *same* methodology to run his own experiments, which *confirmed* the results of Dr. Shan's testing," and that Dr. Evans "confirmed [Dr. Shan's] methodology and results are reliable." Opp. at 5 (emphasis in original). Dr. Evans confirmed no such thing. In fact, Dr. Evans performed supplemental experiments using Dr. Shan's methodology *only to demonstrate the lack of a proper control in Dr. Shan's testing*. But Dr. Evans made clear that his "experiments *do not* endorse Dr. Shan's method as valid or sound." Dkt. 306-3 (Evans Suppl. Testing) at 1 (emphasis added). Instead, he explained that his "results demonstrate that Dr. Shan's procedure fails to show what it purports to since essentially the same results are produced for the 2025 Debut Books [which were not in the training dataset] as for the plaintiff authors' books." *Id.* Dr. Evans also explained that, because "Dr. Shan did not use any controls, the meaning of the results from his test can't really be interpreted." Supp. McMichael Decl., Ex. 1 (Evans Dep. Tr.) at 195:18-196:5; *id.* at 203:21-204:10 (testifying that Dr. Shan's conclusion was "not valid"); *id.* at 201:13-25 (testifying that Dr. Shan did not perform "any validation of the LLM as a judge" methodology). Dr. Evans certainly did not "confirm" that Dr. Shan's testing is reliable; he demonstrated its numerous obvious faults.

FENWICK & WEST LLP

Plaintiffs also contend that Dr. Shan's methodology is repeatable. Opp. at 5, 9. But repeatability is not the same as reliability. A broken thermometer can show consistent readings but still be inaccurate. Repeatability establishes only that a procedure can be mechanically reproduced; it says nothing about whether the procedure *measures what it claims to measure*. The fact that ChatGPT produces somewhat similar outputs when faced with the same inputs and prompts therefore does not establish that those outputs are reliable.[2]

**3. ChatGPT is nothing like Microsoft Excel or the other validated tools Plaintiffs cite.**

Plaintiffs also argue that, under case law involving geolocation mapping programs, statistical modeling, Microsoft Excel, and other widely accepted tools, Dr. Shan's use of ChatGPT as an expert literary critic is reliable. Opp. at 8-9, 11-12. But those decisions establish only the limited proposition that an expert need not reverse-engineer every widely used tool before relying on it for its *defined*, *accepted* purpose. *Id.* at 8, 12; *see also United States v. Morgan*, 292 F. Supp. 3d 475, 481-85 (D.D.C. 2018), *aff'd*, 45 F.4th 192, 203 (D.C. Cir. 2022) (addressing expert's use of mapping software); *United States v. Nelson*, 533 F. Supp. 3d 779, 795-99 (N.D. Cal. 2021) (addressing expert's use of software to create map for demonstrative purposes); *United States v. Wong*, No. 3:24-CR-139, 2026 WL 1632879, at *37-38 (M.D. Pa. June 5, 2026) (addressing expert's use of cell phone location tracking software). Nothing in those decisions eliminates the requirement that the tool be accepted as reliable for the particular use at issue, or the requirement that an expert supply independent judgment as Rule 702 demands. Dr. Shan's testing fails both requirements.

First, the tools that Plaintiffs point to perform known, validated functions with deterministic or statistically characterized outputs. For example, the genotyping software in *Anderson* and *Gissantaner* took specific inputs, applied defined statistical algorithms, and produced outputs that were independently verifiable against known error rates. *See United States v. Anderson*, 171 F.4th

[2] Plaintiffs' reliance on *City of Pomona v. SQM North America Corp.* is misplaced because in that case, the expert's methodology had been independently tested across multiple government laboratories and validated through a decade of peer-reviewed research. 750 F.3d 1036, 1045-47 (9th Cir. 2014). *City of Pomona* does not support the reliability of a black-box LLM reproducing the same unvalidated scores when given the same prompt.



