JEDEDIAH WAKEFIELD (CSB No. 178058)
jwakefield@fenwick.com
FENWICK & WEST LLP
One Front Street, 33rd Floor
San Francisco, CA 94111
Telephone: 415.875.2300
Facsimile: 650.938.5200

DAVID HAYES (CSB No. 122894)
dhayes@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

*Attorneys for Defendants*
DATABRICKS, INC., and
MOSAIC ML, LLC, formerly MOSAIC ML, INC.

*Additional counsel listed on signature page*

FENWICK & WEST LLP

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

*In Re Mosaic LLM Litigation*

Master File Case No. 3:24-cv-01451-CRB
Consolidated with Case No. 3:24-cv-02653-CRB

**DEFENDANTS' REPLY IN SUPPORT OF SUMMARY JUDGMENT**

Date: October 30, 2026
Time: 10:00 a.m.
Dept: Courtroom 6, 17th Floor
Judge: Hon. Charles R. Breyer

**REDACTED**

FENWICK & WEST LLP

## TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1
II. ARGUMENT .......... 1
A. Downloading datasets for LLM research and training was fair use .......... 1
B. Defendants' facilitation of fair-use LLM training and research by select third parties using Defendants' infrastructure was not copyright infringement. .......... 4
1. Sharing limited access to datasets for further fair-use LLM training and research does not give rise to infringement. .......... 4
2. Uncontradicted expert evidence establishes that the limited sharing of dataset access caused no market harm to Plaintiffs. .......... 8
C. Defendants' use of books to train MPT-7B-StoryWriter-65k+ was fair use. .......... 9
1. Factor One Favors Fair Use: MPT-7B-StoryWriter-65k+ is radically transformative of the data used to train and fine-tune it. .......... 10
2. Factor Four Favors Fair Use: MPT-7B-StoryWriter-65k+ caused no cognizable market harm to Plaintiffs. .......... 12
a. Plaintiffs' theory of harm from increased competition is legally non-cognizable and unsupported by the evidence .......... 12
b. Plaintiffs' theory of harm to the market for AI training data is legally non-cognizable and unsupported by the evidence. .......... 14
D. Plaintiffs' inducement and contributory infringement claims fail. .......... 15
E. Plaintiffs have waived any direct infringement claims as to DBRX. .......... 15
III. CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**


*American Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994) ........ 2

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ........ 2-3, 10

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) ........ 14

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) ........ *passim*

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) ........ 2, 4, 14

*Cox Communications, Inc. v. Sony Music Entertainment*,
607 U.S. 583 (2026) ........ 1, 15

*Feist Pubs., Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ........ 6, 12

*Fox News Network, LLC v. TVeyes, Inc.*,
883 F.3d 169 (2d Cir. 2018) ........ 2

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) ........ 12

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025) ........ 8, 10, 13-14

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003) ........ 1, 11-12

*L.A. News Serv. v. Reuters Television Int'l, Ltd.*,
149 F.3d 987 (9th Cir. 1998) ........ 7

*L.A. News Serv. v. Tullo*,
973 F.2d 791 (9th Cir. 1992) ........ 7

*Lenz v. Univ. Music Corp.*,
815 F.3d 1145 (9th Cir. 2016) ........ 7-8

*McGucken v. Pub Ocean Ltd.*,
42 F.4th 1149 (9th Cir. 2022) ........ 7


FENWICK & WEST LLP

*Pac. Dawn LLC v. Pritzker*,
831 F.3d 1166 (9th Cir. 2016)........................................................................................ 15

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007)........................................................................... 1, 11-12

*Princeton Univ. Press v. Michigan Document Servs.*,
99 F.3d 1381 (6th Cir. 1996).............................................................................................. 7

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992)........................................................................................ 12

*SOFA Ent., Inc. v. Dodger Prods., Inc.*,
709 F.3d 1273 (9th Cir. 2013).......................................................................................... 8

*Sony Comput. Ent., Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000).......................................................................................... 13

*Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*,
765 F. Supp. 3d 382 (D. Del. 2025) ................................................................................ 11

*Tresona Multimedia v. Burbank High Sch. Vocal Music Ass'n*,
953 F.3d 638 (9th Cir. 2020).......................................................................................... 14

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000)................................................................................ 7

**STATUTES**

17 U.S.C. § 102(b) ........................................................................................................ 10

17 U.S.C. § 107 ....................................................................................................... *passim*

**OTHER AUTHORITIES**

Korn, Melissa, "Rare-Book Sales Are Booming. They're Getting Sliced Up and
Fed to AI.", *The Wall Street Journal*, Aug. 22, 2026 ............................................................ 8



FENWICK & WEST LLP

## I. INTRODUCTION

Unable to rebut the evidence that Defendants used books for fundamentally transformative purposes without causing any cognizable market harm, Plaintiffs resort to mischaracterizing the facts. They claim that Defendants created a general-purpose library to "check out" books, converted it to a Napster-like "commercial library," and created a "novel-writing machine" to compete with Plaintiffs. That narrative does not survive contact with the record.

