[Counsel on signature pages]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

*In Re Mosaic LLM Litigation*

Master Case No. 3:24-cv-01451-CRB
Consolidated with Case No. 3:24-cv-02653-CRB

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Judge: Hon. Charles R. Breyer

Date: October 30, 2026
Time: 10:00 a.m.
Location: Courtroom 6, 17th Floor

**FILED UNDER SEAL**

**TABLE OF CONTENTS**


**Page**

I. INTRODUCTION ..... 1

II. DEFENDANTS' DOWNLOADING OF PLAINTIFFS' BOOKS WAS COPYRIGHT INFRINGEMENT AND NOT FAIR USE AS A MATTER OF LAW ..... 2

A. Factor 1 Weighs Dispositively Against Fair Use. ..... 2

1. Undisputed Facts Confirm That Defendants Downloaded Books To Amass A *Bartz*-Style Central Library—A Non-transformative Use. ..... 2

2. Defendants' Fair Use Defense Fails Regardless of Their "Ultimate Purpose" In Obtaining Plaintiffs' Works. ..... 3

3. Defendants' Cases Undermine, Rather Than Support, Their Claim to Fair Use. ..... 4

B. Factors 2 And 3 Weigh Against Fair Use. ..... 7

C. Factor 4 Weighs Against Fair Use As A Matter Of Law. ..... 7

III. DEFENDANTS' DISTRIBUTION IS NOT FAIR USE AS A MATTER OF LAW ..... 8

A. Factor 1 Weighs Against Fair Use For Defendants' Distribution As A Matter of Law ..... 8

1. The Allegedly Fair Use Conduct Of Third Party Recipients of Plaintiffs' Works Is Not Cognizable Under Factor 1. ..... 8

2. Public Posting and Distribution of Plaintiffs' Books in a Compressed File Format Was Not Transformative or Justified. ..... 10

B. Factors 2 And 3 Weigh Against Fair Use As A Matter Of Law ..... 12

C. Factor 4 Weighs Sharply Against Fair Use ..... 12

IV. AMICI FACTOR 4 ARGUMENTS THAT MARKET DILUTION IS NON-COGNIZABLE ..... 14

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ....................7, 12

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994).................... *passim*

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023)....................3, 8, 15

*Authors Guild, Inc. v. HathiTrust*,
No. 1:11-cv-06531, Dkt. 113 (S.D.N.Y. June 29, 2012) ....................5

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015).................... *passim*

*Authors Guild v. Google, Inc.*,
No. 1:05-cv-08136, Dkt. 1036-1 (S.D.N.Y. July 27, 2012)....................5

*Bartz v. Anthropic PBC*,
787 F. Supp. 3d 1007 (N.D. Cal. 2025) .................... *passim*

*BMG Music v. Gonzalez*,
430 F.3d 888 (7th Cir. 2005) ....................5, 6, 7, 12

*Capitol Recs., LLC v. ReDigi Inc.*,
910 F.3d 649 (2d Cir. 2018)....................13

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020) ....................12, 15

*Fox News Network, LLC v. TVEyes, Inc.*,
883 F.3d 169 (2d Cir. 2018)....................9

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021)....................4

*Hachette Book Grp., Inc. v. Internet Archive*,
115 F.4th 163 (2d Cir. 2024) ....................11, 12, 13, 14

*Harper & Row Publ'rs, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)....................8

*Irobe v. U.S. Dep't of Agric.*,
890 F.3d 371 (1st Cir. 2018)....................13

*Kadrey v. Meta Platforms, Inc.*,
788 F. Supp. 3d 1026 (N.D. Cal. 2025)....................6, 14

*Kadrey v. Meta Platforms, Inc.*,
No. 3:23-cv-03417, Dkt. 767 (N.D. Cal. July 8, 2026)....................6

*Kelly v. Arriba Soft Corp.*,
336 F.3d 811 (9th Cir. 2003)....................5

*Latin Am. Music Co. v. Televicentro de P.R.*,
2006 WL 8450169 (D.P.R. Mar. 31, 2006)....................13

*L.A. News Serv. v. Reuters*,
149 F.3d 987 (9th Cir. 1998)....................9, 12

*L.A. News Serv. v. Tullo*,
973 F.2d 791 (9th Cir. 1992)....................9

*McGucken v. Pub Ocean Ltd.*,
42 F.4th 1149 (9th Cir. 2022)....................7, 10, 12

*NXIVM Corp. v. Ross Inst.*,
364 F.3d 471 (2d Cir. 2004)....................6

*Perfect 10 v. Amazon.com*,
508 F.3d 1146 (9th Cir. 2007)....................5

*Sega Enterprises Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992)....................1, 4, 5, 15

*Sony Computer Entm't. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000)....................4, 15

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)....................5

*Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*,
765 F. Supp. 3d 382 (D. Del. 2025)....................15

*Tresona Multimedia v. Burbank High Sch.*,
953 F.3d 638 (9th Cir. 2020)....................7

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000)....................10, 11

*United Video, Inc. v. FCC*,
890 F.2d 1173 (D.C. Cir. 1989) ........................................................................................15

*Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*,
447 F.3d 769 (9th Cir. 2006) ...........................................................................................14

## I. INTRODUCTION

Defendants copied and distributed Plaintiffs' works. Their sole defense is fair use, an affirmative defense on which they bear the burden of proof for each factor. Defendants cannot carry that burden as to either their unauthorized downloads or the public dissemination of Plaintiffs' works.