FENWICK & WEST LLP

232, 238-41 (3d Cir. 2026); *United States v. Gissantaner*, 990 F.3d 457, 462-67 (6th Cir. 2021). Microsoft Excel likewise executes deterministic mathematical operations such as summing, averaging, or plotting on a coordinate plane—all of which are verifiable based on the data and formulas displayed for every cell. Plaintiffs' comparison to other tools fares no better. Whether the tools at issue are geolocation mapping programs, accident modeling programs, or economic regression tools (*see* Opp. at 8-9, 11-12), each had been independently validated for its specific application, and the experts thus were permitted to use them.

ChatGPT is nothing like these tools. It does not run basic equations or calculations in a deterministic way with known, ground-truth answers. Nor has it been validated for the specific task for which Dr. Shan used it—evaluating or comparing literary "style." Instead, its outputs are *not* based on formulas; ChatGPT predicts what words to produce based on statistical patterns in language, and in fact it is designed to vary even when the input is the same. Dkt. 319-11 ("Johnson Opening Report") ¶ 70. Courts recognize that LLMs "are not designed to answer questions factually" and cannot "independently fact-check themselves in the same way a human would." *Seither & Cherry Quad Cities, Inc. v. Oakland Automation, LLC*, Nos. 23-CV-11310, 23-CV-11342, 2025 WL 2105286, at *1 (E.D. Mich. July 28, 2025). That is why bar associations and ethics rules prohibit lawyers from relying on the outputs of LLMs without independent review and verification. Mot. at 10. That is why students in schools are taught to practice critical reasoning skills and independent verification before blindly accepting answers from LLMs. And that is why OpenAI, the maker of ChatGPT, expressly warns users that outputs "may not always be accurate" and should not be used as a "sole source of truth or factual information, or as a substitute for professional advice," and to use "human review as appropriate." Mot. at 9-10; Dkt. 308-5 (OpenAI Terms of Use) at 4-5. Dr. Shan ignored all these guardrails, and Plaintiffs do not address any of these facts or the case law in their opposition.

Second, as to the requirement for independent judgment, an expert must "adequately explain[]" his methods so the Court can assess reliability. *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002). Dr. Shan cannot do so here. ChatGPT generated scores for "writing quality," "task quality," "voice similarity," and "overall style match" using criteria and a rubric that

FENWICK & WEST LLP

Dr. Shan did not choose. Opp. at 4-5, 12. He has no idea what ChatGPT did to reach any of its scores; he could not identify what (if anything) it evaluated, the bases for its scores, or what biases affected them. Dkt. 308-3 ("Shan Dep. Tr.") at 247:16-248:19, 260:16-261:15. He never evaluated those scores against scores assigned by human literary experts, and he is not qualified to check ChatGPT's outputs, as he is not an expert literary critic himself. This lack of expertise matters because ChatGPT also is not an "expert" within the meaning of Rule 702; it is a black-box, closed model whose source code is non-public and changes over time without notice. *Id.* at 106:20-107:7. Courts hold that this kind of wholesale delegation is impermissible and that experts who "abdicate their independent judgment and critical thinking skills in favor of ready-made, AI-generated answers" undermine the decisional process. *Kohls v. Ellison*, No. 24-CV-3754, 2025 WL 66514, at *4-5 (D. Minn. Jan. 10, 2025) ("The Court thus adds its voice to a growing chorus of courts around the country declaring the same message: verify AI-generated content in legal submissions!"). Dr. Shan's blind delegation to ChatGPT violates this rule.

**4. Rule 703 does not permit outsourcing the expert judgment to ChatGPT.**

Plaintiffs argue that Rule 703 permits Dr. Shan to rely on prompts and criteria "originate[d]" by a consulting expert because he reviewed the prompts "line-by-line" and confirmed that they were "sufficient and accurate." Opp. at 12-13. While Rule 703 permits an expert to rely on underlying facts or data prepared by others as inputs to the expert's own analysis, that is not the issue here.