There is no evidence that Defendants, or anyone else, ever used Defendants' copies of large language model (LLM) training datasets allegedly containing Plaintiffs' books to even *try* to read a book; that the few customers with whom Defendants shared access to the datasets used them for anything other than highly transformative LLM training and research; or that Defendants' LLMs created—or would be capable of creating—a novel, much less one that could compete for readers with Plaintiffs' books. Plaintiffs' secondary liability claims also fail under the Supreme Court's decision in *Cox Communications*, and Plaintiffs have waived any claim premised on Databricks' DBRX models. The Court should grant summary judgment in Defendants' favor.

## II. ARGUMENT

### A. Downloading datasets for LLM research and training was fair use.

Plaintiffs reprise the argument from their partial summary judgment motion that downloading works from the Internet without paying rightsholders can never be fair use. Dkt. 402-3 (Opp.) at 8-10. The Ninth Circuit holds otherwise. *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-22 (9th Cir. 2003) (unauthorized commercial *downloading* of copyrighted images was fair use); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1163-68 (9th Cir. 2007) (same). As Defendants showed in their opposition to Plaintiffs' motion, the statutory factors weigh decisively in favor of fair use, given the transformative purpose of the downloading—LLM training and research. Dkt. 399 at 9-19. Downloading the training datasets was necessary intermediate copying for that unquestionably transformative purpose. *Id.* at 10-13. Indeed, Plaintiffs' technical expert *agrees* that "downloading [] raw text files" is "a necessary step in [] LLM training." Dkt. 399-3 (Shan Dep.) at 195:3-9. Plaintiffs' attempt to reframe the downloading as a separate unlawful use distorts the law and mischaracterizes the facts.



FENWICK & WEST LLP

FENWICK & WEST LLP

First, Plaintiffs argue that acquiring unauthorized copies of works to "facilitate" LLM training and research cannot be fair use as a matter of law, premising that proposition on two Second Circuit cases. Opp. at 8-9. But those cases merely stand for the proposition that copying works to use them for their original, intended purpose (reading academic articles, watching news shows), rather than a transformative purpose, is not fair use. In *American Geophysical Union v. Texaco Inc.*, a research scientist made unauthorized copies from a scholarly journal "for the *same basic purpose* that one would normally seek to obtain the original—to have it available on his shelf for ready reference …" 60 F.3d 913, 918 (2d Cir. 1994) (emphasis added). In *Fox News Network, LLC v. TVeyes, Inc.*, using Fox's news shows to create a searchable database "d[id] *little if anything to change … the purpose for which the content is used*," as the database "allow[ed] [the defendant's] clients to see and hear virtually all of the Fox programming that they wish." 883 F.3d 169, 181 (2d Cir. 2018) (emphasis added). In both cases, because the defendants copied the works for the same purpose as the originals, the fact that copies might be read or watched for "research" did not qualify the copying as fair use. *TVeyes*, 883 F.3d at 178 n.4; *Texaco*, 60 F.3d at 924. But the Second Circuit did not establish a bright-line rule that copying works for a research purpose can never be fair use, which would contradict Section 107's plain text.

Plaintiffs also rely on language from *Bartz v. Anthropic PBC* that "[y]ou can't just bless yourself by saying I have a research purpose and, therefore, go and take any [academic] textbook you want" because that would "destroy the academic publishing market." Opp. at 9. But that example assumes that one seeks *to read* a textbook for research—its original, non-transformative purpose. By contrast, AI researchers at Mosaic included fiction within training datasets not to *read* it for research, but to conduct computer science research, deriving statistical information about language (which copyright law does not protect) to create a fundamentally new and useful computer technology. Dkt. 319-10 (Johnson Decl.) ¶¶ 14-34; Dkt. 399-1 (Supp. Frankle Decl.) ¶¶ 2-4; Dkt. 319-7 (Frankle Decl.) ¶ 30. Therefore, *Texaco*, *TVeyes*, and *Bartz* are inapposite.

Second, Plaintiffs argue that *Warhol* requires the Court to analyze Defendants' downloading of datasets as a separate "use" from how Defendants ultimately used the datasets. Opp. at 7-8. But *Warhol* says nothing of the sort. In keeping with the text of Section 107, *Warhol*

held that courts should separately analyze distinct *end-uses* of works for different *purposes*, for example "the recording of TV for a commercial or profit-making purpose" as separate from "private home use." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533 (2023) (citation modified). Nothing in *Warhol* suggests that necessary intermediate copying—like Mosaic's downloading of LLM training datasets—is a discrete "use," divorced from the copier's ultimate purpose. Nor could such a position be squared with Section 107, which dictates that courts consider the "purposes" of the "use" of the "work," not of each interim copy of the work made along the way.

Third, Plaintiffs contend that Defendants' purpose in downloading the datasets was not just LLM training and research, but also the creation of a general-purpose, "central library" of books. Opp. at 9. There is zero evidence of that. Plaintiffs do not dispute that Defendants' employees never used, or tried to use, the datasets to find or read any specific book. Frankle Decl. ¶ 30. Plaintiffs' own technical expert demonstrated that the datasets—unlike book libraries—were not indexed or organized to facilitate searching for a specific book, and were not in a readable format. Dkt. 399 at 19-22. And unrebutted evidence establishes only two internal uses of Plaintiffs' books by Defendants: LLM training and discrete LLM research projects unrelated to any specific book. Frankle Decl. ¶¶ 30-36.