***The Free Downloads***. Defendants concede they downloaded full-text copies of Plaintiffs' works for free, that the books were available for purchase, and that Defendants retained them permanently—even after the allegedly transformative use was exhausted. These concessions resolve the case. Long before AI, courts consistently recognized that copying works for free to avoid paying for them is an unfair use, even when those copies are put to some purportedly transformative downstream purpose, like research, journalism, or technological development. This rule makes sense, especially in the internet age: If anyone could steal a book to write a critical book review on Amazon, then anyone could steal a book with impunity. Or, as Judge Alsup put it, "You can't just bless yourself by saying I have a research purpose and, therefore, go take any textbook you want." *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1025 (N.D. Cal. 2025) (quoting defense counsel). Defendants' principal response is a line of cases about "intermediate" copying—*Sega*, *Google Books*, and *HathiTrust*—but in all those cases the copyist either *purchased* the works lawfully or destroyed their copies immediately after the transformative use was complete. Defendants did neither, and for that reason their claim of fair use would "extend" the concept of transformative use "beyond recognition." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 924 (2d Cir. 1994).

***The Copying and Distribution Through Cloud Storage.*** Defendants made additional copies of Plaintiffs' works—separate from any copies used for their own LLM training—and posted them to a publicly configured cloud storage bucket from which anyone with an Amazon Web Services account could access and download them. Defendants concede their distribution and public posting had nothing to do with their *own* allegedly transformative uses of developing the MPT models, and only facilitated the supposedly commercial fair-use activities of *third parties*, *i.e.*, their "customers" and members of the "community." That concession is fatal to Defendants' claim to fair use. The Ninth Circuit has twice held that a copyist cannot borrow the allegedly transformative use of a recipient to justify its own dissemination of a copyrighted work. Without any cognizable evidence, Defendants' fair use defense arising out of its distribution and public posting of Plaintiffs' works fails.

The Court should grant summary judgment on liability for both the downloading and distribution claims. Plaintiffs do not seek summary judgment on Defendants' use of Plaintiffs' works to train their StoryWriter model, which presents triable issues. *See* Pls.' Opp. at 7-25. Plaintiffs address the amici arguments regarding market dilution in Section IV, as this is their sole opportunity to respond.

## II. DEFENDANTS' DOWNLOADING OF PLAINTIFFS' BOOKS WAS COPYRIGHT INFRINGEMENT AND NOT FAIR USE AS A MATTER OF LAW

Defendants admit that they downloaded copies of Plaintiffs' books free from the internet, that Plaintiffs' books were otherwise available to buy from authorized sources, and that Defendants retained permanent copies even after their so-called transformative use was completed. Defs.' Opp. at 4, 11, 13. As Judge Alsup said of Anthropic's downloads of Books3, "[s]uch piracy of otherwise available copies is inherently, irredeemably infringing even if the pirated copies are immediately used for the transformative use and immediately discarded." *Bartz*, 787 F. Supp. 3d at 1025. The undisputed facts regarding Defendants' piracy are dispositive.

### A. Factor 1 Weighs Dispositively Against Fair Use.

#### 1. Undisputed Facts Confirm That Defendants Downloaded Books To Amass A *Bartz*-Style Central Library—A Non-transformative Use.

"Pirating copies to build a research library without paying for it, and to retain copies should they prove useful for one thing or another, was its own use—and not a transformative one." 787 F. Supp. 3d at 1026. Defendants do not dispute this legal principle. Instead, they argue that the facts here are different. The facts are indeed different, but in ways that only further undermine Defendants' claim to fair use.

As in *Bartz*, Defendants downloaded hundreds of thousands of copyrighted books from Books3 for free [redacted]. Pls.' Mot. Ex. 4 (Tang Dep. Tr.) at 285:17-18; *Bartz*, 787 F. Supp. 3d at 1015. Defendants maintained multiple copies of these books in various formats (including plain text), and [redacted]. In one instance, Defendants [redacted], underscoring how Defendants obtained books for their protected expression—not just random data for training. *See* Pls.' Opp. Ex. 10; *compare* Pls.' Opp. Ex. 21 ("Shan Rbtl.") ¶¶ 3-7 (explaining many of Defendants' [redacted]), *with Bartz*, 787 F. Supp. 3d at 1015

(describing Anthropic's library with "bibliographic metadata"). Just like Anthropic, Defendants retained the books even after the "transformative" LLM training purpose was exhausted—all without [redacted]. Dkt. 321-6 (Frankle Decl.) ¶ 33 (Databricks [redacted]"); Pls.' Mot. Ex. 75 (Rao Dep. Tr.) 144:25-145:15.

The difference here is that Defendants used books for the separate purpose of *distributing* them to customers by posting them on public cloud repositories, where any AWS account holder could download their own permanent copy of Plaintiffs' works free. § III, *infra*. Because Defendants retained their books compilation indefinitely for any future purpose, posted it publicly, and distributed it to customers, the undisputed facts establish that Defendants' conduct here is far *less* fair than the central library in *Bartz*.