The undisputed record confirms the limits of Dr. Shan's contributions. His work on the ChatGPT prompts he used was limited to the "structure" or format of the outputs, not the substance of any of the four criteria in the prompts. Shan Dep. Tr. at 254:12-23; *id.* at 258:11-20 (confirming the scoring rubric "was provided to [him]" and that he "ha[d] not made any changes"). He never independently scored a single passage (nor is he qualified to do so), or asked a qualified person to perform that task, and he did not change any number ChatGPT produced before averaging the numbers and dropping them into his expert report. *Id.* at 260:9-15 (conceding he did not independently read or score any passage); *id.* at 268:8-11 (admitting he never changed a "number



FENWICK & WEST LLP

that ChatGPT output"); *id.* at 276:12-15 (confirming that he did not develop an "independent rating" for any passage). The substance of Dr. Shan's opinions—i.e., the evaluation of passages—comes entirely from ChatGPT, not Dr. Shan.

Plaintiffs cite no case, and Defendants are aware of none, in which an expert's expressed opinions were based solely on output from an LLM on a subject matter in which the expert had no qualifications. And existing case law makes clear that such an approach is improper. Rule 703 does not permit an expert to delegate his substantive expert analysis, even to a human expert. For example, in *NXP USA, Inc. v. Impinj, Inc.*, the court held that a damages expert could not invoke Rule 703 to justify the wholesale adoption of a third party's valuation opinions. No. 2:20-CV-01503-JHC, 2023 WL 3933877, at *6 (W.D. Wash. June 8, 2023). The court recognized that while an expert may rely on other experts or witnesses for "facts or data," the expert could not "wholesale adopt" others' *opinions* as their own—least of all "without questioning or even fully understanding the basis for those opinions." *Id.*

That is what happened here. No literary expert provided Dr. Shan's original prompt or any substantive opinions about the "style" of the passages. Shan Dep. Tr. at 255:8-12 (acknowledging he never asked "a human literary expert" whether the four criteria were appropriate); *id.* at 270:16-20 (conceding he never had a human literary expert evaluate the outputs against the input passages).[3] *Only* ChatGPT supplied the purported scores regarding literary "style match[ing]." Like the expert in *NXP USA*, Dr. Shan simply accepted those outputs at face value, averaged them, placed them in his report "without questioning or even fully understanding" them, and offered the resulting conclusions as his own. 2023 WL 3933877, at *6. That is not reliance on underlying

[3] Plaintiffs argue that Defendants never asked Dr. Shan during his deposition "*why* the criteria were chosen." Opp. at 13. That is wrong. Defendants extensively questioned Dr. Shan about the selection and basis for the four criteria, including (1) the origin of the criteria (Shan Dep. Tr. at 252:19-253:1); (2) Dr. Shan's role in selecting them (*id.* at 253:5-19); (3) Dr. Shan's independent validation of them (*id.* at 254:12-23); and (4) whether any human literary expert was consulted in regard to them (*id.* at 255:8-12). Indeed, when Defendants asked whether Dr. Shan came up with the criteria, Plaintiffs' own counsel instructed the witness not to answer on privilege grounds. *Id.* at 252:19-253:1. In any event, Plaintiffs bear the burden to show that the chosen prompt and methodology are reliable. *See* Fed. R. Evid. 702. They have not done so here.

facts or data—it is ignoring the dictates of Rule 703 so that Dr. Shan can serve as a mouthpiece for "opinions" generated by ChatGPT.[4]

Rule 703 does not allow an expert to confer reliability on an unvalidated evaluation by an LLM merely by confirming that the prompt was "sufficient and accurate." *See NXP USA*, 2023 WL 3933877, at *4 ("The *ipse dixit* of an expert—itself relying on the *ipse dixit* of a third-party—cannot alone provide a sufficiently reliable methodology."). Yet Dr. Shan never defined what makes a prompt "sufficient" or "accurate" in this context, never explained how he confirmed that his prompt met those criteria, and cited no literature on point. In fact, in the *BladeRoom Group Ltd. v. Facebook, Inc.* decision cited by Plaintiffs, the court noted that an expert should "substantially participate in the preparation of his report" and *not* merely "peruse the work product of someone else," which is precisely what Dr. Shan did when he accepted a third party's prompts and ChatGPT's resulting scores without verification or independent analysis. No. 5:15-CV-01370-EJD, 2018 WL 1611835, at *4 (N.D. Cal. Apr. 3, 2018) (citation modified).