Plaintiffs' claims that "Defendants categorized their library by genre" and "check[ed] out specific books" are pure fiction. Opp. at 4. Plaintiffs premise those claims entirely on evidence that Mosaic filtered the Books3 sub-dataset for fiction books. *See, e.g.*, Dkt. 390 (Nath Decl.), Ex. 10, Ex. 12 at 13-14 (describing Mosaic's filtering process). But that evidence shows that Mosaic used the fiction-filtered data for one purpose only—fine-tuning MPT-7B-StoryWriter-65k+. It also shows that Mosaic compiled that data by writing software to extract possible ISBNs (International Standard Book Numbers) from Books3 files and "then us[ed] the Google Books API to look up the genre associated with that ISBN to identify fictional works." Nath Decl., Ex. 12 at 14; *see also* Dkt. 321-24 (Trott Decl.) at ¶ 14. That technical process, conducted solely for LLM fine-tuning, is nothing like "checking out" books and categorizing them "by genre" for readers. Plaintiffs' brazen mischaracterization of that evidence does not create a genuine issue of fact. And because



FENWICK & WEST LLP

there is no evidence that Defendants created a general-purpose, "central library … to retain 'forever,'" the *Bartz* court's ruling that such a purpose would exceed fair use has no bearing here. *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1014, 1026 (N.D. Cal. 2025).

**B. Defendants' facilitation of fair-use LLM training and research by select third parties using Defendants' infrastructure was not copyright infringement.**

Plaintiffs next contend that Defendants are liable for operating a so-called "commercial library" of unauthorized book copies. Opp. at 1-2, 10-13. That grossly mischaracterizes the facts. The undisputed evidence establishes only that Defendants shared access to their specially formatted datasets with select third parties, solely to facilitate further fair-use LLM training and research on Defendants' infrastructure. That is not an independent ground for infringement liability, just as it was not infringement for Google to share its interim digital copies of books with libraries to "enable [their] provision of fair use digital searches." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 229 (2d Cir. 2015) ("*Google Books*").[1] Nor is there evidence that this limited access to training datasets caused any economic harm to Plaintiffs' works.

**1. Sharing limited access to datasets for further fair-use LLM training and research does not give rise to infringement.**

Plaintiffs' "commercial library" narrative rests on a single, undisputed fact: Defendants shared links with nine customers and a graduate student to versions of the datasets that had been specially formatted for LLM training on Defendants' infrastructure. Opp. at 10. There is no dispute that Defendants did so only to facilitate LLM training and research by those third parties, so that they would not have to separately reformat publicly available datasets. Supp. Frankle Decl. ¶ 8. It is also undisputed that Defendants never marketed that access, charged nothing for it, and did not share the links externally with anyone else or post them publicly. *Id.* ¶¶ 8-10. Nor do Plaintiffs dispute that, while Defendants maintained RedPajama in an Amazon Web Services (AWS) repository configured to "Public – Requester Pays," this repository could be accessed only with the

---

[1] In their Opposition to Plaintiffs' motion for partial summary judgment, Defendants address in turn each of the four statutory factors as applied to the limited sharing of access to datasets, showing that the factors weigh in favor of fair use. Dkt. 399 at 19-25.



FENWICK & WEST LLP

specific link. There is no evidence that Defendants distributed that link beyond a few customers and the graduate student, or that those entities shared it with anyone else.[2] *Id.* ¶ 10; Opp. at 10-11.

The datasets themselves also lacked the most obvious hallmark of a book "library"—the ability to locate and read specific books. Plaintiffs' and Defendants' technical experts both make clear that even attempting to find a book within the datasets required a multi-step technical process, as they had no interface or index enabling straightforward book searches. Dkt. 319-12 (Johnson Rebuttal Report) ¶¶ 52-54; Nath Decl., Ex. 1 (Shan Opening Report) ¶¶ 28-41. Separately, Plaintiffs concede that any book data in the shared datasets was not human-readable. Opp. at 11. Defendants had preprocessed the datasets not for reading, but to meet their platform's technical requirements, including by converting them into a binary file format called Mosaic Data Shard (MDS). Frankle Decl. ¶¶ 40-42; Johnson Decl. ¶¶ 65-68. While Plaintiffs contend that the data "could be re-converted back to readable text with relative ease" (Opp. at 11), their own technical expert (Dr. Shan) opined that "re-conversion" entails multiple technical steps, including writing and running Python code. Dkt. 323-10 (Shan Rebuttal Report) ¶ 13; Shan Opening Report ¶ 88. In the words of Dr. Shan, that process required the skillset of an "undergraduate student who has taken an introductory Python course and reads [Defendants'] official documentation." Shan Rebuttal Report ¶ 13.

On that record, Defendants did not operate a "commercial library," but merely facilitated additional fair use. As the Second Circuit held in *Google Books*, making interim copies of books for fair use *and sharing* those interim copies for further fair use is not copyright infringement. 804 F.3d at 228-29.