### 2. Defendants' Fair Use Defense Fails Regardless of Their "Ultimate Purpose" In Obtaining Plaintiffs' Works.

***Defendants' Claimed "Research" Use.*** Defendants try to distinguish *Bartz* by arguing that they only used the books for "LLM training and research" and not for "human reading." Defs.' Opp. at 6. But this was also true in *Bartz*. Just like Defendants here, Anthropic argued that it retained its copies of Books3 for "research" for its "products" (*i.e.,* LLMs)—and that because its use of books was for transformative research, its acquisition and maintenance of an unauthorized library was fair use. *Bartz*, 787 F. Supp. 3d at 1016. Judge Alsup rejected this argument, holding that downloading books for free to store "the works' well-organized facts, analyses, and expressive examples for various contingent uses" was non-transformative, relying on a well-worn line of decisions holding that a downstream "ultimate use" does not excuse obtaining for free what one would otherwise pay a customary price for. *Id.* at 1026-29; *Texaco*, 60 F.3d at 924 (rejecting argument that "research," "journalism," or "teaching" provides "fair use insulation" to obtain photocopies of textbooks or articles in lieu of purchasing); Pls.' Mot. at 11-15; Pls.' Opp. at 8-10.

Defendants' claim that they didn't download Plaintiffs' works with the intent to "read books" invokes the subjective-intent argument that the Supreme Court has rejected. Fair use is "an objective inquiry into what use was made, *i.e.*, what the user does with the original work," not "the subjective intent of the user." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 544-45 (2023). And even if Defendants' subjective intent *did* matter, the record confirms that Defendants obtained books precisely

for the expressive elements that the Copyright Act protects. *See* Pls.' Opp. at 6, 14-17; Ex. 10 (Defendants' [redacted]).

***Defendants' "Consumptive Use" Distinction Fails.*** Defendants are wrong that fair use turns on a distinction between "consumptive" or "nonconsumptive" use. For example, in *Texaco*, the use was unfair even though the copyist did not read "five of the photocopied articles at all[.]" 60 F.3d at 919. Regardless, this fails on this record: Defendants' experts [redacted]. Dkt. 319-10 (Johnson Decl.) ¶ 13. And Defendants' employees [redacted] Pls.' Opp. Ex. 10, [redacted] (*id.*), and [redacted]. Defs.' Opp. at 18 (quoting Defs.' Opp. Ex. 1 (Shan Dep. Tr.) 216:11-16); Pls.' Opp. at 15-16. Setting aside Defendants' false narrative as to how their LLMs function (Pls.' Opp. at 23), at summary judgment, crediting Defendants' experts and evidence only hurts their case. If Defendants obtained books to "learn[]" from Plaintiffs' books, then obtaining those books free, for commercial purposes, is not fair use. *See Bartz*, 787 F. Supp. 3d at 1025; *Texaco*, 60 F.3d at 924 (rejecting argument that "schools engaged in 'teaching' may supply its faculty members with personal photocopies of books on educational techniques or substantive fields").

### 3. Defendants' Cases Undermine, Rather Than Support, Their Claim To Fair Use.

Defendants cite cases about so-called "intermediate" copying. Defendants argue these cases hold that a copyist may obtain free, permanent copies of works otherwise available for sale, so long as she uses them for a downstream fair use purpose. Defs.' Opp. at 9-10. None of these cases stand for this proposition.

Most of Defendants' cited cases involve situations where a copyist *purchased* its initial copy of the work. In *Sega Enterprises Ltd. v. Accolade, Inc.*, the defendant bought the console that it disassembled.[1] *See* 977 F.2d 1510, 1514-15 (9th Cir. 1992). In *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015)

[1] The same was true in *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 10 (2021), where the parties agreed that Google had lawful access to the use of Java. *Id.* at 20. In *Sony Computer Entm't. v. Connectix Corp.*, 203 F.3d 596, 601 (9th Cir. 2000) ("*Sony*"), the copyist also purchased an authorized copy.

("*Google Books*") and *HathiTrust*, Google's library partners "spen[t] tens [of] millions of dollars" on the books used. *See* Castillo Guardado Decl., Ex. 1 (*Authors Guild, Inc. v. HathiTrust*, No. 1:11-cv-06531, Dkt. 113 ¶ 8 (S.D.N.Y. June 29, 2012)); *Google Books*, No. 1:05-cv-08136, Dkt. 1036-1 at 107:15-108:3 (S.D.N.Y. July 27, 2012) (library spent roughly $20 million annually on book acquisition). And in *Google Books*, both Google and the libraries also implemented careful technical and contractual measures to insulate electronic copies from unauthorized access. *Google Books*, 804 F.3d at 227. But Defendants here [redacted] when they added Plaintiffs' books to an AWS bucket and made it "public." Pls.' Mot. at 7. *Google Books* and *Sega* only undermine their claim to fair use.

Defendants' other cases involve the copyist immediately deleting, or irretrievably converting, the copies after a transformative purpose was exhausted. *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 815 (9th Cir. 2003) (search engine copied images for indexing and immediately "delete[d] the full-sized originals"); *Perfect 10 v. Amazon.com*, 508 F.3d 1146, 1155 (9th Cir. 2007) (images that were copied in low-resolution thumbnail form were not retained). Here, Defendants kept rather than destroy their copies after the claimed "transformative" use was exhausted. *Bartz*, 787 F. Supp. 3d at 1026 (citing *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001)).

Defendants argue that the Court shouldn't analyze their unauthorized acquisition of Plaintiffs' works any differently from later copies they made, since the copies were all made for the same overarching research and development purpose. Defs.' Opp. at 13-14. But courts have for decades consistently distinguished unauthorized acquisition with copies later made incidental to some transformative purpose. In *Texaco*, furnishing researchers with desk-reference photocopies of scientific articles (and avoiding paying for a standard subscription fee in the process) was not fair use, even though copying the same article on microfilm to save space likely *was* fair use. *Bartz*, 787 F. Supp. 3d at 1023 (discussing *Texaco*). Likewise, in *Sony Corp. of Am. v. Universal City Studios, Inc.*, it was fair use to record a television program to watch later, if one was already authorized to watch it earlier. 464 U.S. 417, 423 & 448-456 (1984). But, as Judge Easterbrook recognized two decades later, the same time-shifting justification did not apply if the copyist wasn't an "authorized recipient" of the work in the first place. *BMG Music v. Gonzalez*, 430 F.3d 888, 890 (7th Cir. 2005). In short, unauthorized downloading by one who had no lawful access is a separate unfair use.