Plaintiffs could have offered a literary expert to independently evaluate the passages and explain the basis for the LLM's criteria and scores subject to the requirements of Rule 702, but they did not. Because the only literary "expertise" came from ChatGPT, not from a qualified human expert, Dr. Shan's "style" opinions must be excluded in their entirety.

**B. Dr. Shan's conclusions about "style memorization" are unreliable because he identifies no protected expression that was purportedly "memorized," and even the ChatGPT scores on which he relies do not support his conclusions.**

Even if Dr. Shan's LLM-as-judge methodology were reliable—and it is not—his *conclusions* from that testing would still fail independently under Rule 702. Dr. Shan concludes

---

[4] Plaintiffs argue that disagreements with an expert's chosen criteria go to "weight, not admissibility." Opp. at 13 (citing *Cadena v. Am. Honda Motor Co., Inc.*, No. 18-CV-04007-MWF, 2025 WL 3483436, at *13 (C.D. Cal. Dec. 3, 2025); *Pelican Int'l v. Hobie Cat Co., Inc.*, 655 F. Supp. 3d 1002, 1033 (S.D. Cal. 2023)). But both cases involved challenges to the factual inputs or design choices within accepted methodologies—a conjoint analysis survey in *Cadena* and a patent claim construction analysis in *Pelican*—not whether the methodology itself is reliable where the entire evaluative framework was generated by a machine without human validation. The issue here is not which criteria Dr. Shan, or the consulting expert, selected but whether a methodology that delegates the substantive expert analysis entirely to an unvalidated LLM is reliable at all.



FENWICK & WEST LLP

that the MPT models exhibit "measurable style memorization." Dkt. 308-2 ("Shan Rebuttal Report") ¶¶ 33, 47. But it is undisputed that he never identifies a single sentence, phrase, passage, or element of "style" from any of the Plaintiff authors that was purportedly memorized.[5] That conclusion is classic *ipse dixit* and should be excluded. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (excluding expert testimony where materials cited by the expert did not support his ultimate conclusion and left too great an "analytical gap between the data and the opinion proffered").

Nothing in Plaintiffs' opposition fixes Dr. Shan's pure say-so. Plaintiffs first argue that Dr. Shan identified a "relative" improvement in ChatGPT scores between models that were purportedly finetuned on Plaintiffs' works and "control models" that were not. Opp. at 13-14. As discussed below, the "control models" are no controls at all. But even setting that aside, Plaintiffs never concretely identify what was "memorized" or any protectable element of expression that was copied. Plaintiffs' argument that "*at least some* elements of Plaintiffs' writing styles are reproduced by StoryWriter" (Opp. at 14 (emphasis added)) cannot save Dr. Shan's opinions. Discovery is closed, and Plaintiffs cannot identify what those purported "elements" are. Dr. Shan's unsupported "memorization" label is a bare conclusion that gives nothing useful to the Court and a jury.

Plaintiffs next argue that the Court should ignore the absolute scores from Dr. Shan's ChatGPT testing in favor of this "relative" improvement. Opp. at 14. But even this "relative" improvement is, at best, an improvement from one failing grade to another. MPT-7B-StoryWriter-65k+'s absolute scores on "voice fidelity" (2.64) and "overall style match" (2.62) are below the midpoint of 3 on Dr. Shan's 5-point scale—meaning that, by the definitions Dr. Shan provided to ChatGPT, the model's outputs were *not* in the style of any Plaintiff author. Mot. at 12 (citing McMichael Decl., Ex. 3 (Dkt. 307-2) (Dr. Shan's ChatGPT Prompt) at SHAN0001191.003). That MPT-7B-StoryWriter-65k+ failed slightly less than the other models Dr. Shan tested is not "memorization" by any fair reading of Dr. Shan's own testing.

---

[5] The closest Dr. Shan comes is paragraph 41 of his rebuttal report, in which he states that the MPT-7B-StoryWriter-65k+ was able to continue a passage in an author's "voice." Shan Rebuttal Report ¶ 41. Dr. Shan does not elaborate, he has no credentials to evaluate literary "voice," and, as explained below, the comparison he draws between the MPT-7B-StoryWriter-65k+ and MPT-7B-Chat models does not support his conclusions. *See infra* at 11, n.6.