Plaintiffs' attempts to narrow that ruling fail. They point out that the libraries to which Google provided digital book copies "already owned" physical copies of those books. Opp. at 12. Yet the Second Circuit's holding did not hinge on the libraries' ownership of physical copies, but on the principle that "[i]f the library had created its own digital copy *to enable its provision of fair use digital searches*, the making of the digital copy would not have been infringement." 804 F.3d

[2] Defendants also did not "productize" RedPajama or The Pile. Opp. at 2, 5, 11. They briefly discussed the *possibility* of "productizing" open-source datasets but never pursued that idea. Supp. Frankle Decl. ¶¶ 5-8.



FENWICK & WEST LLP

at 229 (emphasis added). Thus, providing interim copies of a work to a party that would be entitled to make those copies itself as a fair use does not give rise to liability for copyright infringement. That rule encourages fair use and is thus consistent with the Copyright Act's goal of "encourag[ing] others to build freely upon the ideas and information conveyed by a work." *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349-50 (1991). Because LLM training and research are fair uses that necessarily require initial copying of the training data (Dkt. 312-2 at 11-22), Defendants' customers would have been entitled to copy the data themselves for those purposes. Under *Google Books*, it was therefore not infringement for Defendants to provide those customers copies of the datasets preprocessed for use on Defendants' training infrastructure.

Plaintiffs also point out that, in *Google Books*, the libraries contractually agreed to use the digital book copies "in a manner consistent with the copyright law, and to take precautions to prevent dissemination of their digital copies to the public at large." 804 F.3d at 229; Opp. at 12. But the libraries' contractual undertakings in *Google Books* were relevant because they made it reasonable for Google to expect that those libraries would make fair use of the digital copies, rather than engage in infringing conduct. 804 F.3d at 229 (referencing Google's "*understanding* that the libraries will use the copies in a manner consistent with the copyright law …." (emphasis added)). Here, it was similarly reasonable for Defendants to expect that their customers, all of whom sought to engage in LLM training on Defendants' infrastructure, and who received the datasets in a format useful only for that purpose (not human reading), would not misuse the datasets. Moreover, unlike in *Google Books*, dissemination of the training datasets was not a relevant consideration because they had already been widely disseminated for AI training through the research platform Hugging Face. Thus, Defendants' expectation that their customers would engage in LLM-related fair uses was just as reasonable as Google's expectation of the libraries.

*Google Books* also defeats Plaintiffs' suggestion that Defendants have the burden of proving that the recipients "exclusively" engaged in fair use. Opp. at 2, 13. The Second Circuit did not require Google to establish the libraries' actual fair use of digital book copies. Instead, the court "recognize[d] the possibility that libraries may use the digital copies Google created for them in an infringing manner," but held that "on the present record, the possibility that libraries may misuse



FENWICK & WEST LLP

their digital copies is sheer speculation." 804 F.3d at 229. The same is true here: Defendants shared necessary interim copies with third parties specifically for a fair use purpose, and there is zero evidence that any recipient misused them.

Separately, Plaintiffs argue that *Google Books* supports finding Defendants liable for exposing their books to a *risk* of piracy. Opp. at 12-13. But the court *rejected* a claim based on risk "that hackers might gain access and make the books widely available," where that theory was "not supported by the evidence." *Google Books*, 804 F.3d at 227. Here, too, no such risk exists because Defendants have adequately "restricted the [AWS] bucket to deny external access," as Plaintiffs' expert has confirmed. Shan Rebuttal Report ¶ 29.

Plaintiffs' authorities are all inapplicable because they involve *non-transformative* uses, where infringers copied works to substitute for the same purposes as the originals: viewing photos of nature (*McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1158-61 (9th Cir. 2022)); listening to music (*UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 350-51 (S.D.N.Y. 2000)); reading chapters of academic books (*Princeton Univ. Press v. Michigan Document Servs.*, 99 F.3d 1381, 1388-89 (6th Cir. 1996)); and licensing video recordings of newsworthy events (*L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 993-94 (9th Cir. 1998); *L.A. News Serv. v. Tullo*, 973 F.2d 791, 792-93 (9th Cir. 1992)). By contrast, as in *Google Books*, Defendants here used books (and other text) when creating a new and useful technology "without providing the public with a substantial substitute" for the protected content in Plaintiffs' books. 804 F.3d at 207.

Finally, Plaintiffs say that it would have been "inherently, irredeemably infringing" for Defendants' customers to download for free books that they could purchase "at a bookstore," citing *Bartz*. Opp. at 13. That argument overlooks that LLM training necessarily required making digital copies of the books, which in this case could be most effectively accomplished by downloading pre-existing datasets formatted for that transformative purpose. Forcing AI developers to first obtain physical copies of books as a precursor to making necessary digital copies would only impede fair use.[3] But "[f]air use is not just excused by the law, it is wholly authorized by the law."