Equally meritless is Defendants' argument that their permanent retention of Plaintiffs' works is irrelevant because "there is no exclusive right in *retention* or *storage*." Defs.' Opp. at 13. Courts consistently treat permanent copies differently than transitory copies deleted immediately after a supposed fair use purpose has been exhausted, as a permanent copy retained indefinitely threatens to serve "as a substitute for paid copies to do the same thing." *Bartz*, 787 F. Supp. 3d at 1026; *BMG*, 430 F.3d at 890 (rejecting fair use defense because "instead of erasing songs" after purported fair use exhausted, "she retained them").[2]

Defendants lean on *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026 (N.D. Cal. 2025). While *Kadrey* concluded that Meta's unauthorized downloading should be considered "in light of its ultimate" end, *id.* at 1047, it did not consider the separate uses at issue here—maintaining a central research library and copying pirated books to public cloud repositories to distribute them. In fact, the *Kadrey* court specifically reserved judgment on a separate distribution claim for later. *See id.* at 1043 n.4. Recently, Judge Chhabria recognized that Judge Alsup's decision on unauthorized downloading in *Bartz* made "a good point." *Kadrey v. Meta Platforms, Inc.*, No. 3:23-cv-03417, Dkt. 767 (N.D. Cal. July 8, 2026).

Amici Electronic Frontier Foundation and Chamber of Progress advance a variation on Defendants' argument, claiming that conditioning fair use on lawful acquisition threatens publicly beneficial uses. Dkt. 443-1 at 2. They invoke Professor Nimmer's hypothetical of "an undercover reporter who obtains access to a high politician's private writings under false pretenses," suggesting that "the socially valuable revelations contained in those writings" should not be "lost to the public based on the circumstances of a lie having been told." *Id.* at 4. But Plaintiffs do not contend that *every* unauthorized acquisition of a copyrighted work is *automatically* infringing. Where a work is otherwise unavailable from authorized sources, unauthorized copying done for a compelling public interest, such as public reporting, may be fair use precisely because there was no other alternative. *See NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 475-76, 482 (2d Cir. 2004) (fair use to obtain and quote from cult's secret training manual for journalistic purposes;

[2] Defendants suggest that they only retained their unauthorized copies to preserve them for litigation, but the record contradicts that claim: Mosaic [redacted]. Dkt. 321-6 (Frankle Decl.) ¶ 33 ([redacted]); Pls.' Mot. Ex. 75 (Rao Dep. Tr.) 144:25-145:15.

manual was only available to members under NDAs). This narrow exception is inapplicable—there is no dispute Plaintiffs' works were widely available from authorized sources. Pls.' Opp. Exs. 34-38.

**B. Factors 2 And 3 Weigh Against Fair Use.**

Defendants admit that Plaintiffs' works are close to the "core of intended copyright protection," so factor 2 weighs against fair use. Defs.' Opp. at 17. On factor 3, there is no dispute that Defendants copied Plaintiffs' works in their entirety. *Id.*; Pls.' Mot. at 15. Factors 2 and 3 weigh against fair use.

**C. Factor 4 Weighs Against Fair Use As A Matter Of Law.**

Factor 4 concerns both the market harm caused by Defendants' conduct and the harm that would result from widespread, unrestricted conduct of the same sort. *See McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1163 (9th Cir. 2022). The market harm from unauthorized downloading is self-evident: Defendants obtained for free what they should have bought. Pls.' Opp. Exs. 34-38; *Napster*, 239 F.3d at 1015; *BMG*, 430 F.3d at 890. If anyone engaging in a supposedly transformative use could download copyrighted books for free, the aggregate displacement of sales would be significant. *See McGucken*, 42 F.4th at 1163.

Defendants argue that accounting for these displaced sales is "circular" because it assumes the conclusion that downloading was an infringing use. This misconceives the circularity doctrine. A factor 4 injury is circular where a plaintiff asserts an injury to "the theoretical market for licensing the *very use at bar*," which is why a copyright holder cannot defeat fair use simply by "developing or licensing a market for parody" or "news reporting." *Tresona Multimedia v. Burbank High Sch.*, 953 F.3d 638, 652 (9th Cir. 2020) (cleaned up).[3] But this concern is inapplicable here. The market for book sales is hardly "theoretical." Because it existed long before artificial intelligence, and because it would exist *regardless* of Defendants' claimed transformative use, it is not the type of "market for licensing the very use at bar" that triggers the circularity problem. Counting a displaced book sale as a cognizable harm is not "assuming the conclusion" of infringement, but instead recognizing the self-evident fact that Defendants—like Napster users decades earlier—obtained something for free that they would otherwise pay for.[4] *See Texaco*, 60 F.3d at 929-30 (courts consider "traditional, reasonable, or likely to be developed markets" for factor 4).

---

[3] *Tresona*, where a copyright holder sued a high school music director and nonprofit boosters club for an allegedly infringing musical arrangement, is a far cry from this case. *Id.* at 652.