FENWICK & WEST LLP

Plaintiffs' only cited case on this point, *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017 (9th Cir. 2022), undermines their argument. In *Elosu*, the Ninth Circuit reiterated that an expert must have "sufficient factual grounds on which to draw conclusions" and cautioned courts to avoid "freeform factfinding[] to select between competing versions of the evidence." *Id.* at 1026-27 (citation modified). Here, Dr. Shan has no "factual grounds" to support any claim of memorization that would be relevant to Plaintiffs' copyright claims. And there are no competing versions of the evidence. Across all their testing, neither side's experts identified a single instance of the MPT models memorizing any words or even stylistic elements from Plaintiffs' books.

Plaintiffs also suggest in a footnote that even though style is not protected by copyright, Dr. Shan's testing is relevant as "evidence that Defendants trained a model to write fiction as similar as possible to the underlying works" or that "the outputs may compete with Plaintiffs' works." Opp. at 14 n.5. Plaintiffs neither identify nor explain anything in Dr. Shan's testing that supposedly supports either of these attorney arguments. Nor does any record evidence exist to support these arguments. The Court should exclude Dr. Shan's conclusion that the MPT models exhibit "style memorization."

**C. Dr. Shan's opinions are also unreliable because his experiments lacked controls.**

Dr. Shan opines that the presence of Plaintiffs' books in the finetuning data *caused* MPT-7B-StoryWriter-65k+ to emulate those specific authors' styles. Mot. at 13-14, 14 n.3 (citing Shan Rebuttal Report ¶¶ 40, 42-43, 46-47). To test that causal connection, Dr. Shan would need to compare MPT-7B-StoryWriter-65k+'s ability to generate content similar to Plaintiffs' books (allegedly in the training data) against its ability to generate content similar to books that are *not* in the training data. That latter test—the experimental control—would show that the presence or absence of books in the training data affects the model's outputs. There is no dispute that Dr. Shan skipped this control. Nor is there any dispute that, when this control is included, there is no material difference in purported "style matching" scores between books that were in the training data and books that were not. Mot. at 14-15 (citing Shan Dep. Tr. at 284:5-10, 289:7-18).

Plaintiffs argue that Dr. Shan "explicitly included two separate '*control* models' in his testing" because he compared the performance of MPT-7B-StoryWriter-65k+ to two other models—MPT-7B-Chat and MPT-7B-Instruct—that were never finetuned on datasets of fiction books at all. Opp. at 3 (emphasis in original), 14-15; Shan Dep. Tr. at 278:9-22. But that is not a "control" for the thing Dr. Shan is purportedly testing—the alleged "memorization" of style from *Plaintiffs'* books by MPT-7B-StoryWriter-65k+. To test for that, one would need to test MPT-7B-StoryWriter-65k+ with text from different *books*, not different *models*.

Moreover, as Dr. Shan admitted, his two purported "controls" are models designed for completely different purposes than MPT-7B-StoryWriter-65k+. Shan Dep. Tr. at 278:9-22, 279:14-18. MPT-7B-Chat was designed to generate conversational dialogue. Dkt. 319-4 (Evans Opening Report) ¶ 52; Johnson Opening Report ¶¶ 193-94. MPT-7B-Instruct was designed to follow instructions, for example, converting data from one format to another. *Id.* Neither was designed to continue writing prose supplied in a prompt. Dr. Shan thus did not follow an apples-to-apples comparison. He compared the performance of models that were designed for completely different applications and concluded that, because MPT-7B-StoryWriter-65k+ performs *its* purpose better than models that were not designed for that purpose, this somehow indicates that particular books in MPT-7B-StoryWriter-65k+'s training data *caused* its superior performance. This makes no sense.[6] Using the drug trial analogy from Defendants' opening brief (Mot. at 13), a study that administers a drug to a treatment group but compares the results to a group that received a *different* drug for a *different* condition (rather than a placebo) says nothing about the efficacy of the drug being tested. Dr. Shan's testing suffers from the same problem.