---

[3] While Plaintiffs assume that AI developers would have to buy new books from a bookstore to make digital copies (Opp. at 13), such developers could also simply borrow the books from a public



FENWICK & WEST LLP

*Lenz v. Univ. Music Corp.*, 815 F.3d 1145, 1151-52 (9th Cir. 2016) ("[I]t is logical to view fair use as a right." (citation omitted)). The doctrine exists precisely to avoid the "perverse result" of "an overzealous monopolist" using "his copyright to stamp out the very creativity that the Act seeks to ignite." *SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013). A rule that every AI developer must acquire, digitally scan, and then perhaps destroy hundreds of thousands of physical books would entail a particularly perverse result, stifling the development of a novel technology while diverting books *away* from human readers.[4]

**2. Uncontradicted expert evidence establishes that the limited sharing of dataset access caused no market harm to Plaintiffs.**

Plaintiffs do not attempt to rebut Defendants' expert evidence that the limited sharing of access to the datasets caused Plaintiffs no lost book sales. Dkt. 319-15 (Tucker Decl.) ¶¶ 25-33. Nor did their market harm expert, Dr. Spulber, provide any opinion about whether Defendants harmed Plaintiffs in the consumer market for books or in licensing markets for traditional derivative uses. Dkt. 312-9 (Spulber Dep.) at 63:14-64:13. In these circumstances, "where a defendant introduces evidence of a lack of market harm, and the plaintiff fails to introduce empirical evidence countering such a showing, the fourth factor should be weighed in the defendant's favor." *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1056 (N.D. Cal. 2025) (citation modified).

Unable to point to any empirical evidence of harm, Plaintiffs speculate about hypothetical harms that could purportedly occur if Defendants' conduct became "widespread." Opp. at 11-13. First, Plaintiffs claim they would suffer market harm because "everyone in the AI industry" would "acquire[]" Plaintiffs' books. *Id.* at 11. But that casts Defendants' use too broadly, ignoring the requirement under Section 107 to consider the use "in any particular case." Defendants' use was narrow and for a specific purpose: they made non-human-readable versions of the datasets available only to select customers using Defendants' specific infrastructure, only for LLM training and

---

library or buy them used—which would provide no compensation to Plaintiffs or other authors.

[4] This undesirable outcome is illustrated by recent reports suggesting that AI developers may be purchasing, scanning, and then disposing of rare books, in the wake of the *Bartz* court's conclusion that using copies of "purchased-and-destructively-scanned" books for LLM training was fair use. *See, e.g.*, Korn, Melissa, "Rare-Book Sales Are Booming. They're Getting Sliced Up and Fed to AI.", *The Wall Street Journal*, Aug. 22, 2026; *Bartz*, 787 F. Supp. 3d at 1018, 1022-25.



FENWICK & WEST LLP

research. Frankle Decl. ¶¶ 40-48; Supp. Frankle Decl. ¶ 8. There is no evidence that anyone used the datasets for anything else. Nor is there evidence that those customers released AI models that could conceivably cause market harm to Plaintiffs, as they developed models for industry uses such as healthcare, electric vehicles, and professional workflow automation. Tucker Decl. ¶¶ 11-12. Consistent with those facts, Plaintiffs have never alleged that the customers' models can produce outputs that infringe or substitute for Plaintiffs' books. Thus, even if such conduct were "widespread," it could not cause Plaintiffs to lose book sales or revenue from traditional licensing channels. Moreover, "everyone in the AI industry" *did* have access to RedPajama and The Pile through the AI research platform Hugging Face, yet the evidence shows no deterioration of Plaintiffs' book sales trends during that period. Johnson Decl. ¶¶ 37, 41-43; Tucker Decl. ¶¶ 25-33. That undisputed fact undercuts Plaintiffs' speculation.

Second, Plaintiffs claim that Defendants' conduct could lead to the availability of Plaintiffs' books on "shadow librar[ies]" because bad actors might "scrape" books from Defendants' AWS repository. Opp. at 5, 11. But Plaintiffs' technical expert confirmed that there is no evidence of any malicious actors ever doing so. Shan Rebuttal Report ¶¶ 27-30. And Plaintiffs cannot explain why bad actors would be searching for books in a specialized, *non-readable* binary format. On this record, the fourth statutory factor weighs in favor of fair use.

**C. Defendants' use of books to train MPT-7B-StoryWriter-65k+ was fair use.**

The Opposition does not challenge Defendants' use of Plaintiffs' books to train any of the LLMs in Mosaic's MPT series *other than* MPT-7B-StoryWriter-65k+. Plaintiffs thus tacitly concede that Defendants have established fair use as to those other models. Opp. at 13-14. Plaintiffs argue that using books to train an LLM that produces any "fictional" text cannot be fair use. But MPT-7B-StoryWriter-65k+ is transformative of its training data and has caused Plaintiffs *no* harm.[5]

---

[5] Defendants address below the first and fourth fair use factors. They direct the Court to their opening summary judgment brief (Dkt. 312-2 at 16-18) on the second and third factors, which Plaintiffs concede "are not typically the most important." Opp. at 19.



FENWICK & WEST LLP

### 1. Factor One Favors Fair Use: MPT-7B-StoryWriter-65k+ is radically transformative of the data used to train and fine-tune it.

Plaintiffs do not seriously dispute that MPT-7B-StoryWriter-65k+ itself is transformative. Opp. at 14-17. Plaintiffs' books contain expression intended for human reading, whereas MPT-7B-StoryWriter-65k+ is a multibillion-parameter LLM capable of generating output in response to never-before-seen user prompts, including prompts with long context lengths. Dkt. 319-11 (Johnson Opening Report) ¶¶ 201-09. MPT-7B-StoryWriter-65k+ plainly "adds something new, with a further purpose or different character" than Plaintiffs' books. *Warhol*, 598 U.S. at 509 (citation omitted).