[4] The expert testimony on which Defendants rely does not move the needle. It focuses exclusively on Defendants' conduct in isolation—not the impact if their conduct was widespread—and fails to account for the loss of sales caused by Defendants' decision to obtain books for free. Defs.' Opp. at 18-19.

Defendants' theory of fair use, if accepted, would result in the exception swallowing the rule. By Defendants' telling, anyone could pirate a copyrighted work for free, retain it forever, and distribute it to others without restriction—so long as they could point to some transformative, overarching objective. "The promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report' of the book." *Harper & Row Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 557 (1985); *Bartz*, 787 F. Supp. 3d at 1025-26 (if "research" or "teaching" were sufficient justification to obtain textbooks free, "[t]hat would destroy the academic publishing market …") (quoting defense counsel).

## III. DEFENDANTS' DISTRIBUTION IS NOT FAIR USE AS A MATTER OF LAW

Defendants agree that "distinct *end-uses* of works for *different purposes*" must each be "treated as a distinct 'use'" under *Warhol*. Defs.' Opp. at 12. Their acts of distribution and uploading complete copies of Plaintiffs' books to public cloud storage was a *different* use from their LLM training.

The undisputed facts show that Defendants made [redacted].[5] Defendants copied Plaintiffs' books onto cloud repositories, configured at least one folder so that [redacted], and distributed copies (and links to the public bucket) to customers. Worse still, Defendants failed to [redacted]. And Defendants have not introduced any testimony, documents, or other evidence that shows what these third parties did with the books. Defendants' public distribution—combined with their failure of proof—is fatal to their claim of fair use.

### A. Factor 1 Weighs Against Fair Use For Defendants' Distribution As A Matter of Law.

#### 1. The Allegedly Fair Use Conduct Of Third Party Recipients of Plaintiffs' Works Is Not Cognizable Under Factor 1.

Defendants' sole argument on factor 1 is that they shared copies of Books3 and RedPajama Books so that customers and a researcher would use them "for a transformative use." Defs.' Opp. at 19. But Defendants' *intent* is irrelevant, as fair use is an objective inquiry. *See* § II(A)(2), *supra*. And the objective facts tell a different story. Defendants failed to [redacted]

[5] For example, [redacted], but Defendants offer no evidence that Defendants used *this copy* for any of their own LLM training. Pls.' Mot. Ex. 11 ("Shan Rep.") ¶ 27.

Plaintiffs' works and the 196,000+ other books they shared, allowing their customers and the public to use these books for any purpose, including further redistribution. Pls.' Mot. Ex. 75 (Rao Dep. Tr.) 74:24-75:5.

Perhaps more importantly, Defendants' factor 1 showing, which relies on the speculative fair-use conduct of *third parties*, is entirely irrelevant. In *Los Angeles News Service v. Tullo*, 973 F.2d 791 (9th Cir. 1992), the Ninth Circuit held that a copyist may not borrow the conduct of a recipient to claim that its conduct was fair use. *Id.* at 797 ("[T]he ultimate use to which the customer puts the tape is irrelevant, as is the use AVRS's customers make of the tapes AVRS sells."). The Ninth Circuit reinforced this conclusion six years later in *Los Angeles News Service v. Reuters*, 149 F.3d 987, 993 (9th Cir. 1998). There, the defendant, Reuters, copied footage of the Rodney King riots and distributed it to other broadcasters. *Id.* at 990. Reuters argued that "if a broadcaster's use of the works for news reporting may constitute fair use, then 'it is obvious that the transmission of such Works to a broadcaster for such purpose cannot ... be deemed an infringement.'" *Id.* at 994 (quoting defendants). The *Reuters* court rejected this argument, again holding that "the question of whether defendants' copying and transmission of the works constitutes fair use is distinct from whether their subscribers' broadcasts of the works are fair use." *Id.*

Defendants argue in two sentences that *Tullo* and *Reuters* stand only for the narrow proposition that potential downstream fair uses cannot cure a defendant's own non-transformative use. Defs.' Opp. at 23. But *Reuters* held that the defendant's *own* asserted "news reporting purpose" did not justify its act of copying and transmitting the footage to downstream broadcasters. 149 F.3d at 993-94. If a "news reporting purpose"—a canonical fair use under Section 107—does not excuse as fair the copying and distribution of works for a *subsequent* news reporting purpose, Defendants' copying and distribution for a "LLM training purpose" cannot fare better. *See Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 178 & n.4 (2d Cir. 2018) (recipients' "research" activities not fair use, despite defendant's transformative use).

*Google Books* is of no help to Defendants. Defs.' Opp. at 22. Defendants cite it for their claim that "making interim copies of works for fair use and then sharing those interim copies for further fair use does not give rise to copyright infringement." *Id.* But *Google Books* held no such thing. There, libraries spent "tens [of] millions of dollars" annually to buy books; lent Google hard copies of those purchased books; and received from Google digitized scans of their "***already-owned***" books, along with strict contractual use restrictions. *See* Castillo Guardado Decl., Ex. 1; *Google Books*, 804 F.3d at 229 (emphasis added). At best,

*Google Books* stands for the narrow proposition that it is fair use to deliver an electronic copy, under contractual restrictions, to one who already owns a copy of the work. Defendants offer no evidence that [redacted], and concede that they [redacted]. § III(A)(2), *infra*; Pls.' Mot. Ex. 75 (Rao Dep. Tr.) 74:24-75:5.