Dr. Shan's failure to include a proper control is a fundamental methodological flaw that renders his conclusions unreliable. Mot. at 13 (collecting cases). Plaintiffs do not address

[6] In his sole "Illustrative Example" (Shan Rebuttal Report ¶ 41), Dr. Shan compares continuations generated by MPT-7B-StoryWriter-65k+ and MPT-7B-Chat when given a passage from a novel by Jason Reynolds. But rather than illustrating MPT-7B-StoryWriter-65k+'s ability to mimic Reynolds's style, the example shows the absurdity of comparing these two models. MPT-7B-Chat "insert[ed] a fabricated chapter heading attributed to a different author (Dan Chaon) and shift[ed] into a first-person essay unrelated to the story." *Id.* That is not an example of a model poorly mimicking an author's style; it is an example of a chat model being forced to write prose, a task it was not designed for and therefore cannot perform.



FENWICK & WEST LLP

Defendants' case law and instead cite two cases to argue that these problems go to the weight of Dr. Shan's testimony, not its admissibility. Opp. at 15 (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175, 2014 WL 7882100, at *17 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, No. 06-MD-1775, 2015 WL 5093503 (E.D.N.Y. July 10, 2015)). Neither case supports Plaintiffs. *Alaska Rent-A-Car* dealt with damages expert testimony in a breach of contract case, which by definition "address[es] a hypothetical world that never existed." 738 F.3d at 968. The Ninth Circuit held there was no abuse of discretion in denying a *Daubert* motion where the damages expert had used a competitor rental car company as a comparison to assess how the plaintiff rental car company would have performed but for the breach, and challenges to the expert's assumptions went to weight. *Id.* at 968-70. Likewise, in *In re Air Cargo Shipping Services*, the district court concluded that an economic expert should not be excluded after he ran more than 21,000 regression tests to assess the effects of an alleged price-fixing conspiracy, even though the opposing expert had identified a different way to conduct the test. 2014 WL 7882100, at *1, *16-17. Both cases thus involved disputes about the appropriateness of a control—not the complete *absence* of a control that would isolate the hypothesis being tested, as here.

Dr. Shan's experiments lack any control to test whether the use of books in training data caused the differences in ChatGPT-generated scores on which he relied. This failure is yet another reason his opinions regarding purported "style memorization" must be excluded.

## III. CONCLUSION

For all these reasons, and those in Defendants' opening papers, the Court should exclude the opinions in paragraphs 33 and 38-47 of Dr. Shan's rebuttal report under Rule 702.

FENWICK & WEST LLP

Dated: September 14, 2026

FENWICK & WEST LLP

By: /s/ Jedediah Wakefield

Jedediah Wakefield (CSB No. 178058)
jwakefield@fenwick.com
Ryan Kwock (CSB No. 336414)
rkwock@fenwick.com
One Front Street, 33rd Floor
San Francisco, CA 94111
Telephone: 415.875.2300
Facsimile: 650.938.5200

David Hayes (CSB No. 122894)
dhayes@fenwick.com
Diana C. Buck (CSB No. 339314)
dbuck@fenwick.com
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

Jonathan T. McMichael (CSB No. 304737)
jmcmichael@fenwick.com
Deena Feit (admitted *pro hac vice*)
dfeit@fenwick.com
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone: 206.389.4510
Facsimile: 650.938.5200

Charles Moulins (admitted *pro hac vice*)
cmoulins@fenwick.com
Justine Vandermel (admitted *pro hac vice*)
justine.vandermel@fenwick.com
902 Broadway, 18th Floor
New York, NY 10010
Telephone: 212.430.2600
Facsimile: 650.938.5200

Zachary Harned (CSB No. 335898)
zharned@fenwick.com
730 Arizona Avenue, 1st Floor
Santa Monica, CA 90401
Telephone: 310.434.5400
Facsimile: 650.938.5200

*Attorneys for Defendants*
DATABRICKS, INC., and

MOSAIC ML, LLC, formerly
MOSAIC ML, INC.