Plaintiffs nevertheless argue that Defendants "flunk[]" the first factor because Mosaic trained MPT-7B-StoryWriter-65k+ to output "fiction." Opp. at 15. But there is no dispute that MPT-7B-StoryWriter-65k+ is *incapable* of reproducing the copyrighted content of Plaintiffs' books. Dkt. 399-3 (Shan Dep.) at 202:4-6; Dkt. 319-3 (Evans Decl.) ¶¶ 35-36, 41, 48, 50. And Plaintiffs do not allege—nor is there any evidence—that the model can output infringing derivative works. On this record, there can be no genuine dispute that the model has a "further purpose" than Plaintiffs' books—interactively allowing users to generate new, non-infringing written text.

Plaintiffs contend that MPT-7B-StoryWriter-65k+ is non-transformative because it derived "literary style" from its training corpus. Opp. at 15. That argument fails on two fronts. First, copyright law does not protect "style." *See* 17 U.S.C. § 102(b); *Kadrey*, 788 F. Supp. 3d at 1045. Plaintiffs improperly seek to monopolize generic, non-protectable writing elements—including "prose rhythm" and "vocabulary"—that every author is free to use. Shan Rebuttal Report ¶¶ 39-41. Second, Plaintiffs' purported evidence on that point is inadmissible and *confirms* that MPT-7B-StoryWriter-65k+ does not reproduce Plaintiffs' writing "styles." *See generally* Dkt. 308.

Relatedly, Plaintiffs' hyperbolic claim that Defendants sought to "create a substitution machine capable of supplanting Plaintiffs [sic] works" (Opp. at 16) is defeated by the undisputed record. Defendants created MPT-7B-StoryWriter-65k+ solely as a *demonstration* that Mosaic's platform could train LLMs with a "context window" of over 65,000 tokens—a valuable feature that allows LLMs to consider voluminous documents when generating output—and used fiction as an

FENWICK & WEST LLP

*example* of this capability. Trott Decl. ¶¶ 12-16. Mosaic made this clear when releasing the model: "[W]ith the MosaicML platform …, you can easily finetune MPT-7B to handle context lengths up to 65k! … *To show off this capability and to get you thinking about what you could do with a 65k context window*, we are releasing MPT-7B-StoryWriter-65k+." Dkt. 321-27 at -274 (emphasis added). Mosaic did not market MPT-7B-StoryWriter-65k+ as a standalone product, and using it required specialized hardware and computer skills. Frankle Decl. ¶ 17; Johnson Decl. ¶ 50. MPT-7B-StoryWriter-65k+ was incapable of following instructions—such as "write a novel about X"—and could only probabilistically continue text inputs. Johnson Opening Report ¶ 209. Mosaic entered the entire text of *The Great Gatsby* with the further prompt "epilogue" just to obtain a short (and, as it turns out, flawed) epilogue. Trott Decl. ¶¶ 16-18. Thus, Defendants indisputably did *not* develop MPT-7B-StoryWriter-65k+ as a commercial tool for generating novels at scale.

There is also no evidence that the model could ever do so. Contrary to the Opposition's rhetoric, Plaintiffs have *admitted* that they are unaware of any of Defendants' models generating any novels or of anyone offering for sale a novel generated by the models. Exs. 5, 8, 9 at pp. 1-4; Exs. 6 & 7 at pp. 2-5.[6] More broadly, they are unaware of any outputs from Defendants' LLMs that *substitute for* or *compete with* their books. Exs. 5, 8, 9 at pp. 4-12; Exs. 6 & 7 at pp. 6-14. Indeed, Plaintiffs offer no evidence of MPT-7B-StoryWriter-65k+ *ever* being used to create *any* book. By the same token, the *Thomson Reuters* case (Opp. at 16) is inapposite, because the technology there was "not generative AI (AI that writes new content itself)" and the defendant designed it specifically to compete with the plaintiff whose works it copied. *Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.*, 765 F. Supp. 3d 382, 398 (D. Del. 2025).

Finally, Plaintiffs argue that courts have endorsed intermediate copying only for a transformative purpose where the copier is "content-agnostic." Opp. at 17-19. But many copiers in leading cases upholding the fair use right used works to draw upon their content: Google copied millions of books to create a tool that could identify and display *specific content* in those books (*Google Books*, 804 F.3d at 214-25); Arriba and Google copied countless images online to develop tools for locating and displaying those *specific images* associated with keywords describing their

[6] Exhibits are attached to the Supplemental Wakefield Declaration, unless indicated otherwise.

FENWICK & WEST LLP

content (*Kelly*, 336 F.3d at 818-22; *Perfect 10*, 508 F.3d at 1163-68). The courts in those cases did not require content agnosticism, but instead looked to whether the copying served a transformative purpose. Here, using books and other text to create a new technology and advance the science of LLM development falls squarely within the well-established "intermediate copying" case law.