**2. Public Posting and Distribution of Plaintiffs' Books in a Compressed File Format Was Not Transformative or Justified.**

Defendants' showing on the first factor falls short as a matter of law. With that goes their entire fair use defense for distribution. *McGucken*, 42 F.4th at 1164 (factor 4 less relevant when defendant fails to establish transformative use). Reproducing copyrighted works to hand them out to third parties in furtherance of commercial relationships, for free and [redacted], is the antithesis of a transformative use. *See UMG Recordings, Inc. v. MP3.Com, Inc.,* 92 F. Supp. 2d 349, 350 (S.D.N.Y. 2000).

Rather than confront these undisputed acts of illegal distribution, Defendants argue the MDS format was "bespoke" for LLM usage, the datasets were difficult to discover, and the books were not organized for "human" reading. Defs.' Opp. at 19-22. These assertions are factually wrong and legally irrelevant.

***First***, all of Defendants' assertions about the format and discoverability of the distributed books compilations are contradicted by the undisputed record:

*Defendants claim the books were "not indexed or organized."* Defs.' Opp. at 20. Dr. Shan's unrebutted testimony shows that [redacted] Pls.' Opp. Exs. 10, 12.

*Defendants argue that identifying specific books in the compilations requires a specialized process called "hash-matching."* Defs.' Opp. at 20-21. Incorrect. [redacted]. Shan Rbtl. ¶¶ 5-6.

*Defendants claim that the books compilation required conversion from an "MDS" format, as if it rendered the books unintelligible*. Defs.' Opp. at 19-20. [redacted]. Shan Rbtl. ¶ 20. [redacted]

[redacted]. Shan Rbtl. ¶ 21. At most, Defendants merely changed the digital container for Plaintiffs' books, a format-shift that courts consistently hold non-transformative. *E.g.*, *Hachette Book Grp., Inc. v. Internet Archive*, 115 F.4th 163, 181 (2d Cir. 2024).

*Defendants accuse Plaintiffs' expert Dr. Shan of "false[ly]" presenting Exhibit 48, a readable copy of Plaintiff Brian Keene's* Ghost Walk *drawn from one of Defendants' distributed datasets.* Defs.' Opp. at 21-22. Defendants' objection is that this file was in "MDS format" and therefore required conversion to be displayed as text. That is misleading. *Every* computer file requires software to access; a .docx file requires Microsoft Word to read. The MDS file contained the complete text of Keene's novel, and Dr. Shan viewed it using [redacted]. Shan Rep. ¶ 88. Exhibit 48 confirms Defendants' distributed copies are legible and complete. Pls.' Mot. Ex. 48.

*Defendants falsely claim that "Plaintiffs concede" that the public cloud repository could only be accessed if a "user" was given "a specific link."* Defs.' Opp. at 22. Dr. Shan's unrebutted testimony [redacted], Shan Rep. ¶¶ 60-62; (b) [redacted], Shan Rbtl. ¶¶ 24, 26; (c) Defendants' bucket, [redacted], *id.* ¶ 24; and (d) [redacted]. *Id.* ¶ 32 & n.44. Defendants offer no evidence in rebuttal. Indeed, they cannot, as Defendants [redacted] *E.g.*, Pls.' Mot. Ex. 45.

***Second***, Defendants' parsing of the factual record is irrelevant to factor 1. Even under the most generous reading of Defendants' conduct, they executed a reversible change in the format of Plaintiffs' works. "[R]etransmit[ting] [a work] in another medium" is "an insufficient basis for any legitimate claim of transformation." *UMG Recordings*, 92 F. Supp. 2d at 351; *Internet Archive*, 115 F.4th at 181.

Defendants argue that their distribution posed no risk of substitution beyond their customers because no ordinary user would jump through technical hoops to obtain a single copy of *Ghost Walk* for

free. But this ignores that Defendants posted a compilation of roughly 200,000 full-text books online, downloadable *en masse* for [redacted].[6] Shan Rbtl. ¶ 32 & n.46. Assuming each book costs roughly $5 on Amazon, Defendants' library contained about $1 million in book inventory—a bargain price that could easily motivate any shadow library or book consumer. Defendants' experts admit that [redacted] Pls.' Mot. Ex. 15 (Hersh Rebuttal Rep.) ¶ 63. The substitution risk from Defendants' public posting of Plaintiffs' works underscores its non-transformativeness. *See Napster*, 239 F.3d at 1015.

Defendants claim they never "productized these datasets." Defs' Opp. at 5. Wrong. The undisputed record shows [redacted]. Pls.' Mot. at 6; Pls.' Mot. Ex. 65 at 2. Defendants did so on a freemium basis, not a subscription basis, but they productized the datasets nonetheless.

**B. Factors 2 And 3 Weigh Against Fair Use As A Matter Of Law.**

Factors 2 and 3 weigh against fair use for the same reasons set forth in Section II(B), *supra*.

**C. Factor 4 Weighs Sharply Against Fair Use.**

Defendants are wrong on the legal standard. Under factor 4, "the proponent of the affirmative defense of fair use … must bring forward favorable evidence about relevant markets. And to negate fair use, [Plaintiff] need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work." *McGucken*, 42 F.4th at 1163. Courts may "rely on such logical inferences where appropriate in assessing the fourth fair use factor," especially when determining "widespread use" and where distribution of the copyrighted works is at issue. *Internet Archive*, 115 F.4th at 193. Defendants have a failure of proof on factor 4 for at least two independent reasons.