**2. Factor Four Favors Fair Use: MPT-7B-StoryWriter-65k+ caused no cognizable market harm to Plaintiffs.**

Plaintiffs make no attempt to rebut the evidence that Defendants' conduct—including the development of MPT-7B-StoryWriter-65k+—caused them no loss in traditional book markets. Plaintiffs argue two theories of harm that each fail as a matter of law *and* lack support in the record.

**a. Plaintiffs' theory of harm from increased competition is legally non-cognizable and unsupported by the evidence.**

Plaintiffs contend that they will be harmed by increased competition from *non-infringing* books *if* "models designed to generate long-form fiction *improved* and became widespread." Opp. at 20-21 (emphasis added). That theory of harm is non-cognizable for at least two independent legal reasons.[7] First, the Copyright Act has *never* protected creators against competition from non-infringing works. That is because "the primary objective of copyright is *not* to reward the labor of authors, but to promote the Progress of Science and useful Arts." *Feist*, 499 U.S. at 349 (citation modified) (emphasis added). Allowing innovators to make fair use of works without compensation to rightsholders is not "some unforeseen byproduct of a statutory scheme"—it is "the essence of copyright" and "a constitutional requirement." *Id.* While Plaintiffs invoke *Oracle* (Opp. at 22), the Court there held that copyright cannot be applied as a "lock limiting [] future creativity," as that "would interfere with, not further, copyright's basic creativity objectives." *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 39 (2021). As such, attempting to prevent competition "cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine." *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520-24 (9th Cir. 1992) (copying copyrighted videogames to develop a compatible platform was fair use, even when defendant's new technology "led to an

---

[7] In addition, a court decision applying Plaintiffs' theory of harm would constitute speaker- and content-based discrimination, in violation of the First Amendment. *See* Dkt. 422-1 at 9-15.

increase in the number of independently designed video game programs."); *see also Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 607 (9th Cir. 2000) (recognizing that new technology resulting from a transformative use "is a legitimate competitor in the market" and that "some economic loss … as a result of this competition does not compel a finding of no fair use.").

Thus, Plaintiffs' so-called "dilution" theory—more aptly an "increased competition" theory—flies in the face of these bedrock principles; accepting it would be a sea change in American copyright law. Plaintiffs' copyrights do not entitle them to prevent or control the development of transformative technologies, even if the technology may assist new authors in creating non-infringing books that could compete in the marketplace. Plaintiffs' theory fails.

<u>Second</u>, the relevant conduct for the fourth factor market analysis is not the development of hypothetical, "improved" LLMs that generate pitch-perfect novels on demand, but the development of LLMs with the *same* purpose and capabilities as MPT-7B-StoryWriter-65k+ — that is, "the use made of a work *in any particular case*." 17 U.S.C. § 107 (emphasis added). As such, the relevant question is whether a proof-of-concept LLM with 2023 technological capabilities (that Defendants never updated), and which cannot follow instructions or write novels, could harm Plaintiffs in any cognizable market. As shown in Defendants' opening brief (Dkt. 312-2 at 18-20), unrebutted expert evidence establishes that the answer to that question is an emphatic "no."

Setting aside that increased competition is non-cognizable harm, Plaintiffs have not presented *any* evidence that raises a genuine dispute of material fact about this issue. Their market harm expert presented no evidence of any harm to Plaintiffs' book sales, let alone harm from authors using MPT-7B-StoryWriter-65k+ or even from newer, far more capable LLMs. Dkt. 312-9 (Spulber Dep.) at 63:14-64:13. Plaintiffs have admitted that they are unaware of Defendants' LLMs generating any books, or any outputs that compete with or substitute for their novels. *Supra* II.C.1. And while Plaintiffs rely heavily on the *Kadrey* ruling, the *Kadrey* plaintiffs' harm theory *failed* for lack of evidence. 788 F. Supp. 3d at 1036. The same is true here.

As purported evidence of increased competition from LLMs, Plaintiffs rely on a study co-authored by Dr. Tuhin Chakrabarty and Dr. Paramveer Dhillon, and two articles citing that same study. Opp. at 20-21 & n.3. Those documents are inadmissible hearsay and irrelevant, as they do

FENWICK & WEST LLP

not discuss MPT-7B-StoryWriter-65k+.[8] Worse, Plaintiffs cite these articles without disclosing key facts: Dr. Chakrabarty's development of the "market dilution" theory was *funded by* Plaintiffs' counsel *for this litigation*; both he and Dr. Dhillon were initially disclosed as experts here; and Dr. Chakrabarty never provided a report, while Dr. Dhillon did but was withdrawn as an expert days before his deposition, with Plaintiffs' counsel representing that they would not rely on his opinions in this case. Supp. Wakefield Decl. ¶¶ 2-9 & Exs. 1-4. That underhanded attempt to rely on withdrawn expert opinions bought and paid for by counsel violates Rule 26 and counsel's duty of candor. The Court should disregard those hearsay articles.