***First***, Defendants offer no record evidence addressing the impact on the market for Plaintiffs' works if their use were to become widespread. Defendants' experts admit that [redacted]. Pls.' Opp. Ex. 22 (Tucker Dep. Tr.) 130:22-131:4. Instead, Defendants focus exclusively on whether Defendants' conduct *in isolation* affected Plaintiffs' book sales. This omission alone is fatal. *McGucken*, 42 F.4th at

[6] Similarly, Defendants' argument that third party recipients already had access to unauthorized copies of Plaintiffs' works from places like Hugging Face is irrelevant because "other people doing it" is no defense to infringement—if it were, *Napster* and *BMG* would have come out differently. Defendants' argument is also wrong because Defendants continued to distribute Plaintiffs' books even *after* they were taken down from Hugging Face in response to DMCA notices. Pls.' Mot. Ex. 11 ¶ 19 n.4.

1163; *Reuters*, 149 F.3d at 994; *see also Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020) (defendant "must bring forward favorable evidence about relevant markets").

***Second***, Defendants [redacted]. Defendants posted Plaintiffs' books to a public AWS bucket, which generated [redacted]. Shan Rep. ¶¶ 70, 72-73. But Defendants' Rule 30(b)(6) witness testified that [redacted].[7] Pls.' Opp. at 5; Ex. 52 (Tang Dep. Tr.) 392:3-11. That choice has consequences: Because Defendants bear the burden on fair use, they cannot hide behind an *absence* of records to claim their distribution was harmless. *See, e.g.*, *Latin Am. Music Co. v. Televicentro de P.R.*, 2006 WL 8450169, at *8 (D.P.R. Mar. 31, 2006) (rejecting fair use where defendant failed to retain "the actual recording for these supposed infringements" and "could not determine the exact context on how [the copyrighted works] were allegedly used"); *cf. Irobe v. U.S. Dep't of Agric.*, 890 F.3d 371, 378 (1st Cir. 2018) (cautioning against statutory interpretation that entails "the perverse effect of rewarding businesses for shoddy record-keeping").

Defendants' failure is stark considering the evidence of market harm resulting from widespread conduct like Defendants' here. If Defendants' conduct was widespread, there would be countless public repositories from which any person could download nearly a $1 million in full-text books without paying that could serve as direct substitutes for purchased copies, and also a source to help stock the shelves of notorious shadow libraries like Library Genesis or Anna's Archive—pirate sites Defendants admit [redacted]. Pls.' Mot. Ex. 15 (Hersh Rbtl.) ¶ 63; Pls.' Mot. at 24 (citing Ex. 15 ¶ 10). As Dr. Shan's unrebutted testimony confirms, [redacted]. Because "it is difficult to compete with free," widespread adoption of Defendants' conduct would result in the mass exposure to piracy that is a "substantial rebuttal" to Defendants' "claim of fair use." *Google Books,* 804 F.3d at 227; *Internet Archive*,

[7] This testimony was even after Judge Cisneros concluded that Defendants' corporate representative was initially unprepared and ordered a second deposition. Dkt. 218 at 5. After the close of fact discovery, Defendants belatedly produced heavily-redacted logs dating back to February of 2025 (failing to cover any of 2023 or 2024, when they were actively marketing these datasets). Defendants have provided no documents or testimony that could render any portion of these logs admissible at trial.

115 F.4th at 191; *Capitol Recs., LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018).

Defendants argue that the *Google Books* exposure-to-piracy framework applies only to *future* risk, and because Defendants re-set their AWS bucket to "private" after this case was filed, no future risk remains. Defs.' Opp. at 25. Defendants are wrong. Fair use is undermined where "a secondary user unreasonably *exposed* the rights holder to destruction of the value of the copyright." *Google Books*, 804 F.3d at 227 (emphasis added). That is what happened here. Defendants maintained a public repository of Plaintiffs' works [redacted], Shan Rep. ¶¶ 19 nn.3-4; Shan Rbtl. ¶¶ 29-30. Defendants' representative [redacted]. Pls.' Opp. Ex. 19 (Rao Dep. Tr.) 130:12-23. Making books available online [redacted] "substitute[s] for purchase of the original." *Google Books*, 804 F.3d at 222.

Citing *Kadrey*, Defendants argue Plaintiffs must rebut their evidence of market harm with "empirical evidence." 788 F. Supp. 3d at 1056-57. But *Kadrey* recognized that an inference of market harm is appropriate where there is a risk that users may "choose to download the plaintiffs' books for free." *Id.* at 1057. But *Kadrey* distinguished *Internet Archive* because Meta's LLMs did not make complete copies available for download. *Id.* Here, Defendants *did* make complete copies available to the public.

Defendants also claim Dr. Shan "confirmed there is no evidence" that "malicious actors" accessed Defendants' public buckets. But Dr. Shan's rebuttal report states [redacted]. Shan Rbtl. ¶¶ 24-26; § III(A)(2), *supra*. Defendants' claim that their bucket was effectively secret is untenable.

**IV. AMICI FACTOR 4 ARGUMENTS THAT MARKET DILUTION IS NON-COGNIZABLE**

Plaintiffs also respond to amici arguments responsive to the motion at issue that suggest that market dilution from Defendants' training and development of the StoryWriter model is non-cognizable under factor 4. *See*, *e.g.*, Defs.' Mot. at 19; Dkt. 448-1 at 11; Dkt. 422-1. This reflects a stilted reading of Section 107, is inconsistent with precedent, and ignores the Ninth Circuit's admonition that "fair use is a tool for adapting copyright law to brisk technological advances and for tempering the over-technical application of copyright law." *Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*, 447 F.3d 769, 778 (9th Cir. 2006).