**b. Plaintiffs' theory of harm to the market for AI training data is legally non-cognizable and unsupported by the evidence.**

Plaintiffs' cursory argument about harm to the market for licensing books as AI training data fails to engage with or even acknowledge the many authorities holding that licensing markets for transformative uses—such as LLM training—are not legally cognizable in the fourth-factor analysis. Opp. at 24-25; *see, e.g.*, *Tresona Multimedia v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 652 (9th Cir. 2020); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 99-100 (2d Cir. 2014); *Kadrey*, 788 F. Supp. 3d at 1052; *Bartz*, 787 F. Supp. 3d at 1032. Plaintiffs have no response to courts' conclusion that considering such harm would inexorably lead to the fourth factor "becoming circular and favoring the rightsholder in every case." *Kadrey*, 788 F. Supp. 3d at 1052.

Plaintiffs also fail to rebut Defendants' evidence that there is no market for licensing books like Plaintiffs' to train AI models because of substantial economic barriers that cause market failure. Dkt. 319-13 (Sinkinson Decl.) ¶¶ 11-16. Notably, this hypothetical market would require AI developers to incur massive transaction costs to negotiate at arm's length with hundreds of thousands of authors for licenses to books that, individually, contribute near-zero value to LLM

---

[8] Plaintiffs also point to an internal message thread in which some Mosaic employees expressed [redacted] Opp. at 7, 21. Read in its entirety, the discussion is clearly about [redacted] Indeed, in the same document, the employee whose comment Plaintiffs quote out-of-context followed up by saying that [redacted] Nath Decl., Ex. 31 at -562.

FENWICK & WEST LLP

training. *Id.* Plaintiffs point to a few existing agreements to license books for AI training but ignore that, apart from one idiosyncratic outlier, those agreements are not for licensing trade books from individual authors like Plaintiffs. *Id.* ¶¶ 19-21. And that outlier is irrelevant, as [redacted]. *Id.* ¶¶ 23-26. Accordingly, Plaintiffs' theory of lost AI licensing revenue also fails.

**D. Plaintiffs' inducement and contributory infringement claims fail.**

Plaintiffs do not dispute that *Cox Communications, Inc. v. Sony Music Entertainment*, 607 U.S. 583 (2026), governs their claims for secondary copyright liability. Opp. at 25. They raise no argument that Defendants induced infringement under *Cox*, which requires a showing that Defendants "actively encourage[d] infringement through specific acts." 607 U.S. at 584. Plaintiffs argue that Defendants provided a "service tailored to infringement." Opp. at 25. But under *Cox*, "[a] service is tailored to infringement if it is not capable of substantial or commercially significant noninfringing uses." 607 U.S. at 584 (citation modified). Defendants shared access to datasets specially formatted to train transformative LLMs on Defendants' platform. Defendants' service was thus plainly "capable of substantial or commercially significant noninfringing uses." *Id.* (citation modified). Plaintiffs argue that Defendants must prove that the third parties engaged in fair use, citing to a case that pre-dates *Cox* by nearly a decade. Opp. at 25. But *Cox* undisputedly controls here and it imposes no such requirement. Plaintiffs' secondary liability claims thus fail.

**E. Plaintiffs have waived any direct infringement claims as to DBRX.**

Plaintiffs have waived any argument that Databricks' development of its DBRX models gives rise to copyright infringement. Indeed, their Opposition does not respond to Defendants' request for summary judgment on any such claim (Dkt. 312-2 at 25), and Plaintiffs did not argue for DBRX-related liability in their motion for partial summary judgment (Dkt. 378). *See, e.g.*, *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016) (finding waiver in such circumstances). Defendants are thus entitled to summary judgment on this issue.

## III. CONCLUSION

For the foregoing reasons and those in Defendants' other submissions, the Court should grant Defendants' summary judgment motion.

FENWICK & WEST LLP

Dated: September 14, 2026

FENWICK & WEST LLP

By: */s/ Jedediah Wakefield*

Jedediah Wakefield (CSB No. 178058)
jwakefield@fenwick.com
Ryan Kwock (CSB No. 336414)
rkwock@fenwick.com
One Front Street, 33rd Floor
San Francisco, CA 94111
Telephone: 415.875.2300
Facsimile: 650.938.5200

David Hayes (CSB No. 122894)
dhayes@fenwick.com
Diana C. Buck (CSB No. 339314)
dbuck@fenwick.com
801 California Street
Mountain View, CA 94041
Telephone: 650.988.8500
Facsimile: 650.938.5200

Jonathan T. McMichael (CSB No. 304737)
jmcmichael@fenwick.com
Deena Feit (admitted *pro hac vice*)
dfeit@fenwick.com
401 Union Street, 5th Floor
Seattle, WA 98101
Telephone: 206.389.4510
Facsimile: 650.938.5200

Charles Moulins (admitted *pro hac vice*)
cmoulins@fenwick.com
Justine Vandermel (admitted *pro hac vice*)
justine.vandermel@fenwick.com
902 Broadway, 18th Floor
New York, NY 10010
Telephone: 212.430.2600
Facsimile: 650.938.5200

Zachary Harned (CSB No. 335898)
zharned@fenwick.com
730 Arizona Avenue, 1st Floor
Santa Monica, CA 90401
Telephone: 310.434.5400
Facsimile: 650.938.5200

*Attorneys for Defendants*
DATABRICKS, INC., and

MOSAIC ML, LLC, formerly
MOSAIC ML, INC.

FENWICK & WEST LLP