Amici's argument conflates copyright *infringement*—governed by 17 U.S.C. § 106—with fair use,

governed by 17 U.S.C. § 107(4). Defendants concede that they "copied Plaintiffs' [copyrighted] books verbatim[.]" Defs.' Mot. at 17.[8] *See Warhol*, 598 U.S. at 525. With respect to fair use, Defendants must show that their use of Plaintiffs' works does not harm the market for Plaintiffs' works. *See Dr. Seuss Enters., L.P.*, 983 F.3d at 459. The statutory text encompasses any "effect upon the potential market or value of the copyrighted work," without reference whether that harm stems directly or indirectly from a violation of an exclusive right set forth in Section 106. Considering the market dilution that results from AI training is consistent with treating "the problem of substitution" as the central feature of the fair use analysis. *Thomson Reuters Enter. Ctr. GMBH v. Ross Intel. Inc.*, 765 F. Supp. 3d 382, 400 (D. Del. 2025) (no fair use where copyist developed AI model "meant to compete with Westlaw by developing a market substitute.").[9]

Amici argue that this copyright lawsuit seeks to "protect authors against competition." Dkt. 422-1 at 14. Not true. Plaintiffs instead seek compensation for a use that usurps the creative expression in their books to build a machine capable of generating novels with a fraction of the effort at the push of a button. Because it is the exploitation of Plaintiffs' expression that *enables* StoryWriter and models like it to flood the market with dilutive substitutes, a failure to consider the practical impact of Defendants' use would undermine the central purpose of the Copyright Act: To "provide an economic incentive [for authors to] create original works." *Warhol*, 598 U.S. at 535.

Finally, amici argue that finding market harm to Plaintiffs from AI-generated outputs violates the First Amendment because it "divides creators into two classes simply based on whether they used AI in creating their works." Dkt. 422-1 at 2, 9. Incorrect. AI creators may generate competing works, but they may not copy Plaintiffs' works to do so. There is "no first amendment right to ... make commercial use of the copyrighted works of others." *United Video, Inc. v. FCC*, 890 F.2d 1173, 1190-91 (D.C. Cir. 1989).

---

[8] This also disposes of the meritless argument that acknowledging the market harm resulting from an infinite flood of competitive works will allow copyright lawsuits where works have not been copied. *See* Defs.' Mot. at 19; Dkt. 422-1 at 1. Plaintiffs have shown that Defendants copied their works wholesale.

[9] *Sony,* 203 F.3d 596 and *Sega*, 977 F.2d 1510 are not to the contrary. There, the copyists "copied expression only incidentally and developed the expression for its competing work independently. AI developers present a different scenario because they copy expression intentionally, and they do so for the purpose of enhancing their own competing expression." 5 Nimmer on Copyright § 20.05; Pls.' Opp. at 13-25.

Dated: September 14, 2026

Respectfully submitted,

By: /s/ Joseph R. Saveri

Joseph R. Saveri (SBN 130064)
Christopher K.L. Young (SBN 318371)
Elissa A. Buchanan (SBN 249996)
William W. Castillo Guardado (SBN 294159)
Drew Moss Morgan (SBN 366901)
**SAVERI LAW FIRM, LLP**
550 California Street, Suite 910
San Francisco, CA 94104
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
cyoung@saverilawfirm.com
eabuchanan@saverilawfirm.com
wcastillo@saverilawfirm.com
dmorgan@saverilawfirm.com

Avery M. Wolff (admitted *pro hac vice*)
**SAVERI LAW FIRM, LLP**
780 Third Avenue, Suite 1200
New York, NY 10017
Telephone: (212) 970-0300
awolff@saverilawfirm.com

Matthew Butterick (SBN 250953)
1920 Hillhurst Avenue, #406
Los Angeles, CA 90027
Telephone: (323) 968-2632
Facsimile: (415) 395-9940
Email: mb@buttericklaw.com

Bryan L. Clobes (admitted *pro hac vice*)
Mohammed A. Rathur (admitted *pro hac vice*)
Nabihah Maqbool (admitted *pro hac vice*)
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 South LaSalle Street, Suite 3210
Chicago, IL 60603
Telephone: (312) 782-4880
bclobes@caffertyclobes.com
mrathur@caffertyclobes.com
nmaqbool@caffertyclobes.com

Justin A. Nelson (admitted *pro hac vice*)
Alejandra C. Salinas (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P**
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
jnelson@susmangodfrey.com
asalinas@susmangodfrey.com

Rohit D. Nath (SBN 316062)
**SUSMAN GODFREY L.L.P**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
RNath@susmangodfrey.com

Elisha Barron (admitted *pro hac vice*)
Craig Smyser (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P**
One Manhattan West, 51st Floor
New York, NY 10019
Telephone: (212) 336-8330
ebarron@susmangodfrey.com
csmyser@susmangodfrey.com

Jordan W. Connors (admitted *pro hac vice*)
Trevor D. Nystrom (admitted *pro hac vice*)
Dylan Salzman (admitted *pro hac vice*)
**SUSMAN GODFREY L.L.P**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
jconnors@susmangodfrey.com
tnystrom@susmangodfrey.com
dsalzman@susmangodfrey.com

Rachel J. Geman (admitted *pro hac vice*)
Danna Z. Elmasry (admitted *pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
rgeman@lchb.com
delmasry@lchb.com

Anne B. Shaver
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ashaver@lchb.com

Betsy A. Sugar (admitted *pro hac vice*)
Kenneth S. Byrd (admitted *pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Avenue S. Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000
bsugar@lchb.com
kbyrd@lchb.com

*Counsel for Individual and Representative Plaintiffs and the Proposed Class*